**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PNC FINANCIAL SERVICES GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> PLAID INC., <br><br> Defendant. | Civil Action No. 2:20-cv-1977 |

**FIRST AMENDED COMPLAINT FOR TRADEMARK COUNTERFEITING, TRADEMARK INFRINGEMENT, FALSE DESIGNATION OF ORIGIN, FALSE ADVERTISING, AND UNFAIR COMPETITION**

Plaintiff The PNC Financial Services Group, Inc. ("PNC") by its undersigned attorneys alleges as follows, upon actual knowledge with respect to its itself and its own acts, and upon information and belief as to all other matters:

**THE PARTIES**

1.      PNC is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at The Tower at PNC Plaza, 300 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

2.      Upon information and belief, Plaid Inc. is a Delaware corporation with its principal place of business at 85 Second Street, Suite 400, San Francisco, California 94105.

**NATURE OF THE ACTION**

3.      This is an action for trademark counterfeiting, trademark infringement, false designation of origin, false advertising, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq*. and Pennsylvania statutory and common law.

1

4.      PNC brings this action because Defendant Plaid Inc. has sought to obtain trust and consumer confidence from consumers by intentionally designing user interfaces to misleadingly suggest that Plaid was affiliated or associated with, or sponsored by, PNC.  Initially, Plaid created a user interface for financial services applications that, without authorization, used the



PNC trademark, the logo, and PNC's orange-and-blue color scheme to replicate a genuine PNC login page in order to mislead consumers into believing they are entering their sensitive personal and financial information in PNC's trusted and secure platform or a platform that is otherwise associated or affiliated with, or sponsored by, PNC.  Below are the genuine PNC mobile app login page, which is depicted on the left, and the original fake "PNC" mobile app login page that Defendant previously used, which is depicted on the right.




Genuine PNC Login Page                    Defendant's Fake "PNC" Login Page

2

5.      Upon information and belief, because of the consumer confusion caused by Plaid's unlawful infringement of the trademarks and branding of PNC and other financial institutions, Plaid was able to increase consumer adoption of its services by deceiving consumers into believing that they were providing their banking information to their existing financial institution rather than Plaid, an unknown entity to the consumer who would otherwise not be trusted with such sensitive information.

6.      Upon information and belief, Plaid's original user interface intentionally used PNC's trademarks in an unlawful manner because Plaid wished to confuse consumers into believing that Plaid's services are associated or affiliated with PNC to persuade consumers to provide Plaid the consumer's sensitive financial information.  In reality, however, consumers are unwittingly providing their login credentials to Defendant, who takes the information, stores it on its servers, and uses it to mine consumers' bank records for valuable and sensitive data (e.g., personal contact information, account number, transaction histories, loans, etc.), which Defendant then monetizes by selling to third parties and/or leverages for services it sells to third parties.  Defendant's unscrupulous practices are the subject of a separate consolidated consumer class action in *Cottle v. Plaid Inc.*, No. 3:20-cv-03056 (N.D. Cal. filed May 4, 2020), alleging that Defendant deceptively and fraudulently collects, stores, aggregates, and monetizes consumers' sensitive financial credentials and transactions in violation of consumers' privacy, the Computer Fraud and Abuse Act, and other laws.  A copy of the complaint filed in that lawsuit is attached as Exhibit A.

## JURISDICTION AND VENUE

7.      This action arises under the federal Trademark Act, 15 U.S.C. § 1051, *et. seq.*, and under Pennsylvania statutory and common law.  This Court has subject matter jurisdiction

over these claims arising under Federal law pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b).  Alternatively, this Court possesses diversity jurisdiction under 28 U.S.C. § 1332 because PNC and Defendant reside in different states—namely Pennsylvania and California, respectively—and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over PNC's state law claims because those claims are substantially related to PNC's federal Lanham Act claims.

