**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PNC FINANCIAL SERVICES GROUP, INC., | |
| Plaintiff | Civil Action No. 2:20–cv–1977 |
| v. | The Honorable Mark R. Hornak |
| PLAID INC., | |
| Defendant. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF PLAID INC.'S MOTION TO EXCLUDE</u>**
**<u>THE OPINIONS OF CHARLES LUNDELIUS</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD............................................................................................................... 2

ARGUMENT ........................................................................................................................... 4

    I.      Mr. Lundelius's So-Called Contributed Capital Analysis Does Not "Fit" This Case And Is Based On An Unreliable Methodology.......................................................... 4

           A.      Trademark Damages Are Not Measured Through Contributed Capital. ..... 5

           B.      Mr. Lundelius's Methodology Is An Unreliable And Unhelpful Way To Measure Trademark Infringement Damages. ............................................ 7

           C.      Mr. Lundelius Values the Wrong Asset....................................................... 8

    II.     Mr. Lundelius's Disgorgement Analysis Is Based On Erroneous Assumptions And Thus Unreliable.................................................................................................. 10

    III.    Mr. Lundelius's Calculation of PNC's Losses Should Be Excluded Because They Are Irrelevant And Do Not Fit This Case. ............................................................ 15

CONCLUSION....................................................................................................................... 15

**TABLE OF AUTHORITIES**

**Cases**                                                                                            **Page(s)**

*Avco Corp. Turn & Bank Holdings, LLC*,
   659 F. Supp. 3d 483 (M.D. Pa. 2023) ................................................................................ 12

*Branch v. Temple University*,
   2021 WL 2823071 (E.D. Pa. July 7, 2021) ......................................................................... 13

*Daubert v. Merrell Dow Pharm.*,
   509 U.S. 579 (1993) ....................................................................................................... 2, 3

*Donsco, Inc. v. Casper Corp.*,
   587 F.2d 602 (3d Cir. 1978) ................................................................................................ 5

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000) .................................................................................... 4, 10, 13

*Greenwald Caterers Inc. v. Lancaster Host, LLC*,
   2023 WL 70212139 (E.D. Pa. Oct. 25, 2023) ............................................................ 1, 6, 9

*Gucci America, Inc. v. Daffy's Inc.*,
   354 F.3d 228 (3d. Cir. 2003) .................................................................... 2, 11, 13, 15

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d. Cir. 1994) .................................................................................... 2, 5, 7, 9

*Jones v. SWEPI L.P.*,
   643 F.Supp.3d 547 (W.D. Pa. 2022) .................................................................................. 2

*Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*,
   428 F.3d 706 (7th Cir. 2005) .............................................................................................. 6

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................................... 3

*L&M Beverage Co., Inc. v. Guinness Import Co.*,
   1996 WL 368327 (E.D. Pa. June 24, 1996) ....................................................................... 6

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
   306 F. App'x 781 (3d Cir. 2009) .................................................................................. 13, 14

*MyService Force, Inc. v. American Home Shield*,
   2014 WL 1757161 (E.D. Pa. May 2, 2014) ............................................................ 10, 13, 14

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000) ............................................................................................... 7

*Oracle Am., Inc. v. Google Inc.*,
  2012 WL 850705 (N.D. Cal. Mar. 13, 2012)...................................................................... 8

*Romag Fasteners, Inc v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020).......................................................................................................... 5

*Vino 100, LLC v. Smoke on the Water, LLC*,
  864 F. Supp. 2d 269 (E.D. Pa. 2012) .................................................................................... 5

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000).............................................................................................................. 3

*Wilson v. Saint-Gobain Universal Abrasives, Inc.*,
  2015 WL 1499477 (W.D. Pa. Apr. 1, 2015)................................................................. 13, 14

*Wood v. Showers*,
  822 F. App'x 122 (3d Cir. 2020) ...................................................................................... 3, 14

*Yazujian v. PetSmart*,
  729 F. App'x 213 (3d Cir. 2018) .......................................................................................... 7

## Statutes

15 U.S.C. § 1117....................................................................................................................... 1, 5

## Rules

Federal Rule of Evidence 702 ...................................................................................................... 3, 5

## Regulations

Required Rulemaking on Personal Financial Data Rights,
  88 Fed. Reg.  (proposed Oct. 31, 2023) .................................................................................... 9

## PRELIMINARY STATEMENT

The Lanham Act specifies three categories of damages for a plaintiff who establishes liability: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).[1] To support its claims for damages, PNC has proffered the opinions of Mr. Charles Lundelius, who "calculate[s] remedies based on Plaid's unjust enrichment/disgorgement of gross profits and PNC's actual/compensatory damages." [Ex. 1], Expert Report of Charles Lundelius ¶ 29 ("Lundelius Rep."). Mr. Lundelius's opinions suffer from numerous flaws that render them inadmissible as a matter of law.

