# EXHIBIT 01

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| THE PNC FINANCIAL SERVICES GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> PLAID INC., <br><br> Defendant. | Civil Action No. 2:20-cv-1977 |

## EXPERT REPORT OF CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF

**Submitted on October 6, 2023**

Table of Contents

I.    INTRODUCTION AND ASSIGNMENT ........................................................................ 1

II.    QUALIFICATIONS ..................................................................................................... 1

III.    BACKGROUND ......................................................................................................... 3

a.    PNC ........................................................................................................................ 3

b.    Plaid ....................................................................................................................... 4

c.    Litigation .............................................................................................................. 11

IV.    SUMMARY OF FINDINGS AND OPINIONS ............................................................ 14

V.    DAMAGES ANALYSIS ............................................................................................. 16

a.    Plaid's Historical and Future Gross Profits Attributable to PNC Customers ................... 16

b.    PNC's Investment in Plaid Through "Contributed Capital" ............................................ 25

c.    PNC Losses due to Alleged Plaid Fraud ........................................................................ 31

d.    PNC's Statutory Damages ............................................................................................ 43

APPENDIX A: CIRRICULUM VITAE

APPENDIX B: MATERIALS CONSIDERED

EXHIBITS

## I.    INTRODUCTION AND ASSIGNMENT

1.    I was retained by counsel for Plaintiff, The PNC Financial Services Group, Inc. ("PNC"), to evaluate economic damages claims asserted by PNC against Defendant Plaid, Inc. ("Plaid") for the claims described in PNC's First Amended Complaint in this action.

2.    The purpose of this report is to disclose my professional background and experience and my expert opinions regarding monetary remedies available to PNC in this matter. This report summarizes my opinions given the information available to me as of the date I signed this report.  I may obtain additional documents, testimony or information that may cause me to amend and/or supplement my opinions at a later date, and I reserve the right to amend or supplement this report.

## II.   QUALIFICATIONS

3.    I am the Managing Director of the Capital Markets Accounting Practice at Berkeley Research Group, LLC.  I am a Certified Public Accountant, Accredited in Business Valuation and Certified in Financial Forensics by the American Institute of Certified Public Accountants ("AICPA").  In addition, while a senior officer of a Financial Industry Regulatory Authority ("FINRA") broker/dealer that served as lead underwriter for securities syndications, I held a FINRA General Securities Principal license (Series 24, 7 and 63) and was a Registered Investment Adviser.  In 1999, I was appointed by the NASDAQ Board of Directors to serve on the NASDAQ Listing Qualifications Panel, the body that reviews the listing and delisting of securities traded on The NASDAQ Stock Market.[1]  My term ended in 2006.

4.    I have given testimony before administrative hearings of the SEC, in federal and state courts, at FINRA arbitrations, and before governmental hearings.  I have qualified as an

---

[1] "NASDAQ" stands for National Association of Securities Dealers Automated Quotations.

1

expert in securities trading and valuation, Investment Adviser and Investment Company Act matters, damages, financial analysis, accounting, fiduciary duties and econometrics.

5.      In 2003, I authored *Financial Reporting Fraud: A Practical Guide to Detection and Internal Control*, peer-reviewed and published by the AICPA, which has been used as a textbook in academic and professional courses. The second edition of the book, in which I examine valuation issues related to financial fraud, was released in July, 2010.

6.      I describe specific engagements relevant to this matter below:

a)  On behalf of the founder of Tinder, Sean Rad, and his team members, in their suit against IAC and Match, I testified in New York state court as to the value of Tinder for purposes of assessing damages to plaintiffs' stock options. The valuation involved assessment of cash flow models exceeding 200 spreadsheets, the determination of comparable firms in the high-growth, high-tech sector, and assessment of appropriate beta and discount rates.

b)  I testified, on behalf of Lynn Tilton, in an SEC Administrative Proceeding regarding a private equity fund structured as a Collateralized Loan Obligation. Testimony included discussion of private equity industry standards and valuation guidelines used to assess collateralized debt obligations, representing investments in distressed portfolio companies, for purposes of impairment under *ASC 310 – Receivables and ASC 326 Financial Instruments – Credit Losses* and fair value under *ASC 820 – Fair Value Measurement*.[2] Testimony also included discussion of the development of impairment and fair value standards over time, as well as the link between private equity valuation guidelines and fair value under US GAAP.

c)  In a separate matter on behalf of Lynn Tilton, I calculated out-of-pocket damages related to alleged fraudulent misrepresentations by MBIA Inc. and MBIA Insurance Corp. The engagement included collateral valuations and waterfall analysis at liquidation under various scenarios, as well as disclosures made by MBIA in SEC and statutory filings. I also analyzed the ability of Patriarch to liquidate collateral portfolio companies and related timing and amount of dispositions. The case settled soon after my testimony.

d)  I testified in Florida state court as an expert in post-acquisition disputes regarding alleged fraud in financial reporting of the purchase of a manufacturing division by a Tier One automotive manufacturer and supplier. The analysis involved extensive

---

[2] "ASC" refers to the Accounting Standards Codification implemented in the United States by the Financial Accounting Standards Board in 2009. References to pre-codification financial accounting standards in this report have been updated to current ASC references.

investigation of accounting reserves (*ASC 450 – Contingencies*) for acquisitions made by the seller to allegedly hide losses as well as quantification of damages due to alleged underperformance hidden by fraudulent accounting.

e) I testified in federal district court as a damages expert in a copyright infringement suit against a publisher on issues involving marketing of copyright matter, direct mail advertising, and profitability.

f) I served as an expert witness on behalf of a software development firm to assess damages, determine the value of a counterclaim under software licensing agreement and value software in the suit filed by a nationwide provider of multiple listing services to real estate agents.

g) I testified in federal district court on behalf of a multinational food processing and distribution firm regarding damages resulting from an alleged breach of an exclusive territory agreement with the distributor.

7.      The hourly rate that BRG charges for my time is $1,375.  BRG staff have assisted me on this matter, and their billing rates vary from $380 to $825 per hour.  My compensation for this matter is not contingent on the outcome of the case or the substance of my opinions.  My curriculum vitae is attached as Appendix A.  Please refer to Appendix B for a list of materials considered for this report.

### III. BACKGROUND

**a. PNC**

8.      PNC is one of the largest financial services institutions in the United States, providing retail banking, corporate and institutional banking, and asset management services with assets of $558 billion as of June 30, 2023.[3]  PNC offers its retail banking services through its network of approximately 2,400 branches and 60,000 PNC and partner ATMs, as well as telephonic, online and mobile banking channels.[4]  PNC seeks to build lifelong relationships with

---

[3] PNC Corporate Profile Fact Sheet at https://www.pnc.com/en/about-pnc/media/facts-about-pnc.html.

[4] PNC Corporate Profile Fact Sheet at https://www.pnc.com/en/about-pnc/media/facts-about-pnc.html.

3

customers around a framework of financial wellness, offering a full set of solutions across deposits, payments, personal lending, credit card, and wealth advisory.[5]

9.      According to PNC's Amended Complaint, PNC has a brand that includes several trademarks and logos, which often are displayed with shades of blue, white, and orange colors.  PNC owns federal registrations for its PNC trademark and logo, for various financial, banking, data processing, and online banking services, including the following specific trademark registrations,[6] which I will refer to as the "PNC Marks" for purposes of this Report:

| Mark | Reg. No. Reg. Date | Products/Services |
|---|---|---|
| PNC | 1416898 11/11/1986 | Various banking and financial services, including data processing services |
| ⊘ PNC | 2508843 11/20/2001 | Full line of banking and financial services |
| ⊘ | 2665477 12/24/2002 | Full line of banking and financial services |
| PNC.COM | 5831730 8/13/2019 | Various banking and financial services |

### b. Plaid

10.      Plaid is a privately-owned company that was incorporated in July 2012 and is a data network for over 8,000 third-party financial technology applications ("fintech apps").[7]  In particular, Plaid offers Application Programming Interfaces ("API") that enable fintech apps to connect to, and access various forms of information relating to, the bank accounts of the fintech

---

[5] PNC Corporate Profile Fact Sheet at https://www.pnc.com/en/about-pnc/media/facts-about-pnc.html.

[6] Amended Complaint, ¶14.

[7] Plaid's website discusses Financial Institutions + Plaid at https://plaid.com/for-financial-institutions/.

apps' users.[8]  Plaid's website advertises that it has over 900 employees and 6 offices around the world.[9]

11.      Plaid Link is the user interface that enables a user to connect their financial accounts to the application or service.[10]  Plaid Link handles credential validation, multi-factor authentication, and error handling for each institution that Plaid supports.[11]  Plaid publicly advertises that "[Plaid Link] opens the door to all of Plaid's products"[12]  and states that over 8,000 fintechs are "built on Plaid," and it "supports" over 12,000 financial institutions.[13]  Plaid's fintech app customers include "9 of the top 10 most downloaded fintech apps in the Android + App Store."[14]  Plaid also claims that 1 in 3 Americans have already been presented with the Plaid Link user interface.[15]

12.      For example, users connect their financial accounts to the fintech app Venmo via the Plaid Link user interface.  When a Venmo user chooses to connect their financial account, e.g., a PNC bank account, the user is prompted to enter the PNC username and password associated with his or her bank account into Plaid Link, enabling Plaid to connect the PNC account to the Venmo app.[16]  Plaid acknowledged that when it designed Plaid Link, Plaid

---

[8] Plaid discusses how they handle users' financial data on their website at https://plaid.com/how-we-handle-data/. *See also*, Plaid, Inc. Audited Financial Statements for the year ending 2017, p. 7 (PL00212936-59).

[9] *See* Plaid's website, about the company, at https://plaid.com/company/.

[10] *See* Plaid Link overview on Plaid's website, available at https://plaid.com/docs/link/.

[11] *See* Plaid Link overview on Plaid's website, available at https://plaid.com/docs/link/.

[12] *See* Plaid Link overview on Plaid's website, available at https://plaid.com/plaid-link/.

[13] *See* Plaid's website, about the company, at https://plaid.com/company/.

[14] Plaid's website discusses data connectivity solutions at https://plaid.com/data-connectivity/ (based on the past 30 days as of May 9th, 2022).

[15] *See* Plaid Link overview on Plaid's website, available at https://plaid.com/plaid-link/.  ("1 in 3 US adults has connected a financial account to an app with Plaid—and that number is growing every day.")

[16] Plaid discusses how they handle users' financial data on their website at https://plaid.com/how-it-works-for-consumers/.

"coupled the style of an institution's brand [e.g., PNC's brand] with that of the [Plaid Link] platform to promote a strong sense of familiarity and comfort when users connect their banks to an app."[17]

**Plaid Revenues and Financial Data**

13.    Plaid's product offerings, i.e., API endpoints, allow developers of fintech apps to perform bank account authentication ("Auth"), income validation ("Income"), and real-time balance checks ("Balance"), as well as obtain real-time transaction data ("Transactions") and account holder information ("Identity"), among others.[18]

14.    Plaid markets various "use cases" for fintech apps that require multiple Plaid products to produce a given function.  For example, Plaid's website describes how multiple Plaid products are required to fulfill use cases for "bank onboarding":[19]

Bank onboarding

Auth to fetch account ACH info for money movement
Balance to fetch real-time account balances and avoid overdrafts
Identity to reduce fraud and complement KYC procedures
Income to verify income and employment
Transfer to transfer funds between accounts
Identity Verification to verify user identity for KYC
Monitor to screen customers against AML watchlists
Signal to assess the return risk of an ACH debit transaction

15.    Plaid derives its revenue by providing its customers (e.g., Venmo) with access

---

[17] *See* Plaid's blog post, *Inside the design of Plaid Link*, dated December 11, 2020 at https://plaid.com/blog/inside-link-design/.  *See also* Plaid's blog post, *More improvements to help users find their bank in Link*, dated October 17, 2018 at https://plaid.com/blog/more-improvements-to-help-users-find-their-bank-in-link/("Bank logos and colors help reinforce brand familiarity with your users").

[18] Plaid, Inc. Audited Financial Statements for the year ending 2017, p. 7 (PL00212936-59); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2018, p. 7 (PL00212960-83).

[19] *See* Plaid's website with Plaid Docs (guides, resources, and references) at https://plaid.com/docs/.

to its API platform.[20]  This includes activity where an app user is present (e.g., a PNC customer connecting their bank account to fintech app) and activity where the user is not present (e.g., a fintech financial management app fetching a transaction history overnight).[21]  Through customer contracts, Plaid generates both user-based revenues and non-user-based revenue.[22]  Non-user-based revenues consist of ███████████████████[23] and unmet monthly minimums paid by customers.[24]  In order to track and record user-based revenue, Plaid maintains a raw billing events table that logs each event associated with billing (i.e., data related to a customer's interaction with one of Plaid's APIs).[25]  In the billing events table, Plaid tracks "occurrences,"[26] which are "instances where consumers connect their specific bank, such as PNC, with a chosen financial app or service through Plaid Link."[27]

16.    Plaid's annual total revenues, expenses and net loss from 2015 to 2021 are shown in the table below:[28]

---

[20] Plaid, Inc. Audited Financial Statements for the year ending 2020, p. 8, (PL00213015-41).  For a full list of Plaid's current product offerings, see Plaid's website at https://plaid.com/docs/.

[21]  Plaid and PNC Onsite Presentation, May 8, 2019 (PL00000816-25 at 17).

[22] *See* Plaid's Revenue Data (PL00217569).

[23] Schuster Deposition, December 13, 2022, 116:17-117:7.

[24] Some Plaid customers have a minimum contractual commitment, which is the customer's minimum monthly charges (Schuster Deposition, December 13, 2022, 147:1-148:9).  If the customer's use of Plaid's products does not generate charges equal to the minimum commitment, the unmet monthly minimum the customer is required to pay is recorded as non-user-based revenue (*see* Schuster Deposition, December 13, 2022, 120:7-13 and 171:8-172:4 and Plaid's Revenue Data at PL00217569, Tab: *non-user based revenue*).

[25] Schuster Deposition, December 13, 2022, 65:4-14 and 66:12-67:4.

[26] Plaid produced "items" data for 2015-2016 because occurrence data is not available prior to 2017.  Plaid stated that historically, an "item" referred to "a consumer's online profile for a specific bank, such as PNC" and that "[a]s of the second quarter of 2021, Plaid retroactively changed the definition of items, with the result that the count of items and occurrences should be roughly equivalent, although the data are maintained by two different teams at Plaid and thus may include some marginal differences" (Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6).

[27] Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6; Schuster Deposition, December 13, 2022, 69:22-70:23.

[28] Plaid's Quarterly Profit & Loss Statement (unaudited) for 2015 and 2016 (PL00213070); Plaid, Inc. Audited Financial Statements for the year ending 2017, p. 4 (PL00212936-59); Plaid, Inc. Audited Financial Statements



**Plaid Early-Stage Financing**

17.     The life cycle of a fintech company, such as Plaid, can be categorized into the following stages: (1) validation, (2) early stage start-up, (3) later stage start-up, (4) scale up, (5) mature growth, and (6) turnaround or decline.[29] For fintechs and other innovative companies specifically, the life cycle enterprise valuations often follow an S-curve from validation and start-up, where the main focus of a company is finding funding and surviving, to the scale up phase where the focus is entering new markets, expanding and hiring.[30] When a fintech enters the mature stage, it is often facing an increasing number of competitors and lower margins and finally, in the turnaround stage, a fintech is back to surviving and transitioning to new business models.[31]

18.     At each stage of the life cycle, a fintech has new funding possibilities. Fintechs typically rely on venture capital ("VC") funding to develop products and early-stage VC and

---

for the year ending 2018, p. 4 (PL00212960-83); Plaid, Inc. Audited Financial Statements for the year ending 2019, p. 4 (PL00212984-3014); Plaid, Inc. Audited Financial Statements for the year ending 2020 (PL00213015-41), p. 4; Plaid, Inc. Audited Financial Statements for the year ending 2021, p. 4 (PL00213042-69).

[29] https://www.ey.com/en_nl/banking-capital-markets-transformation-growth/a-fintech-journey-what-to-consider-when-growing-from-start-up-to-scale-up.

[30] https://www.ey.com/en_nl/banking-capital-markets-transformation-growth/a-fintech-journey-what-to-consider-when-growing-from-start-up-to-scale-up.

[31] https://www.ey.com/en_nl/banking-capital-markets-transformation-growth/a-fintech-journey-what-to-consider-when-growing-from-start-up-to-scale-up.

private equity funding to scale up as the customer base grows.  Once a fintech achieves positive cash flows and profitability, the VC and private equity investors often sell their equity stakes or "exit" through mergers & acquisitions, initial public offerings, etc.[32]

19.    Capital raised first is called "seed" capital and is typically raised from family, friends, angel investors, and VC firms.[33]  Once a fintech has raised seed capital and begins to gain traction, quantified as number of users, views, revenues, or any other key performance indicators, it can choose to conduct subsequent fundraising rounds, starting with Series A.[34]  At the Series A round, it is expected that the company will have a plan for developing a business model and increasing revenue.[35]  As a company moves through various Series rounds of fundraising, the level of proven success required increases and the information necessary to attract potential investors becomes more detailed.  At each Series of fundraising, there is a new valuation for the company and previous investors are usually given an opportunity to reinvest in order to maintain their ownership percentage as more shares are being issued.[36]

20.    Plaid successfully completed five fundraising rounds from seed capital through Series D.  Many companies complete fundraising with a Series C round before preparing for an initial public offering or acquisition.[37]  Series D fundraising typically means that a company either has a new opportunity for expansion before an initial public offering and the company wants to increase its value before going public or the company hasn't met the expectations outlined in the

---

[32] Funding for fintechs: Patterns and drivers (https://www.bis.org/publ/qtrpdf/r_qt2109c.htm).

[33] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[34] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[35] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[36] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[37] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

Series C round.[38] The latter is called a "down round" and means a company is raising money at a lower valuation than the previous round.[39] For Plaid, its Series D fundraising round was *not* a "down round."

21.    In order to successfully attract investors and complete a fundraising round, Plaid would have needed to demonstrate user metric growth early in its life cycle. Investment in the early stages can lead to more growth and subsequent successful fundraising rounds, as evidenced by Plaid completing a Series D round. The early investments continued to compound and grow alongside the increasing valuation of Plaid at each fundraising round.

22.    Plaid had five rounds of funding and for each fundraising round, investors bought new shares of Plaid at a share price based on Plaid's enterprise value after the round was to be completed, referred to as the "post-money valuation."[40] The table below lists Plaid's fundraising rounds and related post-money valuations since its incorporation:[41]

| Round | Closed Date | Total Transaction Size | Post-Money Valuation |
|-------|-------------|------------------------|----------------------|
| Seed Round | September 19, 2013 | $2.80 million | N/A |
| Series A | December 31, 2014 | $14.70 million | $42.1 million |
| Series B | June 19, 2016 | $44.13 million | $187.7 million |
| Series C | November 4, 2019 | $256.00 million[42] | $2.7 billion |
| Series D | August 17, 2021 | $507.49 million | $13.6 billion |

23.    For example, prior to the Series B fundraising round in June 2016, Plaid had

---

[38] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[39] https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e.

[40] See, for example, CapitalIQ Series B Transaction Details Tearsheet.

[41] CapitalIQ Seed Round Transaction Details Tearsheet; CapitalIQ Series A Transaction Details Tearsheet; CapitalIQ Series B Transaction Details Tearsheet; CapitalIQ Series C Transaction Details Tearsheet; CapitalIQ Series D Transaction Details Tearsheet.

[42] The gross proceeds were $250 million from 1,932,538 series C shares issued at a price of $129.363 on December 3, 2018. However, Plaid amended the terms of the transaction on May 21, 2019 to issue 1,978,920 series C shares at a price of $129.363 for gross proceeds of $256 million (CapitalIQ Series C Transaction Details Tearsheet).

