# EXHIBIT 02

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

-----------------------------

THE PNC FINANCIAL SERVICES GROUP, INC.,

     Plaintiff,

v.

PLAID, INC.,

     Defendant.

-----------------------------

Videotaped Deposition of

CHARLES R. LUNDELIUS, JR., CPA, ABV, CFF

Washington, D.C.

November 3, 2023

9:00 a.m.

Stenographically Reported

By:  Goldy Gold, RPR

Job No.  J10436916



CHARLES LUNDELIUS

BY MS. ZOSCHAK:

Q.    Okay.  Similarly, if you cited the document, does that mean you believed it to be true?

MR. BRENNAN:  Object to form.

THE WITNESS:  If I cited to a document and the document, say, came from -- from Plaid in the course of discovery, I had certainly put some reliance on that document.  I have no way of independently verifying it.

BY MS. ZOSCHAK:

Q.    You call that documents from Plaid. Did you have a way of verifying the veracity of PNC documents?

A.    Yes, but only by either reading a deposition or a conversation with a -- someone from PNC.  But again, we have to pretty much take that at face value as well.

Q.    Mr. Lundelius, are you aware that PNC submitted other expert reports in this matter?

A.    I am aware, yes.

Q.    Did you review any of those other



CHARLES LUNDELIUS

reports?

A.    No, I did not.

Q.    Do you reference in your report discussions with a Mr. Todd Renner?

A.    I did.

Q.    Did you rely on your discussions with Mr. Renner?

MR. BRENNAN:  Object to form.

THE WITNESS:  I got information from him with regard to the operations of the -- of the fraud activity that PNC had to deal with, so that was more like -- I think it was more background information for purposes of my report.

BY MS. ZOSCHAK:

Q.    Let's turn to page 34 of your report, please.

A.    So in paragraph 70, you say, "I understand from Mr. Renner," and then footnote 125 cites to "discussion Todd Renner on October 4, 2023."

Do you have any other basis for understanding what is contained in that sentence?

MR. BRENNAN:  Object to form.  And,



CHARLES LUNDELIUS

Charles, please feel free to review the paragraph that she just referenced.

BY MS. ZOSCHAK:

Q.    That's fine.

MR. BRENNAN:  Object to form.

THE WITNESS:  We have the assumption, yes, or the information from Mr. Renner.  Then we were able to look at PNC records with regards to the fraudulent activity.  You had, essentially, two sets of the records.  One set that -- where people, I'll say, closed accounts due to the fraud, and they stated that as a reason, and they had a relationship with Plaid through some fintech app.  And then



CHARLES LUNDELIUS

a separate set that was used -- a separate sets of PNC customers who closed their accounts that did not state a reason.  But we found that the closure of those accounts occurred within about the same timeframe as the closure of accounts where people did identify fraudulent activity as the reason for closing those accounts.  So in other words, I'm telling you we have a way of, in a sense, testing some of the -- of the representation made by Mr. Renner by looking at the -- at the PNC data.

BY MS. ZOSCHAK:

Q.    We'll discuss those files later on in more detail.  But to close the loop here, how many conversations did you have with Mr. Renner?

MR. BRENNAN:  Object to form.

THE WITNESS:  The one that I referenced here.

BY MS. ZOSCHAK:

Q.    Just the one on October 4, 2023?

A.    Yes.

Q.    Was this in person?

A.    It was virtual.



CHARLES LUNDELIUS

Q.    Approximately, how long did you speak with Mr. Renner?

A.    I think it may have run at least 30 minutes, perhaps a little longer.

Q.    Who was present for that conversation?

A.    It was Mr. Brennan, as well as, I think, two members of my staff.

Q.    Did you take notes during this conversation?

A.    No.

Q.    Do you know if either member of your staff took notes?

A.    I'm not aware of it, no.

Q.    And you discussed this fraud ACH instant with Mr. Renner?

A.    Yes, that's -- that's essentially the purpose behind the conversation, yes.

Q.    Did you discuss anything else?

A.    No, not that I recall.

Q.    Did you have discussions with any of PNC's other experts?

A.    No.

Q.    Let's look at page 14 of your



CHARLES LUNDELIUS

10:02

10:02

10:02

A.    It's the unjust enrichment calculation as the end of 2022.    10:02

Q.    Are you offering any opinion that that number has changed?    10:03

MR. BRENNAN:  Object -- I'm sorry.    10:03

Changed?    10:03

BY MS. ZOSCHAK:    10:03

Q.    Since 2022?    10:03

A.    I have no other independent analysis past -- past that point, so no, I have not.  I have yet been asked to update it since 2022.    10:03

Q.    And to go back to what I read earlier, "PNC unwittingly contributed a valuable asset to Plaid."    10:03

Is that asset its customers?    10:03

A.    The asset was the -- well, the asset was the customer accounts that then provided a revenue stream to -- to Plaid.  That revenue stream then was incorporated into the valuation of Plaid as to the various funding sequences that went through -- that they went through.    10:03



CHARLES LUNDELIUS

Q.    So PNC contributed customer accounts to Plaid?    10:04 10:04

A.    No, they -- PNC is not contributing customer accounts.  They're contributing the connection to those accounts, which then give rise to revenues to Plaid.    10:04 10:04 10:04 10:04

