# EXHIBIT 03

HIGHLY CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE PNC FINANCIAL SERVICES GROUP, INC.,<br><br>            Plaintiff,<br><br>      v.<br><br>PLAID INC.,<br><br>            Defendant. | Civil Action No. 2:20-cv-1977 |

**CORRECTED EXPERT REPORT OF MAUREEN CHAKRABORTY**

**November 22, 2023**

**HIGHLY CONFIDENTIAL**

HIGHLY CONFIDENTIAL

# Contents

I.     INTRODUCTION.................................................................................................................1

    A.     Overview of Dispute and Assignment ................................................................ 1

    B.     Qualifications...................................................................................................... 2

    C.     Compensation .................................................................................................... 3

    D.     Information Considered ...................................................................................... 3

    E.     Summary of Opinions ........................................................................................ 3

II.    BACKGROUND .................................................................................................................5

    A.     Parties................................................................................................................. 5

        1.     The PNC Financial Services Group, Inc.................................................. 5

        2.     Plaid Inc. ................................................................................................. 6

    B.     Overview of Plaid's Technology and Pricing..................................................... 6

        1.     Plaid's Technology ................................................................................. 6

        2.     Plaid's Pricing and Revenues.................................................................. 11

III.   PNC'S CLAIMED DAMAGES AS PRESENTED IN THE LUNDELIUS REPORT .......... 14

IV.    SUMMARY OF ADJUSTMENTS TO PNC'S CLAIMED DAMAGES................................ 16

V.     MR. LUNDELIUS'S UNJUST ENRICHMENT DAMAGES ARE PREMISED ON A
      FLAWED BUT-FOR WORLD .........................................................................................17

    A.     Mr. Lundelius Incorrectly Conflates PNC's Marks Rights with End-Users and
        Thus Overstates the Alleged Infringement's Role on Whether End-Users Connect
        Accounts Through Plaid Link................................................................................ 18

    B.     Plaid's Conversion Studies Indicate that the Alleged Trademark Infringement
        Had, At Best, a Minimal Impact on Whether End-Users Share Credentials ........ 20

    C.     Mr. Lundelius Fails to Consider the Value End-Users' Receive from Using
        Fintech Apps ........................................................................................................ 29

    D.     Implications for Mr. Lundelius's Claimed Unjust Enrichment Damages ............ 30

VI.    MR. LUNDELIUS'S GROSS PROFITS CALCULATIONS SUFFER FROM
      ADDITIONAL FLAWS THAT FURTHER OVERSTATE CLAIMED UNJUST
      ENRICHMENT DAMAGES .............................................................................................32

    A.     Mr. Lundelius's Calculation of Historical Gross Profits Unjust Enrichment
        Damages................................................................................................................ 33

    B.     Mr. Lundelius's Calculation of Future Gross Profits Unjust Enrichment Damages
        ................................................................................................................................ 33

    C.     Mr. Lundelius Overstates Gross Profits Attributable to PNC Occurrences.......... 35

1. Mr. Lundelius Includes Non-User-Based Revenues in At-Issue Revenues 36

2. Mr. Lundelius Includes Direct Integration-Related Revenues Generated During Plaid Link's Rollout...................................................................................... 39

3. Mr. Lundelius Overstates At-Issue Revenues Received After the Removal of PNC's Marks from the Operative Plaid Link Interface .................................... 41

4. Mr. Lundelius's Discounted Future Gross Profits are Based on an Inappropriate Measurement Date.......................................................................... 46

D. Combined Adjustments to Mr. Lundelius's Claimed Gross Profits Unjust Enrichment Damages ..................................................................................... 46

VII. MR. LUNDELIUS'S CONTRIBUTED CAPITAL UNJUST ENRICHMENT DAMAGES ARE DISCONNECTED FROM THE ALLEGED INFRINGEMENT .................................. 47

A. Mr. Lundelius's Contributed Capital Calculation of Unjust Enrichment Damages .................................................................................................................... 48

B. Mr. Lundelius's Contributed Capital Unjust Enrichment Methodology Is Inappropriate for Measuring Unjust Enrichment Damages in This Matter and Is Fundamentally Flawed ...................................................................................... 49

1. Mr. Lundelius's Contributed Capital Estimate of Unjust Enrichment Damages is Unnecessary and Fundamentally Flawed ......................................... 49

2. Mr. Lundelius Ignores All Other Factors Contributing to Plaid's Growth in Value 51

3. Mr. Lundelius Wrongly Assumes PNC Was Owed Plaid Common Shares 51

C. Summary of Flaws in Mr. Lundelius's Contributed Capital Unjust Enrichment Methodology ................................................................................................... 53

VIII. MR. LUNDELIUS FAILS TO DEMONSTRATE PNC'S CLAIMED LOSSES WERE CAUSED BY THE ALLEGED INFRINGEMENT .................................................................... 54

A. Mr. Lundelius's Calculation of PNC's Claimed Losses ..................................... 54

B. Mr. Lundelius Does Not Establish a Causal Connection between the Alleged Trademark Infringement and PNC Losses............................................................. 56

1. Mr. Lundelius Overstates Disputed Transactions Attributable to the Alleged Infringement ........................................................................................... 57

2. Mr. Lundelius Overstates PNC Account Closures Attributable to the Alleged Infringement ........................................................................................... 58

3. Mr. Lundelius Overstates the Investigation Costs Attributable to the Alleged Infringement ........................................................................................... 61

C. Combined Adjustments to PNC's Claimed Losses ............................................. 61

HIGHLY CONFIDENTIAL

## I.    INTRODUCTION

### A.    Overview of Dispute and Assignment

1.    Plaintiff The PNC Financial Services Group, Inc. ("PNC") brought this action against Defendant Plaid Inc. ("Plaid"), alleging that Plaid infringed upon PNC's trademarks, among other allegations.[1] PNC alleges that Plaid designed user interfaces that misleadingly suggested to consumers that Plaid was affiliated or associated with, or sponsored by, PNC through the use of PNC's trademarks, logo, and orange-and-blue color scheme ("PNC's Marks").[2]

2.    Plaid provides the technology that allows consumers or "end-users", who have chosen to use financial technology applications ("fintech apps"), to consent to share and securely share their data from the financial institutions with which they bank with their chosen fintech apps.[3] Those fintech apps are Plaid's customers, and end-users do not pay for Plaid's services. Plaid's services help fintech apps compete with banks like PNC on peer-to-peer payment and digital exchange of funds, among other things.[4]

3.    PNC submitted the Expert Report of Charles R. Lundelius ("Lundelius Report") on October 6, 2023 in support of its claimed damages. In his report, Mr. Lundelius estimates PNC's claim of unjust enrichment damages at ███████████████████████

---

[1] First Amended Complaint for Trademark Counterfeiting, Trademark Infringement, False Designation of Origin, False Advertising, and Unfair Competition, July 8, 2021, *The PNC Financial Services Group, Inc. v. Plaid Inc.*, United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977 ("First Amended Complaint"), p. 1.  In addition to trademark infringement, the First Amended Complaint includes allegations of trademark counterfeiting, false designation of origin, false advertising, and unfair competition.  For the purposes of my report, I refer to PNC's allegations, collectively, as Plaid's alleged trademark infringement, alleged infringement, or alleged wrongful conduct.

[2] First Amended Complaint, p. 2.

[3] Plaid, "How Plaid Works," available at: https://plaid.com/how-it-works-for-consumers/. ("When you want to share data from your financial accounts with an app, Plaid works to transfer your data securely.").

[4] Henry, David and Anna Irrera, "U.S. banks launching answer to peer-to-peer payment app Venmo," *Reuters*, June 12, 2017, available at: https://www.reuters.com/article/cbusiness-us-usa-banks-payments-zelle-idCAKBN1931C2-OCABS; Consumer Financial Protection Bureau, "Required Rulemaking on Personal Financial Data Rights," October 19, 2023, pp. 12-13, available at: https://www.consumerfinance.gov/personal-financial-data-rights/ and https://files.consumerfinance.gov/f/documents/cfpb-1033-nprm-fr-notice_2023-10.pdf.

HIGHLY CONFIDENTIAL

████████████████████████████████████████ [5] Mr. Lundelius also provides an alternative unjust enrichment damages estimate of ██████████████████████ ████████████████████████████████. Mr. Lundelius also calculates a total of $0.8 million in damages related to PNC's claimed losses incurred as a result of a security incident in mid-2019.[7]

4.    I have been engaged by counsel for Plaid in this matter. I have been asked to evaluate, from an economic perspective, PNC's claimed damages and calculations. Specifically, I have been asked to evaluate the categories of damage identified and quantified by Mr. Lundelius.[8]

## B.    Qualifications

5.    I am a Managing Principal at Analysis Group, Inc. ("Analysis Group"), and I earned my Ph.D. in Economics from the University of Notre Dame and my B.A. in Economics from Colby College. Analysis Group provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. I have an extensive background in economics, finance, accounting, and valuation. I have served as an expert witness and as a consultant in a variety of matters, including those involving economic damages and valuation.

6.    My curriculum vitae, which includes a list of all publications I have authored, is attached as **Appendix A** to this report, and a list of cases in which I have provided expert testimony in the last four years is attached as **Appendix B**.

---

[5] Expert Report of Charles R. Lundelius Jr., *The PNC Financial Services Group, Inc. v. Plaid Inc.*, United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977, October 6, 2023 ("Lundelius Report"), ¶ 30.

[6] Lundelius Report, ¶ 31. Mr. Lundelius testified that his claimed gross profits unjust enrichment damages and contributed capital unjust enrichment damages are alternatives and should not be added together. *See* Deposition of Charles Lundelius taken November 3, 2023 ("Lundelius Deposition"), at 145:10-16.

[7] Lundelius Report, ¶¶ 32-33.

[8] While I assume liability for purposes of assessing damages, I express no opinion on legal matters, and thus my opinions should not be construed as suggesting liability is appropriate or merited in this case.

2

HIGHLY CONFIDENTIAL

### C.    Compensation

7.    Analysis Group, Inc. ("Analysis Group") bills on a time and materials basis for my work in connection with this assignment. My billing rate for time spent on this matter is $1,050 per hour. Employees of Analysis Group, working under my direction and supervision, have assisted me in this assignment at their standard hourly rates. Neither my compensation nor Analysis Group's is contingent upon the opinions I form or the outcome of this case.

### D.    Information Considered

8.    In preparation of this expert report, I, along with Analysis Group staff working under my direction, have reviewed various documents and data sources. These include financial statements, disclosures, and other materials filed with the U.S. Securities and Exchange Commission ("SEC"); documents produced and depositions taken in this litigation; industry data and reports; and media coverage. I attach a list of documents and sources upon which I have relied as **Appendix C** to this report.

### E.    Summary of Opinions

9.    Based on my education and experience, as well as my research and analysis to date, it is my opinion that PNC's claimed damages, as represented in the Lundelius Report, contain flaws that significantly overstate damages. In his presentation of his damages calculations, Mr. Lundelius fails to discuss, much less support, any causal relationship between the alleged infringement and his claimed measures for the damages theories he considers—Plaid's gross profits or valuation for unjust enrichment damages, and PNC's costs for damages related to a security incident in mid-2019. As such, Mr. Lundelius's analyses amount to mechanical exercises relying on unsupported and incorrect assumptions.

10.    Mr. Lundelius's primary calculation of unjust enrichment damages, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is based on the number of Plaid-facilitated connections from fintech apps to end-users' PNC accounts. This methodology is flawed, as Mr. Lundelius assumes incorrectly that no end-users would have chosen to connect to their PNC accounts through Plaid-enabled fintech apps but-for Plaid's use of PNC's Marks. Mr. Lundelius provides no support for this assumption, which is contradicted by evidence that the display of bank logos has a minimal impact on whether

3

HIGHLY CONFIDENTIAL

end-users connect their accounts. Additionally, Mr. Lundelius overstates gross profits attributable to the alleged infringement by failing to adjust his calculations for revenues earned by Plaid that are unrelated to the alleged infringement, such as contractually guaranteed revenue streams and revenues associated with end-users who were never shown a Plaid-designed interface. Similarly, Mr. Lundelius incorrectly includes future revenues that cannot be attributed to the alleged infringement, given Plaid's removal of PNC's Marks from the operative Plaid Link interface after December 2020.

11.  Properly accounting for the minimal impact of bank logos, based on Plaid's statistical experiments studying the effect of bank logos on end-user behavior, reduces Mr. Lundelius's gross profits estimate of unjust enrichment damages from ████████████ ████████ Correcting Mr. Lundelius's calculations for other flaws, which will be discussed below in turn, further reduces his gross profits estimate of unjust enrichment damages to ████████

12.  Mr. Lundelius's alternative calculation of unjust enrichment damages, which he bases on PNC's alleged forced contribution of capital in the form of its banking customers linking their PNC accounts to Plaid-enabled fintech apps, is inappropriate for measuring unjust enrichment damages in this matter, given the fixed duration of the alleged infringement and the perpetual stream of profits reflected in Plaid's valuations. Furthermore, Mr. Lundelius provides no support for his assumption that PNC's opportunity cost from its alleged contribution should entitle it to a return based on Plaid's valuation growth, when unjust enrichment damages—if any are appropriate—can properly be measured by the gross profits Plaid earned from the alleged trademark violation. Mr. Lundelius's analysis of PNC's alleged contribution is additionally flawed by his assumption that no factors other than growth in end-user connections contributed to Plaid's increased valuation, as well as his conflation of PNC's Marks with end-users banking with PNC—PNC has no control over its customers' decisions to use fintech apps and connect their bank accounts to those apps through Plaid Link, and therefore cannot "contribute" its customers to Plaid.

13.  Mr. Lundelius's calculation of damages related to PNC's claimed losses is likewise flawed and unsupported. Instead of evaluating a but-for world in which the alleged infringement was absent, Mr. Lundelius's calculations of PNC's claimed losses are nothing more than a

HIGHLY CONFIDENTIAL

combination of data prepared by PNC (i.e., disputed transactions and customer account closures PNC attributes to "Plaid Fraud Events") with other inputs provided by PNC (e.g., PNC's costs to investigate a dispute and PNC's claimed lifetime value of a customer). As with his calculations of unjust enrichment damages, Mr. Lundelius's calculations incorrectly imply that no end-users would have connected their PNC accounts to Plaid-enabled fintech apps but for the alleged infringement. Additionally, Mr. Lundelius fails to provide any independent analysis substantiating a connection between Plaid and transactions PNC identified as fraudulent. Similarly, Mr. Lundelius also assumes incorrectly that account closures that cannot be tied to a specific closure reason (i.e., no reason was provided for the closure) were caused by fraudulent transactions caused by the alleged infringement. Adjusting Mr. Lundelius's calculations to account for these flaws reduces PNC's total claimed losses to ▇▇▇▇▇▇

## II.    BACKGROUND

### A.    Parties

#### 1.    The PNC Financial Services Group, Inc.

14. PNC is a U.S. financial institution headquartered in Pittsburgh, Pennsylvania and was incorporated in Pennsylvania in 1983. PNC's business includes retail banking and residential mortgage, corporate and institutional banking, and asset management. As of December 31, 2022, PNC had $557.3 billion in total assets, $436.3 billion in total deposits, and $45.8 billion in shareholders' equity.[9] PNC reports in three segments: (1) Retail Banking, providing deposit, lending, brokerage, and other services to consumers through its branch network, ATMs, call centers, and online and mobile banking; (2) Corporate & Institutional Banking, providing treasury management and other services to corporations and government with access to online/mobile information management and reporting

---

[9] The PNC Financial Services Group, Inc., SEC Form 10-K for the fiscal year ended December 31, 2022 ("PNC 2022 10-K"), p. 1.

HIGHLY CONFIDENTIAL

services; and (3) Asset Management Group, providing private banking to high net worth individuals.[10]

### 2.    Plaid Inc.

16. Plaid is a technology company that allows consumers who have chosen to use fintech apps to consent to share and securely share their data. It is headquartered in San Francisco, California and was incorporated in Delaware in 2012.[11] Plaid securely facilitates connections to share financial data from over 12,000 financial institutions to over 8,000 third-party fintech apps and financial service providers.[12] Fintech apps (as well as banks and other financial institutions) are Plaid's customers and, depending upon the particular products they choose, pay monthly flat rate and/or per-connection fees to Plaid.[13] When an end-user chooses to connect their financial account to a fintech app that uses Plaid, Plaid securely accesses the account on the end-user's behalf and collects and shares the end-user's requested financial data with the end-user's chosen app.[14]

### B.    Overview of Plaid's Technology and Pricing

#### 1.    Plaid's Technology

16. Plaid's customers (some of whom are PNC's competitors[15]) are fintech apps; Plaid currently works with over 8,000 fintech apps and providers of financial services—

---

[10] PNC 2022 10-K, pp. 182-184.

