## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

THE PNC FINANCIAL SERVICES GROUP, INC.,   )
                  )
                  )
         Plaintiff,   )
                  )    2:20-cv-1977
          v.   )
PLAID INC.,   )
                  )
         Defendant.   )

### OPINION

**Mark R. Hornak, Chief United States District Judge**

Before the Court are the parties' Cross-Motions for Summary Judgment. (ECF Nos. 341, 343). PNC seeks summary judgment in its favor as to most of the claims that it asserts as Plaintiff— it does not seek summary judgment on Count IV, its false advertising claim.[1] (ECF No. 47 at 23). It also seeks summary judgment on a number of Plaid's affirmative defenses. Plaid seeks a wall-to-wall summary judgment on all of the claims asserted against it, but not as to its affirmative defenses. (ECF No. 343).

Both Motions are denied in full. This action will now proceed to trial.

## I. BACKGROUND

The Court writes principally for the parties, who are familiar with the record in this case.

Plaintiff PNC is a large, diversified financial institution offering retail and wholesale banking services. Defendant Plaid essentially operates as a third-party software broker. (ECF No.

---

[1] PNC's reply brief does not indicate that it is seeking summary judgment on Count VI, its claim for trademark infringement under Pennsylvania common law, but its principal Motion does. (ECF No. 388 at 22). The Court will assume that the omission of a Count VI in PNC's reply brief is a clerical error and that PNC is seeking summary judgment on Count VI.

47 ¶ 22). Plaid, via its products and services, connects cash payment and investment account applications (referred to hereafter as "fintech apps")—such as Venmo, Robinhood, Coinbase, etc.—with a user's banks, thus enabling the user to input the username and password affiliated with their bank account to create the connection between the user's bank and the fintech app that the user was then utilizing. This connection then enables the subsequent transfer of money (that transfer can be, but does not have to be, contemporaneous with the establishment of the connection) between the fintech app and the user's bank.

PNC alleges that Plaid's software violated federal and state trademark laws. (*Id.* ¶¶ 22–24). PNC says that "Plaid replicated the authentic PNC log-on screen in order to intentionally mislead consumers into believing that they are providing their private and sensitive information to PNC or to an entity affiliated with PNC in order to overcome the otherwise present and reasonable apprehension to providing financial information to an unknown third-party." (*Id.* ¶ 29). PNC claims that by having users give their information to Plaid rather than directly to PNC, Plaid was able to collect data from consumers' accounts. (*Id.* ¶ 26). More specifically, PNC alleges that Plaid's software, as it then existed at the time the events giving rise to this action occurred, (1) attempted to bypass PNC's authentication process by having users give their PNC log-in information to Plaid, rather than directly to PNC; and (2) had a user interface for bypassing PNC's authentication process that infringed on PNC's marks and logos. (*Id.*; *see id.* at 12–13 for a visualization of what this looks like in practice). Each of PNC's claims in this action involves the allegedly infringing use of its marks.

For its part, Plaid says that PNC knew about Plaid's use of PNC's marks as early as 2017 but did nothing about it, and in fact, was working hand-in-glove with PNC relative to the involved Plaid products to enable and ease the ability of PNC customers to connect to fintech apps. In

support of this assertion, Plaid has pointed to record evidence that it says demonstrates that PNC, through its representatives (at times, senior PNC officials), knew that its marks were being applied by Plaid in those circumstances, well before the Complaint was filed in this case. (ECF No. 403). Specifically, according to Plaid, the two had an ongoing working relationship that did not become hostile until a 2019 Cybersecurity Event whereby a third-party actor or actors gleaned PNC customer information that had been obtained by Plaid via Plaid Link ("2019 Cybersecurity Event"), which led to PNC consumer account information being leaked on the "Dark Web." PNC blames Plaid for that event, and its occurrence signaled the end of the companies' working relationship.

After that event, PNC blocked Plaid's product from being able to access and link PNC user account information via the Plaid Link software embedded within fintech apps. In plain English, after the 2019 Cybersecurity Event, PNC took the steps necessary to block individuals who banked with PNC from using Plaid Link to connect their PNC bank accounts to fintech apps.

In response, Plaid then presented PNC consumers who were trying to connect to fintech apps via Plaid Link with messaging screens, using what a fact finder could conclude was PNC branding, that said, "we're currently experiencing connectivity issues with this bank" and "PNC has made a change that prevents you from being able to link your accounts." (*Id.*). One of these screens also provided users with a link to the federal Consumer Financial Protection Bureau's ("CFPB") website and advised such users that they could file a complaint against PNC about their lack of fintech app access with that federal enforcement agency, which PNC says led to users (who were presumably PNC retail customers) filing complaints against PNC with the CFPB. (*Id.* ¶ 34). Plaid's messaging also encouraged PNC customers to change banks.

PNC says that regardless of its alleged prior inaction as to Plaid Link's use of PNC's marks (as to which it argues it was driven by a lack of knowledge about what of its marks/branding Plaid was using and the extent of that use), Plaid's actions both before the 2019 Cybersecurity Event and after—until November 2020, when Plaid introduced a new user interface in Plaid Link—constitutes trademark infringement under the Lanham Act.[2]

PNC alleges six (6) causes of action: (1) Federal Trademark Counterfeiting under 15 U.S.C. §§ 1114(1)(b), 1116(d); (2) Federal Trademark Infringement under Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1); (3) Federal Trademark Infringement, False Designation of Origin, and Unfair Competition under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) False Advertising under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (5) Unfair Competition and Unfair or Deceptive Acts or Practices under 73 P.S. § 201-1, *et seq.*; and (6) Trademark Infringement, Unfair Competition, False Designation of Origin, and Misappropriation under Pennsylvania Common Law.

PNC has moved for summary judgment in its favor on all but Count IV, its false advertising claim. (ECF No. 341). PNC also moved for summary judgment on a number of Plaid's affirmative defenses, including fair use, laches, acquiescence, and extenuating circumstances. (*Id.*; ECF No. 90 at 11–12).