8.      This Court has personal jurisdiction over Defendant and venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) and (c) because PNC is being harmed in this District; Defendant is conducting business in this District; and Defendant is infringing upon PNC's trademark rights in this District.

## PNC, ITS SERVICES, AND ITS FAMOUS TRADEMARKS

9.      The product of a merger of two distinguished Pennsylvania banks in 1983 (Pittsburgh National Corporation and Provident National Corporation), PNC's history stretches back more than 160 years.  Today, PNC is one of the largest diversified financial services institutions in the United States with 52,000 employees across more than 40 states and assets of $445 billion as of March 31, 2020.  PNC offers a broad array of retail banking (including residential mortgage), corporate and institutional banking, and asset management products and services.

10.     With approximately 2,300 retail branches around the country servicing millions of customers, PNC is one of the best-known banks in the United States.  In recent years, PNC has grown its customer base beyond its physical retail branch network through digital channels and industry-leading online banking services.

4

<u>PNC's Trademarks</u>

11.     PNC has used the name and trademark PNC® in the U.S.—alone and with other

word and/or design elements—since at least as early as April 15, 1976 to identify its suite of

financial services.

12.     PNC has used its iconic logo ![logo]® ("PNC Logo") alone and together with the

PNC® mark in various formats since at least March 15, 2000 to identify its suite of financial

services.

13.     PNC frequently displays its PNC Logo together with the PNC® mark in vertical

and horizontal formats as shown here:      and     to designate the

source of its various financial services.

14.     PNC owns many federal registrations for its PNC® mark and PNC Logo –

individually, together, and combined with other word and design elements (collectively the

"PNC Marks"), for a variety of financial, banking, data processing, and online banking services,

including:

| Mark | Reg. No. Reg. Date | Products/Services |
|---|---|---|
| PNC | 1416898 11-11-1986 | Various banking and financial services, including data processing services |
| ⬤ PNC | 2508843 11-20-2001 | Full line of banking and financial services |

| Mark | Reg. No.<br>Reg. Date | Products/Services |
|---|---|---|
|  | 2665477<br>12-24-2002 | Full line of banking and financial services |
| PNC.COM | 5831730<br>08-13-2019 | Various banking and financial services |
| PNC CONTROL HUB | 6003441<br>03-03-2020 | Banking services; mobile banking services; online banking services; banking services accessible by means of online software and a mobile application that features user-controlled account security and accessibility. |
| PNC DIGITAL ADVISOR | 5758596<br>05-21-2019 | Providing online financial advice and consulting |
| PNC PAY | 5509205<br>07-03-2018 | Banking services; financial services, namely, providing financial payment and transaction options in the nature of commercial transactions and payment options using a mobile device; banking and financial services in the nature of providing financial payment and transaction processing services of commercial transactions accessible by means of a downloadable mobile application |
| VIRTUAL WALLET BY PNC BANK | 3803702<br>06-15-2010 | Banking services; on-line banking services; bill payment services provided through a website |

Printouts of these registrations, taken from the U.S. Patent and Trademark Office's online database, are attached as Exhibit B.

15.     In addition to the distinctive PNC Marks, PNC has used orange and blue as its primary corporate colors for decades, which have been continuously and prominently used with, in, and throughout PNC's marks, website, advertisements, promotions, branches, and mobile banking app (see examples below):





PNC's Online and Mobile Banking Services

16.     PNC customers can access their accounts online via PNC's website and mobile app.  There, consumers can view and manage their accounts, deposit checks, pay bills, transfer and send money, and more.

17.     When consumers access their PNC accounts online, they are presented with a login screen with the PNC name, mark, and logo, where they enter their user ID and password. Similarly, when consumers access their PNC mobile banking apps, they are presented with a login screen bearing the PNC hallmarks, including the PNC name, mark, logo, and color scheme:



18.     Given the confidential nature of a consumer's personal and financial information, and the ever-increasing risk of identity theft, PNC employs robust security protocols to safeguard its customers' privacy and the security of their financial information entered or visible online and through PNC's mobile apps.  Consumers have come to trust and rely on these and other measures to protect their identities, hard-earned money, and sensitive and valuable financial information.