*First,* Mr. Lundelius ignores the three statutory categories of damages identified above and invents a new measure of damages never before used under the Lanham Act. His so-called "contributed capital" analysis equates—without a basis in fact, law, or economics—a PNC customer's decision to connect their PNC bank account to a fintech app via Plaid with a fictitious "forced investment" by PNC in Plaid's start-up funding. *See* Lundelius Rep. ¶ 31. His theory has no relation to Plaid's profits or PNC's claimed losses and is otherwise nonsensical, and thus is not "relevant for the purposes of the case and [will not] assist the trier of fact." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 2023 WL 70212139, at *8 (E.D. Pa. Oct. 25, 2023) (quoting *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003)). Mr. Lundelius's contributed capital analysis is also unreliable because it is based on an untested and flawed methodology, and lacks factual foundation. This is precisely the type of expert opinion that should be excluded through the Court's gatekeeping function under the recent amendments to Rule 702—an opinion which does not even fall into the statutory categories of damages has no place before a factfinder.

---

[1] Under the Lanham Act, "[i]n a case involving the use of a counterfeit mark," a plaintiff may elect to recover statutory damages in lieu of actual damages or profits under 15 U.S.C. § 1117(b). *Id.* § 1117(c). Mr. Lundelius also provides in his report a framework to calculate statutory damages, Lundelius Rep. ¶ 29, which is not addressed in this motion.

*Second*, Mr. Lundelius's alternative disgorgement (or "gross profits") calculation, *see* Lundelius Rep. ¶ 30, suffers from flawed factual underpinnings that render his conclusions unreliable. Under the Lanham Act, while disgorgement of profits can be appropriate, "a mark holder is only entitled to those profits *attributable to the unlawful use of its mark*." *See Gucci America, Inc. v. Daffy's Inc.*, 354 F.3d 228, 242 (3d. Cir. 2003) (emphasis added) (internal marks omitted). Mr. Lundelius, however, does not attempt to allocate profits attributable to the allegedly unlawful use of PNC's marks in the Plaid Link interface, and instead assumes that *all* revenues earned by Plaid related to PNC customers connecting their accounts to their chosen fintech apps via Plaid were due to the use of PNC logos. But abundant contrary evidence makes clear that consumers' actions are, at best, minimally impacted by the presence or absence of logos in Plaid Link. By refusing to consider evidence bearing on the minimal effect of PNC's marks on consumer behavior, Mr. Lundelius lacks "good grounds" for his calculation of at-issue revenue. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d. Cir. 1994) ("*Paoli II*") (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993)).

*Third*, Mr. Lundelius purports to calculate "actual losses [to PNC] from Plaid-facilitated . . . fraud related to electronic funds transfers." Lundelius Rep. ¶ 32. As explained in more detail in Plaid's motion to exclude the opinions of PNC's cybersecurity expert, Mr. Todd Renner, this fraud is unrelated to Plaid's use of PNC's marks in Plaid Link. Just as the Court should exclude Mr. Renner's opinions due to their lack of relevance to this case, it should also exclude Mr. Lundelius's estimated damages flowing from those same irrelevant facts.

## LEGAL STANDARD

Under *Daubert* and Federal Rule of Evidence 702, courts must consider "(1) the expert's qualifications, (2) the reliability of the expert's methods, and (3) the 'fit' of the expert's methods

to the facts of the case (i.e., whether the expert's methods are helpful to the fact finder)." *Jones v. SWEPI L.P.*, 643 F.Supp.3d 547, 561 (W.D. Pa. 2022); *Daubert*, 509 U.S. at 589.