5,644,059 common shares outstanding,[43] 2,142,557 Series A preferred shares authorized, and 3,040,882 Series A-1 preferred shares authorized[44] with a share price of $13.2579, resulting in a pre-money valuation of $143.5 million.[45] During the Series B fundraising round, Plaid authorized nearly 3.2 million Series B preferred shares and 159,608 Series B-1 preferred shares both at a share price of $13.2579, raising over $44 million in gross proceeds.[46] The Series B and Series B-1 preferred shares were priced using a post-money valuation of $187.7 million, i.e., the value of Plaid after the Series B capital injections.[47] The following table summarizes Plaid's Series B fundraising round data:[48]

| Plaid Series B Fundraising Round | | |
|---|---|---:|
| Price per share | $ | 13.26 |
| Common Shares | $ | 74,828,370 |
| Series A Preferred Shares | $ | 28,405,806 |
| Series A-1 Preferred Shares | $ | 40,315,709 |
| **Pre-Money Valuation** | **$** | **143,549,885** |
| Series B Preferred Shares | $ | 42,013,742 |
| Series B-1 Preferred Shares | $ | 2,116,067 |
| **Post-Money Valuation** | **$** | **187,679,694** |

### c. Litigation

24.      PNC filed its initial Complaint in this matter on December 21, 2020, followed by a First Amended Complaint on July 8, 2021, which I understand is the operative complaint in this action. PNC's First Amended Complaint asserts claims for Trademark Counterfeiting,

---

[43] Absent fundraising round data from Plaid, I have used the CapitalIQ reported common shares outstanding throughout this analysis.

[44] CapitalIQ Series B Transaction Details Tearsheet.

[45] CapitalIQ Series B Transaction Details Tearsheet. (5,644,059 + 2,142,557 + 3,040,882 * $13.2579 = $143.5 million).

[46] CapitalIQ Series B Transaction Details Tearsheet.

[47] CapitalIQ Series B Transaction Details Tearsheet. ($143.5 + $44.13 = $187.7 million).

[48] CapitalIQ Series B Transaction Details Tearsheet.

Trademark Infringement, False Designation of Origin, False Advertising, and Unfair Competition under the Lanham Act, 15 U.S.C.§ 1051, *et seq*. and Pennsylvania statutory and common law.[49]

25.    According to PNC's First Amended Complaint, Plaid created user interfaces and related products for connecting PNC customers' bank accounts to fintech apps that allegedly misleadingly suggested that the interfaces originated from PNC or an entity affiliated or associated with, or sponsored by, PNC.[50]  Specifically, I understand that Plaid's user interfaces used the PNC trademark, the PNC Marks and PNC's orange-and-blue color scheme to create an allegedly fake "PNC" login page.[51]

26.    Since May 2015, the user interface for Plaid Link consisted of a flow of screens that were presented to a bank account holder when interacting with a fintech app that was a Plaid customer.[52]  I understand that Plaid used the PNC Marks, PNC's color schemes, and fake "PNC" login pages in the Plaid Link screens that were presented to PNC customers for the purpose of obtaining their banking credentials.[53]  Using the fintech app Coinbase as an example, a sample of screens that were prompted to the user using PNC Marks are below:[54]

---

[49] Amended Complaint, ¶ 3.

[50] Amended Complaint, ¶ 4.

[51] Amended Complaint, ¶¶ 4, 52.

[52] Plaid's Supplemental Responses to PNC's First Set of Interrogatories, pp. 7-8.

[53] Amended Complaint, ¶ 23.

[54] Amended Complaint, ¶25.

  

27.     PNC contends that Plaid used the PNC Marks, PNC's color schemes, and fake "PNC" login pages to trick and deceive people into believing that they were at PNC's mobile banking or website to obtain their valuable and private financial information.[55]

28.     PNC alleges that Plaid's use of PNC Marks confused customers regarding the source and affiliation of the Plaid Link screens that solicited PNC customers' banking credentials and, thereby, fueled Plaid's revenues, user metrics, growth and value.[56] PNC further contends that Plaid's "unauthorized use of PNC's trademarks and fake 'PNC' login pages, along with [Plaid's] false and misleading statements, have damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure PNC and its reputation and goodwill."[57] I consider Plaid's specific actions and motivations to be factual issues, and I do not have any opinions regarding liability in this matter.  As a damages expert, I have assumed liability for the purposes of calculating remedies available to PNC.

---

[55] Amended Complaint, ¶52.

[56] Amended Complaint, ¶¶ 6, 27.

[57] Amended Complaint, ¶ 51.  For the avoidance of doubt, I do not opine on the scope or amount of damage to PNC's reputation and goodwill in this report.

## IV.  SUMMARY OF FINDINGS AND OPINIONS

29.    I understand from counsel that unjust enrichment/disgorgement of revenues, actual damages, statutory damages, attorneys' fees/costs, injunctive relief and/or punitive damages are available remedies depending upon the specific cause of action.[58]  In this expert report, I calculate remedies based on Plaid's unjust enrichment/disgorgement of gross profits and PNC's actual/compensatory damages.  I also provide the measure for the framework that the Court will employ to calculate statutory damages.

30.    <u>Unjust Enrichment/Disgorgement of Revenues</u>:  As a result of Plaid's alleged wrongful conduct, Plaid has earned revenues that are attributable, directly or indirectly, to Plaid's use of PNC Marks.  For purposes of calculating Plaid's unjust enrichment/disgorgement of gross profits, I have calculated the amount of Plaid's historical gross profits ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I also calculated the estimated amount of Plaid's future gross profits ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Together, Plaid's ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

31.    PNC claims that Plaid's use of PNC's trademarks and branding enabled it to allegedly gain consumer confidence and trust, thereby increasing its consumer base.  The increase in Plaid's revenues due to allegedly misleading PNC customers added greatly to Plaid's value as Plaid was raising capital through its various funding rounds, particularly the Series B through Series D rounds.  Effectively, PNC unwittingly contributed a valuable asset to Plaid, in the form of PNC's allegedly deceived customers, during Plaid's critical early stage of growth.  To illustrate this point, I have also calculated the estimated value of PNC's customer accounts to Plaid as of

---

[58] I do not express an opinion on the scope or amount of attorneys' fees/costs, injunctive relief and/or punitive damages in this report.

the Series B fundraising date of June 19, 2016, treating PNC's valuable asset as "contributed capital" to Plaid, and the corresponding number of PNC's "common shares" as if PNC had been an investor in Plaid as of the date of the Series B fundraising round.  I then determined the value of those PNC "common shares" as of Plaid's Series D fundraising round on August 17, 2021, which results in a value of ▮▮▮▮▮▮ of "contributed capital" by PNC to Plaid as of August 2021.  As explained below, due to a significant decline in the valuations of fintech stocks, I determined that the value of PNC's "contributed capital" at the end of 2022 would be ▮▮▮▮▮▮ ▮▮▮▮  Therefore, gross profits unjust enrichment of ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  However, fintech valuations are forecasted to increase between 2023 and 2030 and accordingly, PNC's "contributed capital" would increase as well.[59]

32.    Actual Losses to PNC:  PNC has incurred actual losses from Plaid-facilitated automated clearing house ("ACH") debit fraud related to electronic funds transfers that include, at least, (a) losses due to reimbursing PNC customers for these fraudulent debits and ACH disputes, (b) the cost to PNC to investigate each dispute and (c) the total lifetime value PNC lost due to PNC customers that closed their account(s) with PNC after experiencing an ACH dispute due to Plaid-related fraud.

33.    I have calculated these losses to PNC and determined that PNC's damages due to Plaid fraud were $224,419 for ACH dispute reimbursements, $31,335 for ACH dispute investigation costs and $592,768 for lost customer accounts, resulting in total damages of $848,522.

34.    Statutory Damages:  I understand that assuming a finding of counterfeiting liability

---

[59] Global FinTech 2023: Reimagining the Future of Finance, Boston Consulting Group, May 3, 2023, pp. 6 and 15 (https://www.bcg.com/publications/2023/future-of-fintech-and-banking).

against Plaid, PNC is entitled to statutory damages in the amount of (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed; or (2) if the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed.

35.     My calculations do not include any pre-judgment interest that may be awarded to PNC on its asserted claims in this matter.

## V.     DAMAGES ANALYSIS

### a.  Plaid's Historical and Future Gross Profits Attributable to PNC Customers

36.     To measure Plaid's unjust enrichment from its alleged wrongful conduct toward PNC, I have calculated Plaid's historical and future gross profits attributable to PNC customers. As previously explained, Plaid provides its fintech app customers with access to its products and generates revenues through product usage by "occurrences" for each fintech app.[60]  For Plaid, a single "occurrence" is an instance where a given set of bank credentials (i.e., a specific bank account) is connected to a specific Plaid customer (e.g., Venmo).[61]  Thus, a single bank account connected to multiple fintech apps would result in multiple revenue generating occurrences for Plaid.

37.     Plaid also reports cost of revenues that consist primarily of fees paid to third-party data partners and fees paid to support its cloud infrastructure.[62]  The reported revenue less costs of revenue results in the relevant gross profits used in my analysis.

38.     Using Plaid's occurrences and revenue data, I calculated the amount of Plaid's

---

[60] Plaid, Inc. Audited Financial Statements for the year ending 2017, p. 8 (PL00212936-59); Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6; see also Schuster Deposition, December 13, 2022, 69:22-70:23.

[61] Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6.

[62] Plaid, Inc. Audited Financial Statements for the year ending 2021, p. 9 (PL00213042-69).

historical gross profits that can be attributed to PNC customers from 2015-2021.[63]  I first verified

the accuracy of Plaid's occurrences data provided in 2022 as compared to contemporaneous PNC

users data provided in March 2019.  To do so, I relied upon a Plaid presentation that charted the

number of PNC customers enrolled in Plaid from Q2 2015 through March 2019 ██████████

████████████████████.[64]  The slide, shown below, includes various data points, but for

purposes of damages, I selected the charted data point of "PNC customers enrolled in Plaid" as a

starting point for my analysis.[65]



39.        To obtain the historical data on the number of PNC customers enrolled in Plaid,

my staff under my direction recreated Plaid's chart[66] and compared the annually active users to

---

[63] I understand that the Plaid interface changed in December 2020, however, customers were not required to update the interface for their apps per customer contracts.  Therefore, there is an unknown runoff period and absent more detailed data on a customer-by-customer basis, I have included the full year of 2021 as damages.

[64] Schuster Deposition Exhibit PNC 0006 at PL00212151.

[65] Schuster Deposition Exhibit PNC 0006 at PL00212151.

[66] Plaid did not provide data underlying the chart showing Number of PNC Customers Enrolled in Plaid at Schuster Deposition Exhibit PNC 0006 at PL00212151.

the Plaid occurrences data[67] for PNC customers.  As demonstrated in the chart below, the monthly PNC customer occurrences data produced in this matter, calculated on a cumulative basis ("Cumulative PNC Occurrences"),[68] compared to the number of PNC customers enrolled in Plaid that I derived from Plaid's March 2019 chart tracks almost identically until around May 2017 when the Cumulative PNC Occurrences data falls below the 2019 contemporaneous data on PNC Customers.[69]

40.      However, Plaid has admitted that the PNC occurrences data produced in this matter "may not accurately reflect the actual number and percentage of PNC customers that connected through Plaid Link in a given time period"[70] and therefore, it is not unreasonable that the Cumulative PNC Occurrences data provided in 2022 is different from the contemporaneous PNC occurrences data provided in 2019.



---

[67] I received a file with occurrences data, which includes the number of occurrences by month and the percentage of occurrences attributable to PNC by month for January 2015 to October 2022.  See PL00213086.

[68] Plaid stated that "[m]onthly 'Occurrence_Adds' reflect the number of occurrences added in a given month." (*see* Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6 and PL00213086, Tab: *Occurrences by Month, 2015-2022)*.

[69] Chart sources: Schuster Deposition Exhibit PNC 0006 at PL00212151; PL00213086, Tab: *Occurrences by Month, 2015-2022.*

[70] Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, p. 6.

41.    My staff also charted total Plaid occurrences data on a cumulative basis for all financial institutions for the same period and concluded that Plaid's cumulative occurrences grew in tandem with the Cumulative PNC Occurrences as demonstrated below:[71]



42.    Despite the inherent data limitations in the occurrences data identified by Plaid,[72] I conclude that the Cumulative PNC Occurrences measure tracks closely with the contemporaneous PNC customers data for June 2015 through March 2019 and total Plaid occurrences grew in tandem with PNC customer growth.    Therefore, absent more precise data

---

[71] Chart source: PL00213086, Tab: *Occurrences by Month, 2015-2022*.

[72] Plaid stated that occurrence metrics  (Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022, pp. 6-7, emphasis added).

from Plaid, I selected the monthly PNC customer occurrences data, which was used to determine the Cumulative PNC Occurrences, as a basis to determine PNC's customers as a percent of total Plaid occurrences (i.e., the share of total bank account credentials connected to Plaid's fintech app customers that are attributable to PNC accounts). I then calculated PNC occurrences as a percentage of total Plaid occurrences on an annual basis:[73]



43.    Next, I applied the PNC occurrences as a percentage of total Plaid occurrences to total reported gross profit from Plaid's financial statements[74] (both user-based[75] and non-user-

---

[73] PL00213086, Tab: *Occurrences by Month, 2015-2022.* Plaid provided occurrence data by financial institution and in total. Total occurrences from all financial institutions presented in PL00213086 was less than total Plaid occurrences. I calculated PNC/total Plaid occurrences instead of PNC/total occurrences from financial institutions.

[74] Due to inherent data limitations in the various revenue data provided by Plaid described herein, I selected the revenue data from Plaid's unaudited quarterly profit and loss statements for 2015-2016 (PL00213070), and Plaid's audited financial statements for 2017 through 2021 (Plaid Inc. Audited Financial Statements for the year ended December 31, 2017 (PL00212936-59), Plaid Inc. Audited Financial Statements for the year ended December 31, 2018 (PL00212960-83), Plaid Inc. Audited Financial Statements for the year ended December 31, 2019 (PL00212984-3014), Plaid Inc. Audited Financial Statements for the year ended December 31, 2020 (PL00213015-41), Plaid Inc. Audited Financial Statements for the year ended December 31, 2021 (PL00213042-69)).

[75] Plaid acquired Quovo, Inc. in January 2019 (Plaid Inc. Audited Financial Statements for the year ended December 31, 2019, p. 17 (PL00212984-3014). Plaid provided user-based revenues on a per product basis for 2015 through 2020 (Plaid's Revenue Data at PL00217569, tab: user-based revenue). Because the data are on a per product basis, under my direction, BRG staff were able to isolate and exclude Quovo related revenues for

20

based[76]) for each year to calculate the Plaid gross profits that were attributable to PNC customers from 2015 through 2021 ████████ Total gross profits from both user-based and non-user-based revenues are appropriate as damages because PNC users contributed to Plaid's ability to generate customer contracts and customer contracts provide for non-user-based fees. See Exhibit: Plaid's Historical Profits Attributable to PNC Customers for the full calculation. Plaid's historical gross profits attributable to PNC customers on a yearly and total basis are reflected in the chart below:[78]

---

2019 and 2020. Plaid did not provide 2021 revenue data on a per product basis, and, therefore, I cannot make an adjustment for Quovo-related revenues for 2021. Should additional data be provided, I reserve the right to update my analysis.

[76] Non-user-based revenue from Plaid's data provided at PL00217569, *tab: non-user based revenue.*

[77] Plaid's Statement of Operations for 2017 through 2021 in Plaid's Audited Financial Statements (PL00212936-59, PL00212960-83, PL00212984-3014, PL00213015-41, PL00213042-69); Plaid's Quarterly Profit & Loss Statement (unaudited) for 2015 and 2016 (PL00213070); Plaid's Revenue Data at PL00217569, Tab: user-based revenue.

[78] I understand that Plaid attempted to estimate pre-2019 revenue attributable to PNC customers in its October 14, 2022 Response to PNC's Request for Production Nos. 9, 16 (First Set). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

I do not have access to underlying data for the October 6, 2022 number and percentage of live occurrences attributable to PNC, and therefore, I could not evaluate Plaid's pre-2019 revenue estimates. However, even if I had the underlying data, Plaid's methodology to estimate pre-2019 revenue attributable to PNC customers is unreliable. Plaid's revenue figures are presumably complete historical data while the occurrences data is admittedly incomplete according to Plaid (for the complete list of data limitations in the occurrences data, see footnote 73). It is inconsistent to apply an October 2022 occurrences estimate to historical revenues, but rather, a more appropriate measure is to determine contemporaneous occurrences to compare to historical revenues, which I have attempted to do using Plaid's incomplete data. In other words, I find no reliable basis for Plaid estimating December 2013 to January 2019 occurrences based on October 2022 occurrences. Therefore, I did not use Plaid's unsupported October 2022 calculation ████████████████ for my damages analysis.

In addition to the missing and incomplete data for revenue attributable to PNC customers prior to 2019, Plaid's estimate of February 2019 to August 2022 revenue attributable to PNC customers is understated because a portion of Plaid's total user-based revenue for that time period is "not trackable by [Financial Institution]" (PL00213085). ████████████████████████████████████████████████ Therefore, I did not use this file for revenue figures. See Plaid's Response to PNC's Request for Production Nos. 9, 16 (First Set), October 14, 2022. Should Plaid provide more refined and complete data, I reserve the right to amend my calculations.



44.      As for profits attributable to PNC customers in future years, I calculated Plaid's future gross profits that can be attributed to its existing users that are PNC customers as of January 1, 2022, and discounted the forecasted gross profit back to that date.  The discounted cash flow ("DCF") method discounts the future cash flows back to the measurement date using a discount rate that captures market risks as well as the time value of money assumptions as of the measurement date.

45.      To calculate Plaid's future gross profits that can be attributed to existing users that are PNC customers, I first forecasted PNC occurrences for 2022 through 2030.  To forecast 2022 PNC occurrences, I annualized the most recent historical data available, the actual PNC occurrences for January through October 2022.[79]  To forecast PNC occurrences for 2023 through 2030, ███████████████████████████████████████████████████████████ ████████████████████████████████.[80]  A 2023 Boston Consulting Group study states that banking fintech revenues are projected to grow at a compound annual growth rate ("CAGR") of 22% through 2030;[81] therefore, ██████████████████████████████████████

---

[79] Actual PNC occurrences of 2,089,422 from January through October 2022 resulted in annualized PNC occurrences for 2022 of 2,507,306.  See PL00213086, Tab*: Occurrences by Month, 2015-2022.*

[80] 2021 actual PNC occurrences of 2,182,912 increased to 2,507,306 forecasted PNC occurrences in 2022, which results in a 15% growth rate.  See PL00213086, Tab*: Occurrences by Month, 2015-2022.*

[81] Global FinTech 2023: Reimagining the Future of Finance, Boston Consulting Group, May 3, 2023, p. 15 (https://www.bcg.com/publications/2023/future-of-fintech-and-banking).

███████████████████████████████████████████████

████████████████████████ as illustrated in the table below:[82]



The year-over-year ("Y-o-Y") changes in the table above further support that ████████

█████████████████████████████████████████████████

████████████████████████████████████████

46.   I then calculated the weighted average of Plaid's revenue per occurrence for 2017 through September 2022 using historical total Plaid revenue divided by total Plaid occurrences. ███████████████████████████████████████████████[83] To calculate recurring Plaid revenue per occurrence (i.e., revenue attributable to existing Plaid users and excluding revenues from any new PNC users through 2030), I multiplied ████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████

---

[82] PL00213086, Tab: *Occurrences by Month, 2015-2022*.

[83] See Exhibit: Future Gross Profits Attributable to PNC Customers for the full calculation.