Q.    Mr. Lundelius, do you -- it is a consumer's choice whether to use a fintech app, correct?    10:04 10:04 10:04

MR. BRENNAN:  Object to form.    10:04

THE WITNESS:  That's what they're meant for, it's for consumers.  So yes, the consumer has a choice.    10:04 10:04 10:04

BY MS. ZOSCHAK:    10:04

Q.    Can a bank account make you sign up for a fintech app?    10:04 10:04

A.    I'm not aware of that happening.    10:04

Q.    Lastly, so you state you calculated damages based on PNC's actual/compensatory damages.    10:04 10:04 10:05

Do you understand those to be two different categories?    10:05 10:05

A.    No, I think it's an actual damage. It is a compensatory damages calculation.  So    10:05 10:05



CHARLES LUNDELIUS

it's one and the same.                                          10:05

Q.      And what are the actual or                       10:05
compensatory damages that you calculated in this            10:05
matter?                                                          10:05

A.      Well, they -- they're described in              10:05
paragraph 32 in the summary and then later in the           10:05
report.  And those total to $848,522.                       10:05

Q.      So there are $224,419 for ACH                    10:05
dispute reimbursements?                                         10:05

A.      That's correct, yes.                             10:05

Q.      And $31,335 for ACH dispute                      10:05
investigation costs?                                           10:06

A.      Right.                                           10:06

Q.      And 592,768 for lost customer                    10:06
accounts?                                                      10:06

A.      Yes.                                             10:06

Q.      And those are the total of actual or             10:06
compensatory damages you were offering an opinion           10:06
on?                                                           10:06

MR. BRENNAN:  Object to form.                 10:06

THE WITNESS:  Yes.                            10:06

BY MS. ZOSCHAK:

Q.      Your report does not contain                     10:06
opinions on any other types of damages, correct?            10:06



800.211.DEPO (3376)
EsquireSolutions.com

CHARLES LUNDELIUS

there -- there would be some holdover.  Or I think I referenced to that as a -- I think there would simply be a holdover or a lagging effect in terms of changing the interfaces.

BY MS. ZOSCHAK:

Q.    If the interface changed automatically, would you cut off past profit damages at that time?

MR. BRENNAN:  Object to form.

THE WITNESS:  I think if we had information that showed that the -- to the extent we had Plaid customers that didn't make the change and we had that information, then I can adjust damages accordingly.  But historical damages would come to an end, perhaps, at an earlier point in time and then it would be future projected damages.

BY MS. ZOSCHAK:



CHARLES LUNDELIUS, JR., CPA, ABV, CFF
PNC FINANCIAL SERVICES vs PLAID, INC.

November 03, 2023
70

CHARLES LUNDELIUS

BY MS. ZOSCHAK:

Q.      After the logo was removed from the



CHARLES LUNDELIUS

interface, revenue attributable to any new                10:47

connections would not be appropriate for                  10:47

disgorgement to PNC under your damages analysis?          10:47

MR. BRENNAN:  Object to form.                10:47

THE WITNESS:  Under our approach,            10:47

we -- we essentially took that position              10:48

with regard to, say, new customers.                  10:48

Obviously, the existing customers that               10:48

were brought in when the marks were there            10:48

would -- would and could continue to                 10:48

generate revenue for Plaid.                          10:48

BY MS. ZOSCHAK:                                           10:48

Q.    If an existing customer created a              10:48

new connection with a new fintech app, would they        10:48

be included in your damages calculation?                 10:48

A.    The -- I'm sorry.  You're saying an            10:48

existing customer; is that right?                        10:48

Q.    Yes.                                           10:48

A.    That -- yes.  That would be included           10:48

in -- in the calculation, yes.                           10:48

Q.    But a new customer would not be                10:48

included in your damages calculation?                    10:48

A.    No.  That's -- what we were trying             10:48

to do was to make sure that we only looked at the        10:49



CHARLES LUNDELIUS

existing customers as of a given cut-off date, in    10:49

this case, the end of 2021.  And then from that    10:49

point forward, just were making estimates of the    10:49

occurrences that would occur after that date,    10:49

given the data that we were provided by Plaid.    10:49

Q.    Why did you want to make sure to    10:49

only look at only existing customers?    10:49

A.    Because, presumably, at some point,    10:49

the customers that -- PNC customers, if they were    10:49

to sign on to Plaid after the marks were removed,    10:49

and by that, I mean, removed from all apps -- all    10:49

fintech apps, then presumably, they're not coming    10:49

in under the -- the allegations made in this    10:49

particular complaint.    10:50

Q.    They did not see the PNC marks on    10:50

the Plaid Link interface?    10:50

MR. BRENNAN:  Object to form.    10:50

THE WITNESS:  I assume that would be    10:50

the case, yes.    10:50

BY MS. ZOSCHAK:    10:50

Q.    So when calculating your damages,    10:50

you attempted to limit to PNC customers who saw    10:50

PNC marks on the Plaid Link interface?    10:50

MR. BRENNAN:  Object to form to the    10:50



CHARLES LUNDELIUS

use of word "customer."                                    10:50

THE WITNESS:  I think what we                              10:50
were -- what we were focusing on was the                   10:50
individuals PNC customers that were --                     10:50
that came to a fintech app while the PNC                   10:50
marks were on -- were being used in some                   10:50
way.                                                        10:50