[11] KPMG, "Plaid, Inc., Consolidated Financial Statements", December 31, 2021 and 2020, PL00213042 – 069, at 051.

[12] Plaid, "Why is Plaid Involved?" available at: https://plaid.com/why-is-plaid-involved/.

[13] Deposition of Samuel Schuster, December 13, 2022 ("Schuster Deposition"), Exhibit 5. (PL00070591 – 592.) Samuel Schuster is a Business Technology Manager at Plaid.

[14] Plaid, "How Plaid Works," available at: https://plaid.com/how-it-works-for-consumers/.

[15] I understand that Plaid's services enable fintech apps to compete with banks like PNC on, among other things, peer-to-peer payment, digital exchange of funds, and mortgage lending. *See, e.g.*, Henry, David and Anna Irrera, "U.S. banks launching answer to peer-to-peer payment app Venmo," *Reuters,* June 12, 2017, available at: https://www.reuters.com/article/cbusiness-us-usa-banks-payments-zelle-idCAKBN19 31C2-OCABS.

HIGHLY CONFIDENTIAL

including, for example, Venmo, Coinbase, and Rocket Mortgage.[16] When an end-user wishes to connect their financial institution account to a fintech app in order to share financial data needed to receive services from that app, Plaid provides the technology and interface that enable end-users to do that. More specifically, with the end-user's permission, Plaid accesses and shares the end-user's requested data from their financial institution account(s) with their chosen fintech app.[17] For example, an end-user who wishes to use Venmo to send and receive money through the app may choose to connect their financial account to Venmo. To do this, the end-user selects an option within the Venmo app to link or connect a bank account, at which time they will have the option of automatically linking their account through Plaid's user interface (called "Plaid Link"). Assuming the end-user chooses to proceed through the Plaid Link account-linking process, Plaid will then securely collect and share the end-user's requested data from their financial institution account with Venmo.[18]

17.    Prior to the creation of Plaid Link, Plaid's fintech app customers worked directly with end-users to facilitate the consumer-permissioned account-linking process, whereas Plaid would only provide the "back-end" technology. As part of that process, an end-user would provide their account credentials to the fintech app, and the app would then pass those credentials to Plaid, which would access and share the end-user's data with the app.[19] Because Plaid originally only provided "back-end" services to its customers, those fintech app customers initially designed their own user interfaces.[20] That is, Plaid's customers initially designed their own user interfaces for which Plaid provided back-end services.[21]

---

[16] Plaid, "Our Mission," available at: https://plaid.com/company/; Plaid, "Why is Plaid Involved," available at: https://plaid.com/why-is-plaid-involved/; Coinbase, "How is bank account information protected," available at: https://help.coinbase.com/en/coinbase/privacy-and-security/other/how-is-my-bank-account-information-protected; Rocket Mortgage, "Data Partners," available at: https://www.rocketmortgage.com/legal/data-partners.

[17] Plaid, "How Plaid Works," available at: https://plaid.com/how-it-works-for-consumers/.

[18] Plaid, "How Plaid Works," available at: https://plaid.com/how-it-works-for-consumers/; Plaid, "Why is Plaid Involved?", available at: https://plaid.com/why-is-plaid-involved/.

[19] Deposition of Al Hertz, February 3, 2023 ("Hertz Deposition"), at 286:10-23. Al Hertz was a designer at Plaid from 2015 to 2020.

[20] Hertz Deposition at, 286:10-23.

[21] Hertz Deposition, at 203:19-22; 235:7-14. *See also* Deposition of William Hockey, February 23, 2023 ("Hockey Deposition"), at 199:5-7, 266:19 – 267:4. William Hockey co-founded Plaid, was President and CTO from 2012 to 2020, and currently serves on the Board.

When a Plaid customer designed its own user interface (also referred to as "direct integration"), it is my understanding that Plaid was not the party incorporating bank logos into the those interfaces, to the extent any were shown.[22]

18. In May 2015, Plaid launched its own user interface, Plaid Link, that fintech apps could embed within their apps.[23] In part, Plaid launched Plaid Link as a way to reduce the proliferation of end-user credentials in the ecosystem; instead of an end-user providing credentials to each of the fintech apps they chose to use, Plaid Link provided a secure method for end-users to provide their credentials to a single entity.[24] Plaid Link was rolled out gradually and was not fully adopted by all of Plaid's customers until sometime in 2018.[25] Plaid Link is the at-issue interface that PNC claims infringed PNC's Marks.[26] Plaid has made certain updates to the Plaid Link interface (or "user flow") that are relevant to my analysis, including the removal of certain bank trademarks and branding. These updates are summarized below. I understand that in all iterations described below, prior to entering the Plaid Link interface, an end-user first would have entered their chosen fintech app and selected an option within that app to link a bank or financial institution account to that app.

19. From May 2015 to June 2018, Plaid Link primarily consisted of an institution selection pane, on which an end-user searches for and selects the institution they want to connect to the fintech app; a credentials pane, on which an end-user enters the login credentials for their selected institution; and a success (or connected) pane, informing an end-user they have successfully linked their chosen financial institution account.[27] (*See* **Figure 1** below.) I understand there may have been other panes, such as a multifactor authentication pane, depending on the financial institution.[28]

---

[22] Hertz Deposition, at 287:16-25; 289:1-5.
[23] Deposition of Rajarshi Chakravorti, March 22, 2023 ("Chakravorti Deposition"), at 14:24 – 15:2; 108:17 – 109:9; 209:4-15. *See also* Hockey Deposition, at 269:3-17. Rajarshi Chakravorti is a Universal Access Lead at Plaid.
[24] Hertz Deposition, at 291:3-6.
[25] Hertz Deposition, at 293:19 – 294:1; Chakravorti Deposition, at 212:10-14.
[26] Lundelius Report, ¶¶ 25-26.
[27] Chakravorti Deposition, at 15:23 – 17:22. *See also* Chakravorti Deposition, Exhibit 4.
[28] Chakravorti Deposition, at 18:12-25.

HIGHLY CONFIDENTIAL

**Figure 1**
**Plaid Link User Flow: Prior to Addition of Consent Pane (Pre-July 2018)[29]**



20.    Starting in July 2018, Plaid Link included a consent pane at the start of the flow, providing end-users with information about Plaid's role in the connection process, including a link to Plaid's End User Privacy Policy, before the end-user clicked "Continue" to proceed with the account-linking process.[30] (*See* **Figure 2** below.) I understand that the majority of Plaid's existing customers used the consent pane starting in July 2018, and all new customers were required to use the consent pane.[31] A subset of customers did not adopt the consent pane immediately but did so eventually.[32] The Plaid Link flow remained consistent with that shown in **Figure 2** from approximately July 2018 to November 2020.[33]

---

[29] Hertz Deposition, Exhibit 21, p. 1.

[30] Chakravorti Deposition, at 29:10 – 30:1. *See also* Deposition of Paolo Bernasconi, March 3, 2023 ("Bernasconi Deposition"), Exhibit 29. (PL00003551.) Paolo Bernasconi was a Software Engineer and Product Manager at Plaid from 2015 to 2021.

[31] Chakravorti Deposition, at 30:19 – 31:3; Hertz Deposition, at 307:18-19.

[32] Chakravorti Deposition, at 30:19 – 31:3; Hertz Deposition, at 308:16-20. My understanding is that this included some of Plaid's larger customers, as indicated by the percentage of traffic that did not show the consent pane by January 2020. *See* Chakravorti Deposition, at 129:3-23.

[33] Chakravorti Deposition, Exhibit 2, pp. 2-5. I understand there were minor changes to the consent pane in August 2019 and March 2020 and messaging about connectivity issues for certain banks in September 2019 and April 2020.

HIGHLY CONFIDENTIAL

**Figure 2**
**Plaid Link User Flow: After Addition of Consent Pane (July 2018 to November 2020)[34]**



21.   Plaid redesigned Plaid Link in November 2020.[35] Referred to as "Plaid Threads," the new design included Plaid branding (i.e., coloration and style) and the Plaid logo on all panes in the Plaid Link user interface.[36] (*See* **Figure 3** below.) While Plaid Link no longer used bank colors, Plaid Threads continued to incorporate bank logos in its design.[37] In December 2020, Plaid removed PNC's Marks from the operative Plaid Link user interface for all of Plaid's customers.[38] Bank logos for all banks were removed from the credential pane in Plaid Threads in August 2021.[39]

---

[34] PL00007467–476 at 468.
[35] Chakravorti Deposition, at 39:1-8.
[36] Chakravorti Deposition, at 214:20 – 215:25.
[37] Chakravorti Deposition, at 216:1-6.
[38] Chakravorti Deposition, at 216:7-16.
[39] Chakravorti Deposition, Exhibit 2, pp. 4, 21 (PL00213087-R).

10

**Figure 3**
**Plaid Link User Flow: Plaid Threads Flow (Post-November 2020)[40]**



### 2.    Plaid's Pricing and Revenues

22.    Plaid earns revenue from its customers through ███████████████████
████████████████ These fees are set as follows and paid by Plaid's customers, the fintech apps.[41]

a. [43]

b. Usage fees are fees Plaid charges its customers for products associated with "items" (i.e., the connection of a bank account and a fintech app, which is also referred to

---

[40] Hertz Deposition, Exhibit 21, p. 3.
[41] Schuster Deposition, Exhibit 5. (PL00070591 – 592.) *See also* Schuster Deposition, Exhibit 10. (PL00187696 – 697.); Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.
[42] Schuster Deposition, Exhibit 5. (PL00070591 – 592.)
[43] Schuster Deposition, at 116:17 – 117:2 (describing support fees as "an additional [] fee" customers may pay); PL00146198 – 204, at 203.

elsewhere as an occurrence).[44] For example, Plaid's Auth product allows its customers to authenticate an end-user's bank account (allowing for retrieval of account and routing numbers for ACH payments), and its Balance product "pull[s] real-time balances on [end-user] accounts."[45] I understand customers interact with Plaid's products through requests to those products' application programming interfaces ("API calls").[46] As discussed below, usage fees for products vary in how and when fees are billed (e.g., only once, monthly, or per API call).[47]

i.  One-time or onboarding fees are charged by Plaid when a customer adds certain products associated with an item's creation, such as Auth, Identity, and Income.[48] The fees charged for these products are limited to the initial one-time fee and do not depend on the number of API calls related to their use.[49]

ii. Subscription fees are charged on a monthly basis for products such as Transaction, Liabilities, and Investments.[50]

iii. Per-request fees are charged for each successful API call. This is either charged as a flat fee for certain products (Balance, Transaction Refresh, Asset Report, Signal Evaluate), or a flexible fee based on the amount of information requested (Assets and Enrich).[51]

---

[44] Schuster Deposition, Exhibit 5. (PL00070591 – 592.) *See also* Schuster Deposition, Exhibit 10. (PL00187696 – 697.) I understand that, while items and occurrences were used to refer to different concepts, a definitional change that Plaid made in 2021 means they now have a near one-to-one equivalence. Defendant Plaid Inc.'s Supplemental Responses and Objections to Plaintiff the PNC Financial Services Group Inc.'s Third Set of Interrogatories dated April 12, 2023, p. 6.

[45] PL0061705 – 712, at 710.

[46] Schuster Deposition, at 66:12-24.

[47] Schuster Deposition, Exhibit 5. (PL00070591 – 592.) *See also* Schuster Deposition, at 221:9 – 223:10. I understand that end-user volume, contract length, contract sign-by date and the combination of products used by the customer are all determinants of the usage fees charged to a given Plaid customer, along with the monthly commitment fees discussed below.

[48] Schuster Deposition, Exhibit 10, PL00187696 – 697; PL00061705 – 712, at 709; Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

[49] Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

[50] Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

[51] Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

iv. Per-payment fees are charged for end-user payments initiated using a product.[52] For example, when a customer (a fintech app) uses Transfer to facilitate a payment for an end-user, Plaid charges the customer a payment fee for the Transfer product.[53]

c. Usage minimum fees (or "monthly commitment fee" or "usage credit") are a minimum amount of usage fees a fintech app guarantees to pay Plaid each month.[54] If a customer's usage fees do not meet the minimum commitment, the customer pays Plaid the difference. Any amount of usage fees the customer generates over this minimum commitment are paid on top of the minimum commitment.[55] I understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ Additionally, the monthly commitment and API unit rates are inversely correlated, meaning a higher monthly commitment often drives down the unit rate cost whereas a lower monthly commitment generally relates to a higher unit rate.[57]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23. Plaid produced revenue data in this case under two separate categories: "user-based revenues" and "non-user-based revenues."[59] User-based revenues include ▮▮▮▮▮▮

---

[52] Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

[53] Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

[54] Schuster Deposition, Exhibit 5. (PL00070591 – 592.) *See also* PL00146198 – 204, at 203.

[55] Schuster Deposition, at 120:7-13 ("Q: But to the extent a customer did not have sufficient utilization of Plaid's products that they exceed their monthly minimum, those portion would fall within the same category as support and platform fees? A: …the category being not relevant to FIs, yes"); Schuster Deposition 171:8 – 172:4. *See also* PL00146198 – 204, at 203.

[56] Schuster Deposition, at 148:22 – 149:1.

[57] Schuster Deposition, Exhibit 5. (PL00070591 – 592.)

[58] Schuster Deposition, Exhibit 5. (PL00070591 – 592.)

[59] PL00213085-R (containing user-based revenues from between December 2013 and September 2022); PL00217569 (containing user-based revenues from between December 2013 and September 2020 and non-user-based revenues from between July 2015 and September 2022).

13

HIGHLY CONFIDENTIAL

[60]

Non-user-based revenues include ████████████████████████████

## III.    PNC'S CLAIMED DAMAGES AS PRESENTED IN THE LUNDELIUS REPORT

24.    As discussed in the Lundelius Report, PNC has brought this suit in objection to Plaid's use of PNC's Marks on Plaid Link.[61] According to Mr. Lundelius, PNC claims Plaid's use of PNC's Marks "deceive[d] people into believing that they were at PNC's mobile banking or website."[62] Mr. Lundelius suggests that PNC's claim of unjust enrichment damages rests on the theory that the alleged infringement "fueled Plaid's revenues, user metrics, and growth and value" because Plaid's use of PNC's Marks "confused customers [i.e., end-users] regarding the source and affiliation of the Plaid Link screens that solicited PNC customers' banking credentials."[63] Mr. Lundelius further articulates this theory in his deposition testimony, claiming end-users who chose to link their PNC accounts to fintech apps through Plaid Link and saw PNC's Marks "should not have been [. . .] Plaid users that would generate revenue for [. . .] Plaid."[64]

25.    Under this theory of unjust enrichment, Mr. Lundelius assesses Plaid's gross profits attributable to all occurrences representing end-users' connections to PNC bank accounts

---

[60] More specifically, Plaid produced user-based revenues for "financial products, or revenue that results from a consumer's use of a fintech application powered by Plaid to connect to a financial institution." My understanding is that this excludes revenue for certain Plaid products, Identity Verification and Monitor. I also understand that the Verification and Monitor products do not use Plaid Link and were not part of Plaid's product offerings until 2022 (well after PNC's Marks were removed from Plaid Link). (*See* Letter from J. Barber to C. Brennan, Re: PNC's March 10, 2023 Letter Concerning Plaid's Financial Data, March 20, 2023, pp. 2-3.)

[61] Lundelius Report, ¶¶ 25-27.

[62] Lundelius Report, ¶ 27.

[63] Lundelius Report, ¶ 28.

[64] Lundelius Deposition, at 123:5-16.

HIGHLY CONFIDENTIAL

("PNC occurrences").[65] Through his gross profits method, Mr. Lundelius calculates claimed unjust enrichment damages to be ████████████████████████ ████████████████████████████████████████ ████████████████ Mr. Lundelius's gross profits unjust enrichment damages include ███ ████████████████████████████████████████ ████████████

26. Mr. Lundelius also presents an alternative calculation of claimed unjust enrichment damages, based on his assumption that end-users who connected their PNC accounts to a Plaid-enabled fintech app (i.e., PNC occurrences) between 2015 to 2016 represent a form of capital contributed to Plaid by PNC that "added greatly to Plaid's value."[66] Mr. Lundelius values this alleged contribution of PNC occurrences as of June 19, 2016, after its Series B fundraising round, claiming that PNC should have been compensated with approximately ████████ of Plaid shares. Mr. Lundelius assesses the value of these hypothetical shares to be ████████████ as of the end of 2022.

27. Mr. Lundelius also calculates $848,522 in damages related to PNC's claimed losses incurred as a result of a security incident in mid-2019.

28. **Table 1** below summarizes Mr. Lundelius's claimed damages.