Plaid has moved for summary judgment on all of PNC's substantive claims, but Plaid did not move for summary judgment on any of its affirmative defenses.  (ECF No. 343).

---

[2] PNC says the post-2020 Plaid screens still used PNC's "word mark," but that it's not pursuing claims based off of that use.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c) provides that a party asserting that a fact cannot be disputed can rely on parts of materials of the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other material."

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1061 (3d Cir. 1991). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989) (stating that the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment).

Before digging in and explaining its disposition of the pending summary judgment motions, the Court believes that some preliminary observations are appropriate. First, the bulk of PNC's Motion relates to claims (or at least major elements of claims) as to which it carries the burden of persuasion. That means that it is in effect saying that no trial is needed and that this Court must conclude as a matter of law that any rational jury properly instructed would necessarily

conclude that PNC has carried *its* burden and proven its case such that a jury must find in its favor

on matters on which PNC carries the obligation of persuasion.

Such is not literally unheard of, *see U.S. Equal Emp. Opportunity Comm'n v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 638 (W.D. Pa. 2017), but it is very uncommon, for obvious reasons. Summary judgment is most often entered when the moving party has pointed out how an opposing party simply does not have record evidence that meets their persuasive burden on claims or defenses that they advance. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 323. Here, PNC turns those tables, and says that it claims are so obviously and unquestionably proven by it that as a matter of law, it must prevail.

While as noted below, some of the claims and defenses in this action may end up carrying a more-than-usual amount of persuasive heft given the record in this case, none of them are of the ilk that either party "must" prevail at trial. And the volume level and earnestness with which the parties argue their points to the Court do not change that calculus.

For the reasons that follow, the Court concludes that as to the claims advanced by PNC, and the defenses advanced by Plaid, a jury could reasonably come out either way. Here's why.

## III.    DISCUSSION

### a.  Count I: Counterfeiting Under the Lanham Act

Section 1114(1)(b) of the Lanham Act provides that any person who

> shall, without the consent of the registrant . . . reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in civil action.[] . . .

15 U.S.C. § 1114(1)(b).

Colloquially, "[c]ounterfeiting is defined as the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Lontex Corp. v. Nike, Inc.*, 384 F. Supp. 3d 546, 554 (E.D. Pa. 2019) (citation and internal marks omitted), *aff'd* 2024 WL 3352875 (3d Cir. July 10, 2024). To establish trademark counterfeiting, a plaintiff must demonstrate that "(1) the defendant 'infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. § 1114(1)(a), and (2) intentionally used the trademark knowing that i[t] was a counterfeit or was willfully blind to such use.'" *Id.* at 544–45 (quoting *Pennzoil-Quaker State Co. v. Smith*, No. 05-cv-1505, 2008 WL 4107159, at *20 (W.D. Pa. Sept. 2, 2008)). In addition, "[t]he fact that a defendant uses a mark in connection with the sale of the same goods covered by a plaintiff's registration does not establish that a mark is a counterfeit; rather, it is a baseline requirement of a trademark counterfeiting claim." *Lontex*, 384 F. Supp. 3d at 558–59 (citing *Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*, No. 96-cv-6961, 1998 WL 288423, at *4 (E.D. Pa. June 3, 1998)).

Thus, a plaintiff seeking to prove counterfeiting must also demonstrate that the use of the allegedly counterfeit mark was in connection with the same types of goods or services covered by the genuine mark. 15 U.S.C. § 1116(d)(1)(B); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:15 (5th ed. 2024) ("Congress intended that a 'counterfeit mark' must be used on the same goods or services as those for which the plaintiff's mark is federally registered.").

A "counterfeit mark" is "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. "The only distinction between the standard for federal trademark counterfeiting and the standard for establishing infringement is that

to obtain treble or statutory damages for a counterfeiting claim, a plaintiff must show that the defendant intentionally used the plaintiff's trademark, knowing that it was a counterfeit." *Coach, Inc. v. Ocean Point Gifts*, No. CIV.A.09-4215, 2010 WL 2521444, at *3 (D.N.J. June 14, 2010) (citation omitted); 15 U.S.C. § 1114(1) ("Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.").

Here, PNC has put in adequate evidence to plausibly establish to a fact finder that the marks used by Plaid were spurious, that is, substantially indistinguishable from PNC's actual marks and suggesting a false origin. (ECF No. 352 at 21 (displaying charts showing PNC's marks in its mobile banking app versus Plaid's use of PNC's marks in Plaid Link)). While a fact finder could note the subtle color differences between the two (white triangle vs. black triangle), the rather overarching similarities between Plaid's depictions and the PNC marks could also readily be seen by a fact finder as essentially indistinguishable. But that is a hallmark question of fact, and the reality that the Court might quickly say that the depictions that Plaid used in its product could readily be found to look a whole lot like PNC's marks does not take that issue away from the jury in these circumstances.

Similarly, there is no dispute as to whether the marks used by Plaid were registered by PNC; those marks are PNC's. Whether Plaid intentionally used one or more of PNC's marks, and whether Plaid "infringed" on those marks are questions discussed in greater detail *vis a vis* the *Lapp* factors in the Trademark Infringement Claim Section below.

Here, it is the "same goods or services" element of counterfeiting that comes into focus and precludes summary judgment for PNC on the counterfeiting claim.[3]

PNC says that (1) it and Plaid Link both offer financial services; and (2) even if they do not offer the same financial services, Plaid is estopped from claiming that it does not offer the same services as PNC because Plaid's registered trademarks cover "financial services," the same services that PNC offers. Plaid disagrees with both points.