<u>The Fame and Goodwill of the PNC Brand</u>

19.     For years, PNC has extensively advertised, marketed, and promoted its PNC-branded services through a variety of high-profile national media, including television, Internet, and print advertisements.  PNC has also received widespread coverage in national media outlets.

20.     Over the years, PNC has also received numerous corporate and business awards, including:

- *Fortune 500* list of America's largest companies
- *Fortune's* list of World's Most Admired Companies (2020)
- Euromoney Awards for Excellent, Best United States Bank (2020)
- Kiplinger list of Best National Banks (2020)
- 50 Most Engaged Workplaces™, Achievers (2018)
- Most Admired for HR, Human Resource Executive magazine (2018)
- 50 Happiest Companies in America, CareerBliss (2018)
- Best Places to Work for LGBTQ Equality, Human Rights Campaign (2019)
- Top 70 Companies for Executive Women, National Association for Female Executives (2019)
- 100% Score on the 2019 Disability Equality Index® (DEI®) Best Places to Work™
- The Most Powerful Women in Banking and Finance, American Banker (2018)
- 50 Best Companies for Diversity, Black Enterprise magazine (2018)
- Best of the Best Top Veteran-Friendly Companies, U.S. Veterans Magazine (2019)
- Corporate Citizenship Award, Pittsburgh Business Times (2017)

Additional representative examples of recognition to PNC for its commitment to excellence, social responsibility, diversity, and inclusion can be found at https://www.pnc.com/en/about-pnc/media/awards-and-recognition.html.

21.     The PNC Marks have become well-known and famous by virtue of extensive public exposure and the tremendous success of PNC's products and services.

## DEFENDANT AND ITS WRONGFUL ACTS

22.     Defendant offers a financial technology infrastructure product consisting of software and a user interface that connects third-party financial services applications ("apps") to consumers' bank accounts.  Specifically, when connecting a third-party app to consumers' bank

accounts, Defendant's Plaid product used an authentication process that attempted to bypass

PNC's customary authentication process.  As a result, PNC was required to institute a process in

order to authenticate and validate traffic originating from Plaid to apply controls to protect

sensitive consumer information and data.

23.     Instead of redirecting consumers from the third-party app to their bank's website

or app, the authentication in the original Plaid user interface attempted to sidestep PNC's process

by creating fake login screens that replicated the banks' login pages, giving consumers the false

impression that they have been transported to their bank's website or app and are logging into

their account.  In reality, consumers are giving their login credentials to Defendant, which then

uses the information to log into the banks' systems in order to extract consumer data on a

systematic basis with the consumer's knowledge.  Indeed, upon information and belief, Plaid

continues to extract consumer data even if the consumer deleted the app that utilizes the Plaid

product.

24.     Defendant's Plaid product is used in several popular payment and investment

apps, including *Venmo*, *Coinbase* and Square's *Cash App*, each of which allows consumers to

send and receive money from their PNC and other financial accounts.

<u>Plaid's First Infringing User Interface</u>

25.     To demonstrate how this process originally worked on one of the apps supported

by Defendant, below are screenshots from the Coinbase app showing how users "automatically"

linked their PNC accounts to Coinbase through Defendant's fake "PNC" login pages as set forth

in the original user interface used by Plaid:



















26.     Once consumers' login credentials were obtained through this deception, such

information was sent to Defendant's servers, where it was used to collect data from *all* of

consumers' accessible accounts (*e.g.*, checking, savings, and credit card)—not just the specific account a customer chose to connect with the third-party app.