*Daubert* created "exacting standards of reliability," *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000), which require "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590.  *Daubert*'s objective "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Wood v. Showers*, 822 F. App'x 122, 125 (3d Cir. 2020) (quoting *Paoli II*, 35 F.3d at 745).

The exacting standards of *Daubert* and Rule 702 have been re-emphasized by the December 1, 2023 amendments to Rule 702, which clarify that "the proponent [of an expert's testimony must] demonstrate[] to the court that it is more likely than not" that the expert meets each of the rule's requirements.  *See* Fed. R. Evid. 702.  Moreover, in amending the rule, the Advisory Committee underscored the necessity of a court's "gatekeeping" role: "[J]ust as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support."  Advisory Comm. Notes to Fed. R. Evid. 702.  As a result, a court must ensure in the first instance that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(d).

3

**ARGUMENT**

## I.   Mr. Lundelius's So-Called Contributed Capital Analysis Does Not "Fit" This Case And Is Based On An Unreliable Methodology.

Mr. Lundelius's largest category of calculated damages—his so-called "contributed capital" analysis—is based on the counterfactual view that Plaid's use of PNC logos in Plaid Link amounted to a "forced investment" in Plaid by PNC. *See* Lundelius Rep. ¶ 53; [Ex. 2], Deposition of Charles Lundelius (Nov. 3, 2023) at 49:2–7 ("Lundelius Tr."). But in undertaking this analysis, Mr. Lundelius does not attempt to assess the value of the trademarks themselves. Instead, he conjures an alternative scenario entirely unmoored from reality: That in exchange for use of PNC's marks, Plaid granted (and PNC accepted) common shares in its company during its Series B fundraising round. Mr. Lundelius attempts to determine the value of the so-called investment by calculating the percentage of total connections made via Plaid for PNC customers from June 2015 to May 2016, Lundelius Rep. ¶ 54, which he multiplies by the growth in Plaid's valuation over that same period of time. Based on this leap of logic, Mr. Lundelius determines that PNC's "forced investment" was worth the equivalent of nearly half a million common shares during Plaid's Series B fundraising round in 2016. *Id*. ¶¶ 54–56. He then speculates that PNC would have held these shares to the present day, and that their present value would be almost 20 times their initial value.

This fictitious series of events is nowhere in PNC's complaint, nor have any related facts emerged in discovery. It is a fabricated view created solely for the purposes of litigation. Mr. Lundelius attempts to rationalize the creation of this novel method of calculating damages under the Lanham Act by speculating that "Plaid's historical and future gross profits"—the typical measure of Lanham Act damages if attributable to the unlawful use of trademarks—"understate the full extent of value that resulted from Plaid's alleged wrongful conduct" because Plaid began using PNC's mark when it was an early-stage company. Lundelius Rep. ¶¶ 51–53. But that

4

speculation does not merit the invention of a new and irrelevant method for assessing damages under the Lanham Act.

At bottom, Mr. Lundelius's contributed capital analysis is simply not how damages are measured in a trademark case—it is not reliable or helpful, and is exactly the sort of "unsupported speculation" courts exercise their gatekeeping responsibility to exclude. *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (internal quotation marks omitted). Moreover, it is based on various unsupported and incorrect factual assumptions, an error that separately militates its exclusion.

### A. Trademark Damages Are Not Measured Through Contributed Capital.

Mr. Lundelius's contributed capital analysis does not assist the trier of fact in determining either Plaid's purported profits related to its use of PNC's mark, or PNC's alleged actual damages caused by the use of its marks, and should thus be excluded for lack of "fit" to this (or any) trademark case. Fed. R. Evid. 702(a); *see Paoli II*, 35 F.3d at 743 (explaining that *Daubert*'s "'fit' requirement" means that "the expert's testimony must assist the trier of fact"). Under the Lanham Act, "[a] district court may award a winning plaintiff injunctive relief, damages, or the defendant's ill-gotten profits." *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1494 (2020); *see also* 15 U.S.C. § 1117(a). The holder of a trademark is only entitled to monetary damages that it can affirmatively show "are attributable to the unlawful use of the mark." *Gucci Am., Inc.*, 354 F.3d at 242 n.15 (citing *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349–50 (5th Cir. 2002) ("Once an award is found to be appropriate, a mark holder is only entitled to those profits attributable to the unlawful use of its mark.")).