[84] Plaid only provided revenue on a per-product basis through 2020 and I considered all products to generate recurring revenue per user except for Auth product revenue. Should Plaid provide additional revenue data, I reserve the right to update my calculations. See Plaid Inc. Audited Financial Statements for the year ended December 31, 2017 (PL00212936-59), Plaid Inc. Audited Financial Statements for the year ended December 31, 2018 (PL00212960-98), Plaid Inc. Audited Financial Statements for the year ended December 31, 2019 (PL00212984-3014), Plaid Inc. Audited Financial Statements for the year ended December 31, 2020 (PL00213015-41); Plaid's Revenue Data at PL00217569, Tab: *user-based revenue*.

47.     Finally, to determine future Plaid revenue attributable to PNC users, I multiplied my forecasted annual PNC occurrences for 2022 through 2030 by ██████████████ ██████████████ To determine future Plaid gross profit attributable to PNC, I multiplied the ████████████████████████████████████████ ██████████████████████████[85] For purposes of calculating damages, I am assuming that damages arise in future years only from existing PNC customers as of 2022 by incorporating actual occurrences through October 2022, annualized for the full year 2022. Further, I added a PNC consumer account attrition rate of 9%, compounded annually through 2030, under the assumption that Plaid's existing PNC users would have an attrition rate similar to that at which they change banks or terminate their relationship with PNC.[86] The result of the calculation is that most PNC users existing in 2022 leave by 2030. The end result of this analysis provided me with the forecasted cash flows to Plaid that are attributable to recurring revenue occurrences for PNC users. See Exhibit: Future Gross Profits Attributable to PNC Customers.

48.     The discount rate, which I used to discount the portion of Plaid's future recurring gross profits attributable to PNC customers back to January 1, 2022, is market-derived to capture market risks related to Plaid's cash flows. The rate of return represents the perceived risk of the investment in Plaid and is equal to or greater than what an investor believes is adequate to compensate for the risk of investing in Plaid. The discount rate considers Plaid's debt-free capital structure,[87] therefore, the discount rate is referred to as the "cost of equity."

---

[85] Plaid's gross profit as a percentage of revenue for 2017 through 2021 was calculated using the cost of revenue excluding amortization (Plaid's Statement of Operations for 2017 through 2020 in Plaid's Audited Financial Statements (PL00212936, PL00212960, PL00212984, PL00213015)).

[86] PNC's 9% attrition rate is the inverse of its 91% retention rate. See PNC's LTV Calculation for Consumer Accounts.

[87] Plaid's 2021 Audited Financial Statements (PL00213042-69), p. 16, Note 7, Debt: ██████████ ████████████████████████████████

24

49.    The cost of equity is a function of the risk-free rate plus a market-derived risk premium. For the risk-free rate, I used the 20-year Treasury rate as of January 1, 2022.[88] The risk premium is the product of the historical return of stocks over the risk-free rate as of January 1, 2022 (the "Equity Risk Premium" or "ERP") multiplied by the beta[89] from comparable companies. I obtained the ERP from data published by NYU Professor Aswath Damodaran[90] and used the median of the five-year monthly levered betas of companies identified by CapitalIQ that I evaluated and determined as being comparable to Plaid.[91] These inputs resulted in a cost of equity of 5.97%. See Exhibit: Future Plaid Gross Profits Attributable to PNC Customers for a complete list of comparable companies included in my analysis and the calculation of the cost of equity.

50.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

### b.  PNC's Investment in Plaid Through "Contributed Capital"

51.    To provide context for Plaid's historical and future gross profits attributable to PNC customers, I also estimated Plaid's unjust enrichment based on the increase in Plaid's value

███████████████████████████████████████████

[88] Economic Research Division, Federal Reserve Bank of St. Louis (https://fred.stlouisfed.org)

[89] Beta measures the volatility of a stock's historical returns relative to the returns of the overall market. The beta of the overall market is 1.0. A beta greater than 1.0 reflects more volatility than the market and a beta of less than 1.0 reflects less volatility than the market.

[90] Damodaran's Annual and Monthly ERP (T12m) as of January 2022 (https://pages.stern.nyu.edu/~adamodar/).

[91] CapitalIQ identified a set of companies it determined to be comparable to Plaid. I evaluated the business descriptions of these companies and excluded Salesforce, Inc. because it does not operate in the fintech space, and SPS Commerce, Inc and Kaspien Holdings, Inc. because I did not consider their respective business operations to be comparable to that of Plaid. See Exhibit: Future Plaid Gross Profits Attributable to PNC Customers for the complete list of selected comparable companies included in my analysis.

through increases in Plaid's utilization metrics and revenues attributable to PNC customers. This measure is appropriate because Plaid's historical and future gross profits understate the full extent of value that resulted from Plaid's alleged wrongful conduct given the timing of that conduct relative to Plaid's life cycle as a private fintech start-up.

52.    As previously discussed, Plaid's ability to demonstrate user metric growth early in its life cycle was critical to its ability to attract VC investment and thereby achieve funding to continue to develop products and scale its customer base. In turn, early-stage investment led to more growth and subsequent successful fundraising rounds. Accordingly, the early investments continue to compound and grow alongside the increasing valuation of Plaid at each fundraising round.

53.    To estimate the full benefit to Plaid from its alleged wrongful conduct, I calculated a measure for PNC's forced investment in Plaid (i.e., Plaid's use of PNC Marks, PNC's color schemes, and fake "PNC" login pages in the Plaid Link screens that were presented to PNC customers for the purpose of obtaining their banking credentials) as of Plaid's June 19, 2016 Series B fundraising round, approximately one year after the implementation of Plaid Link.[92] I will refer to this measure as PNC's "Contributed Capital."

54.    PNC's Contributed Capital in Plaid as of the Series B fundraising round can be determined by the value of PNC's customer accounts to Plaid as of June 2016. PNC users contributed to the successful growth of Plaid's key performance indicators from the seed round through Series B and therefore, contributed to the increasing value of Plaid during the same period. To determine the value of PNC's Contributed Capital in Plaid, I first calculated the PNC occurrences as a percentage of total Plaid occurrences from June 2015 to May 2016, the 12

---

[92] Plaid Link was implemented as of approximately May 2015 (https://plaid.com/blog/inside-link-design/).

months prior to the Series B fundraising date of June 2016, ▮▮▮▮▮▮ as shown in the table below:[93]



55.     As explained above in Section III.b, Plaid derives revenue from occurrences for Plaid's fintech app customers utilizing Plaid's products.   Therefore, 12 months of PNC occurrences following the launch of Plaid Link is appropriate to use to estimate PNC customers as a percentage of Plaid's total customer base as of June 2016.[94]

56.     I then determined the difference between Plaid's Series A post-money valuation of $42.14 million[95] and Plaid's Series B pre-money valuation of $143.5 million to be $101.4 million, which represents the increase in value from Series A to immediately before Series B.[96]  I multiplied ▮▮▮▮▮▮ to determine PNC's Contributed Capital to Plaid as of

---

[93] The total PNC occurrences for June 2015 through May 2016 (*see* file PL00213086, tab "Occurrences by Month, 2015-2022," column titled " item/occurrence adds_pnc") as a percentage of total Plaid occurrences for June 2015 through May 2016 (*see* file PL00213086, tab "Occurrences by Month, 2015-2022," column titled "item/occurrence adds_total_plaid") is 5.88%.

[94] See Section V.a. for discussion on data limitations of Plaid's occurrences data.

[95] CapitalIQ Series A Transaction Details Tearsheet.

[96] $143,549,885 - $42,144,953 = $101,404,932.

June 19, 2016,  As of June 2016, ███████████████████████████████████████████████

███████████████████████████████████████████████[97]

57.    The value of PNC's Contributed Capital is determined using common shares outstanding as of the Series B fundraising round because as of Series B, only convertible preferred shares appear to have been issued to outside investors in the Series A and Series B fundraising rounds.  Accordingly, the common shares outstanding did not change because of Series A and B outside investors and were held by Plaid management and seed investors as of the Series B fundraising date.[98]  The alleged failure to compensate PNC for its "contributed capital" is a failure on the part of Plaid's management, and therefore, an allocation of management's common shares is appropriate to compensate PNC.

58.

███████████████████████████████████████[99]

---

[97] CapitalIQ Series B Transaction Details Tearsheet.  ($5,962,610 / $13.26 = 449,740 shares)

[98] CapitalIQ Series A Transaction Details Tearsheet; CapitalIQ Series B Transaction Details Tearsheet.

[99] CapitalIQ Series B Transaction Details Tearsheet; Plaid, Inc. Audited Financial Statements for the year ending December 31, 2017, p. 15 (PL00212936-59); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2018, p. 15 (PL00212960-83); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2020, p. 25 (PL00213015-41); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2021, p. 17 (PL00213015-41).



59. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

60.    Using the number of PNC's hypothetical "common shares" as of the Series B fundraising round date, I then carry forward the value of PNC's Contributed Capital in Plaid to the Series D fundraising round close date of August 17, 2021.  In its Series D fundraising round, Plaid authorized 772,992 Series D preferred shares, 12,883 Series D-1 preferred shares, and 85,889 Series D-2 preferred shares at a share price of $582.15, resulting in gross proceeds of $507.5 million.[101]  Series D, D-1, and D-2 preferred shares were priced using a post-money valuation of Plaid of $13.5 billion.  The following table summarizes Plaid's Series D fundraising round data:[102]

---

[100] Plaid has not produced any discovery materials related to the post-money valuation methodology at the Series B fundraising round.  Should additional information be provided, I reserve the right to update my analysis.

[101] CapitalIQ Series D Transaction Details Tearsheet.

[102] CapitalIQ Series D Transaction Details Tearsheet.

| Plaid Series D Fundraising Round | |
|---|---:|
| Price per Share | $ 582.15 |
| **Pre-Money Valuation** | **$ 13,067,506,196** |
| Series D Preferred Shares | $ 449,993,814 |
| Series D-1 Preferred Shares | $ 7,499,780 |
| Series D-2 Preferred Shares | $ 49,999,895 |
| **Post-Money Valuation** | **$ 13,574,999,686** |

61.    Using Plaid's share price of $582.15 on August 17, 2021, the closed date of the

Series D fundraising round, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████.[103]



62.    As demonstrated by this analysis, PNC customers contributed to the increase in

Plaid's valuations across its fundraising rounds.  However, PNC was not compensated for Plaid's

use of PNC's trademark, logo and color scheme, nor was PNC given an opportunity to invest

---

[103] CapitalIQ Series D Transaction Details Tearsheet; Plaid, Inc. Audited Financial Statements for the year ending December 31, 2017, p. 15 (PL00212936-59); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2018, p. 15 (PL00212960-83); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2020, p. 25 (PL00213015-41); Plaid, Inc. Audited Financial Statements for the year ending December 31, 2021, p. 17 (PL00213042-69).

more at subsequent funding rounds like other early investors in Plaid.[104]   PNC, therefore, unwillingly "contributed capital" at the Series B fundraising round that grew in concert with Plaid's increasing enterprise value ████████████████████████████████ and if PNC had been able to liquidate its hypothetical shares at or around August 2021, PNC could have realized some or all of that value.

63.   However, since August 2021, the fintech industry has seen a significant decline in valuations.  Boston Consulting Group estimated the decline from Q2 2021 to Q4 2022 to be 55%.[105]  Applying that decline to the value of PNC's hypothetical Plaid "common shares," the value of PNC's Contributed Capital is ██████.[106]  Because the same Boston Consulting Group study predicts that fintech valuations are forecasted to increase between 2023 and 2030,[107] the value of PNC's Contributed Capital could increase as well.  I reserve the right to update my calculations should more information regarding Plaid's valuation become available in the future.

### c.  PNC Losses due to Alleged Plaid Fraud

64.   In early 2019, PNC observed an ongoing increase in ACH debit fraud disputes that appeared to be associated with PNC customers' use of fintech apps – including a 20,000% year-

---

[104] For example, New Enterprise Associates, Inc. invested in Plaid in its Seed Round and continued to invest in every fundraising round through Series D.  See CapitalIQ tearsheets for Seed Round and Series A through D rounds.

[105] Global FinTech 2023: Reimagining the Future of Finance, Boston Consulting Group, May 3, 2023, p. 5 (https://www.bcg.com/publications/2023/future-of-fintech-and-banking).



[107] Global FinTech 2023: Reimagining the Future of Finance, Boston Consulting Group, May 3, 2023, pp. 6 and 15 (https://www.bcg.com/publications/2023/future-of-fintech-and-banking).

over-year increase in ACH debit disputes for the first quarter of 2019.[108]

65.    PNC investigated this increase in ACH debit fraud to develop an "anatomy of attack," or root cause analysis for how these PNC customers' accounts were fraudulently debited.[109]  I understand that PNC's analysis determined that these fraudulent debits were perpetuated by bad actors who exploited Plaid's methods for authenticating and connecting PNC accounts for its fintech app customers.[110]

66.



---

[108] PNC Security Presentation, ACH Fraud and Credential Validation Attacks ("CVA") against PNC Customers, April 2019 (PNC0035060-99 at 61).

[109] PNC ACH Fraud Presentation (PNC0035422-26 at 23-25).

[110] PNC CVA ACH Event Presentation (PNC0035214-54 at 20-22).

[111] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[112] Chad Ballard Deposition, January 19, 2023, 124:16-23.

[113] Chad Ballard Deposition, January 19, 2023, 124:16-23; PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[114] Chad Ballard Deposition, January 19, 2023, 234:8-235:15.



67. ███████████████████████████████████████████████████████

68.    I understand – based on my review of materials produced in this litigation and discussions with PNC's retained security expert, Mr. Todd Renner, that the following process was used by bad actors to commit ACH debit fraud against PNC customers:

   i.   First, a bad actor would obtain and validate a PNC account holders' credentials (i.e., username and password). I understand this could occur through various ways, such as a data breach where the account holder used the same credential pair for other logins,[118] but the exact mechanism is not material to my analysis.

   ii.  Next, a bad actor would set up an account with a fintech app that used Plaid Link and that allowed for the transfer of funds. The bad actor would connect

---

[115] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[116] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[117] Chad Ballard Deposition, January 19, 2023, 234:8-235:15 and 242:23-243:20.

[118] PNC ACH Fraud Presentation (PNC0035422-26 at 25).

the PNC bank account (using the previously obtained credentials) to this fintech app.[119]

iii. Finally, the bad actor would debit the PNC account using the fintech app, and then "cash out" those fraudulently obtained funds by forwarding the money to other accounts controlled by the bad actor.[120]

69.    Bad actors also could exploit this process to fraudulently debit PNC accounts via electronic money transfer platforms that used means other than Plaid Link to connect bank accounts.  In particular, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

70.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[119] PNC ACH Fraud Presentation (PNC0035422-26 at 25).

[120] PNC ACH Fraud Presentation (PNC0035422-26 at 25).

[121] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[122] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[123] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[124] PNC Presentation, Fraudulent Usage of Plaid Aggregators (PNC-R0033370).

[125] Discussion with Todd Renner on October 4, 2023.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████[126]

71.    PNC was only alerted to the ACH debit fraud when a PNC customer filed a fraud dispute, which per PNC, had a negative impact on customer experiences with PNC.[127]  I understand that this is because the bad actor's use of the fintech app to fraudulently debit the PNC account would appear to PNC's systems as ordinary transactions generated through legitimate traffic sources.[128]  Collectively, I will refer to this Plaid-facilitated debit fraud as the "Plaid Fraud Events."

72.    PNC experienced various losses as a result of the Plaid Fraud Events.  In particular, PNC incurred losses due to reimbursing PNC customers for these fraudulent debits, the cost to PNC to investigate each dispute, and the total lifetime value ("LTV") lost for customers that closed their account with PNC in the wake of experiencing this ACH debit fraud.  I discuss and calculate each of these losses in more detail below.

**PNC Losses For Unreimbursed ACH Disputes From Plaid Fraud Events**







37



**PNC Losses To Investigate ACH Disputes From Plaid Fraud Events**

[text redacted]







███████  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ █ █████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ ██ █

████████████████████████████████████████████████████████████

██████

███  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

███  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

#### d. PNC's Statutory Damages

92.     For statutory damages under 15 U.S.C. § 1117(c), I understand that PNC may elect an award of statutory damages in the amount of (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed;



or (2) if the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed.

93.    I understand that PNC alleges that Plaid counterfeited four federally registered PNC Marks in Plaid Link.  Assuming that Plaid is liable for the willful infringement of all four PNC Marks, I understand that the statutory award would be calculated by multiplying the number of counterfeit marks (four) by the number of goods or services on which such counterfeit marks were used.  For example, if the jury determines that Plaid used four counterfeit marks in connection with eight different services, the statutory multiplier would be 32 (4 times 8).  This statutory multiplier would then be multiplied against the statutory award that the jury finds appropriate.  For example, if the jury determines that Plaid engaged in willful counterfeiting and determines that the maximum statutory award was appropriate, the total statutory award would be $62,000,000 ((4 counterfeit marks x 8 services) x $2,000,000).

94.    While I discuss the method of calculating a statutory award under the Lanham Act, I do not opine on (1) the number of counterfeit marks used by Plaid; (2) the number of goods and services on which Plaid allegedly used the counterfeit marks; (3) whether Plaid's counterfeiting was willful; or (4) the appropriate statutory award.

95.    Should additional information come to my attention, I may update this report.

Charles R. Lundelius, Jr.                                    October 6, 2023

44

**HIGHLY CONFIDENTIAL**

Case 2:20-cv-01977-MRH     Document 248-1     Filed 02/09/24     Page 48 of 102

## Curriculum Vitae



**CHARLES R. LUNDELIUS, JR.**
BERKELEY RESEARCH GROUP, LLC
1800 M Street, NW, Second Floor
Washington, DC 20036

Direct: +1 202 480 2684
clundelius@thinkbrg.com

Charles Lundelius, CPA/ABV/CFF is the Managing Director of BRG's Capital Markets Accounting Practice, specializing in regulation of and securities trading by broker-dealers, investment advisers, hedge funds, insurance companies and banks and commodities trading by futures commission merchants. He consults with and provides expert testimony on behalf of clients in the areas of:

- securities, commodity futures and investment management,

- valuation and investment banking, and

- insurance.

Specific engagements for each area are listed on the following pages.

As an expert witness over the past thirty years, Mr. Lundelius has testified in over seventy different cases.  When the United States Securities and Exchange Commission ("SEC") identified key cases it brought relating to the 2007 financial crisis, Mr. Lundelius had testified or was asked to testify in three of those matters.[1]  Also, among Mr. Lundelius' more notable consulting engagements, the SEC Inspector General asked Mr. Lundelius to lead the team investigating the SEC's failure to uncover the Madoff Ponzi scheme.

Mr. Lundelius is a Certified Public Accountant and is Accredited in Business Valuation and Certified in Financial Forensics by the American Institute of Certified Public Accountants.  In addition, while a senior officer of a Financial Industry Regulatory Authority ("FINRA") broker/dealer that served as lead underwriter for securities syndications, Mr. Lundelius held a FINRA General Securities Principal license (Series 24, 7 and 63) and was a Registered Investment Adviser.  In 1999, Mr. Lundelius was appointed by the NASDAQ Board of Directors to serve on the NASDAQ Listing Qualifications Panel, the body that reviews the listing and delisting of securities traded on The NASDAQ Stock Market.[2]  His term ended in 2006.

---

[1] SEC Enforcement Actions Addressing Misconduct That Led to or Arose From the Financial Crisis, http://www.sec.gov/spotlight/enf-actions-fc.shtml.
[2] "NASDAQ" stands for National Association of Securities Dealers Automated Quotations.



Mr. Lundelius has over 40 years of experience, including 7 years in securities and investment banking in Houston and 3 years as senior vice president and chief financial officer of a life and health reinsurance carrier in Dallas. Mr. Lundelius' securities and investment banking experience includes underwriting, portfolio management, derivatives, high-yield bond and securities and commodities market analysis. He has consulted and/or testified in the areas of the underwriting process, securities market pricing, hedge fund operations, investment suitability, securities fraud, fiduciary duties, compliance and due diligence practices. He has given testimony before administrative hearings of the SEC, in federal and state courts, at FINRA arbitrations, and before governmental hearings. Mr. Lundelius has qualified as an expert in securities trading and valuation, Investment Adviser and Investment Company Act matters, damages, financial analysis, accounting, fiduciary duties and econometrics.  Also, while working for major, international accounting firms over several years, Mr. Lundelius served as an auditor of financial institutions, including broker-dealers, banks and thrifts, in the practice of public accountancy.