BY MS. ZOSCHAK:                                            10:50

Q.    If a user connected their account                    10:50
via Plaid did not see the PNC marks while doing            10:51
so, would you consider revenue attributable to             10:51
that connection as part of damages?                        10:51

MR. BRENNAN:  Object to form.                               10:51

THE WITNESS:  You're positing that                         10:51
we have a user coming to -- that's a PNC                    10:51
customer that comes to a fintech app, and                  10:51
if I understood your question correctly,                   10:51
you were saying it's not -- they do not                    10:51
see a PNC mark; is that right?                              10:51

BY MS. ZOSCHAK:                                            10:51

Q.    Yes.                                                  10:51

A.    Okay.  Well, then we're trying to                    10:51
excluded those, but the -- the information we              10:51
have is that the PNC marks were up for a given             10:51

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CHARLES LUNDELIUS

BY MS. ZOSCHAK:                                          10:57

Q.      But for the PNC marks, a PNC          10:57
customers would not have signed up for the              10:57
fintech app?                                            10:57

MR. BRENNAN:  Object to form.               10:57
Outside the scope of his opinion, as he                 10:57
said.                                                   10:57

THE WITNESS:  Yeah.  I think the            10:57
complaint on that issues speaks for                     10:57
itself, and I just have to assume the                   10:57
complaint.                                              10:57

MS. ZOSCHAK:  It is almost 11:00.           10:57
It is all right if we take this time to be              10:57
our break?                                              10:58

MR. BRENNAN:  Sure.  How long?              10:58

MS. ZOSCHAK:  Can we go off the             10:58
record?                                                 10:58

VIDEOGRAPHER:  We are off the record        10:58
at 10:57.                                               10:58

(Brief recess.)                             11:38

VIDEOGRAPHER:  We are back on the           11:38
record at 11:38.                                        11:39

BY MS. ZOSCHAK:                                          11:39

Q.      Mr. Lundelius, let's turn back to     11:39



CHARLES LUNDELIUS

page 14 of your report.  You say, "As a result of        11:39

Plaid's alleged wrongful conduct, Plaid has              11:39

earned revenues that are attributable directly or        11:39

indirectly to Plaid's use of PNC -- PNC marks."          11:39

          Those revenues are unjust enrichment           11:40

that we spoke of earlier?                                11:40

     A.     Yes.                                          11:40

     Q.     Do you agree that unjust enrichment          11:40

should only include revenues that were earned as         11:40

a result of the alleged wrongful conduct?                11:40

          MR. BRENNAN:  Object to form and               11:40

     potentially asked and answered.                     11:40

          THE WITNESS:  I think they are --              11:40

     essentially, that -- that is the                    11:40

     definition, is that they are revenues that          11:40

     are earned that are related to the                  11:40

     wrongful conduct.                                   11:40

BY MS. ZOSCHAK:                                          11:40

     Q.     So you would agree it would be               11:40

incorrect to include revenues not attributable to       11:40

the alleged wrongful conduct?                            11:40

          MR. BRENNAN:  Object to form.                  11:40

          THE WITNESS:  No.  I think that's --           11:40

     in a broad general sense, I think that's            11:40



CHARLES LUNDELIUS

true.

BY MS. ZOSCHAK:

Q.    In what sense is that not true?  You said "in a broad sense."

A.    Well, if there are revenues that are directly attributable and perhaps revenues that are indirectly attributable.  I'm talking just generally, not in regard to this case.

Q.    So does your damages estimate attempt to calculate what revenue Plaid earned because of its use of PNC marks?

MR. BRENNAN:  Object to form.

THE WITNESS:  Yeah.  That is the -- that is the mandate I was given, yes.

BY MS. ZOSCHAK:

Q.    You assumed that no PNC customers would connect their bank accounts using the Plaid Link interface in the absence of the alleged trademark infringement, right?

MR. BRENNAN:  Object to form.

THE WITNESS:  Based on the limited data we had, yes, we had to make that assumption because we have no way of discerning whether someone -- someone



CHARLES LUNDELIUS

linked for some other reason, but I think     11:42
given that the PNC marks were on the          11:42
website -- were in the fintech apps for       11:42
that period of time, I think                  11:42
it's certainly -- certainly, the PNC          11:42
customers that linked during the time 2015    11:42
to 2021 time frame were certainly exposed     11:42
to those marks, and I think that's -- that    11:42
was a reasonable assumption for us to use.    11:42

BY MS. ZOSCHAK:                               11:42

Q.     So your assumption is that if Plaid    11:42
had not used the PNC marks, there would be zero   11:42
PNC occurrences?                              11:42

MR. BRENNAN:  Object to form.    11:42

THE WITNESS:  There would certainly   11:42
not be a -- well, there would not have        11:42
been the -- the predicate false pretense.     11:43
It could be that some individuals could --    11:43
could come to -- come to a Plaid app          11:43
through some other means, but the -- the      11:43
issue before us is that there is the          11:43
alleged misuse the PNC marks that attract     11:43
it, and it certainly gave comfort to the      11:43
individuals that were coming forward to       11:43


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CHARLES LUNDELIUS

hand over their more -- most sensitive financial information.  I think that's -- that was a valid basis for us to proceed forward and -- and make this calculation.  The -- as I said, we have no information that someone would come -- come some other way.