---

[65] As noted above, occurrences are connections between end-users' bank accounts and fintech apps facilitated by Plaid. As described in Mr. Schuster's deposition, an occurrence is active if the end-user is still serviced by the Plaid customer. If the same end-user has active accounts with two Plaid customers that end-user will account for two active occurrences. (Schuster Deposition, at 69:22 – 70:23; 87:5 – 90:21.)

[66] Lundelius Report, ¶ 31.

HIGHLY CONFIDENTIAL

**Table 1: PNC's Claimed Damages as Calculated by Mr. Lundelius[67]**

| Damages Approach | Claimed Damages |
|---|---|
| **Unjust Enrichment/Disgorgement of Gross Profits** | |
| Plaid's Gross Profits Attributable to PNC Occurrences (2015 – 2021) | ███████ |
| Plaid's Future Gross Profits (2022 – 2030) Attributable to Existing PNC Occurrences as of January 1, 2022 | ███████ |
| **Total** | ███████ |
| ***Alternative Damages:*** *Estimated Value of PNC's Contributed Capital to Plaid as of end of 2022* | ███████ |
| **PNC's Losses** | |
| ACH Dispute Reimbursements | $224,419 |
| ACH Dispute Investigation Costs | $31,335 |
| Lost Customer Accounts | $592,768 |
| **Total** | **$848,522** |

## IV.    SUMMARY OF ADJUSTMENTS TO PNC'S CLAIMED DAMAGES

29.    As discussed in detail throughout the remaining sections of my report, Mr. Lundelius's calculations of PNC's claimed damages suffer from a variety of flaws that cause them to be unreasonable and overstate the potential damages in this case, assuming liability has been established. As an initial matter, Mr. Lundelius fails to establish a causal connection between his damages calculations and the alleged infringement. Putting aside that fundamental flaw, other flaws in Mr. Lundelius's calculations can be at least partially addressed by making reasonable adjustments to his methodology and/or assumptions.

30.    The flaws in Mr. Lundelius's gross profits unjust enrichment calculations are discussed in **Sections V** and **VI**. I perform several adjustments to address some of the flaws. These adjustments include: (1) removing gross profits attributable to PNC occurrences unaffected by the inclusion of PNC's Marks in Plaid Link (*see* **Section V.D**); (2) removing platform fees, support fees and guaranteed user-based revenues that would have been unaffected by a small decrease in occurrences (*see* **Section VI.C.1**); (3) removing gross profits attributable to PNC occurrences that are not associated with Plaid Link (*see* **Section**

---

[67] Lundelius Report, ¶¶ 29 – 33.

16

**VI.C.2**); (4) limiting future gross profits to only recurring revenues associated with the estimated number of live PNC occurrences that were created prior to the removal of PNC's Marks from operative Plaid Link interface in December 2020 (*see* **Section VI.C.3**); and (5) discounting future gross profits to an as-of date of January 1, 2021 to reflect the end of the alleged infringement (*see* **Section VI.C.4**). In total, these adjustments to Mr. Lundelius's gross profits unjust enrichment calculations reduce PNC's claimed unjust enrichment damages to ███████ (*See* **Exhibit 1** for a summary of these adjustments to Mr. Lundelius's gross profits unjust enrichment calculations.)

31. The flaws in Mr. Lundelius's contributed capital unjust enrichment calculations are discussed in **Section V** and **VII**. It is my opinion that Mr. Lundelius's contributed capital approach is inappropriate for measuring unjust enrichment damages in this matter for a variety of reasons, and thus Mr. Lundelius's contributed capital unjust enrichment calculations do not provide the trier-of-fact with any guidance as to PNC's potential damages. For this reason, I do not adjust Mr. Lundelius's contributed capital approach.

32. The flaws in Mr. Lundelius's calculations of PNC's claimed losses are discussed in **Section VIII**. I perform two adjustments to address certain flaws with Mr. Lundelius's calculations: (1) removing PNC's claimed losses attributable to PNC occurrences unaffected by the inclusion of PNC's Marks in Plaid Link (*see* **Section VIII.B.1**) and (2) removing PNC's claimed lost customer accounts that were closed with a description of "Reason not Listed" (*see* **Section VIII.B.2**). These adjustments to Mr. Lundelius's calculations reduce PNC's total claimed losses to ██████

## V.    MR. LUNDELIUS'S UNJUST ENRICHMENT DAMAGES ARE PREMISED ON A FLAWED BUT-FOR WORLD

33. Mr. Lundelius's unjust enrichment damages are based on the profits or value purportedly attributable to *all* PNC occurrences. As indicated in his deposition testimony, Mr. Lundelius assumes that, *in the absence of PNC's Marks on Plaid Link, no end-user would have provided their PNC credentials to Plaid in order to link their PNC accounts to fintech*

17

*apps*.[68] However, he provides no analysis to support this assumption and, for the reasons discussed below, the assumption is contrary to both industry surveys and empirical analyses conducted by Plaid. Mr. Lundelius's calculations thus overstate unjust enrichment damages, assuming any are legally appropriate, and do not provide a reliable measure of the portion of Plaid's profits or value that would have been lost had Plaid Link not incorporated PNC's Marks.

A.    **Mr. Lundelius Incorrectly Conflates PNC's Marks Rights with End-Users and Thus Overstates the Alleged Infringement's Role on Whether End-Users Connect Accounts Through Plaid Link**

34.    Unjust enrichment is a method of calculating damages in which alleged ill-gotten profits are surrendered by the breaching party.[69] More specifically, unjust enrichment returns to the injured party the profits that the breaching party would not have earned but for the wrongful act.[70] It follows, then, that an economic estimate of the breaching party's unjust enrichment includes only the "profits that resulted or flowed from" the wrongful act, and therefore must be linked to the alleged misconduct.[71]

35.    In other words, even assuming that Plaid is found to have infringed PNC's Marks, a proper evaluation of unjust enrichment in the current matter would need to be based on a

---

[68] Lundelius Deposition, at 123:5 – 123:16 ("[End-users] were brought in -- on to those fintech apps that they initially signed on to through those PNC marks […] they shouldn't have been there in the first place [. . .] they should not have been […] Plaid users that would generate revenue for [. . .] Plaid.").

[69] Evans, Elizabeth A., et al., "Developing Damages Theories and Models," in Litigation Services Handbook, 5th Edition, 2012, Chapter 4, p. 15 ("Disgorgement requires the surrender of profits earned by the breaching party through illegal or unethical means.")

[70] Evans, A. Elizabeth and Simon, Peter, "Economic Analysis of Nonpatent Intellectual Property Rights and Damages Measures," in Litigation Services Handbook, 5th Edition, 2012, Chapter 18, p. 29 ("Most cases award the infringer's profits to make the infringer forgo profit it would not have earned but for its wrongful acts and to restore those profits to the owner. Courts refer to such awards as unjust enrichment." (emphasis in original)); *The Comprehensive Guide to Economic Damages*, BVR, 5th Edition, 2018, p. 646 ("The but-for analysis also involves apportioning the defendant's enrichment, limiting the remedy to the portion of the defendant's enrichment infringement alone caused.").

[71] Evans, A. Elizabeth and Simon, Peter, "Economic Analysis of Nonpatent Intellectual Property Rights and Damages Measures," in Litigation Services Handbook, 5th Edition, 2012, Chapter 18, p. 16 ("The owner's recovery of the infringer's profits in nonpatent intellectual property cases should not exceed the portion of profits attributable to the infringer's alleged wrongful act."); Arad, Ronen et. Al., "Patent Infringement Damages," in Litigation Services Handbook, 5th Edition, 2012, Chapter 19, p. 37 ("Because the law provides for the disgorgement of profits that resulted or flowed from the infringement, the infringer will disgorge its incremental profit and not some measure of aggregate profits.").

HIGHLY CONFIDENTIAL

comparison between Plaid's actual profits and Plaid's profits in a but-for world in which the alleged infringement did not occur. Given Mr. Lundelius's theory of damages, which assumes alleged deception of PNC's customers,[72] this comparison would require understanding the role of PNC's Marks on the number of end-users connecting through Plaid. Mr. Lundelius states, "[a]s a result of Plaid's alleged wrongful conduct, Plaid has earned revenues that are attributable, directly or indirectly, to Plaid's use of PNC Marks."[73] Therefore, a properly specified but-for world, in which revenues attributable to the alleged infringement are removed, would measure only the portion of end-users who would not have connected their PNC accounts through Plaid in the absence of PNC's Marks in Plaid Link. The number of end-users who would not have connected their PNC accounts through Plaid in the absence of PNC's Marks in Plaid Link form the basis for a damages analysis, assuming liability has been established. In contrast, end-users who would still have connected their PNC accounts through Plaid even in the absence of PNC's Marks in Plaid Link should not be included in any analysis of claimed damages.

36.    Rather than construct a but-for world considering the effect of PNC's Marks on user behavior, Mr. Lundelius incorrectly conflates PNC's at-issue trademark rights with PNC's customers and customer choice (which PNC has no rights over). As discussed below, an end-user's decision to use a fintech app is driven, in part, by the value the end-user places on the service.[74] By using PNC's share of total Plaid occurrences to calculate unjust enrichment damages, Mr. Lundelius effectively assumes no end-users would have connected their PNC accounts through Plaid in the absence of PNC's Marks in Plaid Link, thus overlooking any possibility that the value end-users place on the fintech app (and connection of a bank account to that fintech app) would result in connections of their PNC accounts through Plaid regardless of the display of the Plaid Link interface. Nowhere in his report does Mr. Lundelius discuss or support his assumption.[75] Mr. Lundelius's unjust enrichment analysis therefore reduces to a fundamentally flawed and unsupported

---

[72] Lundelius Report, ¶¶ 27-28.
[73] Lundelius Report, ¶ 30.
[74] *See* Section V.C.
[75] At his deposition, Mr. Lundelius provided no support for this assumption, explaining that "[w]e have to make the assumption that the marks did allow and provide the catalyst that brought the customer to the fintech app. I think that's also in the complaint as well." *See* Lundelius Deposition, at 77:12-16.

19

mechanical exercise, absent economic analysis addressing the causal connection between usage of PNC's Marks and users' choice to connect their PNC account to a fintech app through Plaid Link.

37.  In contradiction to Mr. Lundelius's analysis, the empirical findings and additional observations discussed below indicate the absence of bank trademarks has only a small impact, if any, on end-users' decisions to connect their financial institution accounts to fintech apps through Plaid. Specifically: (a) Plaid's internal studies show the inclusion of bank logos in Plaid Link has a minimal impact, at best, on user "conversion" (i.e., the ability of end-users to successfully connect their accounts to their chosen apps); and (b) the uses of fintech apps provide value to end-users, and so whether they use fintech apps is determined by more than the method of connecting a bank account. In other words, the alleged infringement had a minimal impact, at best, in increasing Plaid's count of PNC occurrences.

### B.      Plaid's Conversion Studies Indicate that the Alleged Trademark Infringement Had, At Best, a Minimal Impact on Whether End-Users Share Credentials

38.  Plaid's own experimental studies demonstrate the inclusion of bank trademarks had a minimal impact on the number of occurrences. Mr. Lundelius does not reference these studies, much less incorporate their findings into his analysis, and as a result he significantly overstates unjust enrichment damages. As discussed above, his analysis presumes in the but-for world *no* end-users would connect their PNC accounts to Plaid-enabled fintech apps if PNC's Marks had been absent from Plaid Link—an assumption directly undermined by the findings of Plaid's studies.[76]

---

[76] Additionally, PNC's expert retained to opine on cybersecurity, Todd Renner, testified that it would have been a good idea to run a study on conversion rates if Plaid logos were removed—experiments Plaid did run (see conversion studies detailed in this section). Deposition of Todd Renner, November 15, 2023, at 124:15 – 125:13. ("it would have been a good experiment to see how many people actually entered their credentials and usernames and passwords if they -- if they didn't have the bank logos. I think that would have been a good experiment at the time for Plaid.")

20

39.  Plaid conducted several studies ("conversion studies") between 2018 and 2021.[77] These studies assess the impact of changes to various interface options on Plaid Link's conversion rate (i.e., the share of users opening Plaid Link who successfully connect their bank accounts).[78] Based on my review of the conversion studies, ███████████████████ ████████████████████████████████████████████ are the most relevant to my analysis.[79] Specifically, ████████████████████████████████████████████ ██████████████████████████████████████—the relevant metric for adjusting Mr. Lundelius's claimed unjust enrichment damages to be based on only the at-issue set of PNC occurrences in this case, given PNC's damages theory.[80]

40.  The ████████████████████████████████████████████████ ██████,[81] and ████████████████████████████████████████████

---

[77] Chakravorti Deposition, at 107:17 – 108:13; Chakravorti Deposition, Exhibit 18, at pp. 11-12; Affidavit of Emeline Minor, November 13, 2023 ("Project Gold Affidavit"); PL00182236; PL00192553–555; PL00180856–871; PL00047322–333; PL00007467–476; PL00050779–780; PL00191630–638; PL00181446 – 451; PL00184973 – 5012, at 4984 – 4985.  Emeline Minor was in business development at Plaid from 2017 to 2022.

[78] I also consider the "credential-entering rate" (i.e., the share of users that selected a financial institution in Plaid Link who entered their credentials). ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████      See PL00192553–555.

[79] PL00192553–555; Project Gold Affidavit. ████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████      See PL00181446–451 at 449; PL00180856–871, at 863; PL00047322–333, at 330.

[80] PL00182236; PL00192553–555; Project Gold Affidavit, pp. 4-5, 8.

[81] PL00182236; PL00192553–555. I understand from Mr. Bernasconi's testimony that the ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████      See Bernasconi Deposition, at 71:7 – 74.7.

21



[82 redacted]

[83] PL00192553-555; Project Gold Affidavit.

HIGHLY CONFIDENTIAL



---

[84] PL00192553 – 555, at 554.

HIGHLY CONFIDENTIAL



---

[85] Project Gold Affidavit, p. 2.

24

HIGHLY CONFIDENTIAL



**Table 2** below shows ███████████████████████████████████████ ████████████████████████████████████ For users to successfully connect a bank account to their chosen fintech app, they must not only select a bank and enter credentials but also enter correct credentials that are successfully authenticated. The conversion rate in each group represents the share of end-users who successfully connected a bank account. For example, this conversion, or handoff, rate ███████████████████████████████

---

[86] Project Gold Affidavit, p. 6.

HIGHLY CONFIDENTIAL



42.    The differences in conversion rates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ suggest that if PNC's Marks had not been displayed in Plaid Link, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In other words, in a but-for world where PNC's Marks were not displayed on Plaid Link (and no allegedly wrongful conduct had occurred), end-users would still have connected their PNC account through Plaid Link

[89] PL00182236; Project Gold Affidavit, pp. 4-5, 8.

26

███████████████████████████████████ As discussed above, only the number of end-users who would not have chosen to connect their bank account to their chosen fintech app through Plaid Link but for the allegedly infringing interface form the appropriate basis for a damages analysis. In contrast, end-users who would have shared their PNC account information even absent the alleged misconduct should *not* be included in any analysis of claimed damages.

43. Additionally, another relevant metric from these studies is the "credential-entering rate" (i.e., the percent of end-users that selected a financial institution that also enter credentials), as PNC claims end-users were allegedly deceived by the use of its Marks at this stage in the process into thinking they were directly signing into their bank.[90] Plaid also considers this metric in addition to the conversion rate when discussing the outcome of these studies.[91] █████████████████████████████████████████████████████████████ ████████████████████████████████████████████

---

[90] Lundelius Report, ¶¶ 27-28.
[91] *See* Project Gold Affidavit; PL00047322 – 333, at 329-330; PL00180856 – 871, at 863.
[92] PL00182236, tabs "Conversion – search institution," "Conversion – Auth + search inst," and "Conversion – Transactions + sea."



44. In a but-for world where PNC's Marks were not displayed on Plaid Link (and no allegedly wrongful conduct had occurred), the Plaid studies referenced above indicate that end-users would still have entered credentials for their PNC account through Plaid Link ███████ ████████████████████ This finding indicates that total damages in this case could be as low as zero, as the presence of logos ███████████████████████ ███████████████████████████████ In other words, ██████████ ████████████████████████████████████████████ ████████████████████████████

45. Moreover, ████████████████████████████████████████████ ██████████████ likely overstate the portion of end-users who would not have shared

████████████████████████████████████████████████

their PNC account information *absent the alleged wrongful conduct*. PNC alleges Plaid "trick[ed] and deceive[d] people into believing that they were at PNC's mobile banking or website to obtain their valuable and private financial information."[94] But the conversion rate difference discussed above does *not* necessarily represent end-users who were "trick[ed] or deceive[d]." As discussed in the deposition of Mr. Paolo Bernasconi, a software engineer at Plaid, bank logos also help end-users identify the correct financial institution when signing up for a fintech app.[95] Therefore, the percent decrease in the conversion rate following removal of bank logos likely is, in part, attributable to end-users who selected the wrong financial institution, which differs from end-users who did not successfully signup because they were skeptical of submitting credentials in the absence of bank logos.