A reasonable fact finder could find for either party as to this issue, which is both material and in dispute. At a surface level, a jury could rationally conclude that Plaid and PNC do not offer the same financial services. As one of PNC's executives put it, "Plaid is not a bank." (ECF No. 380 at 8). Plaid Link, the product that used the marks alleged to be counterfeit and infringing, is a mechanism for consumers to connect their bank accounts to fintech apps such as Venmo or Robinhood. Unlike PNC, Plaid does not provide mortgages or loans; Plaid does not offer checking or savings accounts; Plaid does not offer retirement accounts. (*Id.*). PNC offers all those things. In addition, Plaid's direct customers are, primarily, the fintech apps that use Plaid's software to enable users to connect to banks such as PNC, whereas PNC's customers are everyday people and entities that wish to store money with PNC for varied purposes and/or engage in retail and wholesale banking transactions.

---

[3] Plaid also argues that PNC must prove an additional element of counterfeiting under 15 U.S.C. § 1114(1)(b). It argues that PNC cannot show that Plaid Link is an advertisement, wrapper, or label, which is an additional element of a Section 32(1)(b) claim. (*Cf.* ECF No. 47 (stating a Counterfeiting Claim under Section 32(1)(b)). PNC has, at minimum, raised a genuine issue of material fact as to whether Plaid Link's user interface constitutes an advertisement, wrapper, or label. A contrary conclusion would render the Lanham Act's prohibition on counterfeiting toothless against digital applications. *See McCarthy on Trademarks and Unfair Competition* § 25:10 (discussing counterfeit apps). However, because the Court concludes that a genuine issue of material fact exists as to whether Plaid's use of PNC's marks was in connection with the same goods or services covered by PNC's marks, the Court does not decide whether Plaid Link *is* an advertisement, wrapper, or label. The Court's decision on this point is limited to concluding that a genuine issue of material fact exists as to this element of PNC's counterfeiting claim. The Court does note that PNC's counterfeiting claim was brought under Section 32(1)(b), not the more widely-utilized Section 32(1)(a). (ECF No. 47 at 21). As a result, this is an element that must be proven at trial as to the counterfeiting claim.

Where the parties' core customer bases are different, the assertion that the parties offer the same goods or services can be undermined. *See R.J. Ants, Inc. v. Marinelli Enters., LLC*, 771 F. Supp. 2d 475, 501 (E.D. Pa. 2011) (concluding under the *Lapp* factors that there was no likelihood of confusion in part because of the parties' different customer bases); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 213 n.7 (3d Cir. 2000) ("Courts have also occasionally borrowed from antitrust law's definition of 'relevant market' and 'submarket' to determine whether goods are directly competitive for the purpose of unfair competition claims."); *cf. Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018) (stating that the arena of effective competition is the "arena within which significant substitution in consumption or production occurs"). Given the broad differences in the parties' customer bases, a reasonable jury could conclude that the parties here do not offer the same goods or services.

But a jury could also conclude that this pendulum swings the other way. A reasonable jury could rely on Plaid's representations to the United States Patent and Trademark Office ("USPTO") in concluding that Plaid offers the same "financial services" as PNC. (ECF No. 341-65). First, PNC stated in its representations to the USPTO that one of its competitors is Varo. (ECF No. 388 at 10 n.1 (citing ECF No. 341-65 (Exhibit 61)). Varo is a bank. Varo, https://www.varomoney.com/ (last visited August 5, 2024). More broadly, PNC's point about Plaid's insistence that it offers financial services, purely as a factual matter, after its trademark application for such was originally rejected by the USPTO, may carry weight with a reasonable jury. (ECF No. 376 at 18). That is, a reasonable jury could look at Plaid's USPTO applications and come to the conclusion that PNC and Plaid are competitors, at least in enough material respects to meet the "same goods or services" test.

A jury could also rationally conclude that even if the customer bases of Plaid and PNC are not the same, the intended "audience" of Plaid's "messaging" via its visual depictions of PNC's marks and of PNC's use of them in its regular business are substantially the same, namely, PNC's retail banking customers. So on this record, the issues of material fact on this point cut both ways.

But PNC goes one step further; it also argues that Plaid should be judicially estopped from stating that it does not provide the same financial services as PNC because of its representations to the USPTO. (ECF No. 376 at 18). "Judicial estoppel is one arrow in the Court's equitable quiver designed to remedy bad faith inconsistencies in a party's pleadings." *W.S. v. Wilmington Area Sch. Dist.*, No. 15-cv-406, 2015 WL 7721840, at *5 (W.D. Pa. Nov. 30, 2015) (Hornak, C.J.). "'It is not intended to eliminate all inconsistencies, however slight or inadvertent, rather it is designed to prevent litigants from 'playing fast and loose with the courts.'" *Id.* (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 358 (3d Cir. 1996)).[4]

Courts have applied judicial estoppel to prior inconsistent statements made in an administrative proceeding. *Health Advoc., Inc. v. Health Advocs., LLP*, No. 03-cv-4277, 2005 WL 8176688, at *3 (E.D. Pa. July 14, 2005) (collecting cases). However, some courts have declined

---

[4] A recent opinion from the Federal Circuit addresses whether it is regional circuit law that controls the Court's judicial estoppel analysis. *See The Sherwin-Williams Co. v. PPG Indus., Inc.*, No. 2022-2059, 2024 WL 3534113, at *6 (Fed. Cir. July 25, 2024) ("[T]he issue arose from conduct in an adjudicatory proceeding before the Patent and Trademark Office ('PTO') over which we have exclusive jurisdiction, and where Federal Circuit law governs procedural issues."). However, other cases cited by *Sherwin-Williams* indicate that Federal Circuit law controls a juridical estoppel analysis only in patent actions. *Id.* at *7 n.5 (citing *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1376–77 (Fed. Cir. 2000) (applying regional circuit law when the statements were made to the PTO in a non-adjudicatory trademark registration process)). In *Lampi*, the Federal Circuit applied regional circuit law to determine whether one of the parties was estopped from arguing a position that was in contrast to a position it took with the USPTO during the trademark registration process. *Lampi*, 228 F.3d at 1376. Other cases cited by *Lampi* make this distinction clear: "In applying judicial estoppel we look to the law of the Seventh Circuit, for the issue is not unique to patent cases. *U.S. Philips Corp. v. Sears Roebuck & Co.,* 55 F.3d 592, 596 n.3 (Fed. Cir. 1995) (citing *Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556 (Fed. Cir.) (in matters not unique to patent law the Federal Circuit applies the perceived law of the circuit in which the case was tried), *cert. denied,* 488 U.S. 850 (1988))."