27.     The revenues Defendant derived and continues to derive from its unlawful activities are substantial.  Indeed, Defendant touts that "[o]ver a quarter of people with US bank accounts" and "tens of millions of users" have financial accounts connected through Plaid.  (*See* https://plaid.com/overview-privacy/; https://plaid.com/documents/plaid-for-financial-institutions.pdf.)  According to Defendant's website, Defendant stores and analyzes "typically 24 months of transaction data, including geolocation, merchant, and category information" using machine learning.  (*See* https://plaid.com/products/transactions/.)  Defendant sells this highly valuable personal financial information to third-party apps for monetary gain.  (*See* https://plaid.com/pricing/.)

28.     Although the above screens display the PNC logo and PNC's orange-and-blue color scheme, they were in fact fake "PNC" screens created by Defendant to dupe consumers into believing that they are interacting directly with PNC.

29.     Plaid replicated the authentic PNC log-on screen in order to intentionally mislead consumers into believing that they are providing their private and sensitive information to PNC or to an entity affiliated with PNC in order to overcome the otherwise present and reasonable apprehension to providing financial information to an unknown third-party.

30.     Defendant has openly admitted that it obtains consumers' sensitive financial information by misappropriating bank "branding elements," which give "end-users [] a greater sense of security and familiarity" because "they recognize their institution's look-and-feel."  (*See* https://blog.plaid.com/improved-search/.)  The "native experience" of consumers entering login credentials on fake screens without ever leaving the original app further "eliminates the barriers

and clunkiness of redirect-based OAuth, increasing user conversion."  (*See* https://fin.plaid.com/articles/demystifying-screenless-exchange/.)

31.     In view of Defendant's unlawful activities, PNC implemented additional security measures to protect consumer's sensitive account information from the risks posed by Plaid's processes, while continuing to allow consumers to link their accounts directly through a given fintech app (such as *Venmo*, *Coinbase*, or *Cash App*) by manually inputting their PNC account number and routing information directly.

32.     In retaliation for PNC instituting such safeguard measures, Defendant placed misleading statements on its fake "PNC" login pages falsely telling consumers that PNC is preventing them from linking their accounts in *any* manner and encouraging consumers to file a complaint with the Consumer Financial Protection Bureau (CFPB).  For instance, Defendant's infringing user interface previously included the following false and misleading statements on its fake "PNC" login screens:




33.     The above statements are false and highly misleading in several respects.  The statement that "We're currently experiencing connectivity issues with this bank" falsely states that PNC is experiencing Internet connectivity issues that are preventing consumers from linking their accounts.  Likewise, the statement "PNC has made a change that prevents you from being able to link your accounts" is literally false because PNC has not prevented consumers from linking their accounts with the third-party fintech app by requiring them to manually input their account number and routing information directly.  Defendant's false and misleading statements undermine and damage PNC's reputation as a reliable and trusted financial institution.

34.     Further, the statement previously appearing on Defendant's fake "PNC" login page that directed customers to file CFPB complaints has resulted in actual consumer confusion, as CFPB complaints have been filed by those who mistakenly believed that it was PNC giving the direction on the PNC login screen to file a complaint with the CFPB.

35.     After PNC filed this Complaint setting forth Defendant's literally false statements to consumers that PNC is preventing them from linking their PNC accounts to third-party fintech apps (which PNC is not), Defendant continued to disseminate these false and damaging statements.

36.     For example, "Plaid Support" customer representatives have stated in direct communications to PNC customers that "PNC recently made changes that prohibit their customers from sharing bank details needed to use third-party applications."  In these same direct communications with PNC customers, Plaid Support customer representatives have stated, "It's unclear how long this problem will last. So if in the meantime you'd like to explore an additional bank to connect with the apps you rely on, Plaid is supported by nearly 11,000 other financial institutions."

37.     The statement that "PNC recently made changes that prohibit their customers from sharing bank details needed to use third-party applications" is literally false because PNC has not prevented consumers from linking their accounts with the third-party fintech app. Rather, a consumer must merely manually input their account number and routing information directly in the third-party application.