These enumerated forms of monetary damages are exclusive and require "an award based on either actual damages to the plaintiff or actual profits of the infringer, measurable in dollars and cents." *Vino 100, LLC v. Smoke on the Water, LLC*, 864 F. Supp. 2d 269, 288 (E.D. Pa. 2012)

5

(quoting *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975)).  By contrast, where a damages calculation is unmoored from actual damages or profits, it is impermissible.  *See Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 607 (3d Cir. 1978) (rejecting a damages award under the Lanham Act that was not based on either plaintiff's actual damages or defendant's actual profits).

Mr. Lundelius's contributed capital analysis makes no attempt to measure either PNC's claimed damages or Plaid's actual profits supposedly attributable to use of PNC's marks.  While Mr. Lundelius refers to this calculation as an "estimate [of] the full benefit to Plaid from its alleged wrongful conduct," Lundelius Rep. ¶ 53, he makes no attempt to link the calculation to the Lanham Act's enumerated categories of damages.  Indeed, at his deposition, Mr. Lundelius described his contributed capital measure as an *alternative* to his disgorgement analysis, which explicitly measures historical and future Plaid profits.  *See* Lundelius Tr. 145:10–18 (explaining that only "one or the other" could be applied).

Regardless of whether Mr. Lundelius believes that his contributed capital analysis offers a more complete picture of the peripheral benefits Plaid allegedly acquired through use of the PNC logo in Plaid Link, it is undisputed that it is not a measure of Plaid's actual profits or PNC's actual damages.  It thus "will not help the [fact finder] in this case." *Greenwald*, 2023 WL 7021239, and should be excluded.  *See, e.g.*, *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 712–13 (7th Cir. 2005) (affirming exclusion of damages expert by district court where calculation included damages that "would be unrecoverable under any set of facts," and thus, unable to "assist the trier of fact to determine the issue of [] damages in this case"); *L&M Beverage Co., Inc. v. Guinness Import Co.*, 1996 WL 368327, at *4 (E.D. Pa. June 24, 1996) (precluding expert's testimony, after concluding that diminution in value was the correct measure of damages, "on the

6

ground that his proposed testimony with respect to lost profits is not relevant to the facts at issue in this case").

### B. Mr. Lundelius's Methodology Is An Unreliable And Unhelpful Way To Measure Trademark Infringement Damages.

Even if the court declines to exclude Mr. Lundelius's contributed capital analysis based solely on its categorical mismatch to Lanham Act damages, the unreliability of his novel methodology independently mandates exclusion. He points to no instance where this contributed capital approach has ever been applied, either judicially or non-judicially, *see* Lundelius Tr. 154:24–155:5; he can offer no support, peer–reviewed or otherwise, for his approach, *see* Lundelius Rep. ¶¶ 51–63; *Yazujian v. PetSmart*, 729 F. App'x 213, 216 (3d Cir. 2018) (excluding expert who "conceded that his methods were not subject to peer review"); and he readily admits that he has never before applied this methodology to a trademark infringement case, *see* Lundelius Tr. 152:11–153:8. Given these concessions, it is clear that contributed capital is not "generally accepted" as a reliable methodology for calculating damages in a trademark case. *See Paoli II*, 35 F.3d at 742 (listing reliability factors). Instead, it is just the type of "subjective belief or unsupported speculation" that courts routinely exclude. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir. 2000).

Indeed, Plaid has found no support whatsoever for the proposition that a plaintiff in a trademark case is entitled to a portion of the defendant's valuation. This is for good reason. Mr. Lundelius's faulty contributed capital analysis assumes both that (i) all of Plaid's value growth from June 2015 through May 2016 was due to growth in the number "occurrences," *i.e.*, consumer connections between bank accounts and fintech apps, and (ii) that the growth in the number of "occurrences" resulted solely from Plaid's use of PNC's logo and branding in Plaid Link. Setting aside the numerous flaws with those assumptions, Mr. Lundelius also ignores the *actual* factors

contributing to Plaid's value growth, like the make-up of Plaid's equity investors, its underlying technology, or Plaid's relationships with its fintech app customers. *See, e.g.*, [Ex. 3], Expert Report of Dr. Maureen Chakraborty (Nov. 22, 2023), § VII.B, ¶ 91 ("Chakraborty Rep."). Furthermore, by looking to Plaid's valuation, rather than revenues or profits, the contributed capital measure inappropriately compensates PNC for Plaid's future value in perpetuity, even though the alleged infringement in this matter ended in December 2020 and thus, Plaid's future value cannot be attributable in any way to the use of PNC's marks. *See id.* ¶ 89.