In his capacity as insurance company chief financial officer ("CFO"), Mr. Lundelius' duties included managing the company's bond investment portfolio, financial forecasting, and regulatory reporting. In addition, Mr. Lundelius' firm participated in the National Association of Insurance Commissioners' pilot study that led to the implementation of risk-based capital measurement in the insurance industry. Concurrent with his service as insurance company CFO, Mr. Lundelius was also CFO of one of the largest managing general agencies in the U.S., writing in excess of $40,000,000 in new premium business annually, and served as trustee of the firm's self-directed 401k pension plan.  Mr. Lundelius also served on the board of directors of the life and health insurance company and the boards of several insurance marketing firms.  In his present role as a consultant, Mr. Lundelius has analyzed finite reinsurance issues relating to various SEC and criminal investigations.

In 2003, Mr. Lundelius authored *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*, peer-reviewed and published by the AICPA, which has been used as a textbook in academic and professional courses.  The second edition of the book was released in July, 2010.

Volunteering with not-for-profit organizations, Mr. Lundelius has served on finance and audit committees overseeing financial reporting, internal control, investment management and policy, and operational issues.  For a major Episcopal Church congregation in Washington, DC, Mr. Lundelius analyzed investment objectives and operating cash requirements to develop long-term investment policy, as well as processes to monitor performance.  For another congregation, as chair of the finance committee, Mr. Lundelius analyzed internal control, supervised the change in accounting systems, revised administrative and investment policies, and updated budgeting processes.  Currently, under appointment by the Episcopal Diocese of Washington, Mr. Lundelius now serves as the Chair of the Diocesan Audit Committee, overseeing internal control for the multi-million dollar operating budget for the diocese and its endowment funds.  Mr. Lundelius also has served on the Diocesan Finance Committee and as a seminar instructor to church treasurers on Not-For-Profit accounting and internal

2



control issues, and he has consulted with the diocese on audit and accounting issues relating to diocesan financial statements. In addition, in 2021, Mr. Lundelius published a teacher's guide and classroom manual for confirmation in the Episcopal Church and an accompanying student reference book.[3]

## Securities, Commodity Futures and Investment Management Expertise

In the areas of securities and commodity futures transactions, investment management and related regulatory regimes, Mr. Lundelius has:

### *Securities Transactions and Regulation*

- On behalf of the SEC's Office of Inspector General, assisted in the investigation of the failure of the SEC to uncover the Madoff Ponzi scheme. Mr. Lundelius led a team of securities experts that interviewed SEC examinations staff and reviewed examination work papers, policies and procedures and related documents. His work was cited by the Inspector General throughout the IG's report of investigation,[4] and his team issued a separate report of recommendations to improve operations at the SEC Office of Compliance Inspections and Examinations.[5] Mr. Lundelius supervised the analysis of purported trading volume on behalf of investors by comparison of trading reported by Bernard L Madoff Investment Securities LLC ("BMIS") to FINRA and NSCC,[6] as well as securities positions held at DTC,[7] and he developed findings relating to how the SEC could have detected Madoff's fictitious trades. Mr. Lundelius and his team also developed recommendations for improvement of SEC broker-dealer and investment adviser examinations. In his written testimony before the US Senate Committee on Banking, Housing and Urban Affairs, the Inspector General said Mr. Lundelius and his team brought specialized experience:

    > … including expertise in complex financial fraud investigations, securities-related inspections and examinations, hedge fund operations, cash flow analysis and valuations, market regulation rules, market structure issues, accounting fraud,

---

[3] The teacher's guide was titled *Did Not Our Heart Burn Within Us?* and the reference was titled *Then Opened He Their Understanding*.

[4] Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme, August 31, 2009, http://www.sec.gov/news/studies/2009/oig-509.pdf.

[5] Review and Analysis of OCIE Examinations of Bernard L. Madoff Investment Securities, LLC, SEC OIG Report No. 468, September 29, 2009, https://www.sec.gov/oig/reportspubs/468.pdf.

[6] "NSCC" is the National Securities Clearing Corporation, a subsidiary of the Depository Trust & Clearing Corporation ("DTCC"), which provides clearing, settlement, risk management, central counterparty services and a guarantee of completion for certain transactions for virtually all broker-to-broker trades involving equities, corporate and municipal debt, American depositary receipts, exchange-traded funds, and unit investment trusts.

[7] "DTC" is the Depositary Trust Company, another subsidiary of DTCC, which effects "book-entry" changes to ownership of the securities. DTC provides securities movements for NSCC's net settlements, and settlement for institutional trades (which typically involve money and securities transfers between custodian banks and broker/dealers), as well as money market instruments.

3



investment suitability, the underwriting process and compliance and due diligence practices.[8]

- With regard to investment advisers who recommended investments in Madoff funds, was qualified as an expert in investment adviser due diligence and testified in multiple arbitrations on the fiduciary duties of advisers.

- On behalf of KPMG LLP, was qualified in international arbitration as an expert in auditing standards, investment fund operations and forensic accounting. Mr. Lundelius testified regarding the legitimate and illegitimate operations of BMIS, materiality of compliance with trading directives and the presumed findings of auditors had those auditors performed extended procedures at BMIS as a service organization during the audits of funds that invested with Madoff. Testimony included the roles of NSCC, DTC and London Stock Exchange in securities clearance, the role of primary dealers in trading and custody of US Treasury securities, and OTC options trading in Europe.

- On behalf of PricewaterhouseCoopers Canada and PricewaterhouseCoopers Netherlands, testified regarding auditing standards under both US Generally Accepted Auditing Standards ("US GAAS") [9] and International Standards on Auditing ("ISA")[10] relating to audits of funds that invested with BMIS. Areas of testimony included the regulatory framework for broker-dealers and investment advisers, the auditors' role related to internal control and assessing materiality under US Generally Accepted Accounting Principles ("US GAAP"),[11] materiality of compliance with trading directives, and how the Madoff fraud was perpetrated.

- In a matter before the High Court of Ireland, prepared a report to address sub-custodian and direct custodian issues under the US Customer Protection Rule (SEC Rule 15c3-3 and NASD[12] Rule 3230) relating to the handling of funds between BMIS and HSBC.

- On behalf of the SEC, assisted in the investigation of alleged use of odd-lot non-agency mortgage-backed securities ("MBS") by a major fixed income fund manager to increase returns on its total return Exchange-Traded Fund. Analysis included determination of size, liquidity, quantity and trading patterns of odd-lot MBS, as well as impact of odd-lot values on fund returns during the early stages of the fund. Analysis also included review of auditor work papers relating to valuation of financial instruments. The fund manager settled by admitting alleged infractions.

---

[8] Written Testimony of H. David Kotz, Inspector General of the Securities and Exchange Commission, Before the US Senate Committee on Banking, Housing and Urban Affairs, September 10, 2009.

[9] Generally Accepted Auditing Standards in the United States are promulgated by the Public Company Accounting Oversight Board for SEC registrants and by the Auditing Standards Board of the AICPA for non-registrants.

[10] International Standards on Auditing are issued by the International Auditing and Assurance Standards Board.

[11] "US GAAP" are the Generally Accepted Accounting Principles for the United States promulgated by the Financial Accounting Standards Board.

[12] The National Association of Securities Dealers, Inc. ("NASD") was the predecessor self-regulatory organization to FINRA.

4

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed the operations of a broker-dealer subsidiary of a bank holding company with regard to sale of Structured Investment Vehicle (SIV-lite) Asset Backed Commercial Paper to an insurance company. Analysis included a detailed evaluation of the capital structure and vintages of the SIV-lite as well as liquidation and wind-down procedures, evaluations by Nationally Recognized Statistical Rating Organizations, and broker due diligence procedures. With regard to suitability, analysis included evaluations under the Exchange Act of 1934, Investment Advisers Act of 1940, Federal Reserve Board Regulation R, FINRA regulations and California Insurance Code requirements.

- On behalf of Wells Fargo & Company, testified at a FINRA arbitration regarding investment suitability, adviser fiduciary duties, and securities-backed lines of credit ("SBLOCs"). Analysis included use of margin under FRB Regulation T, SBLOCs under Regulation U and bank brokerage operations under Regulation R. Testimony on fiduciary duties included evolution of SEC standards contained in regulations and publications from the Division of Investment Management. Mr. Lundelius also assessed customer sophistication based on emails and text messages between the customer and the broker's registered representative.

- On behalf of regional wirehouse firms, assessed validity of short positions taken in the process of underwriting Private Investment in Public Equity Securities ("PIPEs") offerings. Analyses included compliance with short selling rules prior to PIPEs issuance, liquidity of PIPEs markets, and valuation of related securities.

- On another PIPEs matter in which the SEC alleged inflated share prices created excess compensation for an investment manager, evaluated the impact of PIPE offerings and equity lines of credit on issuer stock price, Rule 144 considerations, and valuations of securities issued.

- Testified on behalf of a private equity fund regarding appropriateness of investments in PIPEs and equity lines of credit.

- While serving on the NASDAQ Listing Qualifications Panel, evaluated multiple financing proposals by listed firms attempting to increase capital utilizing PIPEs, equity lines of credit, and similar vehicles.

- Testified at NASD enforcement proceeding regarding commissions relating to allocations of Hot IPO[13] shares brought by NASD Department of Enforcement (DOE) against Ken Langone's broker-dealer, Invemed Associates, with regard to Rule 17a-5 broker accounting and books and records requirements. Mr. Lundelius' testimony included opinions on US GAAP, US GAAS, and SEC rules and staff accounting bulletins dealing with revenue recognition, materiality and

---

[13] An IPO is a corporation's first offering of stock to the public. A "Hot IPO" or hot issue is one in which the stock immediately trades at a premium in the aftermarket because there is greater public demand for the stock than there are available shares.



financial statement presentation.   Mr. Lundelius also analyzed the impact of DOE's enforcement positions on aspects of the underwriting process such as commission rate structures and the distribution of securities to hedge funds and small investors.  NASD Panel returned a decision in favor of Mr. Langone.  In an unrelated matter, the Supreme Court of the United States cited the *Invemed* decision with regard to reasonableness of securities fees and commissions from customers who received Hot IPO allocations.[14]

- On behalf of an individual investor in a FINRA arbitration, prepared analysis of risk exposure due to portfolio concentrations in limited number of securities using margin debt.  Case was successfully settled.

- On behalf of a broker-dealer, analyzed churning claims by investor who aggressively traded in his account, with turnover in excess of 24:1, while maintaining numerous other accounts at other firms which had little turnover.  Case was successfully settled.

- On behalf of an individual investor, analyzed churning claims related to fixed income trades, including holding periods of treasury and corporate bonds, fees and markups by the broker-dealer and applicable FINRA rules.  Case was successfully settled.

- On behalf of a group of individual investors, analyzed churning claims related to fixed income trades, including holding periods of treasury and corporate bonds, fees and markups by the broker-dealer and applicable FINRA rules.  Analysis also included evaluation of "trading away claims for sale of unauthorized securities by broker representatives.

- At arbitration, testified as to propriety of closing trading windows for corporate insiders and the materiality impact on stock price, using share-trading models, had the windows remained open for an executive wishing to exercise stock options; in addition, analyzed damages using Black-Scholes, variable prepaid forward and share valuation models.

- On behalf of an executive of a major equipment supplier to the gaming industry accused of insider trading by the SEC, prepared an analysis of business plans and public disclosures, as well as published analysts' reports, to determine if inside information was public.  In addition, Mr. Lundelius analyzed market efficiency of the gambling company stock by use of an event study and other metrics, including those metrics established by his testimony in prior cases, to determine materiality.  Business plan analysis included assessment of operations and opportunities in the Las Vegas and Macau markets, the latter involving significant evaluation of Asian gambling practices and patterns.

- In federal district court in San Jose, qualified as an expert in accounting relating to the auditing and accounting for share-based payments in a stock option backdating claim brought against

---

[14] *Credit Suisse Securities (USA) LLC FKA Credit Suisse First Boston LLC, et al. v. Glen Billing, et al.,* 551 U.S. 264 (2007).



the former CFO of Maxim Integrated.[15]  Mr. Lundelius opined on documentation standards under US GAAS and accounting for options under US GAAP, including valuation and materiality.  He also opined regarding duties of a CFO of a public company, how a company prepares its financial statements and how Maxim's compensation structure compared to others.

- In federal district court for the Southern District of New York, qualified as an expert in auditing standards in a criminal proceeding involving a former KPMG partner accused of obtaining advance notice of Public Company Accounting Oversight Board ("PCAOB")[16] audit inspections. Testimony included assessment of changes made to audit work papers after the report release date for audits of publicly traded banks and financial services firms and adequacy of documentation for credit loss provisions. Relevant PCAOB standards included *AS 1001 – Responsibilities and Functions of the Independent Auditor, AS 1105 – Audit Evidence, AS 1215 – Audit Documentation, AS 2201 – An Audit of Internal Control Over Financial Reporting that is Integrated with an Audit of Financial Statements, AS 2501 – Auditing Accounting Estimates, AS 2502 Auditing Fair Value Measurements and Disclosures, AS 2601 – Consideration of an Entity's Use of a Service Organization, AS 2801 – Subsequent Events, AS 2901 – Consideration of Omitted Procedures After the Report Date, AS 2905 – Subsequent Discovery of Facts Existing at the Date of the Auditor's Report,* and *AS 4101 – Responsibilities Regarding Filings Under Federal Securities Statutes*.

- Assisted New York Stock Exchange specialist firms Van Der Moolen and LaBranch with interpretation of Exchange Rules during the Exchange's investigation of specialist interpositioning and best execution violations.  Engagements included analysis of trading systems and matching alleged violations identified by the Exchange with trade records from the specialists, examining for evidence of front-running and latency of trade execution.  Scope of the engagements involved millions of trades.

- In testimony in federal district court in Florida, refuted stock manipulation charges by SEC through analysis of the stock's illiquid market and share price movements at the time the issuer and promoters made news announcements.  Mr. Lundelius discussed measures of random walk, such as Augmented Dickey Fuller tests, bid-ask spread, and stock price reaction to news entering the market.  In his opinion, Senior Judge Gonzalez cited numerous statistics from Mr. Lundelius' testimony and report.[17]

---

[15] The court ruled that Mr. Lundelius could not opine on "whether Maxim's granting process complied with GAAP" because he had not reviewed the testimony of two witnesses.  (*SEC v. Carl Jasper*, U.S. Dist. Ct., N.D. California, No. C 07-06122, Order Re:  Motions *in Limine*, March 31, 2010).  However, the court noted that "Mr. Lundelius does not [intend to] opine whether and how the [option granting] process was actually performed and thus it was not necessary for him to review the employees' deposition transcripts."

[16] The PCAOB issues audit standards for publicly traded companies listed on US stock exchanges.  The PCAOB also inspects auditors of those public companies as well as auditors of broker-dealers.

[17] *Securities and Exchange Commission v. David Gane, et al.*, 2005 U.S. Dist. LEXIS 607; 18 Fla. L. Weekly Fed. D 401, at 35-37.

7



- In a similar case brought by the SEC in federal district court in Connecticut against a public company and brokers trading its stock, testified for defendants about specific alleged matched trades and market maker quotes preceding those trades. The jury deadlocked on some counts but found for defendants on all others. In a retrial at which Mr. Lundelius testified on quote spreads and ability to "mark the close", the jury found for the defendant stockbroker. Testimony in both cases included market efficiency analyses as demonstrated by Augmented Dickey Fuller tests of random walk and other measures of efficiency. Testimony in both Florida and Connecticut district courts, as well as subsequent case history, expanded the list of factors to consider when determining whether a security trades in an illiquid market.[18]

- Before International Chamber of Commerce International Court of Arbitration, testified regarding liquidity and market efficiency of Blackstone stock utilizing metrics established in previous case decisions.

- Further to stock manipulation claims relating to the 2010 Flash Crash, advised high frequency traders on issues relating to regulation, policy and economic issues.

- Consulted for defendants in a criminal action brought by the New York Attorney General against a securities broker and a promoter charged with selling fraudulent and unsuitable investments. On separate matters brought by the Manhattan District Attorney's office and the Office of the U.S. Attorney, consulted on IPO share allocations, marking the close and no-net-sales issues relating to brokers charged with stock manipulation and "pump and dump" schemes.

*Commodity Futures Trading and Regulation*

- On behalf of the National Futures Association ("NFA"), led the investigation of the failure of NFA auditors to detect fraud at Peregrine Financial Group, Inc. The investigation analyzed audit standards and the regulatory and operational aspects of futures commission merchants, especially United States Commodity Futures Trading Commission ("CFTC") Regulations 1.14, 1.15 for risk assessment, CFTC Regulations 1.20, 1.25 and 30.7 for segregated and secured funds and CFTC Regulation 1.17 for net capital. The investigation also included examination of NFA and Joint Audit Committee[19] procedures and an assessment of material compliance

---

[18] A list of factors to consider to determine whether a security traded in an inefficient or illiquid market were developed in *Rose CAMMER, et al., v. Bruce M. BLOOM, et al.*, U.S.D.C. New Jersey, 711 F.Supp. 1264 (1989), also known as the "Cammer Factors".

[19] The Joint Audit Committee is a representative committee of the audit and financial surveillance departments of U.S. futures exchanges and regulatory organizations, including representatives of the NFA and other self-regulatory organizations as well as representatives of the CFTC.

8



with those procedures.  The investigation produced a report of findings[20] and a report of recommendations[21] for NFA.

- On behalf of Jon Corzine and others, testified regarding the scope of CFTC Regulation 1.16 and the role of independent accountants in protecting customer funds at MF Global, Inc., a CFTC-registered futures commission merchant and a SEC-registered broker-dealer.  Analysis included application of CFTC regulations for both segregated and secured funds, and the calculation of required minimum balances for both, the availability and use of excess funds, and the interaction of FINRA rules with CFTC regulations.

- On behalf of a major investment bank, determined the compliance of a major futures commission merchant with accounting and valuation covenants in credit facilities.  Analysis included assessment of CFTC and NFA regulatory requirements, applicable US GAAP standards, and reporting requirements.  Commodities trading separate accounts and investments in commercial paper and futures positions were also assessed, as well as operations of a related global investment fund.

- Relating to a separate futures commission merchant, analyzed the corporate governance and financial reporting for offshore commodities pools, including trading operations, position management and reporting.   Mr. Lundelius consulted on third party administrator functions and duties for hedge funds, especially for foreign funds based in the Cayman Islands.

- On behalf of a futures commission merchant subject to CFTC Order, served as independent third-party reviewer, approved by the CFTC, to assess measures implemented to correct CFTC findings of inadequate supervisory procedures (Regulation 166.3) and inadequate credit and concentration risk policies and controls.  Analyses consisted of detailed examinations of position limits and credit limits and the operation of related controls.[22]

*Investment Management and Regulation*

- On behalf of the US Department of the Interior, analyzed investment practices relating to funds held in trust for Indian Nations, including adequacy of documentation, suitability of investments, and adherence to the Prudent Investor Act.  Mr. Lundelius was qualified in Federal Claims Court as an expert in prudence of trust fund investments, accounting and auditing of trusts, fiduciary duties and trust fund management.

---

[20] Report of Investigation:  Analysis of the National Futures Association's Audits of Peregrine Financial Group, Inc., http://www.nfa.futures.org/news/BRG/report_of_investigation.pdf .

[21] Recommendations Report:  Analysis of the National Futures Association's Audits of Peregrine Financial Group, Inc., http://www.nfa.futures.org/news/BRG/final_recommendations_report.pdf .