BY MS. ZOSCHAK:

Q.    So you said that some individuals could still come to a Plaid app had the PNC marks not been shown.  But for purposes of your damages calculation, you assumed that if Plaid had not used the PNC marks, there would be zero PNC occurrences?

MR. BRENNAN:  Object to form.

THE WITNESS:  I'm just saying that the PNC occurrences were the result of misuse of the marks.  I'm trying to make statement to -- as to some other hypothetical.

BY MS. ZOSCHAK:

Q.    The PNC occurrences were the result of misuse of the PNC marks is what I just heard you say.



CHARLES LUNDELIUS

Do you mean 100 percent of the PNC occurrences?   11:44   11:44

MR. BRENNAN:  Object to form and to the extent when we're talking about opinions he's said he's not giving.   11:44   11:44   11:44

THE WITNESS:  Yeah.  I'm told to assume that the elements of the claim are -- and complaint in this matter are correct, and that the individuals coming to -- to use an app that has PNC marks were misled with regard to those apps and how they signed up for those apps.   11:45   11:45   11:45   11:45   11:45   11:45   11:45

BY MS. ZOSCHAK:   11:45

Q.    Assuming that all individuals were misled, correct?   11:45   11:45

MR. BRENNAN:  Same objection.   11:45

THE WITNESS:  I'm assuming that all the occurrences and data that were handed to us were from -- by Plaid were individuals that would have been and were misled by the PNC marks in accordance with the complaint in this matter.   11:45   11:45   11:45   11:45   11:45   11:45

BY MS. ZOSCHAK:   11:45

Q.    This assumption that all of the   11:45



CHARLES LUNDELIUS

occurrences data were individuals that were

misled by the PNC marks is part of your future

profit calculations as well, correct?

A.     In a limited sense, I guess the --
there, it's the people that have been misled
prior to 2020 -- 2022, that then would continue
to use apps that would generate revenue for
Plaid.

Q.     Your starting point for the future
profits calculation is the number of PNC
occurrences at the end of 2021; is that right?

A.     Starting point, no.  My starting
point is 2022.  And there, we have a new set of
occurrences and a new set of occurrences
attributed to PNC customers and a new set of
total Plaid occurrences.

Q.     New set of occurrences attributed to
existing PNC customers?

A.     This would be a new set of
occurrences attributed to PNC customers.  Then I
make the -- and then I -- I make the adjustment
for the attrition for those customers.

Q.     And you -- similar to your past
profit calculation, you assume that all of those



CHARLES LUNDELIUS

number 18.  That's page 5.

BY MS. ZOSCHAK:

Q.    That says, "Identify what percentage of those who used your interface were PNC customers for each year between 2015 to the present."

Do you see that?

A.    Yes.

Q.    Feel free to review the answer if you'd like.  You cite this on page 19, footnote 72 of your report; is that correct?

A.    Yes, I do.

Q.    And if we turn to -- unfortunately, there are no page numbers, but two pages later where it says, "Supplemental Response."  Do you see that?

A.    I do.

Q.    In the second paragraph, it says, "An additional reason why these metrics may not accurately reflect the actual number and percentage of PNC consumers or occurrences attributable to PNC consumers that connected through Plaid Link in a given time period is because they also comprised connections made via



CHARLES LUNDELIUS

direct integration.  In a direct integration, a  12:05

fintech application or service does not use the  12:05

Plaid Link interface, but rather -- but rather,  12:05

designs and operates its own user interface.  The  12:05

majority of Plaid's traffic was through direct  12:05

integrations until 2018."  12:05

Did I read that correctly?  12:06

A.      Yes, you did.  12:06

Q.      Have you read it before?  12:06

A.      Yes.  Sometime before, yes.  12:06

Q.      You made no adjustments to your  12:06

damages calculations to account for customers who  12:06

did not use Plaid Link, but instead had a direct  12:06

integration?  12:06

MR. BRENNAN:  Object to form.  12:06

Assumes facts not in evidence.  12:06



CHARLES LUNDELIUS

was the premise on which the -- the data were requested, so I assume that's -- that was what was given.

BY MS. ZOSCHAK:

Q.    And if the data included occurrences that did not represent those sorts of connections, would you want to adjust your calculation to account for that?

MR. BRENNAN:  Object to form. Speculation as to such data.

THE WITNESS:  Yeah.  And -- and it says here that -- yes.  The -- and I have -- yeah.  I have no information beyond just a -- you know, the broad statements here that the -- there was -- there were direct integrations.  We don't have a -- an actual number to be able to -- to tie -- assuming your -- your