46.  The end-user behavior ███████████████████████████ ███████ indicates that users' decision to connect their bank accounts to their chosen fintech app (including their willingness to provide their credentials) depends only minimally, if at all, on the presence of banks logos. In **Section V.D** below, I correct Mr. Lundelius's claimed unjust enrichment damages to account for this.

### C.    Mr. Lundelius Fails to Consider the Value End-Users' Receive from Using Fintech Apps

47.  Mr. Lundelius's assumption that no end-users banking with PNC would connect to a fintech app through Plaid but-for the alleged infringement of PNC's Marks within Plaid Link is further contradicted by the growing prevalence of fintech apps. For example, a study conducted by Mastercard found that 81 percent of consumers in the United States and Canada had their primary bank account connected to a fintech app.[96] Similarly, a study

---

[94] Lundelius Report, ¶ 27.
[95] Bernasconi Deposition, at 31:8-13. *See also* Hertz Deposition, Exhibit 8.
[96] Mastercard 2021 Survey, p. 15. *See also* Mastercard, "The Future is Here: new Mastercard study finds majority of consumers embrace open banking to power digital financial experiences," Mastercard Press Release, December 14, 2021, available at: https://www.mastercard.com/news/press/2021/december/the-future-is-here-new-mastercard-study-finds-majority-of-consumers-embrace-open-banking-to-power-digital-financial-experiences/.

conducted by Visa found that the average consumer is connected to more than four fintech apps at any given time.[97]

48.    The growing adoption of fintech apps has been driven by the variety of solutions (e.g., paying bills, banking, filing taxes, investing, etc.) fintech apps provide to end-users.[98] These uses of fintech apps provide value to end-users, and so whether they use fintech apps is not determined by security concerns alone, as Mr. Lundelius assumes. This is especially true for fintech apps that have a strong reputation and generally are not associated with concerns regarding the security of end-users' financial information.[99] Therefore, Mr. Lundelius's premise that <u>no</u> end-users would connect their PNC accounts to Plaid-enabled fintech apps in the absence of PNC's Marks within Plaid Link is unreasonable and contrary to current trends. This conclusion further corroborates Plaid's conversion studies, which indicate that regardless of whether bank logos make end-users feel more comfortable when sharing financial information (as PNC alleges), the removal of bank logos from Plaid Link would not be expected to have a large impact on Plaid occurrences.

### D.    Implications for Mr. Lundelius's Claimed Unjust Enrichment Damages

49.    Based on the discussion in **Sections V.A – V.C**, I conclude Mr. Lundelius's claimed unjust enrichment damages overestimate the portion of occurrences that should be

---

[97] Visa, "The U.S. Open Banking Movement: How consumers are driving U.S. open banking innovation", *Navigate Visa*, 2023, p. 6, available at: https://navigate.visa.com/$/v/5/na/m/x/u/23a556e7-8cb6-43fa-b62b-f8af7e6212be.pdf. *See also* Federal Deposit Insurance Company, "Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021" *FDIC Press Release,* October 25, 2022 (showing "Nearly half of all households (46.4 percent) used a nonbank online payment services [such as Paypal, Venmo, and CashApp] in 2021, including two-thirds of households younger than 35."), available at: https://www.fdic.gov/news/press-releases/2022/pr22075.html.

[98] For example, a study by Mastercard concluded that "[u]se of technology to manage money is mainstream," with "[o]ver 9 in 10 [survey respondents] us[ing] technology to manage money." The study also concluded that respondents "us[e] digital apps, products and services for simple financial tasks (i.e., paying bills, banking)" but also noted "a rising appetite for more complex needs like financial forecasting, investing via cryptocurrency and crowdfunding." *See* Mastercard, "The Rise of Open Banking," 2021 ("Mastercard 2021 Survey"), pp. 6, 11, available at: https://b2b.mastercard.com/reports/rise-of-open-banking-north-america/.

[99] For example, a survey conducted by Ernst and Young found that a greater share of consumers (i.e., end-users) named a fintech firm as their most trusted financial brand (37 percent) than those that named a bank (33 percent). *See* Lele, Nikhil, et al., Ernst and Young, "How financial institutions can win the battle for trust," June 11, 2021, available at: https://www.ey.com/en_us/nextwave-financial-services/how-financial-institutions-can-win-the-battle-for-trust.

HIGHLY CONFIDENTIAL

included in the damages estimates, as there is evidence that removing PNC's Marks would have, at most, a minimal effect on the rate at which end-users enter PNC credentials to connect their PNC accounts to their chosen fintech apps through Plaid Link.

50. I conservatively use ▮▮▮▮▮ as an upper-bound estimate of the percent of occurrences that could potentially form the basis for a gross profits unjust enrichment damages calculation. In other words, I adjust Mr. Lundelius's damages analyses to reflect the portion of Plaid's profits from ▮▮▮▮▮ of occurrences connecting PNC accounts to fintech apps through Plaid Link.[100] Such an approach is conservative, as ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

51. Under his gross profits unjust enrichment calculation, Mr. Lundelius calculates damages by multiplying Plaid's gross profits by the claimed share of PNC occurrences out of total Plaid occurrences, effectively assuming all occurrences contribute equally to Plaid's gross profits. In other words, Mr. Lundelius calculates Plaid's *gross profits* from PNC occurrences as proportional to the *volume* of PNC occurrences. Using that same assumption, a ▮▮▮▮▮ decline (as discussed above) in PNC occurrences also represents the percentage decrease in Plaid's profits in a properly constructed but-for world without the alleged infringement. Therefore, to account for the conservative application of the conversion study findings in estimating the gross profits from only end-users affected by the alleged infringement, Mr. Lundelius's gross profits unjust enrichment damages (which assumes a decrease in gross profits attributable to a 100 percent decrease in PNC occurrences) is reduced by ▮▮▮▮▮▮▮▮▮▮▮ reducing Mr. Lundelius's claimed unjust enrichment damages based on gross profits by ▮▮▮▮▮.[101] This reduction reflects that the majority of end-users who linked a PNC account through Plaid Link would have still done so in the absence of PNC's Marks in Plaid Link.

---

[100] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[101] ▮▮▮▮▮ *See* Lundelius Report, ¶ 50.

52.    As discussed in more detail below, Plaid's conversion studies also call into question the reliability and relevance of Mr. Lundelius's contributed capital approach for estimating unjust enrichment damages in the current matter. Mr. Lundelius assumes growth in Plaid's value can be attributed to the alleged wrongful conduct based on the share of PNC occurrences for the 12 months prior to Plaid's Series B fundraising in June 2016.[102] Again, Mr. Lundelius errs in his assumption that 100 percent of PNC occurrences can be attributed to the alleged wrongful conduct. In addition, as discussed in **Section VI.C.2**, ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████.[103] Therefore, even accepting Mr. Lundelius's flawed assumption that PNC's allegedly contributed capital to Plaid in the form of occurrences, occurrences *that would not have existed in the absence of PNC's Marks in Plaid Link* represent no more than ████████ of new PNC occurrences added in the twelve months prior to June 2016.[104]

## VI.    MR. LUNDELIUS'S GROSS PROFITS CALCULATIONS SUFFER FROM ADDITIONAL FLAWS THAT FURTHER OVERSTATE CLAIMED UNJUST ENRICHMENT DAMAGES

53.    As discussed in **Section III**, Mr. Lundelius calculates unjust enrichment damages based on gross profits—both historical and future—by attributing a portion of Plaid's gross profits to PNC occurrences. These calculations are respectively summarized in **Sections VI.A** and **VI.B** below. As I discuss in **Section VI.C**, Mr. Lundelius's calculations of gross profits suffer from a variety of flaws that overstate gross profits attributable to the alleged infringement and, therefore, unjust enrichment damages.

---

[102] Lundelius Report, ¶ 54.
[103] PL00118871 – 919, at 891.
[104] For illustrative purposes only, ████████████████████ can be applied to Mr. Lundelius's claimed contributed capital unjust enrichment damages to account for the expected impact of the alleged wrongful conduct on PNC occurrences. This adjustment alone, without addressing any other flaws in his analysis, reduces Mr. Lundelius's claimed contributed capital unjust enrichment damages to ████████ ████████████. However, as discussed below in **Section VII**, Mr. Lundelius's contributed capital approach does not provide an appropriate measure of unjust enrichment damages in this case (even with the aforementioned adjustment) for a variety of other reasons.

### A.   Mr. Lundelius's Calculation of Historical Gross Profits Unjust Enrichment Damages

54.   Mr. Lundelius performs the following steps to estimate that ███████████ in Plaid's "historical" gross profits (i.e., Plaid's gross profits earned *during* the period of the alleged infringement according to Mr. Lundelius[105]) are attributable to PNC occurrences from 2015 through 2021.

a.   Mr. Lundelius first calculates Plaid's total gross profits by subtracting Plaid's cost of sales, as reported in Plaid's financials, from Plaid's total revenues less Quovo revenues. Plaid's reported total revenues include both user-based and non-user-based revenues,[106] as well as revenues earned from direct integration during Plaid Link's rollout period.

b.   Mr. Lundelius then calculates the portion of Plaid's gross profits attributable to PNC occurrences. Specifically, for each year, Mr. Lundelius calculates unjust enrichment damages by multiplying his estimate of Plaid's gross profits by the share of PNC occurrences out of total Plaid occurrences, as shown in **Table 4** below.



### B.   Mr. Lundelius's Calculation of Future Gross Profits Unjust Enrichment Damages

---

[105] Lundelius Report, ¶ 30.
[106] Mr. Lundelius claims that "[t]otal gross profits from both user-based and non-user-based revenues are appropriate as damages because PNC users contributed to Plaid's ability to generate customer contracts and ████████████ provide for non-user-based fees." (Lundelius Report, ¶ 43.)
[107] Lundelius Report, p. 22.

55.  Mr. Lundelius calculates ███████ in "future" gross profits (i.e., Plaid's gross profits earned from pre-existing end-users *after* the alleged infringement ended according to Mr. Lundelius[108]) unjust enrichment damages based on future profits that Plaid earned and will continue to earn from existing end-users who linked PNC accounts to Plaid-enabled fintech apps. He first projects Plaid's annual future gross profits attributable to recurring revenues from these end-users through 2030 and then calculates their present value as of January 1, 2022, *i.e.*, the date at which he (incorrectly) assumed the alleged infringement ended.[109] He projects Plaid's future gross profits attributable to recurring revenues from existing end-users who linked PNC accounts to Plaid-enabled fintech apps in the following steps (and as shown in **Table 5**).



56.  Mr. Lundelius first projects future PNC occurrences between 2022 and 2030 attributable to end-users with existing PNC occurrences.[111] He then adjusts this projection of occurrences by applying an annual 9 percent attrition rate based on the attrition of PNC's customer accounts (as assumed by PNC in its calculation of the lifetime value of customer accounts).[112] Mr. Lundelius then multiplies his projection of annual PNC occurrences by

---

[108] Lundelius Report, ¶ 44; Lundelius Deposition, at 114:13 – 115:17.

[109] Lundelius Deposition, at 120:8-21.

[110] Lundelius Report, Exhibit: Future Plaid Gross Profits Attributable to PNC Customers.

[111] Lundelius Report, ¶ 45. Mr. Lundelius projects 2022 occurrences by annualizing PNC occurrences between January and October of 2022. He then allows occurrences from 2022 to 2030 to grow by ███

[112] Lundelius Report, ¶ 47. The annual PNC customer account attrition rate of 9 percent Mr. Lundelius relies upon is based on PNC's estimated annual customer retention rate of 91 percent in its calculation of the lifetime value ("LTV") of its customers. *See* Lundelius Report, footnote 86.

███████████████████████████████████████████████

████████████████████████████████ [113] He then multiplies his projection of revenue attributable to PNC occurrences by an estimate of Plaid's gross margin ██████, which he calculates by averaging his estimate of Plaid's gross profit margin (gross profits divided by revenue), to project gross profits attributable to future PNC occurrences. [114]

57.  Mr. Lundelius represents unjust enrichment damages from future profits as the present value of his projected profits attributable to PNC occurrences, which he calculates by discounting his estimates of future profits at a rate of 5.97% per year to January 1, 2022. Mr. Lundelius estimates the discount rate by adding a risk-free rate estimate to the product of a beta estimated from comparable companies and an estimate of the equity risk premium ("ERP")—with all inputs being as of January 1, 2022.[115]

### C.  Mr. Lundelius Overstates Gross Profits Attributable to PNC Occurrences

58.  As discussed above in **Section IV**, Mr. Lundelius incorrectly assumes that all PNC occurrences during the relevant time period were created as a result of Plaid's use of PNC's Marks within Plaid Link, leading him to significantly overstate unjust enrichment damages. Mr. Lundelius's gross profits unjust enrichment calculations are further flawed and overstated by his inclusion of Plaid revenues that would have been earned even in the absence of end-users connecting a PNC account through Plaid Link. Specifically, Mr. Lundelius's calculations are based on Plaid's *total revenues* reported in its profit and loss statements, thus including revenues that would be unchanged in the but-for world (where PNC's Marks were removed from Plaid Link): (a) fixed platform and support fees, as well

---

[113] Lundelius Report, ¶ 46. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

[114] Lundelius Report, ¶ 47.

[115] Lundelius Report, ¶ 49. Mr. Lundelius uses the 20-Year Treasury rate for his risk-free rate estimate and data from Aswath Damodaran's NYU website for his estimate of the ERP.  Mr. Lundelius estimates beta using "the median of the five-year monthly levered betas of companies identified by CapitalIQ that [he] evaluated and determined as being comparable to Plaid." The companies Mr. Lundelius determined were comparable to Plaid consisted of: Envestnet, Mitek Systems, Fiserv, and Metro One Telecommunications. *See* Lundelius Report, Exhibit: Future Plaid Gross Profits Attributable to PNC Customers, p. 3.

as contractually guaranteed minimum revenues; (b) revenues not associated with Plaid Link during Plaid Link's gradual rollout; and (c) revenues from new PNC occurrences created after PNC's Marks were removed from the operative Plaid Link interface. Finally, as a result of incorrectly assuming the alleged infringement lasted until January 1, 2022, Mr. Lundelius overstates the present value of future at-issue profits by discounting them to a more recent date at a lower discount rate.

### 1.    Mr. Lundelius Includes Non-User-Based Revenues in At-Issue Revenues

59.  As discussed in **Section II.B.2**, Plaid's customers pay ███████████████████ ███████████████████████████████ These fees are fixed and therefore do not vary with small changes in the number of end-users connecting accounts to fintech apps through Plaid. Therefore, these fees would not change in a but-for world in which the removal of PNC's Marks in Plaid Link caused marginally fewer end-users to connect PNC accounts through Plaid. Consequently, ██████████████ should not be included in the at-issue revenues in Mr. Lundelius's unjust enrichment damages. Additionally, a portion of Plaid's revenues from its customers' API usage is guaranteed via minimum revenue commitments in customer contracts and should similarly not be included in the at-issue revenues in Mr. Lundelius's unjust enrichment damages.



60.  Mr. Lundelius attempts to justify his inclusion of ██████████████ based on his claim that "PNC users contributed to Plaid's ability to generate customer contracts and customer contracts provide for non-user-based fees."[116] However, Mr. Lundelius does not provide any analysis to support his assumption that Plaid's ██████████████ would be lower in a world in which there was no alleged infringement and Plaid's base of occurrences was only marginally smaller. As Mr. Lundelius's analysis indicates, the share



---

[116] Lundelius Report, ¶ 43. I note that Mr. Lundelius's claim is directly contradicted by his deposition testimony, in which he indicates there is no connection between Plaid's occurrences and the number of its customers. *See* Lundelius Deposition, at 111:3 – 112:4 (For example, Mr. Lundelius was asked, "So you do not see any connection between the number of PNC occurrences and the number of Plaid's customers being the fintech apps?" to which Mr. Lundelius responded, "I don't see – well, I don't see in your hypothetical that you can make a – a connection between occurrences and customers. It's just – there's no – not necessarily a direct link between occurrences and customers.").

of PNC occurrences has been ███████████ of total occurrences (in 2015 and 2017),[117] and ████████████████████████ after properly adjusting for the portion of end-users who would have connected their PNC accounts through Plaid Link even in the absence of the alleged infringement.[119]

61. Additionally, as also discussed in **Section II.B.2**, a significant portion of Plaid's usage fees, which Plaid earns from user-based activity, are guaranteed through minimum commitments made by its customers (i.e., the fintech apps).[120] For a given month, customers who do not meet their minimum commitments pay the difference between their actual usage fees and their minimum commitments. For example, ████████████

██████████████████████████████████████████

████████ ██████████████████████████████████████

████████████████████████████████████████ [122]

In other words, regardless of whether end-user signups were marginally lower in the but-for world, ████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

---

[117] Lundelius Report, p. 20.