The Court concludes that Third Circuit law provides the rule of decision on this point.

to apply judicial estoppel to prior inconsistent statements stemming from USPTO applications. *See Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 534–35 (S.D.N.Y. 2012) ("[I]n general, courts do not bind parties to their statements made or positions taken in ex parte application proceedings in front of the PTO.") (citations omitted); *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. 21-cv-00705, 2022 WL 605724, at *11 (D. Del. Jan. 25, 2022).

In determining whether to apply judicial estoppel, courts are to look to three factors: the degree to which the inconsistent positions conflict; whether the party changed their position in bad faith; and any remedy must be tailored to address the harm identified. *W.S.*, 2015 WL 7721840, at *5.

Under the first factor, Plaid's representations to the USPTO are not necessarily inconsistent with its representations to the Court. PNC submits the chart attached below in support of its assertion that its services are "the same" as those offered by Plaid Link:

| **Plaid Registered Service** | **PNC Registered Service** | **PNC Trademark Registration** |
|---|---|---|
| "Money transfers; electronic transfer of money" | "Electronic funds transfer services" | PNC® Registration No. 1,416,898 |
| "Financial services" | "Full line of banking and financial services" | Registration No. 2,508,843 |
| "Financial transactions services" | "A full line of financial services" | Registration No. 2,665,477 |
| "Financial risk management" | "Financial risk management and assessment services" | PNC.COM® 831,730 |

(ECF No. 352 at 23).

This chart demonstrates the fact-based gray area between the positions of PNC and Plaid Link. Plaid Link provides for the electronic transfer of money via its connection software; PNC transfers the money from its accounts (which Plaid does not have) to another bank or app or

receives transfers from other entities. Plaid provides financial services by assisting consumers transfer money from their bank to fintech apps and vice versa; PNC provides a more robust line of services that includes "banking" services, services that Plaid does not provide. Plaid provides financial *transaction* services; PNC provides a *full line* of financial services. The financial risk management services have the most overlap, as there is some evidence in the record that demonstrates how Plaid's aggregation of consumer data is sold to banks, (ECF No. 353 ¶¶ 20–22), but a reasonable fact finder could construe the risk management services that PNC provides—in large part to regular consumers—as conflicting with the risk management services that Plaid provides that is generally provided to larger institutions based on consumer data. For instance, a given consumer cannot download a "Plaid app" and use it to further personal financial endeavors like a consumer could via PNC's mobile banking app.

Given the above, Plaid's prior representations to the USPTO do not necessarily conflict with its current ones in this Court: Plaid is saying that although it is in the financial services sphere, its precise services are meaningfully different from the ones that PNC provides, and as set forth above, there are issues of fact as to whether that is true. Consequently, it is not clear whether Plaid's prior statements to the USPTO conflict at all with the ones made to this Court, let alone constitute irreconcilable positions. Therefore, this factor does not weigh in favor of the Court applying judicial estoppel.

Nor can the Court conclude that any change in position by Plaid, to the extent there is any at all, was necessarily done in bad faith. This stems from the reality of the Plaid Link product: Plaid Link's basic operational mechanism could easily be found to be so distinct from the services that PNC generally provides that Plaid's position that it does not provide the same services as PNC is not unreasonable. To be sure, Plaid's representations both to the USPTO and to this Court are

made for the benefit of Plaid, but Plaid's efforts to distinguish itself from PNC do not necessarily reflect an attempt to take advantage of the courts as much as they do an attempt to make its argument.

Where, as here, a party's representations to an administrative body do not necessarily conflict with its representations to the court, there is unlikely to be bad faith at play. Plaid does (broadly) operate in the financial services sphere, but the record supports that it is not the same kind of company or business as PNC and that Plaid does not offer the same kinds of financial services, and such weighs against a finding that Plaid is maliciously litigating this point. Therefore, this factor does not weigh in favor of the application of judicial estoppel as to this motion.

Because the Court concludes that neither of the first two judicial estoppel factors weigh in PNC's favor, the Court need not reach the third factor, which is focused on the fit of a remedy to the misconduct at play. As a result, the Court concludes that judicially estopping Plaid from claiming that it does not offer the same services as PNC is inappropriate.

In summary, PNC has put enough evidence in the record to satisfy the elements of a counterfeiting claim under the Lanham Act, but Plaid has raised an issue of material fact at least as to the whether it and PNC offer the "same goods or services." This dispute of material fact precludes summary judgment for either party as to the counterfeiting claim.

This claim will proceed to trial.

**b. Counts II, III, V, and VI: Trademark Infringement and Unfair Competition**

Trademark infringement and unfair competition under the Lanham Act are measured by the same standard. *A&H Sportswear*, 237 F.3d at 210 ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by

identical standards."); *Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 648 n.6 (D.N.J. 2015). Additionally, PNC's state law claims share the same elements as their federal law counterparts. *Componentone, L.L.C. v. Componentart, Inc.*, No. 05-cv-1122, 2008 WL 4790661, at *5 (W.D. Pa. Oct. 27, 2008); *First Am. Mktg. Corp. v. Canella*, No. 03-cv-812, 2004 WL 250537, at *2 (E.D. Pa. Jan. 26, 2004) (stating that the elements for these claims are the same under state and federal law, except that the Lanham Act requires an effect on interstate commerce). Accordingly, the Court addresses Counts II, III, V, and VI together.