38.     Plaid's advice and encouragement to PNC customers in these same false and misleading communications to use a different bank for their fintech apps is intentionally designed to damage PNC's reputation and goodwill with its customers, decrease customer deposits with PNC, and cause banking customers to terminate their relationship with PNC.

39.     Plaid's false and misleading statements to PNC customers have resulted in actual confusion and injury as PNC has received communications from its customers stating that,

according to Plaid, PNC is preventing the consumer from linking their PNC account to third-party applications.

40.     Similarly, PNC has received communications from its customers who, after communicating with Plaid, stated their intention to terminate or diminish their banking relationship with PNC.

41.     Upon information and belief, Plaid continues to make false and misleading statements to consumers about PNC and to encourage PNC customers to terminate or diminish their business relationship with PNC.

<u>Plaid's Subsequent Infringing User Interfaces</u>

42.     In November 2020, Plaid introduced a new user interface, as set forth below, that continued to infringe PNC's trademark rights by displaying the PNC Marks together with PNC's trademark orange color to falsely suggest that PNC is affiliated, associated, or connected with Plaid:



43.     By unnecessarily including the PNC Logo and PNC's distinctive orange brand color and combining those elements with Plaid's own name and logo, Plaid's subsequent user interface displayed above gave consumers the false impression that PNC has endorsed, approved, or sponsored the Plaid platform being used to enter the consumer's private and sensitive financial information.

44.     Upon and information and belief, Plaid continues to iterate its user interfaces and recently added a disclaimer to its user interface informing consumers, for the first time, that Plaid was not affiliated or associated with, or sponsored by, PNC.

45.     Nevertheless, and upon information and belief, Plaid has already obtained the banking information of tens of millions of Americans, and millions of PNC customers, as a result of its prior user interfaces.

46.     Upon information and belief, Plaid continues to obtain revenues from PNC customers, including those that provided their banking information to Plaid through the original user interface or one of the subsequent infringing versions.

47.     Upon information and belief, additional new user interfaces that Plaid continues to develop and implement improperly use PNC's trademarks and otherwise suggest an affiliation, association, or sponsorship between PNC and Plaid that does not exist.

48.     Upon information and belief, Plaid intentionally infringed PNC's trademarks in order to convince a customer to provide their login information by leveraging a consumer's trust and confidence in PNC's security and privacy protocols by misleading the consumer to believe that PNC is affiliated or associated with Plaid.

## INJURY TO PNC AND THE PUBLIC

49.     Defendant's unauthorized use of PNC's trademarks and the fake "PNC" login pages that further misappropriate PNC's logos and color schemes have caused confusion and/or were likely to confuse and deceive consumers into believing that they were forwarded to PNC's genuine login page and/or that they are providing their login credentials to PNC and not to Defendant or any unauthorized and unaffiliated third party.  Alternatively, consumers were likely to be confused and deceived into believing that Plaid is affiliated or associated with PNC because Plaid's use of PNC's trademarks and brand indicia in its user interface have been specifically designed to connote to consumers an affiliation between Plaid and PNC that does not exist.  Further, Defendant's false and misleading statements regarding "connectivity issues" with PNC, and that PNC is preventing consumers from linking their accounts, damage PNC's hard-earned reputation and goodwill as a trusted financial institution dedicated to providing convenient but secure digital banking applications to its customers.

20

50.     Defendant's unauthorized use of PNC's trademarks and fake "PNC" login pages, along with Defendant's false and misleading statements, caused confusion and/or were likely to cause confusion, mistake, and deception as to the source or origin of Defendant, its business, and/or its commercial affiliation with PNC.

51.     Defendant's unauthorized use of PNC's trademarks and fake "PNC" login pages, along with Defendant's false and misleading statements, have damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure PNC and its reputation and goodwill.