Finally, if taken to its logical conclusion, Mr. Lundelius's contributed capital calculation would produce untenable results. *Oracle Am., Inc. v. Google Inc.*, 2012 WL 850705, at *10–11 (N.D. Cal. Mar. 13, 2012) (excluding expert analysis in an infringement suit as "an unreliable predictor of market share" where the underlying assumptions in their model led to "irrational results"). He attributes 100 percent of the value of PNC occurrences to Plaid's use of the PNC logo when calculating the number of common shares in his "hypothetical transfer," thereby concluding that PNC is entitled to an ownership stake in Plaid. Lundelius Rep. ¶¶ 55–58. However, PNC's logo was not the only bank logo that Plaid used in Plaid Link. By Mr. Lundelius's logic, each of those banks would similarly be entitled to common shares as compensation for the use of those logos, resulting in nearly all of Plaid's equity being owned and controlled by banks, even though none of those banks "bore the risk of Plaid's failure and forwent alternative investment opportunities." Chakraborty Rep. ¶ 95; *see also id.* ¶ 91; [Ex. 4], Deposition of Maureen Chakraborty (Dec. 19, 2023), 354:2–20. Mr. Lundelius's contributed capital analysis is novel for a reason—it is not a reliable or helpful way to measure damages in a trademark case.

## C. Mr. Lundelius Values the Wrong Asset.

Lastly, even assuming the Court agrees that it is possible PNC "contributed" an asset to Plaid for which it should be compensated, Mr. Lundelius does not present a reliable methodology

8

for measuring such a contribution.   While he defines PNC's fictitious "forced investment" as "Plaid's use of PNC Marks . . . in the Plaid Link screens," he chooses to *value* that so-called forced investment using "the value of PNC's customer accounts."   Lundelius Rep. ¶¶ 53–54.   That valuation method is unreliable, and further underscores why Mr. Lundelius's contributed capital approach is inappropriate for a trademark case.

The typical method for valuing the use of a mark is via a royalty, or some other similar payment.  *See* Chakraborty Rep. ¶ 90.   But Mr. Lundelius made no such calculation.   In fact, he readily admits that he neither attempted, nor was he asked to attempt, a valuation of PNC's marks. *See* Lundelius Tr. 157:7–10.   Instead, as explained above, Mr. Lundelius calculated the value of PNC's "forced investment" by multiplying the share of PNC occurrences by what he estimates to be Plaid's growth in value.   *See* Lundelius Tr. 49:4-7 (explaining that PNC contributed a "connection to those [customer] accounts").

However, occurrences are not an asset that PNC is able to "contribute."  An occurrence is created when a consumer decides to connect their bank account to a fintech app—a decision over which PNC has no say.  *See* Lundelius Tr. 49:8–18 (agreeing that "the consumer has a choice" to use a fintech app, and that banks cannot make customers sign up for fintech apps).  PNC's attempt to derive monetary benefit from a consumer's decision to link their PNC account to a fintech app is untenable, particularly given that consumers often choose to use fintech apps as a way to obtain services competitive to those their incumbent financial institution provides.  *See generally* Required Rulemaking on Personal Financial Data Rights, 88 Fed. Reg. 209, 5-6 (proposed Oct. 31, 2023) (to be codified at 12 C.F.R. pts. 1001, 1033), https://perma.cc/P9S8-WTR8.  As Mr. Lundelius measures the wrong asset, his testimony should be excluded as unreliable and not useful "*for purposes of this case.*"  *Paoli II*, 35 F.3d at 743 (emphasis in original); *see also Greenwald*,

2023 WL 7021239, at \*9–\*10 (excluding expert in breach of contract case who compared defendant to an unspecified "industry standard[]," rather than contract requirements).