[22] In the Matter of FC Stone LLC, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, CFTC Docket No. 13-24, May 29, 2013.



- On behalf of The Reserve Fund, as part of settlement negotiations with the SEC, prepared a comprehensive cost allocation study to assess the profitability of the investment adviser and related distribution and management entities within the fund complex. In an action brought by the SEC, Mr. Lundelius testified as to damages incurred when The Reserve Fund, holding three trillion dollars of assets under management, broke the buck in September, 2008, including assessment of investor earnings and asset recoveries. In a ruling on motions in that case, Judge Gardephe stated that Mr. Lundelius was "qualified by training and experience" to offer opinions and that he considered Mr. Lundelius' report "in connection with the parties' arguments about the disgorgement remedy sought in the complaint".[23]

- On behalf of a PE fund general partner suing her other general partners for improper termination, evaluated her alleged conduct in accordance with provisions of the SEC Compliance Rule 206(4)-7, Code of Ethics Rule 204A-1, Marketing Rule 206(4)-1, and Books and Records Rule 204-2. Mr. Lundelius also supervised a team that analyzed cash flows through the PE fund waterfall models.

- On behalf of a fund manager during an SEC Wells Process, submitted an affidavit that evaluated fund returns in accordance with Global Investment Performance Standards,[24] after allocating costs to appropriate categories, including organization costs. Analysis also involved valuation of an early-stage pharmaceutical start-up firm.

- Testified, relating to an insurance claim, regarding the operations of a broker-dealer distributor within TIAA-CREF Individual & Institutional Services, Inc., a major fund complex. Testimony included analysis of servicing agreements and FOCUS reports, tracing fee reimbursements and accounting for proprietary gains and losses due to delayed transactions. Specific areas reviewed included *Brokers and Dealers Investments*, ASC 940-320-35; *Risks and Uncertainties*, ASC 270-10;[25] *Auditing Accounting Estimates, Including Fair Value Accounting Estimates, and Related Disclosures*, AU-C Section 540; SEC Staff Accounting Bulletin No. 99, *Materiality*; Section 22(e), and Rules 22c-1(a) and 2a-4(a) of the Investment Company Act.

- On behalf of a pension plan, assessed the development of investment recommendations by a major registered investment adviser, including application of ERISA standards, relating to an index arbitrage strategy utilizing an unaudited intermediary. Mr. Lundelius analyzed operational due diligence performed by the adviser as well as subsequent correspondence between the adviser and the SEC and US Department of Labor.

---

[23] Transcript of proceedings in United States District Court, Southern District of New York, before Hon. Paul G. Gardephe, March 28, 2012.

[24] Global Investment Performance Standards ("GIPS") are promulgated by the CFA Institute and are used measure and report investment portfolio performance.

[25] "ASC" refers to the Accounting Standards Codification implemented in the United States by the Financial Accounting Standards Board in 2009. References to pre-codification financial accounting standards in this *curriculum vitae* have been updated to current ASC references.



- At a criminal trial in US District Court, was qualified as an expert in accounting, pension plans and business valuation and testified on regulations relating to operations of registered investment advisers with regard to underwritings by affiliates and the related securities and ERISA requirements for pension fund clients, including SEC and US Department of Labor rulings. Testimony also included assessment of internal control and financial and securities reporting requirements under both the Investment Company Act and the Investment Advisers Act of 1940.

- On behalf of a $7 billion AUM investment adviser and under order from the SEC[26] as SEC-approved Independent Consultant to examine compliance with Sections 204(a), 206(2) and 206(4) of the Investment Advisers Act of 1940 and Rules 204-2(a)(12), 206(4)-2(a) and 206(4)-(7) thereunder, reviewed:

- Internal control over financial reporting
- Best execution, trade allocation and compliance reporting
- Investor reporting, accuracy of answers to due diligence questionnaires, and timeliness of fund audits
- Trade monitoring, risk exposure, and controls over use of inside information, cherry-picking, and front-running
- Segregation of duties and functions for related broker-dealer
- Compliance policies and procedures, including Rule 206(4)-(7) reporting
  Additional work was performed to determine if there was evidence of insider trading during the period from 2006 – 2008 and to analyze the controls over insider trading. In addition, pursuant to review of Rule 206(4)-(7), the SEC required assessment of policies and procedures for all issues listed above as well as progress reports on the implementation of remediation to any deficiencies. Two reports were filed with the SEC's Enforcement Division in Los Angeles. In addition, Mr. Lundelius held face-to-face meetings with compliance personnel of major brokerages whose customers invested with the investment adviser regarding the impact of the SEC Order, investment manager changes and control improvements.

- Analyzed portfolio investments, on behalf of a pension plan, for lack of diversification under ERISA as alleged by Department of Labor, incorporating portfolio research findings on time diversification of money with Prudent Investor standards. DOL settled under favorable terms after Mr. Lundelius' presentation of findings to opposing counsel in the Office of Solicitor.

- On behalf of pension fund customer, reviewed broker/dealer due diligence procedures for real estate direct participation programs and suitability of those programs for pension fund investment, analyzing asset allocation and fund investment policies and valuing the investment interests in each real estate entity. Case was successfully settled.

- On behalf of Fifth Third Bank, testified regarding the obligations of a private equity investment adviser when recommending investment in a premium finance lender for life settlements.

---

[26] https://www.sec.gov/litigation/admin/2011/34-64442.pdf.

11



Testimony included failures in due diligence with regard to internal control significant deficiencies and material weaknesses cited by auditors.  Analysis also included forensic tracing of expense and revenue frauds to those internal control deficiencies and weaknesses.

- At FINRA arbitration, testified, as an expert on corporate governance and fiduciary standards, on behalf of Charles Schwab & Co. regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a not-for-profit entity that invested in a Ponzi scheme.

- In a separate matter on behalf of Charles Schwab & Co., testified at FINRA arbitration regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a property and casualty insurance carrier.  Testimony included role of investment committee, investment advisers, and board oversight.

- On behalf of a registered investment adviser, testified at trial in California State Court on portfolio management, fiduciary duties, and damages relating to a long/short strategy fund. Jury returned a favorable verdict.

- In connection with regulatory investigations of research published by securities analysts, evaluated the discounted cash flow and working capital forecasts, including estimates of liquidity, earnings multiples and future funding needs, made by a Salomon Smith Barney analyst, working with Jack Grubman, for telecommunications securities, including equities and distressed high yield bonds, covered by SSB in connection with an NASD arbitration proceeding.

- In connection with a large accounting internal investigation, analyzed derivatives transactions and financial models of Freddie Mac, a major originator of mortgage bond structured securitizations and a primary dealer in treasury bonds utilizing one of the most comprehensive hedging operations in the financial services industry. Areas of investigation included extensive interviews of trading and accounting personnel, evaluation of accounting issues, assessment of bond trading systems, financial analysis of derivative transactions (impact on duration, convexity and swaption valuation using Black-Scholes), *ASC 320 - Investments* classification, issues relating to SEC Staff Accounting Bulletin No. 99, *Materiality,* and determination of economic rationale for transactions.  As part of this analysis, Mr. Lundelius also extensively reviewed and recomputed Value at Risk measurements incorporating findings from the internal investigation.

- Analyzed insider trading activities of Section 16 officers in class action and criminal prosecution matters, including valuation of vested and non-vested options, interaction with short-swing profit rule, tax implications, and SEC Rule 144 and other restrictions.

- On behalf of Lucent, analyzed damages alleged by seller due to decline in Lucent restricted stock received as payment for firm acquired by Lucent, including the timeliness of the process



for removing restrictions under Rule 144.   Damages analysis included ability of seller to hedge by use of option, costless collar, variable prepaid forward and other strategies.

- Before International Chamber of Commerce International Court of Arbitration, testified on damages suffered due to alleged failure of Blackstone to implement sales of stock held by a former partner.  Analysis included assessment of market conditions and development of sales program models under different assumptions.

- Analyzed complex derivative transactions (including Black-Scholes and Convenience Yield analyses) intended as cash flow hedges, under ASC 815 – *Derivatives and Hedging,* for energy commitments made by major utilities with regard to an earnings restatement and an SEC investigation.   In addition, while employed by a major accounting firm, Mr. Lundelius advised auditors of an international electric power company on accounting issues.

- Analyzed auditing and disclosure of derivative transactions of Safety-Kleen, a major landfill and waste disposal firm, including assessment of accounting treatment of swaptions and other instruments.

- In administrative hearing before the SEC, designed and testified regarding econometric models to determine the impact of securities trading under various market conditions, modeling securities price valuation, event analysis, the impact of institutional investor trading and the role of transfer agents. In her opinion, SEC Administrative Law Judge Foelak referenced the modeling methodology and cited extensively from Mr. Lundelius' testimony regarding his assessment of the actions that would have been taken by an "economically rational shareholder".[27]  At the hearing, Mr. Lundelius was qualified as an expert in securities valuation and as an expert in the price behavior of securities sold into thinly traded markets.

- On behalf of several high-net worth investors, investigated alleged misuse of insurance products, SEC Rule 144 offerings and master limited partnerships by family office operations at Merrill Lynch, Morgan Stanley, and major bank trust companies.  Mr. Lundelius' engagements included the suitability of these products, including product liquidity and pricing.  Estate planning was a significant issue in each case, involving the use of grantor trusts, charitable remainder trusts and other estate planning vehicles.

- For an ultra-short mutual fund, provided opinions regarding the industry practice and regulatory framework for a mutual funds' communications with the public, and the process by which communications with the public are created, reviewed, and approved.[28]  Also, Mr. Lundelius analyzed risk-return characteristics of structured finance products in the portfolio and assessed liquidity and the impact of redemptions on net asset value ("NAV").

---

[27] *In the Matter of WHX Corporation*, Initial Decision, October 6, 2000, available through the SEC's web site at http://www.sec.gov/litigation/aljdec/id173cff.htm.
[28] *Securities and Exchange Commission v. Kimon P. Daifotis, et al.,* U.S. Dist., ND Ca., No. C 11-00137 WHA, Order Granting In Part and Denying In Part Motion to Exclude Expert Opinion of Charles R. Lundelius, June 7, 2012.



- On behalf of a major fund administrator, analyzed the flow of transactional data for a master-feeder fund structure into and out of the NAV package ("NAV Pak") provided to investment advisers.  The analysis included assessment of NAV Pak data used to prepare financial statements for the funds under U.S. GAAP, including accounting for redemptions under *Financial Services – Investment Companies*, ASC 946-20-25, including reclassification from equity to redemptions payable.

- On behalf of a mutual fund president, filed an affidavit based on analysis of market timing transactions, disclosure of constraints on those transactions and the impact they had on fund operations.  Analyzed fund Class A, B and C share issues, including impact on investment performance.

- On behalf of a major mutual fund sponsor and administrator, reviewed fee structure and operational controls, including NAV calculations and sales charges for the fund complex.

- On behalf of another mutual fund, consulted on NAV calculations relating to valuation and accounting issues.

- On behalf of UBS PaineWebber, testified at NASD arbitration regarding a novel concept of broker liability for allegedly recommending the wrong type of investment adviser for a wrap account, opining on classifications of investment styles used by fund managers.  NASD panel found in favor of UBS.

*Internal Control and Supervisory Procedures*

- On behalf of the former COO of Countrywide Financial Corporation, analyzed the internal control structure at Countrywide, including specific audit, credit and loan loss committees at both the management and board levels, and assessed compliance with the COSO[29] *Internal Control - Integrated Framework* and Auditing Standards 2 and 5.  In two separate expert reports, Mr. Lundelius analyzed the due diligence process for mortgage loan securitization at Countrywide, including extensive analysis of specific procedures performed, and tied those procedures to disclosures in offering materials.  All reports assessed whether the COO could have reasonably relied upon corporate internal control for the information received.

- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, testified regarding internal control and assessed compliance with the COSO *Internal Control - Integrated Framework* at American International Group relating to reinsurance treaties and consolidation of special purpose entities.  The assessment included analysis of transfer of risk, the development of accounting guidance relating to special purpose entities ("SPEs") from 1990 – 2002, issues relating to SEC Staff Accounting Bulletin No. 99, *Materiality* ("SAB 99"), and review of the organizational and reporting structure at AIG.  In a separate

---

[29] "COSO" stands for Committee of Sponsoring Organizations of the Treadway Commission.

14



defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004.  Analysis included extensive review of audit work papers over the entire period, assessment of internal control under Mr. Greenberg and by his successors, and evaluation of the propriety of each restatement item under SAB 99.

- On behalf of Jon Corzine and others, testified regarding internal control at MF Global Holdings, Ltd., prior to bankruptcy.  Testimony included analysis of the control environment under the COSO *Internal Control - Integrated Framework*, and the analytical work performed by independent accountants, CME Group,[30] the Federal Reserve,[31] and outside consultants.  The analysis specifically looked at entity-level controls at the holding company level in detail to determine materiality of those controls to segregation of funds.

- On behalf of the SEC, testified in Administrative Hearing regarding COSO control environment, human resources and corporate governance standards relating to retention by a public company of a CFO who was subject to a bar by the Public Company Accounting Oversight Board.  Administrative Law Judge Elliot cited extensively from Mr. Lundelius' report[32] and expert testimony in his Initial Decision,[33] including Mr. Lundelius' opinion on the materiality of effectiveness of Internal Control over Financial Reporting.[34]  Subsequently, the U.S. Supreme Court ruled that SEC administrative law judges were subject to the Appointments Clause of the U.S. Constitution,[35] and that decision resulted in a new trial.  Mr. Lundelius testified in the second trial, and Administrative Law Judge Grimes quoted from Mr. Lundelius' testimony and report in his Initial Decision.[36]

- On behalf of a PE fund general partner suing her other general partners for improper termination, testified at arbitration regarding the impact of her alleged conduct on internal control designed to implement SEC Compliance Rule 206(4)-7, Code of Ethics Rule 204A-1, Marketing Rule 206(4)-1, and Books and Records Rule 204-2 using the COSO *Internal Control - Integrated Framework*.

- As consultant, assisted counsel in analysis of impact on revenue recognition of contextual information obtained by Google from certain intellectual property.  Analysis included assessment of Alphabet's financial reporting structure and identification of operating segments in which the contextual information would be monetized.

---

[30] CME Group Inc., the holding company and parent of the Chicago Mercantile Exchange and other exchanges, was the Designated Self-Regulatory Organization for MF Global, Inc., the futures commission merchant subsidiary of MF Global Holdings, Ltd.

[31] MF Global Holdings, Ltd., was a primary dealer for the New York Federal Reserve Bank.

[32] Available at https://www.sec.gov/litigation/apdocuments/3-16386-event-34.pdf.

[33] Initial Decision, dated Dec. 21, 2015, found at https://www.sec.gov/litigation/apdocuments/ap-3-16386.xml.

[34] In the Matter of Traci J. Anderson, CPA, Timothy W. Carnahan, and Cyios Corporation, Initial decision, December 21, 2015, p.18, available at https://www.sec.gov/alj/aljdec/2015/id930ce.pdf.

[35] *Lucia v. SEC*, 138 S. Ct. 2044 (2018).

[36] Initial Decision, dated Jan. 10, 2020, found at https://www.sec.gov/litigation/apdocuments/ap-3-16386.xml.



- On behalf of a sales executive at a software development firm, applied the COSO *Internal Control - Integrated Framework* to determine the scope of improper revenue recognition due to a tone at the top that allowed the use of side agreements that were hidden from auditors.  The forensic analysis included determination of personnel with knowledge of the side agreements and assessment of their roles in sales, finance and accounting.  Analysis also included examination of the role of the CFO and failures to implement proper Internal Control over Financial Reporting.

- On behalf of a member of a SEC-registered investment adviser who was allegedly wrongfully terminated due to compliance breaches, applied the COSO *Internal Control - Integrated Framework* to determine the materiality of the alleged breaches.  Analysis included assessment of SEC requirements under Rule 206(4)-7, Compliance Procedures and Practices, Rule 204A-1, Code of Ethics, Regulation D and Rule 152, Private Placements, and Rule 206(4)-1, Marketing Rule.

- As a consultant to a major publicly traded security firm responding to inquiries from the SEC, prepared an analysis of materiality of accounting errors under SAB 99.

- On behalf of a major California-based financial institution, analyzed the operations of a broker-dealer subsidiary of a bank holding company, including supervision of the processes used by registered representatives to assess investment suitability.  Mr. Lundelius also analyzed the intersection of banking and broker-dealer regulations, particularly Federal Reserve Board Regulation R and FINRA regulations.

- On behalf of an individual customer, testified on supervisory procedures relating to registered representative/insurance salesman who misappropriated customer funds while cashing out various insurance policies, opining on the intersection of insurance and securities regulations relating to supervision.

- On behalf of a senior vice president of a regional broker/dealer, opined at NASD arbitration on turnover calculations used to determine churning of investor accounts.

- Testified for and consulted with investor/plaintiffs at NASD arbitration regarding stock trading manipulation scheme, broker/dealer compliance and supervisory procedures, and damages to investors, including ability to trade in a thin market and the value of shares sold into that market.

- Consulted with hedge funds and prime brokers regarding accounting policies, trading controls, personnel changes, risk management and due diligence procedures.  Work in this field has included detection and assessment of inappropriate investment strategies ("style drift") as well as establishing monitoring controls over short selling, margin accounts and risk exposure.

*Real Estate Investment Trusts*



- On behalf of a nine-billion-dollar hedge fund, constructed the accounting systems, procedures and policies for the initial public offering ("IPO") of a Real Estate Investment Trust ("REIT"), including internal control and valuation mechanisms.

- In a FINRA Department of Enforcement action, on behalf of a leading broker-dealer marketer of non-listed public REITs, analyzed the suitability of the REIT offerings, valuation of the REIT units transacted in tertiary markets and appropriate disclosures of REIT unit values and performance in customer account statements.  Analysis included review of filings with FINRA Corporate Financing Department and analysis of communications with the public and reasonable basis suitability standards.

- On behalf of a former CFO of a publicly traded REIT, analyzed materiality of changes to non-GAAP measures published by REITs and securities analysts, as well as materiality of US GAAP restatement changes made to financial statements, under SEC Staff Accounting Bulletin No. 99, *Materiality,* subsequent to the CFO's departure.  The materiality assessment included extensive analysis of analysts' reports and securities pricing models.

*Hedge Funds and Private Equity*

- Testified, on behalf of Lynn Tilton, in SEC Administrative Proceeding regarding a private equity fund structured as a Collateralized Loan Obligation.  Testimony included discussion of private equity industry standards and valuation guidelines used to assess collateralized debt obligations, representing investments in distressed portfolio companies, for purposes of impairment and fair value.  Analysis also included the procedures used for impairment and valuation by fund personnel and related internal control, as well as due diligence procedures employed by investors.  SEC Administrative Law Judge Foelak found that Mr. Lundelius had "extensive experience in public and forensic accounting" and qualified him as an expert in those fields.  Judge Foelak ruled in favor of Ms. Tilton.[37]

- Testified in a separate matter on behalf of Lynn Tilton in NY Supreme Court regarding claims made by Norddeutsche Landesbank Girozentrale and Hannover Funding Company LLC regarding book and tax differences in capital gains, interest recognition and financial reporting relating to Collateralized Loan Obligation holdings in portfolio companies.  The jury returned a verdict for Tilton.

- Testified, on behalf of Yorkville Advisors, regarding the SEC's alleged violations by the investment adviser of fair value accounting standards under US GAAP.  Analysis included investor due diligence procedures, internal control standards, evaluated under COSO *Internal Control – Integrated Framework* standards, in place at the investment adviser, the scope of

---

[37] *In the Matter of Lynn Tilton, et al.*, Initial Decision, September 27, 2017, available through the SEC's web site at https://www.sec.gov/alj/aljdec/2017/id1182cff.pdf.



audit tests performed under US GAAS, and requirements under both *Statement of Financial Accounting Standards No. 157* and *Fair Value Measurements*, ASC 820-10-35.  With regard to the latter, analysis also included application of US Private Equity Valuation Guidelines.  Fifteen different investment positions were at issue, including investments in manufacturing, technology, oil and gas, and other industries.  After the judge limited the testimony of the SEC's valuation expert, the SEC moved to dismiss the complaint.