CHARLES LUNDELIUS

premise is correct, you don't have an                    12:08

actual number to use to make that                        12:08

adjustment, and perhaps it's not even                    12:08

available.  Well, it says, "Nor has Plaid                12:08

been able to identify the additional --                  12:08

the additional dataset that were permitted               12:08

to do so."  So presumably, it's not                      12:08

gettable.                                                12:08

BY MS. ZOSCHAK:                                          12:08

    Q.    Did you look for any information        12:08

about the split between connections made by              12:08

direct integrations and those made via Plaid            12:08

Link?                                                    12:08

    MR. BRENNAN:  Object to form.               12:08

    THE WITNESS:  Again, no.  That was          12:08

because the -- the dataset that I was                     12:08

given, I understood to have -- to have                    12:08

been the result of the use of PNC marks.                 12:09

BY MS. ZOSCHAK:                                          12:09

    Q.    If a consumer did not use -- did not     12:09

see a Plaid Link interface, would that -- when           12:09

connecting their PNC account, would that change          12:09

your damages calculation in any way?                     12:09

    MR. BRENNAN:  Object to form.               12:09



CHARLES LUNDELIUS

THE WITNESS:  I mean, in theory, it could, but I -- we have no -- no information as to exactly which -- which customers actually saw or used the PNC marks.  I would assume that they do because the marks do show up, according to the allegations in the complaint.  So I find it hard to answer your question, I guess.  Anyone who is logging in through Plaid Link, presumably, would see those marks.

BY MS. ZOSCHAK:

Q.    You started your answer with "in theory."  In what situation would that be?

A.    Where you have someone who logs in, but as I think about it, I -- if someone logs on and they log in through Plaid Link to a fintech app and the fintech app has a PNC marks, then, presumably, they're going to see the PNC mark.  So I can't -- I can't even think of a theory that it works.

Q.    So they log in through Plaid Link, you said.  Looking back at this Exhibit 2, a direct integration of fintech application does



CHARLES LUNDELIUS

not use the Plaid Link user interface.

Would that be a situation where they didn't see the Plaid Link interface?

MR. BRENNAN:  Object to form.

THE WITNESS:  I don't know.  I -- I mean, I -- just looking at this here, it -- yeah, according to this statement here, it does not -- it does not use the Plaid Link interface.  But I assume that, again, the data we were given were those occurrences that relate to those people that saw a -- PNC marks.

BY MS. ZOSCHAK:

Q.     You assumed that the data was occurrences that related to those who saw a PNC mark?

A.     Yes, or those marks were -- or were there when they logged in.

Q.     If the marks were not there when they logged in, you would not want to include revenue attributable to those occurrences in your calculation?

MR. BRENNAN:  Object to form.
Misstates the testimony.



CHARLES LUNDELIUS, JR., CPA, ABV, CFF
PNC FINANCIAL SERVICES vs PLAID, INC.

November 03, 2023
103

CHARLES LUNDELIUS

MS. ZOSCHAK:  And just to pause, I'll represent, I see that there are not



CHARLES LUNDELIUS

Bates numbers on this.  That was an error                    12:15
in the printing.  But for the record, this                   12:15
was produced, and the Bates number is                        12:15
PL00136485 for the record.                                   12:15

BY MS. ZOSCHAK:                                              12:16

Q.     So you assumed that all customers --                  12:16
all PNC customers in 2017 and 2018 connected                 12:16
using Plaid Link?                                            12:16

MR. BRENNAN:  Object to form.                 12:16

THE WITNESS:  I'm assuming that             12:16
they -- that the ones produced in the                        12:16
dataset that we have from Plaid saw the                       12:16
PNC marks.                                                   12:16

BY MS. ZOSCHAK:                                              12:16

Q.     And you assume they saw the PNC                       12:16
marks because they connected using Plaid Link?               12:16

A.     It's my understanding that would be                   12:16
the principal means by which they would -- they              12:16
would see those marks.                                       12:16

Q.     Those would be the principal means.                   12:16
Are there any other meanings that you're aware               12:16
of?                                                          12:16

A.     No, but that's -- again, that's the                   12:16
nature of the data produced in response to the               12:16



CHARLES LUNDELIUS

request.                                                       12:16

Q.    Let's turn back to your report and                       12:16
to page 21.  You state in the paragraph on                     12:17
page 21 that, "PNC users contributed to Plaid's                12:17
ability to generate customer contracts."                       12:17

What is that understanding based on?                 12:17

A.    The -- again, going back, I think,                        12:17
to the earlier paragraph where we -- paragraph 15              12:18
where we explain the customer contracts and Plaid             12:18
generating both user based and nonuser base                    12:18
revenue, the PNC customers then are providing                  12:18
a -- a stream of revenue that is generating                    12:18
both -- generating the nonuser based fees as well
as the user based.  That's essentially what we're              12:18
getting at here.                                               12:18

Q.    So you state that customer contracts               12:18
generate both user-based and nonuser-based                     12:18
revenue.  And this is -- that's paragraph 15?                  12:18

A.    Correct.                                           12:19

Q.    So why do PNC customers contribute                 12:19
to Plaid's ability to get customer contracts?                  12:19

A.    Oh, because that's a revenue stream                12:19
that has a base of users that allow for or that                12:19
are providing revenue for existing Plaid                       12:19



CHARLES LUNDELIUS

Plaid Link screen, correct?                                    12:59

A.      As of January 1, 2022?                             12:59

Q.      Yes.                                               12:59

A.      Presumably not.  I'm sorry.  You're            12:59
asking about Plaid Link's screen?                             12:59

Q.      Yes.  Plaid Link's screen?                      12:59

A.      Oh, I thought PNC marks.  No.  I'm          12:59
not quite sure.  I know there were changes made.             12:59
But I -- you know, again, that was -- that was                12:59
beyond the scope of my report.                                12:59

Q.      An existing user -- an existing PNC          12:59
customers as of January 1st, 2022, who signed up             01:00
for a new app would use Plaid Link?                           01:00

MR. BRENNAN:  Object to form.                  01:00

THE WITNESS:  That's what I                    01:00
understand is the case.                                      01:00

BY MS. ZOSCHAK:                                               01:00

Q.      But you understand -- but is your            01:00
understanding that they would not see the PNC                01:00
marks?                                                       01:00

A.      By that point in time, it's my              01:00
understanding that would not -- or my assumption             01:00
that they would not.  Let's just say that.                   01:00

Q.      If those existing PNC customers             01:00



CHARLES LUNDELIUS

connecting to new apps would not have seen the

PNC marks, why do you include them in your future

profits calculations?