[118] As discussed in **Section V.D**, I conservatively use ████████ as an upper-bound estimate of the percent of occurrences that could potentially form the basis for a gross profits unjust enrichment damages calculation.

[119] Additionally, Mr. Lundelius overstates unjust enrichment damages from Plaid's gross profits even under his assumption that PNC occurrences contributed to all of Plaid's revenue streams. Mr. Lundelius's inclusion of fixed revenue streams implies that additional costs should be deducted in his calculation of Plaid's unjust enrichment damages. For example, Mr. Lundelius's argument that "non-user-based fees are appropriate as damages" because Plaid's user-base is purportedly connected to Plaid's ability to earn non-user-based fees from customer contracts implies that costs associated with generating customer contracts, such as sales and marketing costs, should be accounted for in his damages calculations. However, Mr. Lundelius subtracts only Plaid's cost of revenue from Plaid's total revenue and does not account for Plaid's considerable sales and marketing costs, thus overstating unjust enrichment damages from gross profits. Notably, Plaid's ███████████████████████████████████████ ████████ *See* PL00212960-983; PL00212984-3014; PL00213015 – 041; PL00213042 – 069.

[120] ████████████████████████████████████████ *See* Schuster Deposition, Exhibit 5. (PL00070591 – 592.)

[121] Schuster Deposition, Exhibit 10. (PL00187696 – 697, at 696.)

[122] PL00217569.

62.    Mr. Lundelius acknowledges these contractual minimum commitments in his report.[123] However, he nevertheless uses Plaid's total revenues to calculate at-issue gross profits, ignoring the implication that at least some of Plaid's revenues were guaranteed by its customers and would not have changed in the but-for world. Such an assumption yields an overstated estimate of at-issue revenues.[124]

63.    Mr. Lundelius's erroneous inclusion of ███████████████ as well as contractually guaranteed revenues, in at-issue revenues affects both his historical and future gross profit calculations. First, as shown in **Exhibit 3.1**, I correct Mr. Lundelius's calculation of historical gross profits unjust enrichment damages to exclude such revenues by subtracting Plaid's ████████████████████, and payments to meet guaranteed minimums (i.e., unmet minimums) and guaranteed user-based revenues (i.e., user-based revenues in months when Plaid's customer paid unmet minimums) from the total Plaid revenues Mr. Lundelius relies upon.[125] In other words, I remove non-user-based revenues (i.e., revenues that do not depend on the level of end-user activity) from Mr. Lundelius's calculations.[126]

---

[123] Lundelius Report, ¶ 15 and footnote 24.

[124] I note that, based on his deposition testimony, Mr. Lundelius does not appear to appreciate the implication of his inclusion of Plaid's guaranteed revenues in his calculation of gross profits attributable to the alleged infringement. *See* Lundelius Deposition, at 108:2-13 (Mr. Lundelius was asked, "[if] the usage of a fintech app puts it below the minimum commitment, if there were fewer sign ups, that would not change that it would owe Plaid that minimum commitment, right?" to which Mr. Lundelius responded, "So it's below the minimum and there are fewer sign ups? I don't get the connection sign ups and below the minimum.") and 109:17 – 110:7 (Mr. Lundelius was asked, "if the number of consumers connecting through an app is insufficient to meet the monthly commitment, there being fewer connections would not change that the customer is not making the monthly commitment?" to which Mr. Lundelius responded, "I'm still having trouble with the connection between customers and a minimum. The minimums are based upon accessing, and I think they refer to it as calls [. . .] I don't understand the connection to the customer.").

[125] Data produced by Plaid provides the ███████████████████████ and unmet minimum payments by customer from July 2015 through September 2022. Using those data and data on Plaid's user-based revenues (i.e., usage fees), I calculate additional guaranteed user-based revenues on a monthly basis by identifying usage fees from Plaid customers who paid unmet minimum fees in the same month (i.e., the customer's usage fees were below the contractually guaranteed minimum, meaning that all usage fees in that month were guaranteed). I am able to identify guaranteed user-based revenues associated with customer-months in which unmet minimums were paid over the December 2013 through January 2019 time period. I conservatively do not deduct non-user-based revenues in time periods for which data on non-user-based revenues are unavailable. *See* PL00213085-R, tab "Plaid User-Based Revenue by Mon"; PL00217569, tab "non-user based revenue."

[126] To calculate gross profits, I multiply user-based revenues by the gross profit margins implied by Mr. Lundelius's calculations; as such, the ratio of cost of revenue to revenue in my calculations is identical to that in Mr. Lundelius's.

38

Setting aside all other flaws in his analysis, this adjustment reduces Mr. Lundelius's unjust enrichment damages attributable to Plaid's historical gross profits ███████████.

64. As shown in **Exhibit 3.2**, I also correct Mr. Lundelius's calculation of future gross profits unjust enrichment damages by limiting his calculation of recurring revenue per occurrence to recurring *user-based* revenue per occurrence—otherwise following his future gross profits methodology.[127] This adjustment to Mr. Lundelius's future gross profits calculation reduces unjust enrichment damages based on future gross profits by █████████.

65. In total, removing non-user-based revenues reduces Mr. Lundelius's claimed unjust enrichment damages based on gross profits by █████████.

### 2.    Mr. Lundelius Includes Direct Integration-Related Revenues Generated During Plaid Link's Rollout

66. As discussed in **Section II.B.1**, Plaid Link was gradually rolled out across Plaid's customers from May 2015 through 2018. Based on the evidence available in this case, ████████████████████████████████████████████████ ████████████████████████████████████[129] I assume Plaid Link was used by 100 percent of Plaid's customers by the beginning of 2018.[130] Until a fintech app switched to Plaid Link, the fintech app utilized its own user interface for collecting the end-users' information.[131] During this period of "direct integration," Plaid was not involved in the design of the interface and the decision to display (or not display) bank logos.[132] Instead, Plaid would take the information collected by the fintech app from the end-user, and use

---

[127] In particular, I divide recurring user-based revenue by total user-based revenue and apply the average of this ratio to user-based revenue per occurrence, which I calculate following Mr. Lundelius's methodology.

[128] PL00118871 – 919, at 891.

[129] PL00102306 – 366, at 322.

[130] Chakravorti Deposition, Exhibit 2, p. 2; Chakravorti Deposition, at 212:10-14. This is a conservative assumption, as it is possible that some number of Plaid's customers continued to operate using direct integration throughout 2018.

[131] Chakravorti Deposition, at 212:3-24.

[132] Chakravorti Deposition, at 211:5-16. ("I think, to take a step back, before Plaid Link was introduced, the way in which -- Plaid was operating before that, as were other sort of similar companies that were helping connect consumer accounts to -- consumer financial institution accounts to the apps they wanted to use. But the way that operated was through what we call a direct integration, which is the application would build its own user interface to connect to the financial institution. And those largely incorporated the use of bank logos.")

that information to collect the requisite financial information from the bank, which it would then pass back to the fintech app.

67.   While Mr. Lundelius acknowledges in his report that Plaid Link is the allegedly infringing user interface and was introduced in May 2015,[133] he does not address or acknowledge the gradual rollout of Plaid Link in his report, nor are the implications of this rollout reflected in his calculations of PNC's claimed unjust enrichment damages.[134] Instead, Mr. Lundelius's gross profits calculations include all of Plaid's revenues from January 2015 through 2018, even though some (in fact, likely many) end-users connected to their PNC accounts through interfaces designed by the fintech apps, *not* Plaid, over that time period. End-users who did not connect through Plaid Link, and instead connected through interfaces designed by fintech apps, should be excluded from the damages analysis. Therefore, Mr. Lundelius significantly overstates unjust enrichment damages by including revenues that were not earned through Plaid Link.

68.   As shown in **Exhibit 4.1**, I correct Mr. Lundelius's calculation of historical gross profits unjust enrichment damages to include only Plaid Link-related revenues by prorating the total Plaid revenues reflected in Plaid's consolidated financials, according to conservative estimates of Plaid Link's share of total Plaid traffic, otherwise following Mr. Lundelius's methodology.[135] Setting aside all other flaws in Mr. Lundelius's analysis, limiting Plaid's revenues to those generated from end-users who connected PNC accounts through Plaid

---

[133] Lundelius Report, ¶ 26.

[134] Lundelius Deposition, at 94:14 – 103:23 ("…Q. And if the data included occurrences that did not represent those sorts of connections, would you want to adjust your calculation to account for that? THE WITNESS: Yeah. And -- and it says here that -- yes. The -- and I have -- yeah. I have no information beyond just a -- you know, the broad statements here that the -- there was --there were direct integrations. We don't have a -- an actual number to be able to -- to tie …Q. Did you look for any information about the split between connections made by direct integrations and those made via Plaid Link? THE WITNESS: Again, no. That was because the -- the dataset that I was given, I understood to have -- to have been the result of the use of PNC marks... the data we have represents PNC customers that saw the Plaid marks. So I don't know if that would pick up some, any, or none of the customers that were moving in -- in 2017 and 2018…").

[135] To calculate gross profits, I multiply estimated Plaid Link revenues by the gross profit margins implied by Mr. Lundelius's calculations; as such, the ratio of cost of revenue to revenue in my calculations is identical to that in Mr. Lundelius's.

40

Link, rather than a direct integration, reduces historical gross profits unjust enrichment damages by ███████ [136]

### 3.    Mr. Lundelius Overstates At-Issue Revenues Received After the Removal of PNC's Marks from the Operative Plaid Link Interface

69.    As discussed in **Section II.B.1**, Plaid removed PNC's Marks from the operative Plaid Link user interface for all of Plaid's customers in December 2020.[137] Therefore, the only revenues that may be attributed to the alleged infringement are those earned from occurrences added prior to January 2021. As established in deposition testimony and noted by Mr. Lundelius, occurrences represent connections between bank accounts and a particular fintech app.[138] For example, if the same end-user has active accounts with two Plaid customers, that end-user will account for two active occurrences.[139] That is, any new or added occurrences represent new signups on Plaid-enabled fintech apps.

70.    Occurrences from end-users connecting to PNC bank accounts who were not shown PNC's Marks cannot be attributed to the alleged infringement. However, Mr. Lundelius includes revenues attributable to such occurrences in his calculation of—and thereby overstates— unjust enrichment damages from both Plaid's historical and future gross profits.

### a)    Mr. Lundelius Includes Revenues from New PNC Occurrences in His Calculation of 2021 Gross Profits Attributable to the Alleged Infringement

71.    Plaid's total revenues reported in its 2021 and 2022 profit and loss statements include revenues associated with end-users who connected their PNC accounts to Plaid-enabled fintech apps *after* PNC's Marks were removed from the operative Plaid Link interface in December 2020. Clearly, these revenues cannot be attributed to the alleged infringement. Nonetheless, Mr. Lundelius relies on total revenue in his calculation of at-issue 2021 gross profits, claiming that "customers were not required to update the interface for their apps

---

[136] ███████████████████████    *See* Lundelius Report, ¶ 43; **Exhibit 4.1**.
[137] Chakravorti Deposition, at 216:7-16.
[138] Lundelius Report, ¶ 15; Bernasconi Deposition, at 311:1-4; Hertz Deposition, at 312:8-21.
[139] Schuster Deposition, at 87:5 – 90:21.

per customer contracts."[140] Mr. Lundelius's claim is directly contradicted, however, by the testimony of Plaid's 30(b)(6) witness, Mr. Raja Chakravorti, which states "Plaid voluntarily removed PNC's logo" from the operative Plaid Link user interface in December 2020, and that change was implemented "immediately across Plaid's customers."[141]

72. As a result, Mr. Lundelius overstates gross profit unjust enrichment damages because he includes 2021 revenues from that are attributable to PNC occurrences added after the alleged infringement ended.

### b) Mr. Lundelius Overstates Revenue Attributable to Future PNC Occurrences

73. Mr. Lundelius similarly overstates at-issue revenues after 2021 by including revenues from not-at-issue occurrences. In particular, Mr. Lundelius projects at-issue occurrences to grow ██████████████████████████████████, before accounting for customer attrition from PNC. As indicated in Mr. Lundelius's deposition testimony, the new occurrences implied by Mr. Lundelius's growth rate represent connections from existing end-users who linked their PNC accounts as of January 1, 2022 to *new fintech apps*.[142] These new occurrences cannot form the basis for damages, as PNC's Marks were no longer included on the operative version of Plaid Link.

74. Additionally, Mr. Lundelius overstates recurring revenue per occurrence, as his calculation of Plaid's recurring revenue subtracts only fees from Plaid's Auth product. Mr. Lundelius therefore includes in recurring revenue fees from Plaid's Identity and Income products, which are also products associated with a one-time fee and should thus be excluded from

---

[140] Lundelius Report, footnote 63.
[141] Chakravorti Deposition, at 216:7-16. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████
[142] Lundelius Deposition, at 115:23 – 116:11.

recurring revenues.[143] The Auth product accounts for ███████████████ of Plaid's user-based revenue from 2015-2020, and the Identity and Income products together account for ████████████ [144]

75.    Moreover, Mr. Lundelius underestimates the attrition of PNC occurrences in his projection of future PNC occurrences. While Mr. Lundelius adjusts his projected occurrences downward to reflect 9 percent annual attrition, this attrition rate is based on the attrition rate of *PNC's customer accounts* (i.e., the rate at which end-users close their PNC banking accounts) and does not capture the attrition from PNC customer accounts that remain open but are no longer connected to Plaid-enabled fintech apps (e.g., because the end-user closed their accounts on the fintech apps or removed the connections of their PNC account to the fintech apps.).[145] In fact, Mr. Lundelius does not discuss or provide support for why the rate at which bank customers close their bank accounts is a reasonable proxy for occurrence attrition.[146] Mr. Lundelius ignores the possibility that *active* occurrences, those that continue to generate revenue for Plaid,[147] decline over time as a result of end-user *attrition from fintech apps*. ████████████████████████████████

████████████████████████████████████████████

---

[143] Mr. Lundelius's calculation of recurring revenue per occurrence, which utilizes total Plaid revenue reported in its financial statements from 2017 through September 2022, also overstates the relevant recurring revenues in this case by including revenues associated with Identity Verification and Monitor products. I understand these products do not use Plaid Link. *See* Letter from J. Barber to C. Brennan, Re: PNC's March 10, 2023 Letter Concerning Plaid's Financial Data, March 20, 2023, pp. 2-3; Lundelius Report, Exhibit: Future Plaid Gross Profits Attributable to PNC Customers.

[144] *See* PL00217569, tab "user-based revenue."

[145] I note that Mr. Lundelius incorrectly calculates the effect of his assumed attrition rate. In particular, Mr. Lundelius calculates the share of PNC customers lost from attrition after $n$ years using the following formula: Compound Customer Attrition $= (1 + 9\%) \wedge n - 1$. (While Mr. Lundelius does not provide the formula, he uses to calculate Compound Customer Attrition, the formula I describe replicates his projection of Compound Customer Attrition.) Mr. Lundelius's formula is incorrect, as it reflects compounded exponential *growth* after $n$ years; in fact, setting $n = 9$ would result in over 100 percent attrition of customers, which is not possible. The correct formula to calculate the share of customers lost from attrition after $n$ years is as follows: Compound Customer Attrition $= 1 - (1 - 9\%) \wedge n$. *See* Lundelius Report, Exhibit: Future Plaid Gross Profits Attributable to PNC Customers.

[146] For example, a recent industry study estimates fintech apps retain 35 percent of users year over year, compared to 59 percent for banking apps—equivalent to respective annual attrition rates of 65 and 41 percent. *See* Apptentive, "2022 Mobile Customer Engagement Benchmark Report," 2022, p. 37, available at: https://www.alchemer.com/wp-content/uploads/2023/02/Apptentive_Alchemer-2022-Mobile-Consumer-Engagement-Report.pdf.

[147] *See* Schuster Deposition, at 87:5 – 88:23.

43

HIGHLY CONFIDENTIAL



76. I correct Mr. Lundelius's calculation of gross profits unjust enrichment damages by projecting active, at-issue occurrences between 2021 and 2030. I estimate that there were

---

[148] Schuster Deposition, Exhibit 2, p. 4. ██████████████████████

██████████████████████████████████

[149] I note that Plaid may lose all active PNC occurrences as a result of PNC's recent stance that third-party fintech apps will be "cut off" unless they transition to connecting PNC customer accounts using Akoya, a Plaid competitor partially owned by PNC, by June 2024. Industry experts suggest such actions would render third-party aggregators such as Plaid "non-competitive," as fintech apps would have no incentive to access end-user data through Plaid (which would also have to use Akoya) compared to "going directly to Akoya." *See* Fintech Business Weekly, "Fidelity & PNC Lead Akoya's Open Banking Land Grab; CFPB's Chopra Not Amused, Statements Indicate," October 1, 2023, available at: https://fintechbusinessweekly. substack.com/p/fidelity-and-pnc-lead-akoyas-open. Clearly, if Plaid were to lose all active PNC occurrences, future gross profit unjust enrichment damages from that point forward would necessarily be zero.