To prove a trademark infringement claim under the Lanham Act, a plaintiff must demonstrate that "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear*, 237 F.3d at 210 (citing *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000)). Summary judgments are not unheard of but are "the exception" in trademark infringement cases. *Country Floors*, 930 F.2d at 1063.

The first two elements of trademark infringement are not at issue here. The only element at issue is whether Plaid's use of PNC's marks caused a likelihood of confusion. Courts in this Circuit utilize the *Lapp* factors to ascertain whether a likelihood of confusion exists. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). PNC argues that the Court should not consider the *Lapp* factors given what it says is the very substantial similarity of the marks at issue. But such is not necessarily accurate. *A&H Sportswear*, 237 F.3d at 214 ("As explained above, we do not hold that a District Court *must* use the [*Lapp*] factors. In fact our precedents suggest the opposite. If products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves.").

Thus, though the Court *may* circumvent the *Lapp* factors by considering only the similarity of the marks in conducting its likelihood of confusion analysis, given that there is an issue of fact as to whether Plaid Link and PNC are directly competing services and that the Court has discretion regarding the application of a *Lapp* analysis, the Court concludes a *Lapp* analysis is appropriate in this case.

The *Lapp* factors are:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Lapp*, 721 F.2d at 463.

### 1. Degree of Similarity and Strength of the Mark

The first and second *Lapp* factors may be considered together because they both assess, in different ways, PNC's marks. PNCs marks are strong: "PNC is the 6th largest U.S. bank with a

16

coast-to-coast presence. ECF 341-2 ¶2. In 2021 alone, PNC spent $319 million advertising the services offered under the PNC Marks." (ECF No. 376 at 23).

The record demonstrates that PNC's registered marks and the marks Plaid used could rather easily be found to be nearly identical, spare the alteration to the color of the PNC triangle in Plaid Link's user interface:



(ECF No. 352 at 21). The image on the left is an authentic PNC screen; the center image and the image on the right are screens from Plaid Link. A jury might well and reasonably quickly conclude that the marks present in those images are indistinguishable to all but those looking for the most minute differences.

These factors plainly weigh very heavily in favor of PNC.

**2.  Care and Attention of Consumers, Whether the Goods are Marketed Through the Same Media, Targets of the Parties' Sales Efforts, Function of Goods in the Minds of Consumers**

These factors generally concern whether (1) consumers are careful in distinguishing between products in the arena at issue; (2) the involved parties market to the same customers; and (3) the parties' services serve the same function in the mind of consumers.

The "consumer care" factor weighs against Plaid. There is record evidence that Plaid Link's entire system was designed to make consumers feel more comfortable in providing Plaid their banking information. (ECF No. 353 at 6 ("[W]e use the bank logo and color scheme because it has a significant impact on conversion. It gives users more familiarity and trust in completing the linking flow."); *id.* ("We store the specific labels for Username and Password fields so that the user really feels like they are logging into this [sic] own Bank.")). Plaid even went so far as to utilize software to determine the specific shades of colors various banks used so that it could match those shades in Plaid Link. (*Id.* at 7).

Plaid contends that because banking information was implicated by its conduct, consumers are more likely to be careful for that reason alone, but this is a circular argument. Plaid is essentially arguing that a service invoking the provision of banking information is automatically one in which consumers are likely to be more careful. While the law generally supports the proposition that services involving financial information are "high engagement," *see Alpha Pro Tec, Inc. v. VWR Int'l LLC*, 2017 WL 3671264, at *12 (E.D. Pa. Aug. 23, 2017), such is not in line with the record evidence here, especially given that (1) reported consumer confusion in the study by PNC's "customer confusion" expert, Dr. Kivetz, was rather high (perhaps surprisingly high) in *the control condition* (ECF No. 326-1 at 19 (finding that likelihood of confusion in the control condition was 38%)), (2) Plaid's own statements indicate that the utilization of bank logos made consumers more

comfortable, and thereby perhaps less likely to be careful with their banking information, and (3) Plaid's own experts emphasize that Plaid Link's design structure promotes near-autonomous consumer decision making. (ECF No. 376-1 at 25). Thus, beyond the general rule regarding the "consumer care" factor as applied to consumer banking information, the facts here further cast doubt as to the force with which such principles would support Plaid. This factor therefore weighs rather heavily in PNC's favor.

The other two "consumer-based" factors, however, weigh more in Plaid's favor. As set forth above, notwithstanding Plaid's representations to the USPTO and PNC's arguments on this point, a jury can readily conclude that Plaid and PNC provide far different services and market to very different customers. Plaid works with fintech apps to integrate its software into their applications. Plaid's clients, and the entities that pay it, are fintech apps. PNC is a bank, and while a bank can hold assets for large entities who may be members of Plaid's clientele, PNC also offers retail services that are drastically different from the services that Plaid offers. Indeed, the fact that a jury could find that the parties worked collaboratively before the 2019 Cybersecurity Event undermines an assertion that the two are necessarily market competitors, offer competing services, or market to the very same clientele. *See Com. Nat. Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 442 (3d Cir. 2000) (concluding that there was no likelihood of confusion where the parties "coexisted amicably, even referred customers to one another, and operated in their respective spheres of interest without any confusion"). Given the facially distinct nature of these entities, their services, and their clients, these latter factors weigh in Plaid's favor.

### 3.   Length of Time the Defendant Has Used the Mark and Actual Confusion

Both of these factors implicate actual confusion and are best addressed together. *Primepoint, LLC v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 441 (D.N.J. 2008).