52.     Defendant intentionally used the PNC Marks, PNC's color schemes, and fake "PNC" login pages to trick and deceive people into believing that they are at PNC's mobile banking or website, with the purpose of obtaining their valuable and private financial information.  Defendant also intentionally made false and misleading statements to damage PNC's reputation as a trusted financial institution.  As a result, Defendant has acted knowingly, willfully, in reckless disregard of PNC's rights, and in bad faith.

53.     PNC has no adequate remedy at law.

### FIRST CLAIM FOR RELIEF

**Federal Trademark Counterfeiting Under
Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d)**

54.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 53 of this Complaint.

55.     Defendant has used a counterfeit of PNC's federally registered PNC Marks (including Reg. Nos. 2508843 and 1416898) in connection with the sale, offering for sale, and distribution of online financial services in violation of Sections 32(1)(b), 34(d) of the Lanham Act, 15 U.S.C. §§ 1114(1)(b), 1116(d).

21

**SECOND CLAIM FOR RELIEF**

**Federal Trademark Infringement Under
Section 32(a) of the Lanham Act,
15 U.S.C. § 1114(1)**

56.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 55 of this Complaint.

57.     Without PNC's consent, Defendant has used in commerce reproductions, copies, and colorable imitations of PNC's federally registered PNC Marks in connection with the offering, distribution, and advertising of services, which has caused and was likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

**THIRD CLAIM FOR RELIEF**

**Federal Trademark Infringement, False Designation
of Origin, and Unfair Competition Under
Section 43(a)(1)(A) of the Lanham Act,
15 U.S.C. § 1125(a)(1)(A)**

58.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 57 of this Complaint.

59.     Defendant's actions described above have caused and were likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendant, Defendant's services/goods, and/or Defendant's commercial activities by or with PNC, and thus constitute trademark infringement, false designation of origin, and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

**FOURTH CLAIM FOR RELIEF**

**False Advertising**
**Section 43(a)(1)(B) of the Lanham Act,**
**15 U.S.C. § 1125(a)(1)(B)**

60.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 59 of this Complaint.

61.     The aforesaid acts of Defendant constitute false and misleading descriptions and misrepresentations of material fact in commerce which, in commercial advertising and promotion misrepresent the nature, characteristics, and qualities of PNC's goods, services, and/or commercial activities.

**FIFTH CLAIM FOR RELIEF**

**Unfair Competition and Unfair or Deceptive Acts or Practices Under**
**73 P.S. § 201-1, *et seq*.**

62.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 61 of this Complaint.

63.     Defendant's actions described above constitute unfair methods of competition and unfair or deceptive acts or practices in violation of 73 P.S. §201-1, *et seq*.

**SIXTH CLAIM FOR RELIEF**

**Trademark Infringement, Unfair Competition, False Designation of Origin,**
**and Misappropriation**
**Under Pennsylvania Common Law**

64.     PNC repeats and realleges each and every allegation set forth in paragraphs 1 through 63 of this Complaint.

65.     Defendant's actions described above have caused and were likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendant, Defendant's services/goods, and Defendant's commercial activities by or with PNC, create a

false belief or perception regarding PNC and its products and services, and thus constitute common-law trademark infringement, unfair competition, false designation of origin, and misappropriation of PNC's Marks and goodwill under the common law of Pennsylvania.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, PNC respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, PNC respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it the following relief, including but not limited to:

A.      An Order declaring that Defendant's uses of the PNC Marks knowingly and willfully infringe the PNC Marks, constitute counterfeiting of PNC's registered marks, and constitute unfair competition, as detailed above.

B.      An Order declaring that Defendant's activities as described in Paragraphs 31-37 of this Complaint constitute false and misleading descriptions and misrepresentations of fact in commerce which, in commercial advertising and promotion misrepresent the nature, characteristics, and qualities of PNC's goods, services, and/or commercial activities.