### II.  Mr. Lundelius's Disgorgement Analysis Is Based On Erroneous Assumptions And Thus Unreliable.

As an alternative to his contributed capital analysis, Mr. Lundelius offers a traditional disgorgement analysis.  *See* Lundelius Rep. ¶¶ 36–50; Lundelius Tr. 145:10–18.  However, despite agreeing that unjust enrichment damages should only include "revenues that are related to the wrongful conduct," Lundelius Tr. 79:9–18, Mr. Lundelius relies on a series of unfounded assumptions contrary to available evidence.[2]  Where expert testimony is based on assumptions that "lack foundation in the record," it is properly excluded.  *Elcock*, 233 F.3d at 755 (excluding damages expert who calculated future wages double what plaintiff had previously made and without basis in the record); *see also MyService Force, Inc. v. American Home Shield*, 2014 WL 1757161, at \*12 (E.D. Pa. May 2, 2014) ("[T]he reliability analysis required by *Daubert* applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." (cleaned up)).

*First*, Mr. Lundelius erroneously assumes that 100 percent of PNC occurrences are attributable to Plaid's use of the PNC logo.  In other words, implicit in his calculations is an assumption that, absent use of the PNC logo, no consumers would have connected their PNC accounts to the fintech apps they had already decided to use before ever encountering Plaid Link.  *See* Lundelius Tr. 83:18–23 ("I'm assuming that all the occurrences and data that were handed to

---

[2] Mr. Lundelius makes identical unfounded assumptions as part of his contributed capital analysis, *supra* Section I.  As such, the concerns raised in this section apply equally to undermine Mr. Lundelius's contributed capital analysis.  While Plaid argues that the reliability of both Mr. Lundelius's disgorgement and contributed capital analyses are tainted because they are based on unsupported assumptions, the assumptions are discussed in the context of his disgorgement analysis.

us were from . . . individuals that would have been and were misled by the PNC marks in accordance with the complaint in this matter."). There is ample evidence available that contradicts this assumption, including:

- Studies conducted by Plaid in the regular course of its business showing only a minimal percentage of users change their behavior when a bank's logo is removed. *See* [Ex. 5], PL00192553–555; [Ex. 6], Nov. 13, 2023 Aff. of Emeline Minor; Chakraborty Rep., ¶ 52, n.104.

- Data included in Mr. Lundelius's own report evidencing new connections using Plaid Link by PNC customers through 2022, *see* Lundelius Rep. ¶ 42, even though Mr. Lundelius admits that the PNC logo was removed well before then, *see* Lundelius Tr. 70:25–72:20.[3] By Mr. Lundelius's own assumption, these connections should not exist.

- The work of *PNC's own expert*, Dr. Ran Kivetz, whose faulty survey concluded that roughly 60 percent of users were *not* confused by use of the logos, s*ee* [Ex. 8], Expert Report of Ran Kivetz ¶ 23. Even if one were able to use this survey as reliable evidence of consumer confusion (which Plaid disputes, for the reasons described in its separate motion to exclude Dr. Kivetz's survey), Mr. Lundelius's assumption that 100 percent of consumers would have changed their behavior had the PNC logo not been used, when another PNC expert claims that only approximately 40 percent were confused in the first place, is nonsensical.

---

[3] Mr. Lundelius incorrectly claims that the PNC marks were still visible on the credentials pane within Plaid Link throughout 2021. That is incorrect. All PNC marks were removed from the credentials pane in December 2020. *See, e.g.*, Chakraborty Rep., ¶ 10; [Ex. 7] Deposition of Raja Chakravorti (Mar. 22, 2023), 216:7–16.

11

This evidence, which flatly contradicts Mr. Lundelius's assumption, is crucial because "a mark holder is only entitled to those profits *attributable to the unlawful use of its mark*." *See Gucci America, Inc.*, 354 F.3d at 242 (emphasis added).  To determine those profits, experts will contemplate a "but for world," which requires assessment of "what would have happened to a business had the defendant's injurious acts not occurred." *See* [Ex. 9], Litig. Servs. Handbook, 5th Ed., 2012, Ch. 4, p. 24.[4]  For example, in a trademark infringement case where the Defendant made roughly $10 million in profits from products bearing the infringed marks, but "ninety-eight percent of [defendant's] total sales . . . were driven by factors other than [plaintiff's] marks," the court awarded disgorged profits of merely $265,000.  *See Avco Corp. Turn & Bank Holdings, LLC*, 659 F. Supp. 3d 483, 503–05 (M.D. Pa. 2023).  Mr. Lundelius admitted that he made no attempt to assess which of Plaid's revenues stemming from PNC occurrences were even arguably attributable to use of PNC's marks—he simply assumed they all were.  *See, e.g.,* Lundelius Tr. 123:17–24.