- Also on behalf of Yorkville Advisors, testified in a Tax Court matter regarding the impact of Australian insolvency proceedings on value of convertible debt held by YA Global Investments. Analysis included assessment of voluntary administration procedures, deed of company arrangements, and valuation of the fund's interest in the insolvency process.

- With regard to the debt and equity structure of a hedge fund, reviewed financial reporting and internal accounting records to determine treatment of subordinated debt of Bermuda and Cayman feeder investors.  Mr. Lundelius also assessed accounting for redemption requests, fund leverage, and materiality of financial statement disclosures, as well as the calculations of fees and profit sharing.

- Testified on behalf of Dutchess Capital Management and the private equity fund's offshore Cayman Islands feeder relating to appropriateness of investments by the master fund in ten portfolio companies and the performance of those companies during the 2008 financial crisis. Analysis included investor due diligence and assessment of characteristics under ASC 915 - *Development Stage Entities* and PCAOB *AS 2415 –Consideration of an Entity's Ability to Continue as a Going Concern*.  Valuations were assessed under standards of the Private Equity Industry Guidelines Group and ASC 820 – *Fair Value Measurement*.

- On another private equity fund matter in which the SEC alleged inflated share prices created excess compensation for an investment manager, evaluated the impact of PIPE offerings and equity lines of credit on issuer stock price, Rule 144 considerations, and valuations of securities issued.   Analysis included assessment of illiquid markets on lines of credit and valuations, and investor due diligence.  In a related matter, Mr. Lundelius testified on behalf of the private equity fund regarding appropriateness of investments in PIPEs and equity lines of credit.

- On behalf of a major hedge fund administrator, opined on the appropriate treatment of redemption requests under US GAAP at the master and feeder fund levels, in particular, *ASC 480 - Distinguishing Liabilities from Equity*.  Mr. Lundelius assessed the role of a hedge fund administrator and its calculation of net asset values for fund investors.

- At an international arbitration, assessed fiduciary duties of GPS Partners, an investment adviser, to clients invested in proprietary hedge funds, including reporting and governance standards of Cayman Islands and Switzerland.  Issues also included portfolio management, investor due diligence and suitability of recommendations.

18



- On behalf of a major business development corporation (a publicly traded private equity fund), assessed SEC claims of improper valuations of early stage portfolio companies.  Analysis included assessment of bankruptcy probabilities, valuation models and financial disclosures, as well as fair value standards under US Private Equity Valuation Guidelines and US GAAP.

- On behalf of investors in private equity funds invested in special purpose entities registered in the British Virgin Islands, analyzed the investment presentations and due diligence standards for portfolios of life settlement contracts and other assets to assess breaches of fiduciary duties of the managing director and chief investment officer.

- On behalf of CIBC Oppenheimer, testified at NASD arbitration as to the impact actions taken by a hedge fund's prime broker had on portfolio performance, including analysis of margin calls and the effect of share dispositions in thinly traded markets, as well as damages calculations.

*Securities Class Actions*

- Investigated accounting issues related to the bankruptcy of Global Crossing on behalf of the Special Committee of the Board of Directors, specifically reviewing fair values and revenue recognition of asset exchanges, classification of operating vs. capital (or sales-type) leases, and impact on financial reporting and debt covenants.

- On behalf of a corporate defendant, analyzed the validity of management and analysts' forecasts and their impact on the value of stock prices for $150 million securities fraud class action suit, including analysis of accounting and sales data, revenue recognition issues, and determining when management became aware of certain information. Due to findings on accounting issues, Judge Hilton (E.D. Va.) dismissed all accounting claims prior to trial and found for defendants immediately after plaintiffs presented their case.

- On behalf of plaintiffs in Zuora, Inc. class action suit, assessed assertion by opposing expert that only a portion of the stock drop could be attributed to problems with product integration in the cloud-based subscription management platform.  Analysis included review of board minutes, subscription sales pipeline models, consultants capacity models, and product integration documents for this Software as a Service company.  Analysis also included assessment of securities analysts' rationale for changes to their forecasting models and valuation multiples due to publicly available information.

19



### Valuation and Investment Banking Expertise

As to valuation, due diligence and investment banking, Mr. Lundelius has:

*Securities Valuations*

- On behalf of the founder of Tinder, Sean Rad, and his team members, in their suit against IAC and Match, testified as to the value of Tinder for purposes of assessing damages to plaintiffs' stock options.  The valuation involved assessment of cash flow models exceeding 200 spreadsheets, the determination of comparable firms in the high-growth, high-tech sector, and assessment of appropriate beta and discount rates.  The case settled for $441 million immediately after Mr. Lundelius testified.

- Testified, on behalf of Lynn Tilton, in SEC Administrative Proceeding regarding a private equity fund structured as a Collateralized Loan Obligation.  Testimony included discussion of private equity industry standards and valuation guidelines used to assess collateralized debt obligations, representing investments in distressed portfolio companies, for purposes of impairment under *ASC 310 – Receivables and ASC 326 Financial Instruments – Credit Losses* and fair value under *ASC 820 – Fair Value Measurement*.  Testimony also included discussion of the development of impairment and fair value standards over time, as well as the link between private equity valuation guidelines and fair value under US GAAP.

- In a separate matter on behalf of Lynn Tilton, calculated out-of-pocket damages related to alleged fraudulent misrepresentations by MBIA Inc. and MBIA Insurance Corp.  Engagement included collateral valuations and waterfall analysis at liquidation under various scenarios, as well as disclosures made by MBIA in SEC and statutory filings.  Mr. Lundelius also analyzed the ability of Patriarch to liquidate collateral portfolio companies and related timing and amount of dispositions.  The case settled soon after Mr. Lundelius' testimony.

- On behalf of the SEC, assisted in the investigation of alleged use of odd-lot non-agency mortgage-backed securities ("MBS") by a major fixed income fund manager to increase returns on its total return Exchange-Traded Fund.  Analysis included the determination of odd-lot exit prices under *ASC 820 – Fair Value Measurement,* compared to values of round lots, using Level 2 inputs from thinly traded markets.

- On behalf of Canadian Imperial Bank of Commerce, analyzed fair value accounting for MBS swaps from the perspective of the counterparties:  for CIBC, Canadian Institute of Chartered Accountants Accounting Handbook *Section 3855 Financial Instruments – Recognition and Measurement, IAS 39 Financial Instruments – Recognition and Measurement,* and *IFRS 13 Fair Value Measurement*;[38] for the counterparty, Cerberus Capital Management, *ASC 820 – Fair*

---

[38] "IFRS" are the International Financial Reporting Standards promulgated by the International Accounting Standards Board ("IASB").  IFRS consists of statements issued by the IASB and International Accounting Standards ("IAS") issued by its predecessor.

20



*Value Measurement*, including the role of "conservatism" in fair value.  Mr. Lundelius opined on materiality of different values of synthetic notionals in the swaps and on required representations to auditors under US GAAS.

- With regard to a hedge fund investing in small capitalization stocks, assessed market liquidity of convertible securities, including assessment of investment banking functions performed by affiliates of the hedge fund manager.  Mr. Lundelius also opined on valuations of securities and determined whether markets for those securities were active in accordance with *ASC 820 - Fair Value Measurement*.

- Consulted with publicly traded and privately held institutional investors on valuation of and accounting for auction-rate securities, mortgage-backed securities, credit default swaps and other alternative investment products, including analysis of market liquidity and impact of that liquidity on fair value under IFRS, US GAAP and insurance Statutory Accounting Principles.[39] Drawing upon federal district court decisions, including those cases in which Mr. Lundelius testified, Mr. Lundelius was able to establish whether the markets were active and allowed for orderly transactions.

- On behalf of a US investment adviser affiliate of a major European insurance carrier, evaluated accounting for investments and management stock options under *IAS 39 – Financial Instruments:  Recognition and Measurement, IAS 40 – Investment Property,* and *IFRS 2 – Share Based Payment*.  Analysis included valuation of the investment adviser and related stock options.

- On behalf of two major European insurance carriers, evaluated investment classifications under *IAS 32 – Financial Instruments Presentation, IAS 39 – Financial Instruments:  Recognition and Measurement, IAS 40 – Investment Property,* and *IFRS 7 – Financial Instruments:  Disclosures*. Additionally, Mr. Lundelius analyzed insurance risks under *IFRS 4 – Insurance Contracts* for reinsurance contracts and ceding agreements.

- On behalf of a major European financial institution, evaluated claims by the SEC regarding timely reporting of goodwill impairment under *IAS 36 - Impairment of Assets*.  Analysis involved assessment of allocation of goodwill to cash generating units and the fair value of those units, in addition to assessment of SEC Staff Accounting Bulletin No. 99, *Materiality*.  Other issues involved application of *IFRS 3 – Business Combinations, IFRS 5 – Non-current Assets Held for Sale and Discontinued Operations, IFRS 8 – Operating Segments,* and *IAS 39 – Financial Instruments:  Recognition and Measurement*.

- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, valued the investment made by an affiliate of American International Group in a special purpose entity.  Analysis included assessment of loss development for the book of

---

[39] Statutory Accounting Principles ("SAP") are the primary authoritative statutory accounting practices and procedures promulgated by the National Association of Insurance Commissioners in the United States.



business ceded to the SPE as well as application of accounting rules for other than temporary impairment in accordance with *ASC 320-10-35 - Investments – Debt and Equity Securities.*  In a separate defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004.  Mr. Lundelius led a team of CPAs who performed an extensive review of audit work papers over the entire five-year period, including accounting positions taken by AIG management under Mr. Greenberg and by his successors relating to derivatives, covered calls, dollar roll transactions, hedge funds, foreign exchange and other issues, and evaluation of the propriety of each restatement item.  The analysis consisted of assessments under US GAAP and Canadian GAAP and under US GAAS and International Standards on Auditing.

- Testified at FINRA hearing on damages relating to raiding of the high-yield securities trading unit of Gleacher, a publicly traded broker-dealer, including determination of value of the entire unit and value of registered representatives and other personnel using both market comparables and discounted cash flow methodologies, as well as event analysis of Gleacher stock trading before and after the raid.  The FINRA Panel awarded damages to Gleacher of $17.8 million.

- On behalf of Wells Fargo Advisers ("WFA"), testified as to damages resulting from the raid of an entire branch office in Arkansas in a FINRA arbitration.  The scope of work included valuing the branch as if it had been sold and as if it had been retained by WFA. Damages also included assessment of unjust enrichment of the respondent firm.  Panel awarded Mr. Lundelius' discounted cash flow fair value for the branch of $15.3 million, plus attorneys' fees and costs, to WFA.

- On behalf of Edelman Financial Engines, LLC, testified regarding the hypothetical sale and damages resulting from the alleged misuse of trade secrets when an advisor left Edelman to go to a competitor.  Analysis included assessment of whether the advisor's accounts constituted a "business" under ASC 805 *Business Combinations*, forecasting future cash flows and assessing profitability of the assets under management at issue.

- Valued multi-office broker-dealers and individual branch offices of AG Edwards and Advest regarding alleged raiding of registered representatives.  Valuation included alleged loss of investment advisory clients and confidential information resulting from alleged interference in broker employment agreements.

- Valued and testified regarding multiple-representative day-trading operations within E*Trade in NASD arbitration.  In a separate matter, valued a day-trading unit within E*Trade relating to alleged improper contract termination.  Valuation also addressed alleged loss of reputation due to the contract termination.

- Valued investment advisory unit of regional broker-dealer in alleged client theft matter.  Assets valued included alleged loss of client lists, trade secrets and other confidential information



resulting from alleged interference by investment managers that organized the departure of key investment advisory personnel.

- Analyzed and valued electronic bond trading systems for antitrust claim, including the role of institutional investors, dealers and brokers in the trading of fixed income investments.

*Securities Due Diligence*

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed investment suitability of a structured investment vehicle (SIV) and related due diligence exercised by the bank's broker in a securities lending services program when investing funds deposited by stock borrowers under that program.  Investments included asset-backed commercial paper issued prior to the Financial Crisis.  Mr. Lundelius evaluated application of the Institutional Investor Exemption of FINRA Rule 2111(b) and assessed the broker's credit approval, monitoring and compliance procedures.  Further, Mr. Lundelius analyzed liquidity and damages scenarios related to residential mortgage-backed securities held by the SIV.

- On behalf of an individual investor, investigated the failure of a registered investment adviser to perform adequate due diligence relating to investments in a Ponzi scheme, including failure to register as a broker-dealer and failure to report payments from Ponzi scheme promoters.

- Consulted with hedge funds of funds regarding due diligence procedures for prospective fund managers.

- On behalf of CIBC Oppenheimer, testified at NASD arbitration on investment due diligence procedures utilized to screen and monitor hedge funds, including development of relevant NASD standards and analysis of files, personnel testimony, emails and memoranda.

- Testified in Florida State Court on investment due diligence procedures and findings relating to capital financing of a property and casualty insurance carrier, including statutory accounting financial forecasts, surplus deficiencies and regulatory constraints. Mr. Lundelius was qualified as an expert in insurance company financing and acquisition due diligence.

- As an investment banker, structured underwritings of securities offerings for Blockbuster and Precision Tune franchises, including development of accounting and cash flow forecasts, review of franchise agreements and assessments of markets to value financial interests sold to investors.

- As basis for other investment banking underwritings, valued numerous businesses and business units in the following fields: biotechnology and medical diagnostics, real estate, oil & gas, environmental remediation, wholesale and retail distribution of consumer products, office and industrial construction, automotive and motorcycle dealerships, and service firms. Investment vehicles utilized included public offerings, private placements and master limited partnerships.



- Performed due diligence investigations of direct investment programs involving real estate, oil & gas, food processing, biotechnology and medical diagnostics for a major wirehouse and other broker/dealer clients and valued restricted stock and illiquid debt and equity investments related to those programs.

*Other Due Diligence and Valuation Matters*

- Testified in Florida state court as an expert in post-acquisition disputes regarding alleged fraud in financial reporting of the purchase of a manufacturing division by a Tier One automotive manufacturer and supplier.  Analysis involved extensive investigation of accounting reserves (*ASC 450 – Contingencies*) for acquisitions made by the seller to allegedly hide losses as well as quantification of damages due to alleged underperformance hidden by fraudulent accounting.

- On behalf of Hewlett Packard Enterprises, testified at arbitration regarding accounting treatment (under *ASC 840 - Leases*) of thousands of leases transferred in a Reverse Morris Trust business combination.  Work involved assessment of lease quantities under various scenarios and asset/liability determinations.  In addition, consulted on enterprise value calculations made by the parties during the merger process.

- Regarding a separate Reverse Morris Trust business combination involving major government defense contractors, evaluated the revenue recognition of customer advances and progress payments for government contractors.  Analysis included tax reporting under *Rev. Proc. 2004- 34, Changes in accounting periods and in methods of accounting*[40] as well as financial reporting under *ASC 912 - Contractors – Federal Government*.

- Testified in federal district court as damages expert in copyright infringement suit against publisher on issues involving marketing of copyright matter, direct mail advertising, and profitability.

- Testified in federal bankruptcy proceeding regarding the allocation of purchase price to intellectual property and goodwill for assets sold by debtor, a software developer of supply chain management systems.

- Testified in federal tax court regarding value of an interest in insolvency in an Australian mining company.  Mr. Lundelius was qualified as an expert in valuation in that matter.

- On behalf of a municipality, analyzed damages from alleged government interference in debt collection efforts by a major operator of health and fitness centers.  On behalf of a major fitness celebrity, determined damages due to alleged breach of contract by a national chain of diet centers.

---

[40] Revenue Procedures are issued by the U.S. Dept. of the Treasury Internal Revenue Service to provide guidance in the implementation of income tax regulations.

24



- On behalf of a student loan origination firm, calculated damages due to alleged servicing failures, including debt collection operations.  On behalf of a regional bank, assessed damages due to alleged servicing failures on multiple consumer loan portfolios.  For both engagements, portfolios of student and consumer loans aggregated to more than $800,000,000.  In a separate matter, after the collapse of a student loan originator, analyzed liability and damages relating to securitizations with over $400,000,000 of loan pools.

- On behalf of a regional bank, assessed dealer reserve chargebacks due to loan chargeoffs for a mortgage loan originator.  Work involved evaluating minimum reserves required and performance of loans assigned to the bank.

- On behalf of Resolution Trust Corporation, documented fraudulent lending within real estate mortgage portfolio of failed thrift, analyzing failures to follow lending policies and procedures.

- On behalf of major sports stadium association, preformed due diligence and valuation of multiple hotel properties, including franchises and luxury properties.

- Valued biotechnology patent utilizing offers in restricted stock from various early-stage biotechnology firms.

- Applied Capital Asset Pricing Model to intellectual property litigation for a $60 million polyethylene process patent claim asserted by one Fortune 50 company against two other Fortune 50 companies, including regression analyses of intermediate product values, and determined the basis for an antitrust counterclaim.

- Valued semiconductor technology, including forecasts of product development life cycles and performed R&D cost analyses for patent infringement claim by a European information technology firm against a supplier to major automotive manufacturers.

- Served as expert witness on behalf of a software development firm to assess damages, determine counterclaim under software licensing agreement and value software in suit filed by a nationwide provider of multiple listing services to real estate agents.

- Testified in federal district court on behalf of multinational food processing and distribution firm regarding damages resulting from alleged breach of exclusive territory agreement with distributor.



## Insurance Expertise

When numerous investigations by US and foreign regulators focused on finite reinsurance treaties, bid rigging and other insurance issues, Mr. Lundelius was called upon to assist in the analysis of auditing issues, risk transfer, and internal control. In the course of serving on several investigations, both in the US and in Europe, Mr. Lundelius has reviewed hundreds of reinsurance treaties in both the property and casualty and life and health segments covering workers' compensation, life, casualty and other risks worldwide.

Among his specific engagements, Mr. Lundelius:

- On behalf of Hank Greenberg and Howie Smith relating to charges brought by the New York Attorney General, testified regarding compliance with the COSO *Internal Control - Integrated Framework* at American International Group ("AIG") relating to reinsurance treaties and consolidation of special purpose entities. The assessment included analysis of transfer of risk, including *ASC 450 – Contingencies* and *ASC 944-20-15 - Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*.[41] Analysis also included review of loss development and disclosures in AIG affiliate property and casualty statutory filings, especially Schedule P. In a separate defamation case brought by Hank Greenberg against Elliott Spitzer, analyzed the 2005 restatement of AIG financial statements from 2000 – 2004. Analysis included extensive review of audit work papers over the entire period, assessment of risk transfer and other accounting positions taken by AIG management under Mr. Greenberg and by his successors, and evaluation of the propriety of each restatement item.

- On behalf of Global Bankers Insurance Group ("GBIG"), testified in New York Supreme Court regarding the bidding process for the sale of Lincoln Benefit Life Insurance Company and the representations made by GBIG relating to its bid. Assessment included extensive forensic analysis of discussions with regulators in five states and the financial condition of GBIG carriers. As to damages, Mr. Lundelius and his team analyzed actuarial cash flow projections used in the bidding process. Mr. Lundelius was qualified as an expert in Statutory Accounting Principles and acquisition due diligence under the Insurance Holding Company System Regulatory Act. In his opinion in this matter, Justice Ostrager cited Mr. Lundelius' testimony on several issues, accepted his findings on regulatory disclosure, and accepted his findings on cash flow forecasts.[42]

---

[41] An "SSAP" is a Statement of Statutory Accounting Principles for insurance companies domiciled or licensed in the United States.
[42] Decision After Trial, *GBIG Holdings, Inc., et al. v. Resolution Life L.P., et al.*, Index No. 653258/2019, May 12, 2021.