A.    Because I -- because they were
brought into -- into Plaid through the PNC --
user PNC marks, and they were brought in -- on to
those fintech apps that they initially signed on
to through those PNC marks.  They're now adding
to the -- the revenue of Plaid after that point
in time, and they -- they shouldn't have been
there in the first place, is essentially the --
the way the complaint reads.  So, essentially,
they -- they should not have been Plaid customers
or Plaid -- Plaid users that would generate
revenue for -- for Plaid.

Q.    So is it your assumption that if
they not signed up for that first fintech app
where they saw the PNC mark in Plaid Link, they
would not have signed up for a subsequent fintech
app after January 1st, 2022?

A.    I would certainly not have counted
them because they would not have been -- they
would not have been in the PNC occurrences file.
That -- that, you know, essentially, is -- is



CHARLES LUNDELIUS

what we're looking at in terms of -- of activity                01:02

past 2021.  Is just that these -- you have some                 01:02

base of existing customers that would continue                  01:02

to -- to use or -- or tie in to -- to new fintech               01:02

apps.                                                            01:02

        Q.     And you understand those new                     01:02

occurrences to represent connections to new                     01:02

fintech apps that the consumers were not                        01:02

previously connected to?                                        01:02

        A.     Yes.  That would constitute an                   01:02

occurrence, right, because these are                            01:02

occurrences -- at least the data that came over                 01:02

in Plaid said these are adds, so these are                      01:02

additional occurrences.                                         01:02

        Q.     Is it your understanding that the                01:03

occurrence data that Plaid produced in this                     01:03

matter reflects the number of occurrences that                  01:03

were added in a given month?                                    01:03

        A.     I think that's -- that is the                    01:03

understanding I have, yes.                                       01:03

        Q.     And so to know the total number of               01:03

occurrences, you would have to add the                          01:03

occurrences in each month?                                      01:03

        A.     Well, you can add them and that will             01:03



CHARLES LUNDELIUS

calculation, correct?

A.    I did, yes.

Q.    Do you know whether the companies that you used as comparators to Plaid have different capital structures than Plaid?

A.    They -- some do.  And that is something that is -- I find is -- is only occasionally worth adjusting for.  The -- a levered beta will give you a higher beta and, therefore, a higher discount rate.  So being conservative, I just pick a levered beta.  If -- if the capital structures were important and significant, I might go through the process of un-levering it, but that would give me a lower beta and that would give me a higher unjust enrichment number.

Q.    In your experience as an expert, do you typically use levered betas?

A.    I typically do, yes.  I think they are -- most particularly when -- once you get into an industry that is -- well, where you have a lot of equity financing, it really doesn't matter.  It's not a significant issue.  But here, I just wanted to be conservative, so I said,



CHARLES LUNDELIUS

well, we'll just stick with levered betas instead 01:34

of trying to go through the process of 01:34

un-levering and then adding it back in. 01:34

Q.    Let's move on to your next category 01:35

of damages, the contributed capital measure.  You 01:35

would describe this measure of damages as unjust 01:35

enrichment, correct? 01:35

A.    Correct. 01:35

Q.    Are the contributed capital and 01:35

profit measures of unjust enrichment cumulative 01:35

of each other in your opinion? 01:35

A.    No.  They would be-- you would use 01:35

one or the other.  There's -- there's one way 01:35

of -- of adjusting for unjust enrichment and 01:35

there's another. 01:35

Q.    But you wouldn't add them together? 01:35

A.    I would not add them together. 01:35

Q.    Okay.  Can you describe, generally, 01:36

the methodology you used to calculate contributed 01:36

capital? 01:36

A.    Mm-hmm.  The methodology was fairly 01:36

straight forward.  Identifying the number of -- 01:36

percentage of Plaid Link occurrences that were 01:36

attributable to PNC.  PNC is leading into the -- 01:36



CHARLES LUNDELIUS

or headings into the -- the B round -- the series    01:36

B round of financing for Plaid.  PNC's customers    01:36

were contributing, at that point, a certain    01:36

amount of revenue, and that revenue was added to    01:36

all the other revenues that were provided by    01:36

other -- other users.    01:36

            And then that revenue stream is then    01:36

turned into a value or used to calculate the    01:36

value in some way, and there are a couple of    01:37

different -- at least two different ways that you    01:37

could do that.  That value is used then to price    01:37

the shares price at the B round, and then I    01:37

looked again at the B round.  As we went through    01:37

this process, we assessed that Plaid -- PNC    01:37

effectively contributed to a certain amount of    01:37

the revenue stream that was in the B round, and    01:37

that certainly continued all the way through to    01:37

the D round.    01:37

       Q.    Am I correct that one input for your    01:37

calculation is the percentage of PNC occurrences    01:37

relative to total Plaid occurrences as of    01:37

June 19th, 2016?    01:38

       A.    Yes, it is.    01:38

       Q.    And you picked this 12-month period    01:38



CHARLES LUNDELIUS

Q.    You note on page 31 that, "Fintech valuations are forecasted to increase between 2023 and 2030."

Are you offering an opinion that Plaid's valuation will increase over that time?