[150] I calculate an implied monthly retention rate ($r$) using the total number of active occurrences as of October 6, 2022 and the total number of occurrences added per month. In particular, I assume for each month $m$ that active occurrences at the end of the month ($x_m$) equal the sum of: occurrences added during the month ($y_m$) and active occurrences retained from the previous month ($r \times x_{m-1}$). Formally, I assume $x_m = y_m + r \times x_{m-1}$. ███████████████████



See Schuster Deposition, Exhibit 2, p. 4; PL00213086.

[151] *See* footnote 152. I note that this ██████████ annualized rate of attrition is conservative relative to an industry estimate of 65 percent annual attrition for fintech apps. *See* Apptentive, "2022 Mobile Customer Engagement Benchmark Report," 2022, p. 37 (indicating fintech apps retain 35 percent of users annual, equivalent to 65 percent annual attrition), available at: https://www.alchemer.com/wp-content/uploads/2023/02/Apptentive_Alchemer-2022-Mobile-Consumer-Engagement-Report.pdf.

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*see*

**Exhibit 1.D**). For each month following 2020, I calculate active, at-issue occurrences by reducing the number of such occurrences in the previous month by the ███████ attrition rate. I project that by the end of 2030, only ███████████████████████ After annualizing my monthly occurrence projection (*see* **Exhibit 1.2.E**),[152] I then follow Mr. Lundelius's methodology for calculating unjust enrichment damages from Plaid's future profits, with the exception of the two adjustments below.

a. To account for the fact that I project *active* occurrences, I calculate that Plaid receives ████████████████████████████████████████████████

████████████████████████████████████████████

b. I correct Mr. Lundelius's calculation of recurring revenues by subtracting fees from Plaid's Identity and Income products, in addition to fees from Plaid's Auth product, from Plaid's total revenues. Based on Mr. Lundelius's methodology, these adjusted recurring revenues imply that ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

77.    As shown in **Exhibit 5,** setting aside all other flaws of his analysis, the corrections detailed above reduce Mr. Lundelius's total estimate of unjust enrichments by ██████████

---

[152] To annualize active occurrences in a given year between 2021 and 2030 (throughout which no at-issue occurrences were added), I sum active occurrence-months (i.e., the number of months an occurrence was active, summed across occurrences) and then divide by 12. To calculate active occurrence-months in a year, for each month except December, I calculate the number of active occurrences that were not active in the subsequent month and multiply by the number of months those occurrences were active for in the year. ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████

### 4. Mr. Lundelius's Discounted Future Gross Profits are Based on an Inappropriate Measurement Date

78. Mr. Lundelius discounts Plaid's future gross profits to an as-of date of January 1, 2022 based on the reasoning that the alleged infringement ended at some point in 2021.[153] Mr. Lundelius's calculates a discount rate of ▓▓▓▓▓ using cost of capital inputs as-of January 1, 2022.[154] However, as discussed in **Section VI.C.3**, the alleged infringement ended as of December 2020, when PNC's Marks were removed from the operative version of Plaid Link, and thus future profits should be discounted to January 1, 2021 based on Plaid's cost of capital as of that date. I implement this correction to Mr. Lundelius's discounting of future profits with two adjustments, as shown in **Exhibit 6.1** and detailed below.

   a. Future profits are discounted by an additional year, reflecting the year between Mr. Lundelius's as-of date and the correct as-of date.

   b. Future profits are discounted at a rate of ▓▓▓▓▓, which I calculate using Mr. Lundelius's methodology and inputs as of January 1, 2021, taken from the same sources Mr. Lundelius relies upon (see **Exhibit 1.2.B**).

79. As shown in **Exhibit 6.1**, setting aside any other flaws in his calculations, the above corrections to Mr. Lundelius's future gross profits unjust enrichment calculation reduces future gross profits unjust enrichment damages by ▓▓▓▓.[155]

### D. Combined Adjustments to Mr. Lundelius's Claimed Gross Profits Unjust Enrichment Damages

80. I present my combined adjustments of Mr. Lundelius's claimed gross profits unjust enrichment damages in **Exhibit 1**. This incorporates the adjustments discussed in **Sections V.D**, **VI.C.1**, **VI.C.2**, **VI.C.3**, and **VI.C.4**: (1) removing gross profits attributable to PNC occurrences unaffected by the inclusion of PNC's Marks in Plaid Link; (2) removing ▓▓▓▓▓▓▓▓▓▓ and guaranteed user-based revenues that would have been

---

[153] Lundelius Deposition, at 120:8-21.
[154] Lundelius Deposition, at 120:22 – 121:8.
[155] $11,031,632 - $10,162,372 = $869,260. *See* Lundelius Report, ¶ 50.

HIGHLY CONFIDENTIAL

unaffected by a small decrease in PNC occurrences; (3) removing gross profits attributable to PNC occurrences that are not associated with Plaid Link; (4) limiting future gross profits to only recurring revenues associated with active PNC occurrences that were created prior to the removal of PNC's Marks from the operative version of Plaid Link in December 2020; and (5) discounting future gross profits to an as-of date of January 1, 2021 to reflect the end of the alleged infringement. Combining these adjustments, I calculate adjusted gross profits unjust enrichment damages to be ██████████.

## VII.    MR. LUNDELIUS'S CONTRIBUTED CAPITAL UNJUST ENRICHMENT DAMAGES ARE DISCONNECTED FROM THE ALLEGED INFRINGEMENT

81.    In addition to his calculation of unjust enrichment damages based on Plaid's gross profits, Mr. Lundelius also presents an alternative ██████████ estimate of unjust enrichment damages based on the increase in Plaid's value over the twelve months prior to June 2016.[156] Mr. Lundelius represents this alternative estimate as "the full benefit to Plaid from its alleged wrongful conduct,"[157] based on the assumption that end-users who connected their PNC account to Plaid-enabled fintech apps "contributed to the successful growth of Plaid's key performance indicators from the seed round through Series B and therefore, contributed to the increasing value of Plaid over the same period."[158] Mr. Lundelius claims that PNC should have been compensated with shares of Plaid for this "forced investment in Plaid"[159] and that the recent value of these shares represents Plaid's full benefit from the alleged infringement. **Section VII.A** below overviews Mr. Lundelius's calculations. As I elaborate in **Section VII.B**, these calculations are not an appropriate measure of unjust enrichment damages in this matter.

---

[156] Lundelius Deposition, at 145:10-16; Lundelius Report, ¶ 63.
[157] Lundelius Report, ¶ 53.
[158] Lundelius Report, ¶ 54.
[159] Lundelius Report, ¶ 53.

HIGHLY CONFIDENTIAL

### A.    Mr. Lundelius's Contributed Capital Calculation of Unjust Enrichment Damages

82.    Mr. Lundelius's contributed capital calculation of unjust enrichment damages consists of three steps: (i) quantifying PNC's alleged contribution to Plaid as of its Series B fundraising round; (ii) determining the number of Plaid's common shares this alleged contribution PNC would have ostensibly been entitled to; and (iii) valuing those shares as of the end of 2022.

83.    Mr. Lundelius relies on Plaid's valuations from its Series A and B fundraising rounds to estimate that PNC contributed occurrences worth ██████████████████ ████████████████████[160] Mr. Lundelius arrives at this estimate by first calculating that PNC occurrences accounted for ██████████████████████ ████████████████████████████[161] Then, Mr. Lundelius multiplies his estimate of PNC's share of occurrences ███████ by the ████████████████ Plaid's valuation between its Series A and B fundraising rounds (i.e., Plaid's Series B pre-money valuation less Plaid's Series A post-money valuation), yielding ███████ in claimed contribution to Plaid's value.

84.    Mr. Lundelius calculates that a ███████ contribution by PNC to Plaid is equivalent to ███████ of Plaid common stock (based on Plaid's Series B price of ██████ per share). [162]

85.    Mr. Lundelius then values PNC's "contributed capital" based on PNC's hypothetical receipt of ██████ shares of Plaid common stock and the value of those shares as of Plaid's Series D fundraising round on August 17, 2021, which priced Plaid common stock at ██████ per share. This results in a valuation of ████████ for PNC's hypothetical holdings of ██████ Plaid common stock.[163]

86.    Finally, Mr. Lundelius estimates that the Plaid common stock would be worth 55% less as of the end of 2022, based on a Boston Consulting Group report estimating that fintech

---

[160] Lundelius Report, ¶ 56.
[161] Lundelius Report, ¶ 54.
[162] Lundelius Report, ¶ 56.
[163] Lundelius Report, ¶ 61.

valuations declined 55% between Q1 2021 and Q4 2022.[164]   Therefore, Mr. Lundelius concludes that PNC's hypothetical holding of Plaid common stock would be valued at ███████████ as of the end of 2022 ███████████

### B.    Mr. Lundelius's Contributed Capital Unjust Enrichment Methodology Is Inappropriate for Measuring Unjust Enrichment Damages in This Matter and Is Fundamentally Flawed

87.    Mr. Lundelius's contributed capital unjust enrichment methodology rests on three assumptions: (i) in this case, contributed capital is a necessary and appropriate measure of unjust enrichment damages; (ii) Plaid's valuation growth between its Series A and B fundraising rounds was entirely driven by its growth in occurrences; and (iii) PNC was entitled to Plaid common stock as compensation for its alleged contribution to Plaid. As I discuss below, these assumptions are fundamentally flawed and produce a damage estimate that would provide PNC with an unjustifiable windfall.

### 1.    Mr. Lundelius's Contributed Capital Estimate of Unjust Enrichment Damages is Unnecessary and Fundamentally Flawed

88.    As I discussed in **Section IV**, when liability is established, unjust enrichment damages are those profits earned by the alleged infringement party that would not have been earned in a but-for world in which the alleged infringement never occurred. Given that Mr. Lundelius has put forth a claimed measure of unjust enrichment damages that attempts to directly attribute Plaid's gross profits to the alleged infringement (albeit with significant flaws and unsupported assumptions), alternative measures of unjust enrichment damages, including Mr. Lundelius's contributed capital estimate, are unnecessary. This conclusion is corroborated by Mr. Lundelius's own deposition testimony; despite having previously calculated unjust enrichment damages "several dozen" times as an expert, Mr. Lundelius has never relied on a similar contributed capital methodology to measure unjust enrichment damages in a case involving trademarks.[165]

---

[164] Lundelius Report, ¶ 63.
[165] Lundelius Deposition, at 152:11-25 and 154:24 – 155:5.

HIGHLY CONFIDENTIAL

89.  I understand from his deposition testimony that Mr. Lundelius reasons a contributed capital measurement of unjust enrichment damages is appropriate in this matter given Plaid's growth in value since its Series B fundraising round.[166] However, both in his deposition and report, Mr. Lundelius fails to explain why Plaid's growth in value is a reasonable benchmark for unjust enrichment damages. In fact, calculating unjust enrichment damages based on Plaid's valuation, rather than a direct attribution of its profits to the alleged infringement, is unreasonable because Plaid's valuation reflects investors' expectations about Plaid's stream of *future profits in perpetuity*, while the alleged infringement in this matter ended in December 2020, when PNC's Marks were removed from the operative version of Plaid Link. Therefore, the purported ▮▮▮▮▮▮ forced contribution Mr. Lundelius attributes to the alleged infringement includes expected future profits unrelated to the occurrences Mr. Lundelius alleges PNC contributed in the twelve months prior to Plaid's Series B fundraising round, or PNC occurrences added during the finite duration of the alleged infringement period.[167]

90.  Moreover, even if a contributed capital approach to calculating unjust enrichment damages were appropriate in this matter, such an approach should be based on the value of PNC's Marks, the allegedly contributed asset, which Mr. Lundelius does not measure. For example, Mr. Lundelius does not consider the royalties or payments PNC would typically receive for a license for its Marks. Instead, Mr. Lundelius misrepresents the alleged infringement, which is about Plaid's use of PNC's *Marks*, to be about PNC's *customers*— who PNC does not own and cannot contribute. That is, Mr. Lundelius incorrectly assumes that PNC's alleged "forced investment in Plaid [i.e., PNC's Marks]"[168] may be measured using "the value of PNC's customer accounts to Plaid as of June 2016."[169] As discussed in **Section IV**, bank logos play a minor role, if at all, in influencing whether end-users provide their banking credentials. Mr. Lundelius therefore overstates PNC's alleged contribution

---

[166] Lundelius Deposition, at 152:23 – 153-8.

[167] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[168] Lundelius Report, ¶ 53.

[169] Lundelius Report, ¶ 54.

to Plaid considerably, as the vast majority of end-users connecting to PNC would have chosen to provide their credentials through Plaid Link regardless of whether PNC's Marks were shown.

### 2. Mr. Lundelius Ignores All Other Factors Contributing to Plaid's Growth in Value

91. Mr. Lundelius's method for allocating Plaid's growth in value to the alleged infringement further distances his contributed capital calculations from an appropriate measure of unjust enrichment damages, which should reflect the impact on profit of the alleged infringement alone. By relying on the share of PNC occurrences to apportion ████████████ ████████████████████████████ Mr. Lundelius assumes that Plaid's valuation growth was entirely driven by Plaid's occurrence growth and thus ignores all value resulting from the capital provided by Plaid's equity investors, Plaid's technology, and Plaid's efforts to build relationships with its customers. In fact, based on Mr. Lundelius's methodology, Plaid's Series A equity investors did not contribute to Plaid's subsequent growth or valuation beyond the cash value of their investments. This view of equity funding's role in Plaid's success is unreasonable at face value—raising the question of why Plaid sought funding that would not be helpful—and is directly at odds with Mr. Lundelius's own narrative that "early-stage investment [in Plaid] led to more growth" and allowed Plaid to "develop products and scale its customer base."[170]

### 3. Mr. Lundelius Wrongly Assumes PNC Was Owed Plaid Common Shares

92. Setting aside other flaws of his analysis, Mr. Lundelius's contributed capital estimate of unjust enrichment damages is unreasonable because he suggests that, as of Plaid's Series B fundraising round, PNC should have been compensated for its purported "forced investment" in Plaid with Plaid's stock.[171] In particular, Mr. Lundelius assumes PNC should have been compensated with ██████ Plaid common shares, equal to the approximately ██████ he estimates that PNC contributed to Plaid as of Plaid's Series B

---

[170] Lundelius Report, ¶ 52.
[171] Lundelius Report, ¶ 53.

fundraising round. Mr. Lundelius reasons that because Plaid management failed to compensate PNC, "an allocation of management's common shares is appropriate to compensate PNC."[172] Thus, Mr. Lundelius assumes not only that Plaid was *obliged to compensate* PNC with Plaid shares but also that PNC *would have accepted* compensation in such form—rather than cash, for example. Both assumptions are fundamentally speculative.

93.    In assuming that Plaid's equity was an appropriate form of compensation for its alleged contribution, Mr. Lundelius conflates the use of PNC's Marks with an equity investment. Contrary to Mr. Lundelius's assumption, the appropriate compensation for a party's contribution to a company depends on the risk and opportunity cost associated with the contribution.[173] For example, just as PNC allegedly contributed the use of its Marks to Plaid, a bank may *contribute* to a company by extending a loan. However, banks extending loans do not share the same privileges as equity investors and are not entitled to share in the growth in companies' value. In exchange for being the first claimant on a company's profits—and thus being less exposed to risk—a bank accepts fixed interest payments that do not scale with the company's profitability. On the other hand, a company's equity investors receive higher rates of return on their contributions in exchange for bearing the risk associated with the company's profits. Mr. Lundelius, however, fails to discuss PNC's opportunity costs, much less justify why they entitle PNC—which did not lose its ability to use or license its Marks—to the same returns as Plaid's equity investors, who forwent other investment opportunities and risked losing their investments in Plaid.[174]

94.    Mr. Lundelius also does not discuss PNC's risk tolerance for holding Plaid shares.  A decline in Plaid's value was a salient possibility in 2016, with a "veteran financial services

---

[172] Lundelius Report, ¶ 57.

[173] Berk, Jonathan, and Peter DeMarzo, *Corporate Finance*, 5th ed., Pearson, 2020 ("Berk and DeMarzo (2020)"), p. 195 ("In order to attract funds, the firm must offer an expected return comparable to what investors could earn elsewhere with the same risk and horizon.").