PNC's record evidence of actual confusion unconnected to Plaid's messaging on the heels of the 2019 Cybersecurity Event is relatively sparse. PNC cites to a complaint from a customer in support of the "actual confusion" factors:

> Venmo says they have lost connection with my bank – sounds like Venmo's problem. I attempt to reconnect. Then the 'Plaid' screen appears. (As noted, I'm sure it's safer to have this extra level of security – when it functions). Then the PNC (?) 'Enter your credentials' screen appears; when I enter my username and password the PNC screen says 'the username you provided was incorrect.' I have called PNC to confirm my username, and it's the same one that works on the pnc.com site. So what next?

(ECF No. 341-2 ¶ 125). While this complaint may be relevant to the False Advertising Claim because that claim turns on the Plaid messaging screens steering users to a federal enforcement agency that Plaid displayed to consumers after PNC blocked users from connecting their fintech apps to PNC via Plaid Link, this cited complaint does not necessarily implicate confusion as to the source of Plaid's images based on Plaid's utilization of PNC's marks. That is, while such could be read as saying that the complaining consumer believed that Plaid is a security feature of PNC (as PNC contends), this consumer complaint could also be read as saying that Plaid is an independent software service that provides another level of security. More importantly, there is minimal other record evidence of *actual* confusion based exclusively off of Plaid's use of PNC's marks. (ECF No. 376-1 at 26).

Most of the actual confusion PNC relies upon here stems not from Plaid's use of PNC's marks, but from Plaid's publication of messaging screens after the 2019 Cybersecurity Event encouraging users to file reports against PNC with the CFPB. And while Dr. Kivetz's survey

opinion advanced by PNC addresses and is relevant to a likelihood of confusion question, substantial evidence of actual confusion is not advanced by PNC, at least not as to confusion stemming directly from Plaid's use of PNC marks. Because of that, a jury could conclude that these *Lapp* factors, while closer, weigh in Plaid's favor.

### 4. Intent

The intent factor can be highly probative of a likelihood of confusion *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d Cir. 2001) ("[C]ourts have recognized that evidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks weighs strongly in favor of finding the likelihood of confusion.") (citation and internal marks omitted).

The Court cannot conclude at this juncture and as matter of law that Plaid used PNC's marks in bad faith given the statements of Plaid representatives indicating that the actual purpose of Plaid's actions was consumer ease of use and bank identification. However, the act of using and integrating PNC's marks into Plaid Link's user interface was volitional by Plaid, with at least one of its goals being to make Plaid appear more reliable and trustworthy than it otherwise would if it did not use bank logos. (ECF No. 353 at 7). Plaid's conduct here could therefore readily be seen by a jury as intentional and probative. Bad faith is not required as to this factor—only intentional conduct is—and statements from Plaid's CEO regarding Plaid's efforts to conceal its use of bank marks from the banks supports the conclusion that Plaid's intent was willing and voluntary. (*Id.* at 15 (Plaid CEO telling employees to make sure that they did not send an email announcing the addition of over 6,000 new bank logos to Plaid Link to the banks themselves)).

A jury could readily conclude that Plaid wanted to guise itself in the marks of other banks, including PNC, (*id.*) and there is strong evidence that Plaid willingly and intentionally used PNC's marks to accomplish that feat. So, a jury might rationally conclude that this factor cuts substantially in favor of PNC.

### 5.   Likelihood of Expansion by PNC

Plaid argues that PNC is unlikely to expand and offer the types of service that Plaid offers because PNC apparently has a stake in another company (Akoya) that is designed to compete with Plaid. (ECF No. 344 at 32–33). But this argument instead leads the Court to note that a jury could readily conclude that, if true, this means that PNC is *more* likely to compete with Plaid, albeit perhaps indirectly, via that entity. That said, PNC does not address its partial ownership of the alleged Plaid competitor, Akoya. While it could be said that PNC could expand its business into the account linking and data aggregation field through Akoya, Plaid also contends that such expansion would provide PNC an additional motive for bringing this litigation so as to hamstring Plaid as PNC attempts to empower Akoya, which has been one of Plaid's theories of its case since day one in this litigation. Thus, while a jury could reasonably conclude that PNC is likely to indirectly compete with Plaid and that Plaid's use of PNC's marks harms PNC's hypothetical future efforts in the account linking and data aggregation field, a jury could also conclude that PNC is prosecuting this case less to foster its own expansion plans and more to undermine Plaid before advancing its competing product. Accordingly, the Court concludes that this factor is essentially a jump ball and weighs in favor of neither party.[5]

---

[5] And as to this factor, whether to what degree the Court would allow testimony on these points remains unresolved, as there may by significant FRE 403 issues (waste of time and jury confusion foremost) as to these topics.

### 6.  Lapp Factors Summary

In summary, for all of the reasons noted, a jury could conclude that some of the *Lapp* factors favor PNC, that some favor Plaid, or that they cut substantially in only one direction or the other. And as with any multi-factor test, sometimes the fact finder weighs them, rather than tallying the score into two columns. Those realities as to the outcome of the *Lapp* inquiry preclude a finding as to the likelihood of confusion issue as a matter of law at this procedural stage, especially in light of the Third Circuit's command that summary judgment in a trademark case is permissible but is not the norm. *See Country Floors*, 930 F.2d at 1063. Therefore, summary judgment is denied as to Counts II, III, V, and VI.

These claims will proceed to trial.

### c.  Count IV: False Advertising and Actual Damages

PNC's false advertising claim is based on the messaging screens that Plaid displayed to users after PNC implemented changes that prevented users from using Plaid to link their PNC accounts with their chosen fintech apps. Only Plaid moved for summary judgment in its favor on this claim. (ECF No. 352 at 40; ECF No. 344 at 19).

To prevail on a false advertising claim under the Lanham Act, the plaintiff must demonstrate "1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Warner–*

*Lambert v. Breathasure,* 204 F.3d 87, 91–92 (3d Cir. 2000) (citing *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc.,* 19 F.3d 125, 129 (3d Cir. 1994)).

First, there is no dispute that element four, the interstate commerce element, is satisfied here. There appears to be no dispute that Plaid and PNC both affect and "travel" in interstate commerce.