C.      An Order permanently enjoining Defendant, its officers, directors, employees, agents, subsidiaries, distributors, dealers, app partners, related companies, and all persons in active concert or participation with any of them:

1.      From using, registering, or seeking to use or register any name, mark, trade name, company name, domain name, source identifier, or designation comprised of or containing the PNC Marks or any similar term(s) in any manner

24

likely to cause confusion with PNC and/or its marks, mobile app login page, or to otherwise injure PNC and/or its reputation;

2.      From representing, by any means whatsoever, directly or indirectly, that Defendant, its services/goods, and/or its activities originate from, are sponsored by, or are associated, affiliated, or otherwise connected with PNC in any manner;

3.      From creating and/or using login and other screens, materials, or imagery that misappropriate or purport to be real PNC screens, materials, or imagery or are otherwise likely to confuse consumers into believing that such login and other screens originate from, are associated or affiliated with, or sponsored by, PNC, including but not limited to the first and second infringing user interfaces depicted above; and

4.      From assisting, aiding, and/or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs B(1) through (3) above.

D.      An Order requiring Defendant to immediately retract and destroy all products, logins, packaging, signage, advertisements, promotional materials, stationery, forms, and/or materials and things that contain or bear PNC, or any other name, mark, trade name, company name, source identifier, or designation that contains or is confusingly similar to the PNC Marks.

E.      An Order requiring Defendant to display a prominent and conspicuous disclaimer that truthfully and accurately discloses to users that Defendant's services and login pages: (1) are not authorized by and do not have any affiliation or association with PNC and (2) are not a direct secure and protected login communication with PNC free of any unauthorized intermediaries.

F.      An Order requiring Defendant to engage in corrective advertising that notifies all

users who linked or connected a PNC bank account with any third-party app through Defendant's services: (1) that such links or connections were not established directly through PNC; (2) that Defendant obtained, used, sold, and supplied such users' sensitive financial information to others; and (3) that PNC has never prevented consumers from linking their accounts with third-party fintech apps.

G.      An Order directing that, within thirty (30) days after the entry of the injunction, Defendant file with this Court and serve on PNC's attorneys a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

H.      An Order requiring Defendant to account for and pay to PNC all profits arising from Defendant's unlawful acts, and increasing such profits, for payment to PNC in accordance with 15 U.S.C. § 1117 and other applicable laws.

I.      An Order requiring Defendant to pay statutory damages in accordance with 15 U.S.C. § 1117(c) of up to $2,000,000 for each type of service sold, offered for sale, or distributed by Defendant under the registered PNC Marks.

J.      An Order requiring Defendant to pay PNC actual damages, in an amount to be determined (but exceeding $75,000), caused by the foregoing acts, and trebling such damages in accordance with 15 U.S.C. § 1117, 73 P.S. §201-1, *et seq.*, and other applicable laws.

K.      An Order requiring Defendant to pay PNC all of its litigation expenses, including reasonable attorneys' fees and costs under 15 U.S.C. § 1117, 73 P.S. §201-1, *et seq.*, Pennsylvania common law, and other applicable laws.

L.      An Order requiring Defendant to pay PNC punitive damages in an amount to be determined due to the foregoing willful acts.

M.      All other relief as the Court may deem appropriate and just.

26

Respectfully Submitted,

Dated: July 8, 2021

*s/ Jayme L. Butcher*
Jayme L. Butcher, PA ID #87568
Shawna J. Henry, PA ID #316881
BLANK ROME LLP
501 Grant Street, Suite 850
Pittsburgh, PA 15219
(412) 932-2801 (phone)
(412) 932-2777 (fax)
Email: jbutcher@blankrome.com
          shenry@blankrome.com

Hara K. Jacobs (admitted *pro hac vice*)
Noah S. Robbins (admitted *pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
(215) 665-8500 (phone)
(215) 864-8999 (fax)
Email: jacobsh@ballardspahr.com
          robbinsn@ballardspahr.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 8, 2021, I electronically filed and caused to be served the foregoing using the Court's CM/ECF system.

_____/s/ Jayme L. Butcher_____