*Second*, Mr. Lundelius assumes that all connections to PNC bank accounts were made by consumers who viewed the PNC logo in the Plaid Link interface.  *See* Lundelius Rep. ¶¶ 54–55. This too is contradicted by the evidence.  While Plaid Link was launched in May 2015 and included the PNC logo at the time, it took years for Plaid Link to be fully adopted by Plaid's customers.  In the interim, Plaid provided only back-end services to many of its customers, who themselves created the user interface viewed by consumers.  Mr. Lundelius does not consider evidence that many of the connections that underlie his damages assessment did not involve consumers' use of a Plaid-designed interface.  *See* Lundelius Tr. 97:12–98:10; 104:7–14.

---

[4] While this specific section relates to "lost profits" damages, the handbook notes that "most of the steps identified (if not the specific procedures described) pertain to most damages analyses."  *See* Litig. Servs. Handbook, 5th Ed., 2012, Ch. 4, p. 23.

*Third*, Mr. Lundelius includes "non-user-based revenues," *i.e.*, revenues from fixed Plaid revenue streams like unmet monthly minimums. *See* Lundelius Rep. ¶¶ 15, 46. These revenues are paid to Plaid by its fintech app customers regardless of whether any particular consumer makes a connection (or sees a logo), and are thus inappropriate to include as damages in a trademark case. *See Gucci America, Inc.*, 354 F.3d at 242 (explaining that "a mark holder is only entitled to those profits attributable to the unlawful use of its mark").

During his deposition, Mr. Lundelius indicated that his reliance on unfounded assumptions was somehow necessary due to a lack of information. *See, e.g.,* Lundelius Tr. 80:17–81:10 (explaining that he had to assume "that no PNC customers would connect using Plaid Link in the absence of the [PNC logo]," "[b]ased on the limited data we had"); 99:21–100:12 (explaining that "we have no . . . information as to exactly which – which customers actually saw or used the PNC marks," and that thus he "assume[s] that they do because the marks do show up, according to the allegations in the complaint"). However, when faced with additional actual evidence of those relevant facts that bear on his opinions, as discussed above, and which entirely undermine his assumptions about supposedly lacking information, he made no attempt to reconcile them. Experts are not permitted to offer opinions that "rest on assumptions unsupported by the factual record and are therefore unreliable." *Branch v. Temple University*, 2021 WL 2823071, at *3 (E.D. Pa. July 7, 2021). Like the expert in *Elcock*, Mr. Lundelius "ignored the[] more concrete numbers rooted in the record" in favor of unsupported assumptions. *See* 233 F.3d at 756; *see also MyService Force, Inc.*, 2014 WL 1757161 at *12 (excluding an expert's opinion as unreliable where his

"methodology was based on his assumption that the [contract] imposed an obligation . . . that it did not, in fact, impose").[5]

Taken together, there is plentiful evidence contradicting the assumptions underlying Mr. Lundelius's disgorgement analysis. And while an opinion is properly excluded where any step of its analysis is suspect, *Wood*, 822 F. App'x at 125, it is especially appropriate here where the analysis is compromised by multiple faulty assumptions. Mr. Lundelius does not justify or offer evidence to support those assumptions, nor does he even *attempt* to explain why, when faced with contrary facts, they should continue to stand. By including revenue streams in his analysis that are not properly attributable to PNC's marks, Mr. Lundelius fails to provide a reliable analysis in this case. *See Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 F. App'x 781, 790 (3d. Cir. 2009) ("[E]xpert testimony based on assumptions lacking factual foundation in the record is properly excluded."); *Wilson v. Saint-Gobain Universal Abrasives, Inc.*, 2015 WL 1499477, at *9 (W.D. Pa. Apr. 1, 2015) ("[W]hen assessing reliability, an expert's conclusions must be examined to decide whether they could reliably flow from the facts known to the expert . . . ." (internal quotations omitted)). His failure to consider evidence that undermines his baseline assumptions thus necessitates exclusion. *See Meadows*, 306 F. App'x at 789 (explaining that where the opinion