- In a separate matter, testified on behalf of GBIG in North Carolina state court relating to the fair value of affiliated assets.  Mr. Lundelius was qualified as an expert in insurance statutory accounting principles.

- On behalf of Companion Property and Casualty Insurance Company, an affiliate of Blue Cross-Blue Shield, testified regarding the operation and due diligence of fronting carriers, including reinsurance and reserve credit trusts.  Analysis also included valuation requirements of the trusts and standards required under ASC 820 – *Fair Value Measurement* and SSAP 100 - *Fair Value Measurements.*

- On behalf of Metropolitan West Securities, a unit of Wells Fargo, analyzed investment suitability of Structured Investment Vehicle (SIV-lite) Asset Backed Commercial Paper and related due diligence regarding collateral for securities loaned by California's State Compensation Insurance Fund ("SCIF").  Investments included asset-backed commercial paper issued prior to the Financial Crisis.  Evaluation included ability of SCIF to absorb losses through analysis of California Insurance Code restrictions on investments and requirements for investment approval, as well as assessment of Risk-Based Capital and other insurance reporting issues.

- On behalf of a major, publicly traded European insurance carrier, analyzed the claims made by an internal audit whistleblower relating to hedging and segregation of duties.  Analysis included assessment of macro-hedging strategy and internal control requirements under the COSO *Internal Control - Integrated Framework* and Auditing Standard 5.  In addition, Mr. Lundelius reviewed actuarial analyses, financial statements prepared under US GAAP and IFRS, and filings with US Department of Labor and the UK Prudential Regulatory Authority.

- On behalf of Lynn Tilton, analyzed the statutory filings of MBIA Insurance Corp., a monoline bond insurance carrier, and the SEC filings of its parent, MBIA, Inc.

- On behalf of a regional financial institution, testified, in Florida State Court, on investment due diligence procedures and findings relating to capital financing of a property and casualty insurance carrier that the Florida Office of Insurance claimed could have been rehabilitated.  Mr. Lundelius reviewed statutory accounting financial forecasts, underwriting practices, forecast surplus deficiencies and assessed regulatory constraints. Mr. Lundelius was qualified as an expert in insurance company financing and acquisition due diligence under the Insurance Holding Company System Regulatory Act.

- On behalf of a regional accounting firm, testified, in Texas State Court, regarding auditing and accounting issues relating to a workers' compensation carrier that the Oklahoma Insurance Department claimed was insolvent.  Mr. Lundelius analyzed audit work papers and programs, underwriting and case reserve practices, reinsurance and regulatory examinations.  Mr. Lundelius was qualified as an expert in auditing and forensic accounting, and his testimony also covered damages as a result of deepening insolvency involving valuation of the carrier on various dates.



- Consulted with a major health insurance company licensed in all US jurisdictions regarding prompt-pay requirements under workers' compensation statutes, including detailed analysis of underwriting, claims operations and reserves.  Analyses also covered financial reporting and disclosures in SEC filings and discussions with insurance regulators.

- Filed an expert report to calculate restitutionary damages for a putative class of employers that purchased a certain workers compensation insurance product from Applied Underwriters.  Analysis included assessment of product components, rate filings, National Council on Compensation Insurance data, and insurance company cost of capital.

- Was retained as an expert in reinsurance and solvency issues related to the collapse of Reliance Insurance, a major workers' compensation property and casualty carrier that was the subject of a criminal investigation.  As part of his work, Mr. Lundelius analyzed statutory and US GAAP financial statements and assessed issues related to auditing, internal control, accounting for reinsurance treaties and deposits, including *ASC 944-20-15 - Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*, and analyzed changes to risk-based capital.

- Has consulted on the structuring of finite reinsurance contracts and has been engaged by major US and European carriers to assess finite reinsurance arrangements, related to various SEC and regulatory investigations, involving US GAAP and Statutory Accounting Principles, foreign GAAP (Bermuda, France, Ireland, UK and Switzerland) and International Financial Reporting Standards.  His work has included conducting internal investigations of treaty negotiations with insurance brokers and counterparties, risk transfer analyses among captives and affiliates, and assessment of auditing and accounting practices and associated internal control, including *SSAP 61 - Life, Deposit-Type and Accident and Health Reinsurance* and *SSAP 62R - Property and Casualty Reinsurance*, as well as *ASC 944-20-15 -Reinsurance* and *IFRS 4 - Insurance Contracts*.

- Advised on restructuring of bank credit facilities for major reinsurer and its offshore special purpose reserve credit trusts for Regulation XXX, including review of *ASC 825 - Financial Instruments* and *SSAP 27 - Disclosure of Information about Financial Instruments* disclosures.  Analysis involved assessment of subprime and other illiquid instruments and determination of market values under both GAAP and Statutory Accounting Principles.

- Advised on strategic decisions relating to runoff for a $13 billion life and health reinsurer, including assessment of regulatory restrictions imposed by US, Bermudan, Irish, British and Cayman regulators, liquidity and cash flow forecasting, and US risk-based capital requirements and related capital requirements in foreign jurisdictions.  The engagement also involved extensive analysis of special purpose vehicles, including *ASC 810-10 - Consolidation – Variable Interest Entities* and *ASC 860 - Transfers and Servicing* issues, as well as *ASC 825 - Financial Instruments* and related *SSAP 27 - Disclosure of Information about Financial Instruments*.

28



- With regard to life settlement acquisitions by a major insurance carrier from an industry leading originator, evaluated transfer of risk with regard to Lender Protection Insurance Coverage ("LPIC") related to premium financing.  The evaluation included analysis of LPIC claims history, *ASC 450 – Contingencies,* and related salvage and subrogation issues.

- On behalf of Fifth Third Bank, testified regarding the obligations of a private equity investment adviser when recommending investment in a premium finance lender for life settlements.  Testimony included assessment of impact of alleged structural flaws in life settlement underwriting.  Analysis also included evaluation of required rates of return for life settlement investors.

- On behalf of a major property and casualty insurance carrier's US operations, consulted on bid rigging and market conduct investigations by numerous state insurance commissions.

- On behalf of Charles Schwab & Co., testified at FINRA arbitration regarding the appropriate governance structure and board fiduciary duties with respect to investment selection and monitoring by a property and casualty insurance carrier.  Analysis included assessment of interaction between the NAIC Model Investment Act and company-specific controls over investing, role of the NAIC SVO[43] in accordance with the Purposes and Procedures Manual of the NAIC Investment Analysis Office, permissible investments and investment disclosures on Schedule D of NAIC filings, and impact of investing on profitability and surplus.

- On behalf of several carriers, testified regarding the operations of the broker-dealer distributor within a major fund complex relating to a professional liability insurance claim.  Testimony included analysis of investment and brokerage industry terms and practices relating to delayed transactions.

- With regard to sales of insurance products to wealthy families, determined suitability relative to alternative investments.

- On behalf of major health insurer, consulted on unlocking of *ASC 944-20 -Insurance Activities* reserves, including discussions with SEC staff in the Office of Chief Accountant, and advised on *ASC 825 - Financial Instruments* and *SSAP 27 - Disclosure of Information about Financial Instruments* issues.

- On behalf of a major health insurance carrier, analyzed classifications and disclosures of investments under *SSAP 27 - Disclosure of Information about Financial Instruments* and directed negotiations with NAIC SVO on re-classification of securities.

- Has conducted internal investigations of corporate officers relating to existence of reinsurance side agreements, documentation of risk transfer analyses, and violations of auditing standards and internal control.

---

[43] "NAIC SVO" is the Securities Valuation Office of the National Association of Securities Commissioners in the United States.

Previously, Mr. Lundelius served as CFO of a life and health insurance carrier that reinsured books of business placed with major insurance companies.  As CFO, the scope of duties Mr. Lundelius performed included the following:

- Valuation of books of business and insurance company operating units for purposes of financial reporting and capital acquisition.

- Negotiation of reinsurance treaties and surplus debenture financing.

- Management of variable life and annuity investment products through captive sales force.

- Development of integrated financial and regulatory forecasting systems, including re-scoping of general ledger and chart of accounts.

- Management of and financial reporting for government bond investment portfolio.

- Participation in the NAIC pilot study for implementation of risk-based capital adequacy standards.

- Implementation of product line profitability reporting systems.

- Design of hierarchical agent commission and debit advance systems.

- Discussions with auditors and SEC regarding applications of GAAP, including *ASC 450 – Contingencies*, *ASC 944-20 - Insurance Activities,* especially *ASC 944-20-05 - Long Duration Contracts and Reinsurance*.

- Managing the audit process, internal audit and auditor inquiries.

- Translation of actuarial data and projections into financial and regulatory formats.

- Interaction with regulators, investment bankers and commercial lenders.

- Financial management of underwriting and claims functions.


**Publications and Selected Speeches**

- "Financial Firm Spotlight – Enforcement and Regulatory Developments for Asset Managers, Broker-Dealers, Hedge Funds and More", Securities Enforcement Forum West 2020, panelist, May 12, 2020.

- "How to Respond to the SEC's Increased Focus on Valuations and Impairments", Practising Law Institute, co-presenter, June 24, 2019.

- "Hedge Fund Innovation and Regulatory Enforcement", presentation before faculty and students at the Freeman School of Business, Tulane University, October 23, 2017.

- "SEC's Non-GAAP Guidance Should Be Withdrawn", *CFO.com*, May 18, 2017.

- Panelist, *Key Issues Facing Boards of Directors:  New SEC Enforcement Initiatives and Corporate Governance Risks*, April 5, 2017.

- "SEC's Expanded Use of Administrative Proceedings:  How an Expert Can Help", *Westlaw Journal Derivatives*, Vol. 20, Issue 15, June 20, 2014.

- *IFRS Conference* sponsored by the New York State Society of Certified Public Accountants Foundation for Accounting Education, Inc., panelist, October 22, 2013.

- *"Expert Witnesses:  Dos and Don'ts of Complex Securities Enforcement Cases"*, panelist, Berkeley Research Group seminar, October, 31 2013.

- "SEC Guidance on Reg FD for Social Media Communication", *Corporate Compliance Insights*, May 29, 2013, co-authored with Karina Bjelland.

- Hedge Fund Regulation Conference, speaker, London, United Kingdom, November 22, 2010.

- "Hedge Fund Disclosure:  The Best Defense for an Industry Under Siege", by Adam Cohen with contribution from Charles Lundelius, *FTI Journal*, Spring 2010, Issue 2.

- "Keeping Track of Funds To Avoid Getting Sued and Other Nasty Things", presentation at the Treasurers Workshop sponsored by the Episcopal Diocese of Washington, December, 2008.

- "Insurers Face Repercussions of New Accounting Options", *National Underwriter Property & Casualty*, December 10, 2007, co-authored with Mark Radke and John Pruitt of Dewey & LeBoeuf, LLP.

- Presentation and panel discussion at the International Reinsurance Summit, Bermuda, June 8, 2007, on reinsurance investigations and auditing procedures involving side agreements and other issues.

- "Risk Analyses Unique to Emerging Markets," *Financier Worldwide*, March, 2007.

- "Reinsurance Accounting Issues," Presentation for Practicing Law Institute *Reinsurance Law and Practice* seminar, October 7, 2005.

- "Where to find fraud in closely held companies", *The Practicing CPA*, November 2003 [adaptation of Chapter 5 of *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*].

- "Disclosing Guesswork," *The National Law Journal*, September 8, 2003.

- "Balance sheet becomes breeding ground for fraud", Journal of Accountancy, May 2003 [adaptation of Chapter 4 of *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*].

- *Financial Reporting Fraud:  A Practical Guide to Detection and Internal Control*, a book published by the American Institute of Certified Public Accountants, first edition 2003, second edition 2010.



- "Risk Management and the Audit Committee," (co-author) *The Corporate Board*, September/October 2002

- Before the American Institute of CPAs' National Conference on Fraud:

  October 31, 2002 - "CPA's Role in Securities Litigation"

  October 2, 2003 - "Forensic Accounting Case Studies"

- "Reducing the Risk of Financial Statement Fraud," Chapter 10 of *The CPA's Handbook of Fraud and Commercial Crime Prevention*, American Institute of Certified Public Accountants, March 2001.

- Presentation on financial reporting issues at the Eastern Region Fraud Conference, November 3, 2000.

- "Post Reform Act Standards for Pleading and Proving Scienter," seminar sponsored by Deloitte & Touche LLP and Kirkpatrick & Lockhart LLP, October 19, 1999.

- "How Much Is A Stock Worth?" article in *Hearsay* (published by Deloitte & Touche LLP), May 1999.

- "Beyond SAS 82: International Issues in Fraud & Forensic Accounting," before the faculty and students of the University of Virginia McIntire School of Commerce, October 21, 1998.

## Certifications

Certified Public Accountant since 1982
Accredited in Business Valuation since 2002
Certified in Financial Forensics since 2008
AICPA IFRS Certificate Program - 2015
COSO Internal Control Certificate Program - 2016

## Professional Affiliations

American Institute of Certified Public Accountants since 1983
Beta Alpha Psi Honorary Accounting Fraternity - 1978
Beta Gamma Sigma Honorary Business Fraternity - 1980

## Education

M.B.A. with a concentration in Finance, Tulane University, 1980
B.S. in Commerce with a major in Accounting, University of Virginia, 1978

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 1**

| Year | Case | Court/ Agency | Case or Docket No. | Party Represented | Deposition | Trial/ Hearing |
|------|------|---------------|--------------------|--------------------|------------|----------------|
| 2023 | Carling O'Brien v. Emerald Lake Capital Management, L.P., *et al.* | American Arbitration Association | 01-22-0001-5300 | Claimant | 1 | 1 |
| 2023 | Edelman Financial Engines, LLC v. Scott Butera | American Arbitration Association | 01-22-0003-4780 | Claimant | 1 | |
| 2022 | Commissioner of Insurance of North Carolina v. Southland National Insurance Corporation, *et al.* | North Carolina Superior Court, Wake County | 19 CVS 008664 | Respondents | | 1 |
| 2022 | Casey Roberts, *et al.*, v. Zuora, Inc., *et al.* | U.S. Dist. Ct., N.D. California | 3:19-cv-03422 | Plaintiffs | 1 | |
| 2022 | Wells Fargo Advisors, LLC, v. Raymond James Financial Services, Inc., *et al.* | Financial Industry Regulatory Authority | 20-02796 | Claimants | | 3 |
| 2018 and 2022 | Norddeutsche Landesbank Girozentrale and Hannover Funding Company LLC v. Lynn Tilton; Patriarch Partners, LLC; *et al.* | Supreme Court of the State of New York – New York County | 651695/2015 | Defendants | 1 | 1 |
| 2017 and 2021 | Lynn Tilton and Patriarch Partners XV, LLC, v. MBIA, Inc. and MBIA Insurance Corporation | Supreme Court of the State of New York – Westchester County | 68880/2015 | Plaintiffs | 1 | 1 |
| 2021 | Securitized Asset Funding 2011-2, Ltd. v. Canadian Imperial Bank of Commerce | Supreme Court of the State of New York – New York County | 653911/2015 | Defendant/ Counterclaim-Plaintiff | 1 | |
| 2021 | Sean Rad, *et al.*, v. IAC/Interactive Corp, *et al.* | Supreme Court of the State of New York – New York County | 654038/2018 | Plaintiff/ Counterclaim-Defendant | 1 | 1 |
| 2021 | Securities and Exchange Commission v. Mack and Blaney | U.S. Dist. Ct., Minnesota | 19-cv-918 | Defendant Blaney | 1 | |
| 2021 | Southland National Insurance Corporation, in rehabilitation, *et al.* v. Academy Association, Inc., *et al.* | North Carolina Superior Court | 19 CVS 013093 | Defendant | 1 | |
| 2020 | Paul C. Schorr IV and BG/BLK-1 LP v. The Blackstone Group, Inc, *et al.* | ICC International Court of Arbitration | 25390/MK/PDP | Claimants | | 1 |
| 2020 and 2021 | GBIG Holdings, Inc. v. Resolution Life L.P., *et al.* | Supreme Court of the State of New York – New York County | 650575/2019 653258/2019 | Plaintiffs/ Counterclaim Defendants | 1 | 1 |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 2**

| Year | Case | Court | Number | Role | | |
|---|---|---|---|---|---|---|
| 2020 | YA Global Investments, LP, et al. v. Commissioner of Internal Revenue | US Tax Court | 14546-15 | Petitioners | 1 | 1 |
| 2019 | Maurice R. Greenberg v. Eliot L. Spitzer | Supreme Court of the State of New York – Putnam County | 1436/2013 | Plaintiff | 1 | |
| 2015 and 2019 | In the Matter of Cyios Corporation, et al. | United States Securities and Exchange Commission | 3-16386 | SEC Division of Enforcement | | 2 |
| 2019 | United States of America v. David Middendorf, et al. | U.S. Dist. Ct., S.D. New York | 18 CRIM 036 | Defendant | | 1 |
| 2019 | DXC Technology Company v. Hewlett Packard Enterprise Company | International Institute for Conflict Prevention & Resolution | | Defendant | 1 | 1 |
| 2018 | Christopher and Lori Davis v. Wells Fargo Advisers, LLC; Wells Fargo Bank, N.A.; Wells Fargo & Company | American Arbitration Association | 01-14-0001-6223 | Respondents | | 1 |
| 2017 | Companion Property and Casualty Insurance Company v. U.S. Bank National Association | U.S. Dist. Ct., South Carolina | 3:15-1300-JMC | Plaintiffs | 1 | |
| 2017 | Securities and Exchange Commission v. Yorkville Advisors, LLC, et al. | U.S. Dist. Ct., S.D. New York | 12 CIV 7728 | Defendants | 2 | |
| 2017 | Nina Investments, LLC, v. Fifth Third Bank, et al. | Circuit Court of Cook County, Illinois | 2012 L 007547 | Defendants | 1 | |
| 2016 | In the Matter of Lynn Tilton; Patriarch Partners, LLC; et al. | United States Securities and Exchange Commission | 3-16462 | Respondents | | 1 |
| 2016 | TIAA-CREF Individual & Institutional Services, Inc., et al. v. Illinois National Insurance Company, et al. | Delaware Superior Court (New Castle) | N14C-050178-JRJ(CCLD) | Defendants | 1 | |
| 2016 | Cannonball Fund, Ltd., et al., v. Dutchess Capital Management, LLC, et al. | Commonwealth of Massachusetts | Civil Action No. 11-2307 | Defendants | 1 | |
| 2016 | International Fidelity Insurance Company v. Charles Schwab & Co., Inc. | Financial Industry Regulatory Authority | 14-02620 | Respondents | | 1 |
| 2015 | In re MF Global Holdings, Ltd., Investment Litigation | U.S. Dist. Ct., S.D. New York | 1:11-cv-07866 | Defendants | 1 | |
| 2015 | Gleacher & Company Securities, Inc. v. Robert W. Baird & Co. Incorporated, et al. | Financial Industry Regulatory Authority | 13-00608 | Claimants | | 2 |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 3**