A.    I'm offering an opinion that it will go up.  It could very well go up.  I can't -- I've not been asked to go ahead and calculate what it will be at some future day.

Q.    Is your opinion that it will go up based on the BCG article you cite in footnote 105?

A.    Well, that, plus the -- the increase in -- in, -- at least from what I saw, a recent increase in the number of occurrences.  So we have internal data and then the BCGR article.



CHARLES LUNDELIUS

BY MS. ZOSCHAK:

Q.    How many times as an expert have you calculated unjust enrichment damages before?

A.    Quite a few recently.  About four of five cases.  I think I've got one going currently and several that I've done unjust enrichment in, like, the last year.

Q.    Four of five cases in the last year?

A.    In the last year, right.

Q.    How many would you say over your entire career?

A.    That would be a -- a difficult one to kind of grasp, but let's say several dozen.



CHARLES LUNDELIUS

Q.    When calculating unjust enrichment, you typically will use a DCF methodology?

A.    I -- I will use a DCF methodology, except in a fairly unique case like this where you've got an increase in value that -- to the firm overall, that cannot be captured adequately or sufficiently in the DCF calculation.

Q.    Was calculating Plaid Link's unjust enrichment in this way your idea?

MR. BRENNAN:  Object to form.

THE WITNESS:  In this way?  Well, yes.  I recognized that there is a -- an element of value that was created by the -- by the PNC customers and determined that this was a -- an appropriate way to illustrate that.  So, yes, it was an approach that I developed, yes.



CHARLES LUNDELIUS

BY MS. ZOSCHAK:

Q.    Are you aware of anyone else calculating unjust enrichment damages in terms of a contributed capital measure like this?

MR. BRENNAN:  Object to -- object to form.

THE WITNESS:  I'm aware of damages being calculated using shares that should have been given to one party versus another.  That's -- that happens with a fair amount of regularity with any type of a -- of a suit where you have a dispute over the number of shares that should have been granted.

That is certainly something similar to what I did say in the -- in the case with Sean and Tender (phonetic).  So, yes, I have and used the methodology, but just in a different context.  In the context of just why -- why shares should have gone to one party versus another.

BY MS. ZOSCHAK:

Q.    Have you ever used that methodology in terms of shares that should have gone to one



CHARLES LUNDELIUS

party versus another in a case involving

trademark law claims?

          MR. BRENNAN:  Object to form.

          THE WITNESS:  Not that I recall.

BY MS. ZOSCHAK:

    Q.    So you conclude in your report that PNC was essentially forced to invest in Plaid, right?

    A.    That's -- that is correct, yes.

    Q.    And this forced investment is the contributed capital?

    A.    Yes.

    Q.    And what is your basis for calling PNC's investment in Plaid forced?

    A.    In that, PNC did not -- certainly would not have gone out and -- at least as I understand it, was looking to go out and invest in Plaid.  It was the use of the marks caused PNC customers to start using a -- fintech apps that earned Plaid revenues that then generated the value, significant value that was used at the various fundraising rounds.

    Q.    So how would you define PNC's forced investment in Plaid?



CHARLES LUNDELIUS

MR. BRENNAN:  Object to form.  Asked and answered.          01:51

THE WITNESS:  Well, I think that's exactly what I just said.          01:51

BY MS. ZOSCHAK:          01:51

Q.    PNC's forced investment was the use of the marks by Plaid?          01:51

MR. BRENNAN:  Object to form. Misstates his testimony.          01:52

THE WITNESS:  The use of the marks, presumably, according to the complaint, caused PNC customers to utilize the -- the fintech apps that generated revenue for Plaid.  And so, then, that revenue is part of the -- the earnings that is used to valuate Plaid for each of these rounds of financing.          01:52

BY MS. ZOSCHAK:          01:52

Q.    So you concluded that the best proxy for PNC's forced investment in Plaid was based on the percentage of PNC occurrences as a total -- as a percentage of total Plaid occurrences?          01:53

A.    I wouldn't call that a proxy.  I would just call that a means of calculating the          01:53



CHARLES LUNDELIUS

value of the contributed capital.                                01:53

Q.    So Plaid has no value other than its       01:53
occurrences?                                                     01:54

A.    It has value from revenue, and             01:54
occurrences are tied to revenue.                                01:54

Q.    You did not make any attempt to            01:54
value PNC's trademarks directly, correct?                       01:54

A.    That's correct, yes.  I wasn't asked       01:54
to.                                                             01:54

Q.    If Plaid had not used PNC marks in         01:54
Plaid Link at any point, would PNC have still                   01:54
made a forced investment in Plaid?                             01:54