[174] I understand that PNC has not received any royalties from data aggregators, financial services providers or fintech apps for the use of PNC's Marks in any user interface. *See* Plaintiff The PNC Financial Services Group, Inc.'s Responses and Objections to Defendant Plaid Inc.'s Second Set of Interrogatories, *The PNC Financial Services Group, Inc. v. Plaid Inc.,* Civil Action No. 2:20-cv-1977, August 29, 2022, pp. 5-6.

investor" predicting that most new fintech companies would "come to a bad end."[175] For PNC to have accepted equity in Plaid as compensation—thus participating in not only the rewards but also the risks of the still unproven fintech industry—would not have been consistent with PNC's portfolio of assets which consisted mostly of bonds and loans.[176] Thus, Mr. Lundelius's assumption that PNC would have elected to receive compensation in Plaid shares that it would hold for several years grants PNC a windfall with the benefit of hindsight and bestows upon PNC the rewards of a venture in which it would likely not have participated.

### C.    Summary of Flaws in Mr. Lundelius's Contributed Capital Unjust Enrichment Methodology

95.    Mr. Lundelius's contributed capital unjust enrichment damages calculation represents a fundamentally flawed and speculative exercise. In addition to relying on the flawed premise that Plaid's growth in value is an appropriate benchmark for unjust enrichment damages—despite the fact that Plaid's valuation reflects profits unattributable to the alleged infringement—Mr. Lundelius fundamentally misconstrues the allegedly contributed asset to be end-users connecting their PNC bank accounts to fintech apps, instead of PNC's Marks. Moreover, setting aside his conflation of PNC's Marks and end-users, Mr. Lundelius's representation of PNC's alleged contribution as a direct occurrence-based share of Plaid's valuation growth implies that investments from Plaid's shareholders had no role in supporting Plaid's growth as a business, contradicting his ostensible motivation for evaluating unjust enrichment damages based on contributed capital—that contributions from early investors played a critical role in Plaid's subsequent growth. Mr. Lundelius provides no support for his inappropriate and fundamentally speculative assumption that equity in Plaid was an appropriate form of compensation for PNC's alleged contribution, failing to discuss PNC's opportunity costs from its alleged contribution,

---

[175] Clark, Simon, "'Fintech' Will Mostly End in Tears, Cristopher Flowers Says," *The Wall Street Journal*, February 25, 2016, available at: https://www.wsj.com/articles/fintech-will-mostly-end-in-tears-christopher -flowers-says-1456411711.

[176] As of the end of its 2016 fiscal year, of its $366 billion in total assets, PNC held approximately $600 million in corporate stocks (accounting for less than 1 percent of its total assets), owning mostly less volatile assets such as loans (of which it held over $208 billion). *See* The PNC Financial Services Group, Inc., SEC Form 10-K for the fiscal year ended December 31, 2016, pp. 31, 39.

much less justifying his assumption that those costs entitled PNC to the returns of equity investors, who bore the risk of Plaid's failure and forwent alternative investment opportunities. In the same vein, Mr. Lundelius fails to consider whether PNC would have *accepted* Plaid's equity as compensation at the time of its alleged contribution. He simply assumes, with the benefit of hindsight, that PNC would have chosen to share in the fortunes of a risky fintech startup, without any guarantee of the windfall Mr. Lundelius now claims PNC is owed. In light of these flaws, Mr. Lundelius's contributed capital unjust enrichment calculations do not provide the trier-of-fact with any guidance as to PNC's potential damages in this case.

## VIII.    MR. LUNDELIUS FAILS TO DEMONSTRATE PNC'S CLAIMED LOSSES WERE CAUSED BY THE ALLEGED INFRINGEMENT

96.    In addition to unjust enrichment damages, Mr. Lundelius calculates damages in the form of losses PNC claims to have incurred as a result of certain disputed debit transactions from its customers' accounts.[177] Mr. Lundelius categorizes a subset of these transactions as "Plaid-facilitated fraud," based on a characterization provided by PNC,[178] and calculates three types of costs ("considered costs") related to them: (i) the cost of reimbursing PNC customers for the transactions; (ii) the cost of investigating the transactions; and (iii) the loss of lifetime value ("LTV") associated with customer accounts that were allegedly closed as a result of the fraudulent transactions.[179] Mr. Lundelius represents these costs, which sum to $848,522, as losses attributable to Plaid.[180] In **Section VIII.A** below, I summarize Mr. Lundelius's calculations of these claimed losses. As I explain in **Section VIII.B**, Mr. Lundelius's estimated losses are flawed and unreliable, as he provides no analysis or evidence substantiating the connection between the alleged infringement and PNC's claimed losses.

### A.    Mr. Lundelius's Calculation of PNC's Claimed Losses

---

[177] Lundelius Report, ¶ 32.
[178] Lundelius Report, ¶¶ 75-76.
[179] Lundelius Report, ¶ 32.
[180] Lundelius Report, ¶¶ 33, 71-72.

HIGHLY CONFIDENTIAL



97. ███████████████████████████████████

████████████████████████████████████

████████████████████ ██ █████████████

████████████████████████████████████

████████████████████████████████████

████ ██

98. ███████████████████████████████████

████████████████████████████████████

████████████████ ██ █████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████ ██

99. ███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████ ██ ████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████ ██

100. ██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

181 Lundelius Report, ¶¶ 75-76.
182 Lundelius Report, ¶¶ 75-76.
183 Lundelius Report, ¶ 74.
184 Lundelius Report, ¶ 77.
185 Lundelius Report, ¶ 80.
186 Lundelius Report, ¶ 79.



### B.  Mr. Lundelius Does Not Establish a Causal Connection between the Alleged Trademark Infringement and PNC Losses

101.  As detailed in **Section VIII.A**, Mr. Lundelius's calculations of PNC's claimed losses rely on the identification of Plaid Fraud Event ACH Disputes. However, as in his analysis of unjust enrichment damages, Mr. Lundelius does not construct an appropriate but-for world in which the alleged infringement did not occur, thus failing to demonstrate a reasonable causal connection between the event (here, disputed transactions) and the alleged wrongful conduct.

102.  In particular, Mr. Lundelius fails to consider the number of transactions he identifies as Plaid Fraud Event ACH Disputes that would have occurred in a but-for world without the alleged trademark infringement. Rather, Mr. Lundelius simply assumes without support that none would have occurred. Therefore, Mr. Lundelius's analysis amounts to a simple mechanical exercise, based on assumptions provided by PNC, which overstate losses attributable to the alleged infringement. As I discuss in **Section VIII.B.1**, Mr. Lundelius ignores any consideration of the role of PNC's Marks on end-user behavior, as well as other explanations for how transactions identified as Plaid Fraud Event ACH Disputes occurred, leading him to overstate the number of disputed transactions attributable to the alleged infringement. Because Mr. Lundelius's calculation of all three considered costs depends upon his identification of Plaid Fraud Event ACH Disputes, his estimate of each considered cost is accordingly overstated. Additionally, as I discuss in **Sections VIII.B.2-3**, his subsequent attribution to the alleged infringement of (i) customer accounts lost and (ii) investigation costs incurred is similarly assumption-driven and overstated.

---

[187] Lundelius Report, ¶¶ 85-86.

HIGHLY CONFIDENTIAL

### 1. Mr. Lundelius Overstates Disputed Transactions Attributable to the Alleged Infringement

103. Similar to his analysis of unjust enrichment damages, Mr. Lundelius does not consider the role of the bank logos on end-user conversion, resulting in significantly overstated loss estimates. As discussed in **Section V**, ███████████████████████ show that the usage of bank logos had a minimal impact on whether users of fintech apps provided their banking credentials over Plaid Link, such that Plaid's end-user base would be ████████ ██████ smaller if Plaid Link had not featured bank logos.[188] Therefore, in a but-for world in which Plaid never showed PNC's Marks on Plaid Link, the number of transactions Mr. Lundelius identified as Plaid Fraud Event ACH Disputes would decline by ████████ ██████ In other words, while many of these ACH disputes arguably still may have happened, PNC's losses incurred due to these disputes have no demonstrable connection to the behavior at issue in this case (i.e., the inclusion of PNC's Marks in Plaid Link). Setting all other flaws of Mr. Lundelius's cost calculations aside, properly accounting for the minimal role of bank logos in end-user signup results in a total loss estimate of █████ (= $848,522 × ███), far lower than the $848,522 in total losses Mr. Lundelius attributes to the alleged infringement.

104. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ ██ ████████████████████

███████████████████████████████████████ ██

████████████████████████████████████

████████████████ ██

---

[188] As discussed in **Section VI.C.2**, until 2018, many end-users connected to their bank accounts through fintech apps relying on their own interfaces for collecting user credentials. For such end-users, whether banks logos were included in Plaid Link would not have affected their decision to share their credentials.
[189] Lundelius Report, ¶ 75.
[190] Lundelius Report, ¶¶ 75-76.
[191] Lundelius Report, ¶ 76.

105. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

**2.    Mr. Lundelius Overstates PNC Account Closures Attributable to the Alleged Infringement**

106. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

[192] Lundelius Report, ¶¶ 65-69.
[193] Lundelius Report, ¶¶ 84-86.

58

107. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ █ ██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ █ █

108. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ ██ ██ ██ ██████████████

[194] Lundelius Report, footnote 157.



HIGHLY CONFIDENTIAL



### 3.    Mr. Lundelius Overstates the Investigation Costs Attributable to the Alleged Infringement

109. Additionally, PNC's risks of security breaches allegedly stemming from the use of Plaid-enabled fintech apps would still be present in a but-for world in which only a small fraction of PNC bank customers were no longer using Plaid-enabled fintech apps. However, Mr. Lundelius does not consider this but-for world, much less demonstrate that PNC would reduce its security measures in it. Consequently, Mr. Lundelius has overstated the security and business expenses PNC allegedly would have avoided in the absence of Plaid's alleged trademark infringement.

### C.    Combined Adjustments to PNC's Claimed Losses

110. Setting aside all other flaws of Mr. Lundelius's analysis, I apply the following adjustments to his estimate of PNC's claimed losses to correct for certain flaws: (i) exclude claimed lost LTV associated with accounts closures indicating "Reason not Listed" for the closure; and (ii) reflect the minimal role of bank logos on end-user behavior. These adjustments reduce Mr. Lundelius's estimate of PNC's claimed losses by ▮▮▮▮, from \$848,522 to ▮▮▮▮▮[198]

Dated: November 22, 2023

_____
Maureen Chakraborty, Ph.D.

---

[198] Calculation: ▮▮▮▮ = (\$848,522 - \$300,594) ▮▮▮ where \$300,594 is the total lost LTV Mr. Lundelius attributes to No Reason Closures and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* **Section V.D**).

**Exhibit 1.2.B**
**Calculation of Adjusted Discount Rate**
**Combined Adjustments**

|   | | Lundelius Report | Adjusted Value |
|---|---|---|---|
| [A] | As-of Date For Inputs | 1/1/2022 | 1/1/2021 |
| [B] | Risk Free Rate | 1.94% | 1.46% |
| [C] | Risk Premium | 4.24% | 4.72% |
| [D] | Beta | 0.95 | 1.08 |
| [E] | **Discount Rate** | **5.97%** | **6.56%** |

**Notes and Sources:**

[A] The adjusted "As-of Date" is based on January 1, 2021 to reflect the end of the alleged infringement in this case (as PNC's Marks were removed from the operative Plaid Link interface in December 2020).

[B] Data for January 1, 2021 was unavailable; thus I have used data from the next available date of January 4, 2021. *See* Board of Governors of the Federal Reserve System (US), Market Yield on U.S. Treasury Securities at 20-Year Constant Maturity, Quoted on an Investment Basis [DGS20], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/DGS20, January 1, 2021.

[C] Damadoran, Aswath, "Historical Implied Equity Risk Premiums," available at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/histimpl.html.

[D] Lundelius Report, Exhibit: Plaid's Cost of Equity as of January 1, 2022; the adjusted beta is based the median levered beta of Mr. Lundelius's comparable companies as of January 1, 2021; *See* S&P Capital IQ.

[E] = [C] × [D] + [B].

**APPENDIX A**

**MAUREEN M. CHAKRABORTY, PH.D.**
**Managing Principal**

Phone: 212 492 8105             151 West 42nd Street
Fax: 212 492 8188             23rd Floor
maureen.chakraborty@analysisgroup.com      New York, NY 10036

Dr. Chakraborty is an economist with an extensive background in economics, finance, accounting, and valuation. She has been retained both as an expert witness and as a consultant in a number of matters involving equity and fixed income securities, valuation, solvency, fraudulent conveyance, and economic damages. Dr. Chakraborty has conducted analyses in matters involving bankruptcy, mergers and acquisitions (M&A), tax and transfer pricing, international arbitrations, fraud, and theft of trade secrets and misappropriation. Her work has involved the development of financial and economic models, the evaluation of large datasets, and the application of statistical methods to a variety of complex problems. She has worked on matters involving companies in many industries, including financial services, energy, retail, and pharmaceuticals.

## EDUCATION

Ph.D.          Economics, University of Notre Dame, Notre Dame, IN

B.A.          Economics, Colby College, Waterville, ME

## PROFESSIONAL EXPERIENCE

2003–Present    Analysis Group, Inc., New York, NY

1995–2003      PricewaterhouseCoopers LLP, Dallas, TX
               *Dispute Analysis & Investigations (1997–2003)*
               *Dispute Analysis & Corporate Recovery Group (1995–1997)*

## SELECTED CONSULTING EXPERIENCE

**Valuation / Mergers & Acquisitions**

- Valued numerous privately held companies using discounted cash flow and market multiple approaches in a variety of industries including energy, telecom, pharmaceutical, retail, and banks and other financial institutions.

- Developed models to assess forecasting uncertainty, majority and minority holding positions, illiquidity, and blockage discounts.

- Evaluated the reasonableness of financial projections and cash flows prepared for purposes of assessing value.

- Evaluated the economic fairness of deal terms in the contexts of acquisitions and hostile bids, including disputes in the Delaware Court of Chancery.

- Assisted a special committee with topics related to valuation for purposes of evaluating a proposed acquisition offer.

- Assessed the reasonableness of the defensive measures taken by a board of directors in a hostile bid.

- Analyzed the economic circumstances and valuation implications arising from material adverse change (MAC) and material adverse events (MAE).

- Analyzed the financial implications of a proposed merger on a company's creditworthiness, liquidity, and ability to raise capital.

**Bankruptcy and Solvency Analysis**

- Assessed the solvency of numerous companies based on a comparison of the fair market value of assets and liabilities, ability to pay debts as they come due, and capital adequacy.

- Assessed companies' access to liquidity and capital, their ability to monetize or sell assets, and their ability to restructure debt.

- Analyzed the reasonable equivalent value of assets disposed in periods leading up to an event of insolvency or bankruptcy.

- Evaluated the price impact of asset sales in distressed situations.

- Prepared oil price forecasts and evaluated conditions affecting the supply and demand for oil and gas for purposes of evaluating corporate restructuring plans.

- Developed an economic framework and models to forecast the economic growth of Puerto Rico for purposes of assessing fiscal surplus and ability to repay creditors in connection with the restructuring proceedings of the Commonwealth and related entities.

- Developed a "liquidation comparator" to evaluate potential shareholder claimant and creditor recoveries in a hypothetical liquidation of Steinhoff International Holdings N.V.  Valued Steinhoff's assets and liabilities and modeled intercompany flows of value between the Steinhoff corporate entities.

- Provided financial analysis to evaluate the reinstatement of senior debt proposed in the *Joint Plan of Reorganization of Spectrum Jungle Labs Corporation, et al., Debtors* (the Plan). Provided analysis demonstrating that the Plan would violate certain provisions of the Senior Secured Lenders' Credit Agreement.

**Securities**

- Evaluated issues related to loss causation, market efficiency, class certification, and damages in a number of securities litigation cases involving both equity and fixed income securities. Provided assistance with settlement discussions and mediations, as well as filed expert reports and provided testimony.

- Constructed a stream of counterfactual share prices based on counterfactual market disclosures.

- Examined trading strategies, statistical patterns in trading activities, the timing of information disclosure (public and non-public) relative to trading patterns and securities prices, and the impact of large volume trades on securities prices.

HIGHLY CONFIDENTIAL

*Maureen M. Chakraborty, Ph.D., Page 3 of 4*

- Assessed the market efficiency for traded securities.

- Valued a number of complex securities, including tranches of collateralized loan obligations, executive stock options, mortgage-backed and other asset-backed structured securities, auction rate securities, credit linked notes, and sovereign debt.

- Analyzed and valued derivative securities including futures, forwards, options, and swaps.

- Evaluated the risk of auction rate failure, the liquidity of auction rate securities, and the ultimate collapse of the auction rate securities market.

- Investigated and analyzed many economic issues arising from the 2008 financial crisis, including the causes and foreseeability of the severity of the economic crisis, the effect of the crisis on hedge fund strategy and performance, and the impact of the crisis on repo financing, leverage, margin, and asset values.