Elements one and two can be considered together because both concern whether the statements made by Plaid were misleading and had a tendency to deceive. After PNC rendered Plaid Link unavailable for consumers with PNC accounts, Plaid published a series of messaging screens within its user interface aimed at PNC customers. Those screens contained a link for consumers to contact the CFPB regarding the inability of PNC customers to instantly connect to fintech apps via Plaid Link and then encouraged consumers to report PNC to the CFPB. (ECF No. 376-1 at 15). Internally, Plaid referred to its publication of the messaging screens as its "nuclear option." (*Id.* at 26).

When PNC customers directly contacted Plaid about this disconnect, Plaid representatives told those customers to switch banks. (*Id.* at 31 ("We're in contact with PNC to encourage them to unblock their customers from accessing their data so they don't have to change banks in order to use the apps they choose. It's unclear how long this problem will last. So if in the meantime you'd like to explore an additional bank to connect with the apps you rely on, Plaid is supported by nearly 15,000 other financial institutions."); *id.* at 32 (suggesting a specific bank that the complaining customer could use instead of PNC)).

While not necessarily literally false, these statements could be found to be intentionally misleading. These messaging screens and statements implicitly place the culpable fault on PNC

for the measures it took to protect its customers' data after the 2019 Cybersecurity Event. While PNC was the one that made the changes that then rendered Plaid Link ineffective for PNC customers, the reason those changes were made is omitted from Plaid's messaging and communications with consumers—a jury could conclude that Plaid did not tell PNC customers the full story, namely that there had been a security breach involving Plaid by which PNC customers' private data was leaked on the "Dark Web."

Further, Plaid's inclusion of a reference to the CFPB, which has some significant federal enforcement authority as to consumer transactions with banks such as PNC, could also be found to imply that PNC's conduct was at least wrongful, if not illegal. Taking these facts together, a reasonable jury could conclude that the statements on these messaging screens were therefore misleading, deceitfully leading PNC customers to believe that they were being illegally wronged by PNC and only by PNC. A jury could quickly conclude that Plaid was in effect telling PNC retail banking customers to "call the cops" on PNC to report unlawful conduct. And communications between Plaid representatives and PNC customers only accentuate this conclusion, as a jury could conclude that a significant number of communications from Plaid representatives to PNC customers regarding the "connectivity issue" contained language suggesting that PNC customers leave PNC for another bank. A fact finder could reasonably conclude that Plaid's complained of screens and communications were knowingly misleading and deceitful.

Element three is also satisfied for purposes of addressing Plaid's Motion for Summary Judgment. PNC outlines multiple communications from consumers to the CFPB regarding their dissatisfaction with PNC after Plaid's messaging screens went live. (*E.g.*, *id.* ("PNC has blocked access to Plaid, which allows me to transfer funds in and out of my account. It's extremely inconvenient and I will have to switch banks because of it."); *id.* ("If this doesn't change, I will

definitely be pulling all my accounts from PNC. This bank has gone down the drain in the last few years and I am fed up."); *id.* ("I would not want to have to change banks after so many years with PNC but I need to get the problem fixed. I have no other problems with online banking payments. It would be a lot of trouble for me to change banks, but I don't know what choice I have."). These complaints demonstrate, at minimum, a dispute of material fact as to the materiality of Plaid's allegedly misleading and deceitful statements.

The final element goes to PNC's claim of harm. The inquiry under this element can be considered in tandem with Plaid's argument that PNC is not entitled to actual damages. (ECF No. 344 at 36).[6] The potential for harm to PNC's goodwill is apparent: a jury could conclude that another entity (Plaid) published screens that held PNC responsible for a "connectivity issue," implicitly indicated that such conduct was wrongful, or even illegal, and suggested that PNC's consumers should change their banks and call the federal regulators to complain about PNC's actions. Harm to good will can satisfy the "harm" element of a false advertising claim *See Warner–Lambert,* 204 F.3d at 91–92. The harm asserted to have impacted PNC's goodwill and its loss in the form of confused and departing customers raises a dispute of material fact as to this element.

In summary, there are issues of material fact as to several elements of PNC's false advertising claim. This claim will also proceed to trial.

---

[6] Plaid correctly notes that to obtain damages under the Lanham Act, a plaintiff must show that it was actually damaged by the defendant's actions. *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 480–81 (D.N.J. 2009) *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016). However, as set forth later in this section, PNC has demonstrated more than a mere possibility of harm. Plaid's Motion for Summary Judgment on this issue is denied.

### d. Laches and Acquiescence

PNC seeks summary judgment on several of Plaid's affirmative defenses.[7] Plaid does not seek summary judgment in its favor on those affirmative defenses.[8]

Taking them one at a time, the Court will start with laches. The application of laches "depends on the particular equitable circumstances of each case, and is a question primarily addressed to the discretion of the trial court." *Anaconda Co. v. Metric Tool & Die Co.*, 485 F. Supp. 410, 427 (E.D. Pa. 1980). Laches requires Plaid to prove two elements: (1) that PNC "inexcusably delayed in bringing suit" and (2) that Plaid "was prejudiced as a result of the delay." *Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 443–44 (3d Cir. 2024).

The record contains evidence from which a jury could conclude that PNC delayed inexcusably in bringing this suit. More specifically, Plaid Link launched in 2015, and it was not until 2019 that PNC complained about the image content of the Plaid Link user interface and another year after that before PNC brought this case. This is despite evidence that shows that PNC worked with Plaid during much of that four-year period and had access to demos that showed PNC what the Plaid Link user interface looked like. (ECF No. 373 at 34). Thus, the record could support a finding that Plaid's conduct was not only open and notorious, but it was directly showcased to PNC for years and that PNC only had a problem with Plaid's use of its marks after the 2019 Cybersecurity Event.[9]

---

[7] Plaid dropped its unclean hands defense. (ECF No. 373 at 32 n.8). Accordingly, the Court need not rule on that issue.