---

[5] Some courts categorize a lack of factual foundation as an issue of "fit" rather than one of reliability. *See, e.g., Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009) (explaining that "expert testimony based on assumptions lacking factual foundation in the record is properly excluded" for lack of fit); *Wilson v. Saint-Gobain Universal Abrasives, Inc.*, 2015 WL 1499477, at *9 (W.D. Pa. Apr. 1, 2015) (excluding expert's opinion where it "depend[ed] on his own assumptions and lack[ed] a sufficient factual foundation in the record"). Whether Mr. Lundelius's reliance on faulty assumptions is deemed an issue of reliability or one of fit, the result is the same—his opinions should be excluded. *See MyService Force, Inc.,* 2014 WL 1757161, at *12 (explaining that reliance on a faulty assumption leads to exclusion on *both* fit and reliability grounds).

14

and the data are connected "only by the *ipse dixit* of the expert, not by any evidence," the expert must be excluded as unreliable); *Wilson*, 2015 WL 1499477, at *5.

### III.    Mr. Lundelius's Calculation of PNC's Losses Should Be Excluded Because They Are Irrelevant And Do Not Fit This Case.

Lastly, the only category of actual damages that Mr. Lundelius attempts to calculate are the losses purportedly suffered by PNC "due to alleged Plaid fraud." Lundelius Rep. § V(c), ¶ 68. These calculations are explicitly based on discussions with PNC's cybersecurity expert Mr. Todd Renner, whose opinions Plaid also moves to exclude. However, Mr. Renner himself admitted that "if Plaid had not included PNC's marks in Plaid Link," the security incident that is the basis for Mr. Lundelius's actual damages calculation would still have happened. [Ex. 10] Deposition of Todd Renner (Nov. 15, 2023), 127:21–128:2. As a result, because this security incident is not attributable to the use of PNC's marks in Plaid Link, Mr. Lundelius's opinions on related damages (like Mr. Renner's opinions about the incident itself) should be excluded as irrelevant. *See Gucci America, Inc.*, 354 F.3d at 242 (explaining that "a mark holder is only entitled to those profits attributable to the unlawful use of its mark"). Additionally, to the extent that Mr. Lundelius's opinions rely on Mr. Renner's unreliable conclusions, *see* Lundelius Tr. 36:19–38:13; 166:3–18; Lundelius Rep. ¶ 70, his opinions are similarly unreliable and should be excluded. Finally, as Plaid argues in its motion to exclude Mr. Renner, expert opinion related to a security incident that is divorced from the infringement claims at issue here should be excluded for failing to fit the facts of the case.

### CONCLUSION

For these reasons, the Court should grant Plaid's motion to exclude the opinions of Mr. Charles Lundelius.

15

Dated: February 9, 2024    Respectfully submitted,

          */s/ Jeremy Barber*
          Jeremy Barber (*pro hac vice*)
          Ralia Polechronis (*pro hac vice*)
          **WILKINSON STEKLOFF LLP**
          130 W 42nd Street, Floor 24
          New York, NY 10036
          (212) 294–8929 (phone)
          (202) 847–4005 (fax)
          Email: jbarber@wilkinsonstekloff.com
          Email: rpolechronis@wilkinsonstekloff.com

          Beth Wilkinson (*pro hac vice*)
          Hannah Bedard (*pro hac vice*)
          Alison Zoschak (*pro hac vice*)
          Mikaela Meyer (*pro hac vice*)
          Robert Laird (*pro hac vice*)
          **WILKINSON STEKLOFF LLP**
          2001 M Street NW, 10th Floor
          Washington, DC 20036
          (202) 847–4000 (phone)
          (202) 847–4005 (fax)
          Email: bwilkinson@wilkinsonstekloff.com
          Email: hbedard@wilkinsonstekloff.com
          Email: azoschak@wilkinsonstekloff.com
          Email: mmeyer@wilkinsonstekloff.com
          Email: rlaird@wilkinsonstekloff.com

          *Counsel for Defendant Plaid Inc.*

16

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 9, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

/s/ Jeremy Barber
Jeremy Barber