| | | | | | | |
|---|---|---|---|---|---|---|
| 2014 | [Individual] v. Jackson National Life Insurance Co. and Prudential, PLC. | U.S. Dept. of Labor | 2013-SOX-00047 | Respondents | | 1 |
| 2014 | The People of the State of New York v. Maurice R. Greenberg and Howard I. Smith | Supreme Court of the State of New York – New York County | 401720/05 | Defendants | 1 | |
| 2014 | Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, *et al.* | U.S. Dist. Ct., Massachusetts | 11-cv-10414-MRP | Respondents | 1 | |
| 2014 | Hillcrest Children's Center, *et al.* v. Charles Schwab & Co., Inc. | Financial Industry Regulatory Authority | 13-00664 | Respondents | | 1 |
| 2014 | Acument Global Technologies, Inc., *et al.* v. Towers Watson & Co., *et al.* | U.S. Dist. Ct., S.D. New York | 1:12-cv-00506-LLS | Plaintiffs | 1 | |
| 2014 | Pasha Anwar, *et al.* v. Fairfield Greenwich Limited, *et al.* | U.S. Dist. Ct., S.D. New York | 09-cv-118 | Defendants | 1 | |
| 2013 | Pine Street Associates, L.P. v. Southridge Partners, L.P., Southridge Capital Management, LLC, and Southridge Advisors, LLC | Supreme Court of the State of New York, County of New York | 652109/2010 | Respondents | 1 | |
| 2013 | Eastham Capital Appreciation Fund LP, et al., v. KPMG LLP | International Institute for Conflict Prevention & Resolution | | Respondents | | 1 |
| 2013 | Texas A&M Foundation v. Strategic Investment Management, L.P. and Strategic Investment Partners, Inc. | American Arbitration Association | 16 148 Y 00396 10 | Claimants | | 1 |
| 2013 | Anders and Elizabeth Hejlsberg, derivatively on behalf of Cornerstone Alternative Fixed Income Fund, L.P., as a Limited Partner, v. Cornerstone Portfolio GP, LLC, Keith J. Schafer, Robert Trenner, Kenneth Hart and Cornerstone Advisors, Inc. | American Arbitration Association | 75-512-Y-000062-12 JMLE | Claimants | 1 | |
| 2012 | Securities and Exchange Commission v. Southridge Capital Management LLC, Southridge Advisors LLC, and Stephen M. Hicks | U.S. Dist. Ct., Connecticut | 3:10-cv-01685 | Defendants | 1 | |
| 2012 | Securities and Exchange Commission v. Kimon P. Daifotis and Randall Merk | U.S. Dist. Ct., N.D. California | CV-11-cv-137 | Defendants | 1 | |
| 2012 | State Compensation Insurance Fund v. Metropolitan West Securities LLC; Wachovia Bank, N.A.; *et al.* | U.S. Dist. Ct., N.D. California | CV 09 2959 JSW (EDL) | Defendants | 1 | |
| 2011 | Securities and Exchange Commission v. Lisa C. Berry | U.S. Dist. Ct., N.D. California | C-07-04431 RMW | Defendant | 1 | |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 4**

| 2011 | Securities and Exchange Commission v. R. Brooke Dunn and Nicholas P. Howey | U.S. Dist. Ct., Nevada | 2:09-CV-02213-PMP-LRL | Defendant | 1 | |
| 2011 | Securities and Exchange Commission v. Reserve Management Company, Inc., Resrv Partners, Inc., Bruce R. Bent, Sr. and Bruce R. Bent II | U.S. Dist. Ct., S.D. New York | 09 Civ. 4346 (PGG) | Defendants | 1 | |
| 2011 | Hampton Investments, Ltd.; Oakdale Investments, Ltd.; Seacliff Investments, Ltd.; and Stephen Finlay v. GPS Partners, LLC; GPS New Equity Fund (Cayman), Ltd.; and GPS Income Fund (Cayman), Ltd. | American Arbitration Association | 50512 T 00097 10 | Defendants | | 1 |
| 2010 | Elliot Horowitz v. Gardner Lewis Asset Management | California Superior Court for the County of Los Angeles | BC406551 | Defendants | 1 | 1 |
| 2009 - 10 | Securities and Exchange Commission v. Carl W. Jasper | U.S. Dist. Ct., N.D. California | CV 07-6122 | Defendant | 1 | 1 |
| 2008 | Charles O. Bradley Trust, et al., v. Zenith Capital, LLC, *et al.* | U.S. Dist. Ct., N.D. California | C 04 2239 JSW (EMC) | Plaintiffs | 1 | |
| 2008 | Kim Holland, Insurance Commissioner of the State of Oklahoma, as Receiver of Petrosurance Casualty Company, v. Murrell, Hall, McIntosh & Co., PLLP, *et al.* | District Court – 44th Judicial District, Dallas County, Texas | 04-01687-B | Defendants | 3 | 1 |
| 2006 | Steven Maass v. E*Trade Professional Trading, LLC, *et al.* | Financial Industry Regulatory Authority | 03-01763 | Respondents | | 1 |
| 2006 - 8 | Securities and Exchange Commission v. Competitive Technologies, Inc., *et al.* | U.S. Dist. Ct., Connecticut | 3:04-cv-1331-JCH | Defendants | 1 | 2 |
| 2005 - 6 | The Osage Nation and/or Tribe of Indians of Oklahoma v. The United States of America | Federal Claims Ct. | 99-550 & 00-169 L | Defendant | 1 | 1 |
| 2005 - 6 | Breed Technologies, Inc. v. AlliedSignal, Inc. | FL Cir. Ct., 10th Dist. | G-99-2478 | Plaintiff | 3 | 2 |
| 2005 | In re:  Galaxy Computer Services, Inc. | U.S. Dist. Ct., E.D. Va. | CA 1:2004CV1036 | Plaintiff | | 1 |
| 2005 | National Association of Securities Dealers Department of Enforcement v. Invemed Associates, LLC | Financial Industry Regulatory Authority | Disciplinary Proceeding No. 030014 | Respondent | | 1 |
| 2005 | Jo Ann Oster, et al. v. CIBC World Markets Corp., *et al.* | Financial Industry Regulatory Authority | 03-07585 | Respondents | | 1 |
| 2004 | National Rural Electric Cooperative Association, et al. v. Breen Capital Services Corporation, *et al.* | U.S. Dist. Ct., New Jersey | 2:00cv00722 | Plaintiffs | 1 | |
| 2004 | United States of America v. Nathan A. Chapman, Jr. | U.S. Dist. Ct., | WDQ-03-0301 | Defendant | | 1 |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 5**

| | | Maryland | | | | |
|---|---|---|---|---|---|---|
| 2004 | Securities and Exchange Commission v. David Gane, *et al.* | U.S. Dist. Ct., S.D. Florida | 03-61553-CIV-Seitz/Bandstra | Defendants | 1 | 1 |
| 2004 | Mountain States Mutual Casualty Company v. UBS PaineWebber, Inc. | Financial Industry Regulatory Authority | 02-05813 | Respondent | | 1 |
| 2003 | Hermann Holdings, Ltd., et al. v. Lucent Technologies Inc. | U.S. Dist. Ct., N.D. Texas | 3:01-CV-0625-G | Defendant | 1 | |
| 2003 | In re:  The Receivership of Dealers Insurance Company | Second Judicial Circuit Court, Leon County, Fl. | 94-4009-A | Defendant | 1 | 1 |
| 2002 | In re:  SpaceWorks, Inc. | U.S. Bankruptcy Court, Md. | 01-17875-PM | Unsecured Creditors | 1 | 1 |
| 2001 | InterVest Financial Services, Inc. v. Bear Stearns Co., Inc., *et al.* | U.S. Dist. Ct., E.D. Pa. | 99-CV-5463 | Defendants | 1 | |
| 2001 | Carabetta v. Novadigm, Inc., *et al.* | American Arbitration Association | 74 160 01455 00 AD1 | Plaintiff | 1 | 1 |
| 2000 | Bennett v. Wheat First Union, *et al.* | Financial Industry Regulatory Authority | 99-02219 | Claimant | | 1 |
| 1999 | Helman v. Mendelson, *et al.* | Circuit Court of Maryland for Montgomery County | CA 195927 cons 195925 | Plaintiff | 1 | |
| 1999 | In the Matter of WHX Corporation | United States Securities and Exchange Commission | 3-9634 | Respondent | | 1 |
| 1999 | American Federal Savings Bank v. Harry L. Leavy | Circuit Court of Maryland for Montgomery County | 167641–V | Plaintiff | | 1 |
| 1998 | Berliner Specialty Distributors v. Conopco a/k/a Good Humor-Breyers Ice Cream | U.S. Dist. Ct., E.D. Va. | 98-143-A | Defendant | 1 | 1 |
| 1998 | Associated Financial Group v. Chevy Chase Bank | U.S. Dist. Ct., E.D. Va. | 2:97 CV 985 | Defendant | 1 | |
| 1997 | White v. Cahoon and Anchor National, *et al.* | U.S. Dist. Ct., N.D. Miss. | 4:95 CV 374-B-B | Plaintiff | 1 | |
| 1997 | Powter v. Nutri/System L.P. *et al.* | U.S. Bktcy. Ct., C.D. Cal. | LA 95-10009-SB | Plaintiff | 1 | |

**CHARLES R. LUNDELIUS, JR., CPA/ABV/CFF**
**Expert Testimony Case History**
**Page 6**

| 1997 | Weiner, *et al.* v. Dickinson & Co., *et al.* | Financial Industry Regulatory Authority | 95-04047 | Claimants | | 1 |
|---|---|---|---|---|---|---|
| 1996 | Robinson v. R&R Publishing, Inc. | U.S. Dist. Ct., D.C. | 95-CA-00833 | Plaintiff/ <br><br> Cross-Defendant | | 1 |
| 1996 | Frank W. Griswold, III, *et al.* v. The United States of America | U.S. Dist. Ct., M.D. Fla. | 93-565-CIV-T-23A | Defendant | 1 | |
| 1995-1996 | In the Matter of Lend Lease Trucks, Inc. | Pennsylvania Department of Revenue and Board of Finance and Revenue | 421919 MCRT | Petitioner | 1 | 1 |
| 1995 | Simos v. Metzger Construction Co. and Sub-Zero Freezer Co. | 125th Judicial Dist. Ct. of Harris Co., Tex. | 91-016216 | Plaintiff | | 1 |
| 1994 | Forman Brothers, *et al.,* v. The Law Firm of Graham & James, *et al.* | Superior Ct. for the District of Columbia | CA 92-7919 | Defendants | 1 | |
| 1994 | Stoneman v. Stoneman | Henrico Co., Va. Cir. Ct. | CH-91- 001234 | Plaintiff | 1 | * |
| 1994 | Ace Sign v. Southwestern Bell Yellow Pages, Inc. | 58th Judicial Dist. Ct., Jefferson Co., Tex. | A-137,152 | Defendant | 1 | |
| 1993 | UST Services, Inc., v. Southwestern Bell Yellow Pages, Inc. | 234th Judicial Dist. Ct., Harris Co., Tex. | 91-055806 | Defendant | 1 | |
| 1992-1994 | Tele-A-Call Answering Service v. Southwestern Bell Yellow Pages, Inc. | 122nd Judicial Dist. Ct., Galveston Co. Tex. | 90CV0917 | Defendant | 1 | 1 |

\* Deposition testimony entered at trial.

## APPENDIX B: MATERIALS CONSIDERED

**Bates-Stamped Documents**

- PL00212936-59
- PL00212960-83
- PL00212984-3014
- PL00213015-41
- PL00213042-69
- PL00213070
- PL00217569
- PL00213086
- PL00212151
- PNC0035060-99
- PNC-R0033370-71
- PNC0040802
- PNC0040803
- PNC0040804
- PNC0036904
- PL00213071
- PL00136485-545
- PL00136546-66

- PL00209442-91
- PL00022323-351
- PL00177168-220
- PL00105658-700
- PL00179065-125
- PL00213085 and PL00213085-R
- PNC0031798
- PL00000816-25
- PL00000463-94
- PL00213751-56
- PNC0036906
- PNC0036902
- PNC0036903
- PNC0036905
- PNC0036907
- PNC0035422-26
- PNC0035213
- PNC0035214

**Case Filings**

- *In the matter between The PNC Financial Services Group, Inc., v. Plaid, Inc.*

    o First Amended Complaint, filed July 8, 2021
    o Plaid's Response to PNC's Request for Production Nos. 9, 16 (First Set), October 14, 2022
    o Plaid's Responses and Objections to PNC's Third Set of Interrogatories, December 5, 2022
    o Plaid's Letter Concerning Plaid's Revenue Analysis, December 9, 2022
    o Plaid's Supplemental Responses and Objections to PNC's Third Set of Interrogatories, December 23, 2022
    o PNC's Supplemental Responses to Interrogatory Numbers 14-15, 19, 21, and 25 from Plaid's Third Set of Interrogatories, February 17, 2023
    o Plaid's Letter Concerning Plaid's Financial Data, March 20, 2023
    o Plaid's Supplemental Responses to PNC's First Set of Interrogatories, April 12, 2023
    o Plaid's Second Supplemental Responses and Objections to PNC's Third Set of Interrogatories, April 12, 2023
    o PNC Letter to Plaid, Additional Information for PNC Excel Files, September 15, 2023

1

**Deposition Testimony**

- Samuel Schuster Deposition, December 13, 2022 (with exhibits)
- George Zachary Perret Deposition, July 10, 2023
- Chad Ballard Deposition, January 19, 2023 (with exhibits)
- Karen Larrimer Deposition, April 14, 2023 (with exhibits)
- Rajarshi Chakravorti Deposition, March 22, 2023 (with exhibits)
- Natalie Talpas Deposition, February 27, 2023 and March 1, 2023
- William Hockey Deposition, February 23, 2023
- Deborah Guild Deposition, February 28, 2023
- Emeline Minor Deposition, May 19, 2023

**Other Materials**

- PNC's LTV calculation for consumer customers
- Financial Accounting Standards Board, Accounting Standards Codification
- 12 CFR Part 1005, Electronic Funds Transfers (Regulation E)
- CapitalIQ
- https://www.pnc.com/en/about-pnc/media/facts-about-pnc.html
- https://plaid.com/data-connectivity/
- https://plaid.com/plaid-link/
- https://plaid.com/for-financial-institutions/
- https://plaid.com/company/
- https://plaid.com/docs/
- https://plaid.com/docs/link/
- https://plaid.com/how-it-works-for-consumers/
- https://plaid.com/how-we-handle-data/
- https://plaid.com/blog/inside-link-design/
- https://plaid.com/blog/more-improvements-to-help-users-find-their-bank-in-link/
- https://www.ey.com/en_nl/banking-capital-markets-transformation-growth/a-fintech-journey-what-to-consider-when-growing-from-start-up-to-scale-up
- https://www.bis.org/publ/qtrpdf/r_qt2109c.htm
- https://www.startups.com/library/expert-advice/series-funding-a-b-c-d-e
- https://www.bcg.com/publications/2023/future-of-fintech-and-banking
- https://fred.stlouisfed.org
- https://pages.stern.nyu.edu/~adamodar/
- https://www.nacha.org/news/which-60-days-it-understanding-different-periods-regulation-e-and-nacha-rules

All other materials cited in the report.

2

Exhibit: Future Plaid Gross Profits Attributable to PNC Customers

# S&P Capital IQ

**Plaid Inc. > Quick Comparable Analysis > Operating Statistics**

| Details | |
|---|---|
| Template: | Capital IQ Default Comps |
| Currency: | US Dollar |
| As-Of Date: | Jan-01-2022 |

| Company Comp Set | Business Description | |
|---|---|---|
| **Company Name** | | **5 Year Beta** |
| **Envestnet, Inc. (NYSE:ENV)** | Envestnet, Inc., together with its subsidiaries, provides wealth management software and services in the U.S. and internationally. The Envestnet Wealth Solutions segment provides an end-to-end open architecture wealth management platform, trading, rebalancing, portfolio accounting, performance reporting, and client relationship management software, and goals-based financial planning solutions to the financial services industry. The Envestnet Data & Analytics segment provides a data aggregation, data intelligence, and experiences platform that enables consumers to aggregate financial accounts within client applications. The company serves retail banks, credit unions, credit card providers, wealth management financial advisors and institutions, research and analyst firms, personal financial management, small business accounting, e-commerce, payment solutions providers, small business lending, and authentication customers. Envestnet, Inc. was founded in 1999 and is headquartered in Berwyn, Pennsylvania. | 1.23 |
| **Mitek Systems, Inc. (NasdaqCM:MITK)** | Mitek Systems, Inc. provides mobile image capture and digital identity verification solutions worldwide. Its product portfolio includes Mobile Deposit that enables individuals and businesses to remotely deposit checks using their camera-equipped smartphone or tablet; Mobile Verify, an identity verification solution that is integrated into mobile apps, mobile websites, and desktop applications; and Mobile Fill, which includes automatic image capture, minimizes the numbers of clicks, and expedites form fill completion. Mitek Systems, Inc. was incorporated in 1986 and is based in San Diego, California. | 0.36 |
| **Intuit Inc. (NasdaqGS:INTU)** | Intuit Inc. provides financial management and compliance products and services for consumers, small businesses, self-employed, and accounting professionals in the United States, Canada, and internationally. The company operates in four segments: Small Business & Self-Employed, Consumer, Credit Karma, and ProTax. The Small Business & Self-Employed segment provides QuickBooks services, that includes financial and business management online services and desktop software, payroll solutions, time tracking, merchant payment processing solutions, and financing for small businesses. The Consumer segment provides TurboTax income tax preparation products and services. The Credit Karma segment offers consumers with a personal finance platform that provides personalized recommendations of home, auto, and personal loans. The ProTax segment provides desktop tax-preparation software products, electronic tax filing service, and bank products and related services. The company was founded in 1983 and is headquartered in Mountain View, California. | 1.03 |
| **Fiserv, Inc. (NYSE:FI)** | Fiserv, Inc., together with its subsidiaries, provides payment and financial services technology worldwide. The company operates through Acceptance, Fintech, and Payments segments. The Acceptance segment provides point-of-sale merchant acquiring and digital commerce service, mobile payment services, security and fraud protection products, an omnichannel commerce solution, a cloud-based point-of-sale and business management platform, and an independent software vendors platform. The Fintech segment offers customer deposit and loan accounts, as well as manages an institution's general ledger and central information files. The Payments segment offers card transactions, such as debit, credit, and prepaid card processing and services; security and fraud protection products; card production; print services; and various network services, as well as non-card digital payment software and services, including bill payment, account-to-account transfers, person-to-person payments, electronic billing, and security and fraud protection products. Fiserv, Inc. was incorporated in 1984 and is headquartered in Brookfield, Wisconsin. | 0.84 |
| **Metro One Telecommunications, Inc. (OTCPK:WOWI)** | Metro One Telecommunications, Inc. provides mobile commerce platform that enables retailers to launch their own branded mobile application in the United States. Its Mobile Commerce Merchant Platform allows small and medium-sized business retailers and enterprises to launch a branded and functional mobile app; Mobile Commerce Enterprise Platform that enables enterprise retailers, who own and operates brick and mortar store, as well as e-commerce platforms to engage with their customer online and in-store through the customer's mobile application; and Instore engagement Suite solutions. Metro One Telecommunications, Inc. was incorporated in 1989 and is based in Sheridan, Wyoming. | 5.92 |
| **CoreCard Corporation (NYSE:CCRD)** | CoreCard Corporation, together with its subsidiaries, offers technology solutions and processing services to the financial technology and services market in the United States, Europe, and the Middle East. It designs, develops, and markets a suite of software solutions to program managers, accounts receivable businesses, financial institutions, retailers, and processors to manage their credit and debit cards, prepaid cards, private label cards, fleet cards, buy now pay later programs, loyalty programs, and accounts receivable and loan transactions. The company's software solutions allow companies to offer various types of transacting account or card issuing program, as well as installment and revolving loans; set up and maintain account data; record advances and payments; assess fees, interests, and other charges; resolve disputes and chargebacks; manage collections of accounts receivable; generate reports; and settle transactions with financial institutions and network schemes. CoreCard Corporation was founded in 1973 and is headquartered in Norcross, Georgia. | 0.87 |

| Summary Statistics | | 5 Year Beta |
|---|---|---|
| **High** | | **5.92** |
| **Low** | | **0.36** |
| **Mean** | | **1.71** |
| **Median** | | **0.95** |

Note: CapitalIQ identified a set of companies it determined to be comparable to Plaid. I evaluated the business descriptions of these companies and excluded Salesforce, Inc. because it does not operate in the fintech space, and SPS Commerce, Inc and Kaspien Holdings, Inc. because I did not consider their respective business operations to be comparable to that of Plaid.

Values converted at today's spot rate.

CapIQ Comps