MR. BRENNAN:  Object to form.              01:54

THE WITNESS:  Are you saying Plaid         01:55
never used PNC marks?                                          01:55

BY MS. ZOSCHAK:                                                  01:55

Q.    Correct.                                   01:55

A.    Then you wouldn't this -- you              01:55
wouldn't have the -- the complaint.  So if you                  01:55
take away the complaint, you don't have -- you                  01:55
don't have anything.  You don't have any damages                01:55
or anything.                                                    01:55

Q.    And if Plaid had used -- had not           01:55
used PNC marks in Plaid Link at any point, you                  01:55



CHARLES LUNDELIUS

assume there would be no PNC occurrences?                01:55

MR. BRENNAN:  Object to form.                01:55

THE WITNESS:  I'm sorry.  You lost                01:55
me on that one.                01:55

BY MS. ZOSCHAK:                01:55

Q.    No worries.  If Plaid had not used                01:55
PNC marks in Plaid Link at any point, do you                01:55
assume there would be no PNC occurrences?                01:55

A.    Well, I think by -- again, if -- if                01:55
they're never using PNC marks, then you take away                01:56
the whole basis for the complaint in this case,                01:56
and everything goes away.                01:56

Q.    Everything including all connections                01:56
by PNC customers?                01:56

A.    No, I'm sorry.  You wouldn't have                01:56
a -- you wouldn't have a cause of action.  You                01:56
wouldn't have -- we wouldn't be here.  If I                01:56
understand your question correctly, if Plaid                01:56
never used PNC marks, then, presumably, there's                01:56
reason for PNC to file a complaint.                01:56

Q.    Regardless of whether PNC would have                01:56
sued Plaid or not, do you assume that the                01:56
endusers would have still signed up for fintech                01:56
apps --



CHARLES LUNDELIUS

THE WITNESS:  I -- I did in the   02:25
sense that the customer accounts that were   02:25
identified as to why they closed laid the   02:25
blame at -- at the -- about half of them   02:25
laid -- laid the blame on the fact that   02:25
there was fraud.   02:25

If there is fraud, the customer, for   02:25
whatever reason, determined that there was   02:25
some either loss of confidence in PNC or   02:25
some other reason that meant that they --   02:25
that caused them to want to close the   02:25
account.  So, yes, in that context, I do   02:25
have some information.   02:25

BY MS. ZOSCHAK:   02:25

Q.    In terms of the monetary damages,   02:25
the calculation of monetary damages, you did not   02:25
apportion any of those to PNC?   02:26

MR. BRENNAN:  Object to form.   02:26

THE WITNESS:  Well, no, I did not   02:26
because it's -- PNC tracked this   02:26
particular set of account closures to   02:26
activity relating to its customers that   02:26
logged on to a fintech app through --   02:26
through Plaid Link.   02:26



CHARLES LUNDELIUS

BY MS. ZOSCHAK:                                                    02:26

Q.    So based on the information you          02:26
received from PNC, you assumed that the fraud was   02:26
based on Plaid's activity?                          02:26

MR. BRENNAN:  Object to form.          02:26

THE WITNESS:  It's -- it's based on    02:27
the proximity to the access to a -- a              02:27
fintech app that -- and the occurrence of          02:27
the fraudulent debit, that was -- that was         02:27
the evidence that was given to me and              02:27
explained to me by -- by Mr. Renner as             02:27
well.  And so based on that, I was able to         02:27
at least understand the rationale for why          02:27
this is an -- an issue that is related to          02:27
Plaid and Plaid's use or, perhaps,                 02:27
override of the multifactor authentication         02:27
process.                                           02:27

BY MS. ZOSCHAK:                                                    02:28

Q.    It's based on the proximity to the       02:28
access of a fintech app that use Plaid.  You --    02:28
there's no way for you to know for sure whether    02:28
the fraud was, in fact, caused by the Plaid        02:28
access --                                          02:28

MR. BRENNAN:  Object to form.



CHARLES LUNDELIUS

Sorry.

BY MS. ZOSCHAK:

Q.    -- you made that assumption based on    02:28
the proximity?    02:28

A.    And --

        MR. BRENNAN:  Sorry.  Let me say it
now.  Object to form.    02:28

        THE WITNESS:  And Mr. Renner    02:28
explaining to me why that -- why that is    02:28
a -- an appropriate means of analysis that    02:28
he performed.    02:28

BY MS. ZOSCHAK:    02:28

Q.    So your assumption that the    02:28
proximity of the fintech app connection and the    02:28
closure the account is based on Mr. Renner's    02:28
analysis?    02:28

        MR. BRENNAN:  Object to form.    02:28

        THE WITNESS:  Mr. Renner provided    02:28
the -- the background information as to    02:29
what a security expert looks at with    02:29
regard to determining the cause of a -- of    02:29
a fraudulent debit.  And then from there,    02:29
he and I both looked at the -- I think the    02:29
proximity of the -- of the fraudulent    02:29



CHARLES LUNDELIUS, JR., CPA, ABV, CFF

CERTIFICATE OF REPORTER/NOTARY PUBLIC


I, Goldy Gold, a Notary Public within and for the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to the law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this 7th day of November 2023.



_____
GOLDY GOLD, RPR
Notary Public




My Commission Expires:  February 29, 2028


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com