**Tax and Transfer Pricing**

- Assessed an arm's length royalty rate using the comparable profits method and the comparable uncontrolled transaction method to inform the economic reasonableness of a profit split between corporate functions for tax purposes.

- Valued the outbound transfer of a customer relationship intangible from a large global securities custody business to a foreign subsidiary following the merger of two financial companies.

- Valued the transfer of intangible property associated with a foreign owned branch of a global custody and collateral management business to a newly established foreign bank subsidiary.

- Assessed the fair market value of Class A common units in a partnership for trust administration and tax compliance purposes.

- Provided economic and financial analysis on behalf of GlaxoSmithKline in a long-running transfer pricing dispute with the Internal Revenue Service (IRS). Supported experts in the valuation of pharmaceutical drugs at various stages of development and sales cycles, the valuation of a sales and marketing team, and a study of M&A activity in the pharmaceutical industry.

- Quantified the expected tax benefits relating to various research and development (R&D) activities on behalf of a large airline.

**Economic Damages**

- Provided analysis and testimony on damages in matters involving theft of trade secrets and misappropriation, as well as in claims related to violations of non-compete and non-solicitation agreements.

- Quantified economic damages in a variety of disputes arising from defamation and reputational harm, employment disputes, contract disputes, investment allegations, and fraud claims.

- Evaluated alleged economic harm from a failed merger.

HIGHLY CONFIDENTIAL

*Maureen M. Chakraborty, Ph.D., Page 4 of 4*

**Antitrust**

- In a high-profile debate over the effects of market power in the online advertising market, provided analytical and empirical support to academic affiliate Susan Athey in an examination of the ways in which online search platforms compete for advertising; an analysis of the online advertising auction pricing mechanism and the ability to exert monopoly power over pricing in the relevant market; and the development of a framework to assess the effects of monopoly power on consumer surplus, output, and quality. Professor Athey testified before the Department of Justice (DOJ) on issues relating to competition among search advertising platforms.

- Evaluated a damages claim from alleged price discrimination in a major pharmaceutical industry Robinson-Patman Act litigation matter. Analysis involved a critique of a theoretical economic model and the damage model used to quantify the alleged damages. Other tasks involved researching market trends, defining and calculating the incremental costs of operating chain store and grocery store pharmacies, and analyzing non-discriminatory prices for the industry.

HIGHLY CONFIDENTIAL

## APPENDIX B

### MAUREEN M. CHAKRABORTY, PH.D.
**Managing Principal**

Publications and Expert Testimony Given
As of November 17, 2023

## PUBLICATIONS

"Calculating Damages in Broker Raiding Cases," with John D. Finnerty and Michael J. McAlister, *Stanford Journal of Law, Business & Finance*, Vol. 11, No. 2, 261–297 (Spring 2006)

## DEPOSITION TESTIMONY

- ***The Florida Department of Financial Services, as Receiver of Guarantee Insurance Company v. BDO USA, LLP, formerly known as BDO Seidman, LLP***
  *American Arbitration Association, Case No. 01-21-0017-5516 (2023)*

- ***In re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al; In re: The Financial Oversight and Management Board for Puerto Rico, as representative of The Puerto Rico Electric Power Authority.***
  *US District Court of Puerto Rico (2023)*

- ***The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Electric Power Authority, Puerto Rico Fiscal Agency and Financial Advisory Authority, the Official Committee of Unsecured Creditors of all Title III Debtors, Cortland Capital Market Services, Sola LTD., Solus Opportunities Fund 5 LP, Ultra Master LTD, Ultra NB LLC, Union de Trabajadores de la Industria Electrica y Riego Inc., and Sistema de Retiro de Los Empleados de la Autoridad de Energia Electrica v. US Bank National Association, as trustee, the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp, National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc.***
  *US District Court of Puerto Rico (2023)*

- ***In re: LATAM Airlines Group S.A., et al.***
  *US Bankruptcy Court, Southern District of New York* (2022*)*

- ***BDO USA, LLP v. Everglade Global, Inc.***
  *Court of Chancery of the State of Delaware* (2022)

- ***NMR E-Tailing LLC v. Oak Investment Partners, et al.***
  *Supreme Court of the State of New York, New York County* (2020)

- ***US Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera, et al.***
  *US District Court, Southern District of Florida* (2018)

- ***James R. Thompson and Clifford Weiner v. ORIX USA Corporation, ORIX Capital Markets, LLC***
  *District Court of Dallas County, Texas* (2016)

- ***Reach Commerce, LLC, et al. v. Cinsay, Inc., et al.***
  *District Court of Dallas County, Texas* (2015)

- ***Denis Kaplan and Alan Liebowitz v. Old Mutual, PLC, et al.***
  *US District Court, Southern District of New York* (2015)

- ***Higher Education Student Assistance Authority v. UBS Securities LLC, et al.***
  *Superior Court of New Jersey, Mercer County Law Division* (2014)

- ***Pittsburg SNF LLC, et al. v. Pharmerica East, LLC, as successor in interest to Pharmaster, L.P., v. Pharmaster, L.P., Pharmaster GP, LLC, Peter Licari, Michael D'Arcangelo, William D. Jacobson, and David C. Milling***
  *US District Court, Eastern District of Texas* (2012)

- ***K.J. Egleston, individually and on behalf of all others similarly situated, v. Heartland Industrial Partners, L.P., an Delaware Limited Partnership , Heartland Industrial Associates, L.L.C., a Delaware limited company, David A. Stockman, J. Michael Stepp, and Bryce M. Koth; Mainstay High Yield Corporate Bond Fund, on behalf of itself and all others similarly situated v. Heartland Industrial Partners, L.P., an Delaware Limited Partnership, Heartland Industrial Associates, L.L.C., a Delaware limited company, David A. Stockman, J. Michael Stepp, Timothy D Leuliette, Daniel P. Tredwell, W. Gerald McConnell, Samuel Valenti, III, John A. Galante, Bryce M. Koth, Robert A. Krause, Gerald E. Jones, David R. Cosgrove, Elkin B. McCallum, Paul C. Barnaba, Thomas V. Gougherty, and Christopher M. Williams***
  *US District Court, Eastern District of Michigan* (2009)

- ***Casual Male Retail Group, Inc., et al. v. Robert H. Yarbrough, et al.***
  *US District Court, District of Massachusetts* (2007)

- ***Health Directions, Inc., v. Healthcare Purchasing Partners International, LLC, Paul Frazier, Doris Frazier***
  *Commonwealth of Kentucky, Fayette Circuit Court, 7th Division* (2003)

- ***Electronic Data Systems Corporation v. Computer Freight Sales, Inc., et al.***
  *US District Court, Eastern District of Texas, Sherman Division* (2000)

## TRIAL / ARBITRATION TESTIMONY

- ***The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Electric Power Authority, Puerto Rico Fiscal Agency and Financial Advisory Authority, the Official Committee of Unsecured Creditors of all Title III Debtors, Cortland Capital Market Services, Sola LTD., Solus Opportunities Fund 5 LP, Ultra Master LTD, Ultra NB LLC, Union de Trabajadores de la Industria Electrica y Riego Inc., and Sistema de Retiro de Los Empleados de la Autoridad de Energia Electrica v. US Bank National Association, as trustee, the Ad Hoc Group of PREPA Bondholders, Assured Guaranty Corp., Assured Guaranty Municipal Corp, National Public Finance Guarantee Corporation, and Syncora Guarantee, Inc.***
  *US District Court of Puerto Rico (2023)*

*Maureen M. Chakraborty, Ph.D.*
*Prior Testimony*
*Page 3 of 3*

- ***In re: Purdue Pharma L.P., et al.***
  *US Bankruptcy Court, Southern District of New York* (2021)

- **Confidential arbitration**
  Provided testimony regarding damages arising from a sale of a large block of publicly traded stock. Utilized an options-based approach to estimate the price risk associated with the sale of the block of equity units. (2020)

- **Confidential arbitration**
  Provided written direct testimony regarding the solvency of a real estate holding company (2019)

- **Confidential JAMS arbitration**
  Assessed a bargaining framework used to assess allegations of fraud (2019)

- ***US v. David Riley***
  *US District Court of New York, Southern District of New York* (2014)

- **Confidential FINRA arbitration**
  Assessed damages related to investments in a personal portfolio (2011)

- ***Lumber Liquidators, Inc. v. Kevin H. Sullivan***
  *Arbitration No. 11 166 00490 10, US District Court, Eastern District of California* (2010)

- ***Citigroup Global Markets, Inc., d/b/a Smith Barney v. Peter F. Dunne, George A. Dunn, Lori Van Dusen, David Mattia, Bruce Wall, Winship Ross, Richard Vankuren, Jeffrey Wagner, Thomas Hawks, Jeffrey Santos, James Henson, Douglas Smith, and Convergent Wealth Advisors, LLC***
  *FINRA Arbitration No. 08-03123* (2010)

- ***UBS Financial Services, Inc. v. Timothy Flynn***
  *FINRA Arbitration No. 08-04349* (2009)

- ***Citigroup Global Markets, Inc. d/b/a Smith Barney v. James M. Hodges***
  *FINRA Arbitration No. 09-01368* (2009)

- ***Citigroup Global Markets, Inc., a New York Corporation, d/b/a Smith Barney v. James Potter; Eugene Brendan McCarthy, III; Brian W. Laughlin; Dennis W. Laughlin; and Stifel Nicolaus & Company, Inc.***
  *National Association of Securities Dealers, Inc.* (2007)

- ***Casual Male Retail Group, Inc., et al. v. Robert H. Yarbrough, et al.***
  *US District Court, District of Massachusetts* (2007)

HIGHLY CONFIDENTIAL

# APPENDIX C

# MATERIALS RELIED UPON

HIGHLY CONFIDENTIAL

**Case Documents**

Affidavit of Emeline Minor, November 13, 2023.

Defendant Plaid Inc.'s Supplemental Responses and Objections to Plaintiff the PNC Financial Services Group Inc.'s Third Set of Interrogatories, *The PNC Financial Services Group, Inc. v. Plaid Inc*., United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977, April 12, 2023.

Expert Report of Charles R. Lundelius Jr., *The PNC Financial Services Group, Inc. v. Plaid Inc*., United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977, October 6, 2023.

First Amended Complaint for Trademark Counterfeiting, Trademark Infringement, False Designation of Origin, False Advertising, and Unfair Competition, *The PNC Financial Services Group, Inc. v. Plaid Inc*., United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977, July 8, 2021.

Letter from J. Barber to C. Brennan, Re: PNC's March 10, 2023 Letter Concerning Plaid's Financial Data, March 20, 2023.

Plaintiff The PNC Financial Services Group, Inc.'s Responses and Objections to Defendant Plaid Inc.'s Second Set of Interrogatories, *The PNC Financial Services Group, Inc. v. Plaid Inc*., United States District Court, Western District of Pennsylvania, Civil Action No. 2:20-cv-1977, August 29, 2022.

**Deposition Transcripts**

30(b)(1) Deposition of Emeline Minor, May 19, 2023 and accompanying exhibits

Deposition of Al Hertz, February 3, 2023 and accompanying exhibits

Deposition of Charles Lundelius, November 3, 2023 and accompanying exhibits

Deposition of Paolo Bernasconi, March 3, 2023 and accompanying exhibits

Deposition of Rajarshi Chakravorti, March 22, 2023 and accompanying exhibits

Deposition of Samuel Schuster, December 13, 2022 and accompanying exhibits

Deposition of Todd Renner, November 15, 2023 and accompanying exhibits

Deposition of William Hockey, February 23, 2023 and accompanying exhibits

**Bates Stamped Documents**

PL00003551

PL00007467-476

PL00047322-333

PL00050779-780

C-1

HIGHLY CONFIDENTIAL

PL00061705-712

PL00070591-592

PL00102306-366

PL00118871-919

PL00146198-204

PL00180856-871

PL00181446-451

PL00182236

PL00184973-5012

PL00187696-697

PL00191630-638

PL00192553-555

PL00212936-959

PL00212960-983

PL00212984-3014

PL00213015-041

PL00213042-069

PL00213070

PL00213071

PL00213085-R

PL00213086

PL00213087-R

PL00217569

PNC0036904

C-2

HIGHLY CONFIDENTIAL

**Academic Articles and Books**

Arad, Ronen et. al., "Patent Infringement Damages," in *Litigation Services Handbook*, 5th Edition, 2012, Chapter 19.

Berk, Jonathan, and Peter DeMarzo, *Corporate Finance*, 5th Edition, Pearson, 2020.

Evans, Elizabeth A., et al., "Developing Damages Theories and Models," in *Litigation Services Handbook*, 5th Edition, 2012, Chapter 4.

Evans, A. Elizabeth and Simon, Peter, "Economic Analysis of Nonpatent Intellectual Property Rights and Damages Measures," in *Litigation Services Handbook*, 5th Edition, 2012, Chapter 18.

Heumann, Christian and Michael Schomaker, *Introduction to Statistics and Data Analysis*, Springer, 2016.

*The Comprehensive Guide to Economic Damages*, BVR, 5th Edition, 2018.

**Publicly Available Documents**

Apptentive, "2022 Mobile Customer Engagement Benchmark Report," 2022, available at: https://www.alchemer.com/wp-content/uploads/2023/02/Apptentive_Alchemer-2022-Mobile-Consumer-Engagement-Report.pdf.

Clark, Simon, "'Fintech' Will Mostly End in Tears, Cristopher Flowers Says," *The Wall Street Journal*, February 25, 2016, available at: https://www.wsj.com/articles/fintech-will-mostly-end-in-tears-christopher.

Coinbase, "How is bank account information protected," available at: https://help.coinbase.com/en/coinbase/privacy-and-security/other/how-is-my-bank-account-information-protected.

Consumer Financial Protection Bureau, "Required Rulemaking on Personal Financial Data Rights," October 19, 2023, available at: https://www.consumerfinance.gov/personal-financial-data-rights/ and https://files.consumerfinance.gov/f/documents/cfpb-1033-nprm-fr-notice_2023-10.pdf.

Federal Deposit Insurance Company, "Despite COVID-19 Pandemic, Record 96% of U.S. Households Were Banked in 2021," October 25, available at: https://www.fdic.gov/news/press-releases/2022/pr22075.html.

Fintech Business Weekly, "Fidelity & PNC Lead Akoya's Open Banking Land Grab; CFPB's Chopra Not Amused, Statements Indicate," October 1, 2023, available at: https://fintechbusinessweekly.substack.com/p/fidelity-and-pnc-lead-akoyas-open.

Henry, David and Anna Irrera, "U.S. banks launching answer to peer-to-peer payment app Venmo," Reuters, June 12, 2017, available at: https://www.reuters.com/article/cbusiness-us-usa-banks-payments-zelle-idCAKBN1931C2-OCABS.

Lele, Nikhil, et al., "How financial institutions can win the battle for trust," *Ernst and Young*, June 11, 2021, available at: https://www.ey.com/en_us/nextwave-financial-services/how-financial-institutions-can-win-the-battle-for-trust.

HIGHLY CONFIDENTIAL

Mastercard, "The Future is Here: new Mastercard study finds majority of consumers embrace open banking to power digital financial experiences," December 14, 2021, available at: https://www.mastercard.com/news/press/2021/december/the-future-is-here-new-mastercard-study-finds-majority-of-consumers-embrace-open-banking-to-power-digital-financial-experiences/.

Mastercard, "The Rise of Open Banking," 2021, available at: https://b2b.mastercard.com/reports/rise-of-open-banking-north-america/.

Plaid, "How Plaid Works," available at: https://plaid.com/how-it-works-for-consumers/.

Plaid, "Our Mission," available at: https://plaid.com/company/.

Plaid, "Plaid Billing," available at: https://plaid.com/docs/account/billing/.

Plaid, "Why is Plaid Involved," available at: https://plaid.com/why-is-plaid-involved/.

Rocket Mortgage, "Data Partners," available at: https://www.rocketmortgage.com/legal/data-partners.

The PNC Financial Services Group, Inc., SEC Form 10-K for the fiscal year ended December 31, 2016.

The PNC Financial Services Group, Inc., SEC Form 10-K for the fiscal year ended December 31, 2022.

Visa, "The U.S. Open Banking Movement: How consumers are driving U.S. open banking innovation," May 31, 2023, available at: https://navigate.visa.com/$/v/5/na/m/x/u/23a556e7-8cb6-43fa-b62b-f8af7e6212be.pdf.

**Data Sources**

Board of Governors of the Federal Reserve System (US), Market Yield on U.S. Treasury Securities at 20-Year Constant Maturity, Quoted on an Investment Basis [DGS20], retrieved from FRED, Federal Reserve Bank of St. Louis, available at: https://fred.stlouisfed.org/series/DGS20.

Damadoran, Aswath, "Historical Implied Equity Risk Premiums," available at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/histimpl.html.

PNC LTV Calculation.

S&P Capital IQ.