[8] The burden ultimately rests with Plaid to prove its estoppel-based affirmative defenses, as PNC filed suit within the six-year statute of limitations period, and where such occurs, the burden shifts to the proponent of these defenses to demonstrate why a delay within the limitations period bars recovery. *Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir. 1972); *Am. Diabetes Ass'n v. Friskney Family Trust, LLC*, 177 F. Supp. 3d 855, 878 (E.D. Pa. 2016).

[9] For the same reasons articulated in this paragraph, PNC's Motion for Summary Judgment on Plaid's Extenuating Circumstances Defense is denied. That defense is for these purposes essentially the same as Plaid's estoppel

Whether Plaid was prejudiced by this delay presents a closer question. Plaid says that PNC's delay in bringing this suit allowed it (PNC) to run up the potential damages, which prejudices Plaid. Some courts hold that inaction is inherently prejudicial because it runs up the potential damages in the case. *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984). Others have held the opposite. *See Andover Healthcare, Inc. v. 3M Co.*, No. CV 13-843, 2016 WL 6246360, at *2 (D. Del. Oct. 18, 2016) ("Courts are tasked with looking to changes in the alleged infringer's economic position; infringement damages alone are insufficient."). *But cf. id.* at *4 ("The Court concludes that genuine disputes of material fact exist regarding (at least) the extent of prejudice to 3M. There is sufficient evidence in the record to support both parties' positions. . . . For example, as for economic prejudice, a reasonable fact finder could conclude either that 3M changed its plans based on its belief—after up to 13 years without patent litigation—it would not be sued[.]"). Because laches is a defense that the Court is to view as equitable and flexible, this ambiguity can be resolved in favor of Plaid, but it doesn't have to be, and vice versa. That is what trials are for. Plaid shall be permitted to try and prove the application of this defense at trial; PNC's Motion for Summary Judgment on laches is denied.

Acquiescence is a concept similar to laches. A party invoking acquiescence must prove the elements of laches and also show that the holder of the mark, "by affirmative word or deed, convey[ed] its implied consent to" the alleged infringer. *Analytic Recruiting, Inc. v. Analytic Res., LLC*, 156 F. Supp. 2d 499, 516 (E.D. Pa. 2001). Here, Plaid has pointed to plenty of record evidence that suggests that PNC made a thoughtful decision to continue working with Plaid despite

---

defenses—Plaid argues that its working relationship with PNC should be considered at trial, and as set forth above, such may be as the case proceeds ahead.

having access to Plaid's allegedly infringing user interface, at least in demo version, such that PNC conveyed implied consent to Plaid to use PNC marks as it did.

While PNC argues that this is mere inaction and that it never actually gave affirmative consent to Plaid to use its marks, the asserted "affirmative deed" here is alleged PNC's choice to continue working with Plaid and not complain about Plaid's use of PNC's marks for years on end. *Christian Broad. Network, Inc. v. ABS–CBN Int'l*, 84 U.S.P.Q.2d 1560, at *15 (T.T.A.B. 2007) ("In the context of this case, we find that the almost five-year period of delay between the issuance of the registration and the filing of the petition for cancellation constitutes undue or unreasonable delay. We find this based on petitioner's actual knowledge of respondent's use of its mark by virtue of petitioner contracting with respondent to broadcast on its network shortly after the ABS-CBN mark registered and petitioner's testimony that it purportedly actively policed its mark.").

Based on the record, it might well be concluded that PNC knew of Plaid's use of its marks but did not complain to Plaid about it for at least over two years. (ECF No. 403 at 2 (Plaid Link with PNC marks displayed to PNC representatives during in-person meeting); *id.* at 3, 8 (discussing the Plaid Link demo conducted for PNC personnel); ECF No. 403-5 at 11–14; ECF No. 403 at PDF pp. 117–20). Some of these communications were directed at and received not by lower-level PNC staffers, but by PNC senior executives. (ECF No. 403 at 2–5). Further, the bluntness of the communications, which purportedly contained then-live demonstrations of a journey through the Plaid Link user interface (*id.*), demonstrates that any suggestion that senior PNC personnel did not know what Plaid was doing may be seen as untenable.

As a result, the record can reasonably support the finding that the duration for which PNC continued collaborating with Plaid was not because Plaid hid its conduct from PNC but was instead because PNC concluded that doing so furthered its business and financial interests and those of its

customers. Thus, PNC's continued silence could be viewed as more than "mere" inaction, as PNC's continued collaboration with Plaid after being repeatedly shown that Plaid was using PNC's marks could readily be found to be a multi-year series of affirmative deeds indicating PNC's consent. As such, summary judgment for PNC on this defense is inappropriate.

### e. Nominative Fair Use

Plaid's nominative fair use defense only applies to the portion of PNC's infringement claim directed at Plaid's use of PNC's marks since 2020, after Plaid redesigned its user interface. (ECF No. 373 at 31). In its reply brief and during oral argument, PNC said that it is not asserting a claim as to those post-2020 screens. (ECF No. 388 at 16 ("Because no Plaid Link pane at issue displayed the PNC Word Marks alone, Plaid appears to be seeking a determination that its current iteration of Plaid Link constitutes a fair use. PNC has not asserted a claim against these screens and Plaid has not asserted a counterclaim under the Declaratory Judgment Act.")). Because Plaid is not arguing nominative fair use for its 2015–2020 screens and because PNC is not advancing a claim based on post-2020 Plaid Link screens, a ruling on the nominative fair use defense is unnecessary and would be merely advisory.

## IV.   CONCLUSION

For the reasons set forth above, both parties' Motions for Summary Judgment (ECF Nos. 341 and 343) are denied in full and without prejudice. All pending claims and defenses, other than fair use, will proceed to trial.

s/ Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated:  August 7, 2024